Charles J. Cooper (*Pro Hac Vice* Application
Forthcoming), DC Bar No. 248070
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC  20036
Telephone: (202) 220-9600
Email:  ccooper@cooperkirk.com

Michael B. McClellan, CBN 241570
NEWMEYER & DILLION LLP
895 Dove Street, Fifth Floor
Newport Beach, CA  92660
Telephone: (949) 854-7000
Email:  Michael.McClellan@ndlf.com

Michael W. Battin, CBN 183870
NAVIGATO & BATTIN, LLP
755 West A Street, Suite 150
San Diego, CA  92101
Telephone: (619) 233-5365
Email:  mike@navbat.com

*Attorneys for Plaintiff The GEO Group, Inc.*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE GEO GROUP, INC., | CIVIL ACTION NO.: **19CV2491 JLS  WVG** |
| Plaintiff, | **COMPLAINT** |
| v. | |
| GAVIN C. NEWSOM, in his official capacity as Governor of the State of California; XAVIER BECERRA, in his official capacity as Attorney General of the State of California, | |
| Defendants. | |

1.     Plaintiff The GEO Group, Inc. (GEO) brings this action for declaratory and injunctive relief against Defendants Governor Gavin C. Newsom and Attorney General Xavier Becerra regarding California Assembly Bill 32 (AB-32).

2.     The unlawful effect of AB-32 is to undermine and eliminate the congressionally funded and approved enforcement of federal criminal and

immigration law by U.S. Immigration and Customs Enforcement (ICE), the U.S. Marshals Service (USMS), and the U.S. Bureau of Prisons within the State of California. AB-32 will impact at least ten (10) of the privately managed facilities totaling 10,925 beds, which represent the overwhelming majority of detention capacity held by the Federal Government in the State of California.  GEO manages seven (7) of the privately managed facilities for USMS and ICE, totaling 5,727 beds.

3.     Two hundred years ago, in the foundational case of *McCulloch v. Maryland*, Chief Justice John Marshall invoked the "great principle" that "the constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective states, and cannot be controlled by them." 17 U.S. (4 Wheat.) 316, 426 (1819). This principle "so entirely pervades the constitution, is so intermixed with the materials which compose it, so interwoven with its web, so blended with its texture, as to be incapable of being separated from it, without rending it into shreds." *Id.* Based on this bedrock precept—derived from the Supremacy Clause of the United States Constitution—it has been incontestable from *McCulloch* onward that "the activities of the Federal Government are free from regulation by any state." *Hancock v. Train*, 426 U.S. 167, 178 (1976) (quotation marks omitted).

4.     And just as the activities of the Federal Government may not be directly regulated by any state, "[t]he government of the United States, . . . though limited in its powers, is supreme; and its laws, when made in pursuance of the constitution, form the supreme law of the land, 'anything in the constitution or laws of any state to the contrary notwithstanding.'" *McCulloch*, 17 U.S (4 Wheat.) at 406; *see also Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824) (Marshall, C.J.) (Supremacy Clause ensures that States not enact laws that "interfere with, or are contrary to the laws of Congress"). This power of Congress to preempt inconsistent state laws is, like the Federal Government's immunity from state regulation, a "fundamental / / /

principle of the Constitution." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000).

5.     Like the State of Maryland two hundred years ago, the State of California seeks to subvert these principles, asserting the authority to regulate and undermine the United States Government in the exercise of sovereign powers undoubtedly within the supreme sphere of federal action. And as it was two hundred years ago, it is the duty of the federal courts to guard our constitutional order against this attack.

6.     There is no question that the Federal Government has the power to detain individuals in anticipation of, or as a consequence of, federal criminal or immigration proceedings. Nor is there any question that the Federal Government has the authority to contract with private entities with expertise in the operation of detention facilities to carry out its detention responsibilities. And, indeed, Congress has enacted statutes that clearly authorize the Executive Branch to house federal detainees in private facilities as that Branch deems appropriate. Yet, under the recently enacted Assembly Bill 32, it will be illegal as of January 1, 2020, for the Federal Government to enter into or renew such contracts for facilities in the State of California. This transparent attempt by the State to shut down the Federal Government's detention efforts within California's borders is a direct assault on the supremacy of federal law, and it cannot stand.

7.     The GEO Group, as the owner and operator of federal private detention facilities threatened by the State, brings this action to reassert the foundational principles laid down in *McCulloch v. Maryland* two centuries ago. This Court should declare AB-32 unconstitutional and enter a preliminary and permanent injunction restraining Defendants from enforcing the statute against GEO.

/ / /

/ / /

/ / /

## JURISDICTION & VENUE

8.    This Court has jurisdiction under 28 U.S.C. § 1331 because the question whether AB-32 violates the United States Constitution or is preempted by federal law is a federal question.

9.    This Court also has jurisdiction under 28 U.S.C. § 1332 because The GEO Group, Inc. and the Defendants are citizens of different states and the value of the declaratory and/or injunctive relief sought by GEO exceeds $75,000.

10.    Finally, this Court has supplemental jurisdiction under 28 U.S.C. § 1367 over GEO's request for relief pursuant to AB-32 because that claim is "so related to claims in the action within [this Court's] original jurisdiction that [it] form[s] part of the same case or controversy." 28 U.S.C. § 1367(a).

11.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred, or a substantial part of the property that is the subject of this action is situated, in this District. GEO's Western Region Detention Center and El Centro Service Processing Center—two of the private detention facilities threatened by AB-32—are located in this District, and the effects of AB-32 will be felt in this District.

## THE PARTIES

12.    Plaintiff The GEO Group, Inc. is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.

13.    Defendant Gavin C. Newsom is a citizen of California and the Governor of the State of California. He has "[t]he supreme executive power" of the State of California (the "State") and is charged with "see[ing] that the law is faithfully executed." CAL. CONST. art. V, § 1. As head of the Executive Branch, he has a duty to "supervise the official conduct of all executive and ministerial officers," including the Attorney General. CAL. GOV'T CODE § 12010. In light of these duties, Governor Newsom has responsibility for enforcing AB-32. He is sued in his official capacity.

14.     Defendant Xavier Becerra is a citizen of California and the Attorney General of the State of California. He is "the chief law officer of the State" with "the duty . . . to see that the laws of the State are uniformly and adequately enforced." CAL. CONST. art. V, § 13. In light of these duties, Attorney General Becerra has responsibility for enforcing AB-32. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

## I.     Assembly Bill 32 and Detention in California

15.     Shortly after the 2016 presidential election, California began to take steps to interfere with federal immigration policy, all of which culminated in the enactment of Assembly Bill 32, the subject of this litigation.

### A.     Senate Bill 29 (SB-29) & Assembly Bill 103 (AB-103)

16.     On December 5, 2016, Senate Bill 29 (SB-29) was introduced in the California Legislature. As enacted, the bill prohibits city, county, and local law enforcement agencies from entering into contracts "with the federal government or any federal agency or a private corporation to house or detain noncitizens for purposes of civil immigration custody" unless those contracts were in effect before January 1, 2018, and it prohibits the renewal or modification of such contracts thereafter "in a manner that would expand the maximum number of contract beds that may be utilized to house or detain in a locked detention facility noncitizens for purposes of civil immigration custody." CAL. CIVIL CODE § 1670.9(a)–(b).

17.     SB-29 also prohibits cities, counties, and public agencies from "approv[ing] or sign[ing] a deed, instrument, or other document related to a conveyance of land or issue a permit for the building or reuse of existing buildings by any private corporation, contractor, or vendor to house or detain noncitizens for purposes of civil immigration proceedings unless the city, county, city and county, or public agency" provides the public 180 days' notice and allows for public comment at two separate public meetings. *Id.* § 1670.9(d).

/ / /

18.   Approximately one month later, on January 10, 2017, Assembly Bill 103 (AB-103) was introduced in the California Legislature. As enacted, AB-103 prohibits, among other things, city, county, and local law enforcement agencies from entering into contracts "with the federal government or any federal agency to detain adult noncitizens for purposes of civil immigration custody" unless those contracts were in effect before June 15, 2017, and it prohibits the renewal or modification of such contracts thereafter "in such a way as to expand the maximum number of contract beds that may be utilized to house or detain in a locked detention facility noncitizens for purposes of civil immigration custody." CAL. GOV'T CODE § 7310(a)–(b).

19.   The Senate Floor Analysis of SB-29 stated that its enactment was necessary to obstruct federal immigration policy: "President Donald Trump has . . . made it clear that he intends to detain more immigrants and expand private for profit detention facility use. This bill would protect immigrants held in immigrant detention in California."[1] The Assembly Committee on Judiciary analysis of the bill likewise stated that it was needed "[i]n light of the changed circumstances in the White House,"[2] and it quoted the author as saying that the bill was necessary due to "the new administration's commitment to deport millions."[3]

20.   Governor Jerry Brown signed AB-103 into law on June 27, 2017, and signed SB-29 into law a few months later, on October 5, 2017.

**B.   Assembly Bill 32 (AB-32)**

21.   On December 3, 2018, Assembly Bill 32 was introduced in the California Legislature.

/ / /

---

[1] Senate Rules Comm., Senate Floor Analyses for SB-29, 2017–18 Sess., at 5 (Cal. May 27, 2017), https://bit.ly/2O9c3eP.

[2] Assemb. Comm. on Judiciary, Analysis of SB-29, 2017–18 Sess., at 2 (Cal. June 27, 2017), https://bit.ly/2O9c3eP.

[3] *Id.* at 4.

22.     AB-32 builds on SB-29 and AB-103 by amending the California Penal Code in two principal ways.

23.     <u>First</u>, it generally prohibits the California Department of Corrections and Rehabilitation (CDCR) from contracting with private, for-profit prison facilities to house state inmates. As enacted, Section 1 of AB-32, codified at California Penal Code § 5003.1, provides:

> 5003.1. (a) On or after January 1, 2020, the department shall not enter into a contract with a private, for-profit prison facility located in or outside of the state to provide housing for state prison inmates.
>
> (b) On or after January 1, 2020, the department shall not renew an existing contract with a private, for-profit prison facility located in or outside of the state to incarcerate state prison inmates.
>
> (c) After January 1, 2028, a state prison inmate or other person under the jurisdiction of the department shall not be incarcerated in a private, for-profit prison facility.
>
> (d) As used in this section, "private, for-profit prison facility" does not include a facility that is privately owned, but is leased and operated by the department.
>
> (e) Notwithstanding subdivisions (a) and (b), the department may renew or extend a contract with a private, for-profit prison facility to provide housing for state prison inmates in order to comply with the requirements of any court-ordered population cap.

24.     Thus, after January 1, 2020, CDCR may not enter into new contracts with private, for-profit prison facilities; nor may it renew such contracts.

25.     Significantly, Section 1 of AB-32 contains an exception permitting CDCR to "renew or extend a contract with a private, for-profit prison facility to provide housing for state prison inmates in order to comply with the requirements of any court-ordered population cap." CAL. PENAL CODE § 5003.1(e).

26.     California's prison system is subject to a court-ordered population cap under which its total prison population may not exceed 137.5 percent of the prisons' design capacity. *See generally Brown v. Plata*, 563 U.S. 493 (2011); *Coleman v. Brown*, 952 F. Supp. 2d 901 (E.D. Cal. 2013).

27.    As of December 1, 2019, California's prison system was operating at 131.2 percent of design capacity. Its male institutions were at 131.3 percent of capacity, while its female institutions were at 129.9 percent of capacity.[4]

28.    <u>Second</u>, AB-32 generally prohibits the operation of a private detention facility in the State of California, subject to a handful of exceptions. Section 2 of AB-32, codified at California Penal Code §§ 9500–03, 9505, states:

9500. As used in this title, the following terms have the following meanings:

(a) "Detention facility" means any facility in which persons are incarcerated or otherwise involuntarily confined for purposes of execution of a punitive sentence imposed by a court or detention pending a trial, hearing, or other judicial or administrative proceeding. (b) "Private detention facility" means a detention facility that is operated by a private, nongovernmental, for-profit entity, and operating pursuant to a contract or agreement with a governmental entity.

9501. Except as otherwise provided in this title, a person shall not operate a private detention facility within the state.

9502. Section 9501 shall not apply to any of the following:

(a) Any facility providing rehabilitative, counseling, treatment, mental health, educational, or medical services to a juvenile that is under the jurisdiction of the juvenile court pursuant to Part 1 (commencing with Section 100) of Division 2 of the Welfare and Institutions Code.

(b) Any facility providing evaluation or treatment services to a person who has been detained, or is subject to an order of commitment by a court, pursuant to Section 1026, or pursuant to Division 5 (commencing with Section 5000) or Division 6 (commencing with Section 6000) of the Welfare and Institutions Code.

(c) Any facility providing educational, vocational, medical, or other ancillary services to an inmate in the custody of, and under the direct supervision of, the Department of Corrections and Rehabilitation or a county sheriff or other law enforcement agency.

(d) A residential care facility licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code.

(e) Any school facility used for the disciplinary detention of a pupil.

---

[4] CAL. DEP'T OF CORR. & REHAB., MONTHLY REPORT OF POPULATION 2 (Dec. 1, 2019), https://bit.ly/38ZnK07.

(f) Any facility used for the quarantine or isolation of persons for public health reasons pursuant to Division 105 (commencing with Section 120100) of the Health and Safety Code.

(g) Any facility used for the temporary detention of a person detained or arrested by a merchant, private security guard, or other private person pursuant to Section 490.5 or 837.

9503. Section 9501 does not apply to any privately owned property or facility that is leased and operated by the Department of Corrections and Rehabilitation or a county sheriff or other law enforcement agency.

9505. Section 9501 does not apply to either of the following:

(a) A private detention facility that is operating pursuant to a valid contract with a governmental entity that was in effect before January 1, 2020, for the duration of that contract, not to include any extensions made to or authorized by that contract.

(b) A private detention facility contract renewed pursuant to subdivision (e) of Section 5003.1.

29.     Thus, after January 1, 2020 (the effective date of AB-32), the operation of a private detention facility will be prohibited in California unless an exception applies.

30.     On the day he introduced AB-32, Assembly Member Rob Bonta issued a press release touting the bill, in which he attacked "the Trump Administration['s] . . . cruel immigration policies" and criticized GEO for "facilitating the Trump Administration's political agenda."[5]

31.     The Senate Floor Analysis of AB-32 anticipated litigation challenging its constitutionality by "this anti-immigrant President's Administration."[6]

32.     Christina Fialho, co-founder of Freedom for Immigrants, a group listed as a supporter of AB-32 in the Senate Floor Analysis,[7] observed that AB-32 "will

---

[5] Press Release, Assembly Member Rob Bonta, *Bonta Introduces Bills Ending State's Involvement in For-Profit, Private Prison Industry* (Dec. 3, 2018), https://bit.ly/2Pga7Ch.

[6] Senate Rules Comm., Senate Floor Analyses for AB-32, 2019–20 Sess., at 5 (Cal. Sept. 9, 2019) [hereinafter "Senate Floor Analyses for AB-32"], https://bit.ly/35htShk.

[7] *Id.* at 8.

deal a critical blow to the Trump administration's efforts to further expand its system of immigration detention, especially as other states follow our lead."[8]

33.    Governor Newsom signed AB-32 into law on October 11, 2019.

**II.    U.S. Marshals Service Detention Facilities**

34.    Established in 1789, the United States Marshals Service (USMS) is an agency within the United States Department of Justice under the supervision of the Attorney General. *See* 28 U.S.C. § 561(a).

35.    Congress has authorized the Attorney General to provide for "the housing, care, and security of persons held in custody of a United States marshal pursuant to Federal law under agreements with State or local units of government or contracts with private entities." 18 U.S.C. § 4013(a)(3). Congress has also authorized the Attorney General, in his "reasonable discretion," to carry out the activities of the Department of Justice "through any means," including "through contracts, grants, or cooperative agreements with non-Federal parties." 28 U.S.C. § 530C(a)(4); *see also id.* § 530C(b)(7) (authorizing the release of funds available to the Attorney General to the Department of Justice's "Detention Trustee," now merged with USMS, "in the exercise of all power and functions authorized by law relating to the detention of Federal prisoners in non-Federal institutions or otherwise in the custody of the United States Marshals Service").

36.    "The U.S. Marshals Service houses and transports all federal prisoners from the time they enter federal custody until they are either acquitted or convicted and delivered to their designated federal Bureau of Prisons facility. The Marshals Service assumes custody for all prisoners charged with a federal offense, no matter which agency made the arrest."[9]

---

[8]Don Thompson & Amy Taxin, *California To End its Use of Private, For-Profit Prisons*, ASSOCIATED PRESS (Oct. 11, 2019), https://bit.ly/2Pgb6C6.

[9]   U.S. MARSHALS SERV., DEFENDANTS IN CUSTODY AND PRISONER MANAGEMENT, https://bit.ly/2MSd4Wv (last visited Dec. 30, 2019).

37.     Pursuant to the Attorney General's statutory authority under 18 U.S.C. § 4013(a)(3) and 28 U.S.C. § 530C(a)(4), "[t]he Marshals Service does not own or operate detention facilities but partners with state and local governments using intergovernmental agreements to house prisoners. Additionally, the agency houses prisoners in Federal Bureau of Prisons facilities and private detention facilities."[10]

38.     Because "both defense attorneys and prosecutors require routine access to prisoners, the Marshals attempt to house prisoners in close proximity to the judicial district in which they are prosecuted."[11]

39.     USMS's average daily population (ADP) of detainees has "increased at an unprecedented rate" since April 2017.[12] The Marshals estimate that, in Fiscal Year 2020, they will have an average daily population of 62,159 detainees, the highest level in more than a decade.[13]  These "[p]opulation increases from 2017 through 2019 have already created a significant strain on USMS resources during FY 2019."[14]

40.     Along the Southwest Border, in particular, "DOJ has not been able to rely as much on [intergovernmental agreements with state and local detention facilities] and Federal facilities to meet housing requirements . . . . As less space in Federal facilities is available, DOJ has increasingly had to rely on the private sector" to meet its detention obligations.[15]

41.     USMS estimates that approximately 18 percent of its detainees in FY 2020 will be housed in private detention facilities.[16] Indeed, as of April 2019,

---

[10] U.S. MARSHALS SERV., FACT SHEET: PRISONER OPERATIONS 2 (2019), https://bit.ly/2Yi5RED.

[11] *Id.*

[12] U.S. MARSHALS SERV., FY 2020 PERFORMANCE BUDGET PRESIDENT'S BUDGET: FEDERAL PRISONER DETENTION APPROPRIATION 2 (2019), https://bit.ly/2SnzdAx.

[13] *Id.* at 4.

[14] *Id.* at 30.

[15] *Id.* at 15.

[16] *Id.* at 19.

28.6 percent of the detention facilities used by the Marshals to house detainees from the Southern District of California were privately run.[17] Now that GEO began operating the El Centro Service Processing Center on December 23, 2019, *see infra*, ¶¶ 51–55, that figure has risen to 37.5 percent. Two of those private facilities— the Western Region Detention Facility and El Centro Service Processing Center— are operated by GEO.

### A.   Western Region Detention Facility

42.   The Western Region Detention Facility, located at 220 West C Street, San Diego, CA 92101, was originally built by the County of San Diego as a maximum-security correctional facility. It has a capacity of 725 beds,[18] and as of April 2019, it had an average daily population of 676 detainees.[19]

43.   In 1999, GEO[20] leased the facility from the County,[21] and GEO began housing USMS detainees at Western Region in 2000.

44.   USMS renewed its contract with GEO on November 14, 2017, for a base period of approximately two years. The contract included four options that USMS could exercise to continue the services by two years per option. Thus, the contract's period of performance is 10 years, through September 30, 2027.

---

[17] U.S. MARSHALS SERV., USMS DETENTION POPULATION 2 (Apr. 31, 2019) [hereinafter DETENTION POPULATION], https://bit.ly/2BmUFMp. This excludes facilities located in other States used by the Marshals to house detainees from this District, to which Section 2 of AB-32 does not apply. It also excludes intergovernmental service agreement facilities with an average daily population below 50 because publicly available data does not identify these facilities and the number of individuals detained in them is minimal. These facilities are omitted from all data provided in this Complaint unless otherwise stated.

[18] Capacity numbers provided herein refer to capacity as stated in the relevant contract, unless a source other than the contract is indicated.

[19] DETENTION POPULATION, *supra* note 17, at 2.

[20] At that time, GEO was called the Wackenhut Corrections Corporation (WCC) and was part of the Wackenhut Corporation. WCC spun off from the Wackenhut Corporation in 2003 and changed its name to The GEO Group.

[21] In June 2019, the County of San Diego agreed to convey the premises of the Western Region Detention Facility to Holland Acquisition Co., LLC. Nonetheless, GEO's lease term runs through March 31, 2029.

45.     USMS exercised its first option under the contract on October 1, 2019, thereby continuing GEO's contract with USMS through September 30, 2021.

46.     Absent relief from this Court, AB-32 will force GEO to close the Western Region Detention Facility upon the expiration of GEO's contract with USMS.

47.     The Western Region Detention Facility is one of only two USMS facilities currently located in San Diego, California. The other, Metropolitan Correction Center (MCC) San Diego, is a Federal Bureau of Prisons facility located at 808 Union Street, San Diego, CA 92101. As of April 2019, MCC San Diego has an average daily population of 779 detainees.[22]

48.     The next-closest USMS facility outside of San Diego—Otay Mesa Detention Center—is also privately run. It is primarily used by U.S. Immigration and Customs Enforcement to house aliens and is described more fully below.

49.     Thus, if no privately run USMS detention facilities were permitted in California, there would be only one USMS detention facility in the San Diego area (i.e., MCC San Diego).[23]

50.     Other than the single non-private USMS San Diego facility, the next-closest non-private USMS facilities are located approximately 90 miles away from San Diego in Santa Ana, California. The two USMS facilities in Santa Ana had a combined average daily population of 213 in April 2019, less than one-third the average daily population of the Western Region Detention Facility.[24]

**B.     El Centro Service Processing Center**

51.     The El Centro Service Processing Center, located at 1115 North Imperial Avenue, El Centro, CA 92243, has a capacity of 512 beds.

/ / /

---

[22] DETENTION POPULATION, *supra* note 17, at 2.

[23] *Id.*

[24] *Id.*

52.     El Centro is owned by U.S. Immigration and Customs Enforcement, which has authorized USMS to use the facility for USMS detainees.

53.     GEO was awarded a contract to operate El Centro on December 23, 2019. The base contract period is for two years, starting on December 23, 2019, with the Marshals retaining the authority to exercise three additional two-year options and one nine-month option. Thus, the El Centro contract's period of performance runs through September 25, 2028.

54.     Absent relief from this Court, AB-32 will force GEO to close the El Centro Service Processing Center upon the expiration of GEO's contract with USMS.

55.     The effect of AB-32 on federal criminal law enforcement will not be limited to USMS facilities. Any other federal facility operated by private contractors would have to close. For example, the Taft Correctional Institution, located at 1500 Cadet Road, Taft, CA 93268, has a capacity of 2,500 beds and is operated by Management & Training Corporation (MTC).[25] This facility, which houses aliens convicted of felonies, would likewise have to be shut down under AB-32 at the conclusion of its present contract expiring January 31, 2020, and a two-month extension expiring March 31, 2020.

**III.    U.S. Immigration and Customs Enforcement Detention Facilities**

56.     In November 2002, Congress assigned the border-enforcement functions of the former Immigration and Naturalization Service to the newly created Bureau of Immigration and Customs Enforcement, housed within the Department of Homeland Security.[26] The Bureau began operations in March 2003 and was renamed U.S. Immigration and Customs Enforcement (ICE) in March 2007.[27]

---

[25] Management & Training Corporation, *Taft Correctional Institution*, https://bit.ly/34Ye1DG (last visited Dec. 30, 2019).

[26] U.S. IMMIGRATION & CUSTOMS ENF'T, CELEBRATING THE HISTORY OF ICE (Mar. 1, 2019), https://bit.ly/35Jas68.

[27] *Id.*

57.     Congress has authorized or required the detention of aliens under several different statutes and conditions. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1)(B)(ii), 1225(b)(2)(A), 1226(a), 1226(c); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 836–38 (2018).

58.     Congress has also directed that "[t]he Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," 8 U.S.C. § 1231(g)(1), and it has instructed that ICE "shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for [detention]" "[p]rior to initiating any project for the construction of any new detention facility," *id.* § 1231(g)(2). Thus, like USMS's authority under Section 4013(a)(3), Section 1231(g)(2) authorizes ICE to use private contractors to arrange for detention. *See United States v. California*, 921 F.3d 865, 882 n.7 (9th Cir. 2019).

59.     Pursuant to this authority, ICE "manages and oversees the nation's civil immigration detention system."[28]

60.     Whereas ICE's immigration-enforcement efforts are usually aimed at the interior of the United States, U.S. Customs and Border Protection (CBP) enforces immigration law at the border.[29]

61.     According to Matthew Albence, the Acting Director of ICE: "Typically, when an alien is apprehended by CBP, they are transferred to ICE custody pending removal proceedings. However, ICE's resources have been overburdened by the record numbers of CBP apprehensions at the southwest border . . . ."[30]

/ / /

---

[28] U.S. IMMIGRATION & CUSTOMS ENF'T, DETENTION MANAGEMENT (Dec. 18, 2019), https://bit.ly/2ZvGnGO.

[29] STATEMENT OF MATTHEW T. ALBENCE, ACTING DIR., U.S. IMMIGRATION & CUSTOMS ENF'T, THE FISCAL YEAR 2020 PRESIDENT'S BUDGET REQUEST 3 (July 25, 2019) [hereinafter ALBENCE STATEMENT], https://bit.ly/2Bllfp9.

[30] *Id.* at 4.

62.     As of July 2019, ICE was "detaining over 53,000 single adults, and there [were] approximately 8,000 single adults in CBP custody awaiting processing or transfer to ICE custody."[31]

63.     According to Acting Director Albence, "[t]he influx [of aliens] at the border has especially strained ICE's detention resources . . . . Comparing FY 2019 year-to-date with FY 2018 year-to-date, there has been a 79% percent increase (184,461 to 330,049) in intakes resulting from CBP apprehensions . . . ."[32] These apprehensions "have taxed ICE's already overburdened detention system."[33]

64.     "[I]n FY2018 the number of book-ins to ICE facilities was nearly 400,000," yet "[a]s of July 12, 2018, ICE's detention capacity was approximately 45,700 beds."[34]

65.     "Filling every available bed in a detention facility would necessitate housing detainees of varied threat levels together, posing serious safety concerns for detainees, officers, staff, and facility owners. ICE consequently maintains a target utilization rate of about 85 to 90% of total facility capacity," which "also allows for flexibility to respond to emergencies or other unforeseen circumstances that might require immediate availability of detention beds (e.g., charter flight cancellations, surges, or smuggling loads)."[35] In the facilities ICE currently uses, "ICE meets or exceeds its target utilization in almost every instance."[36]

/ / /

---

[31] *Id.*

[32] *Id.*

[33] U.S. IMMIGRATION & CUSTOMS ENF'T, DEP'T OF HOMELAND SEC., BUDGET OVERVIEW: FISCAL YEAR 2020 CONGRESSIONAL JUSTIFICATION ICE-O&S-17 (2019) [hereinafter 2020 CONGRESSIONAL JUSTIFICATION], https://bit.ly/336G3g3.

[34] AUDREY SINGER, CONG. RESEARCH SERV., R45804, IMMIGRATION: ALTERNATIVES TO DETENTION (ATD) PROGRAMS 14 (July 8, 2019), https://bit.ly/2ojQNsE.

[35] CONGRESSIONAL JUSTIFICATION, *supra* note 33, at ICE-O&S-119.

[36] *Id.*

66.     Across the country, ICE's ability to house detainees is "already dire."[37] As then-Acting Secretary of Homeland Security, Kevin K. McAleenan, said in April 2019: "It's clear that all of our resources are being stretched thin. The system is full, and we are beyond capacity[.]"[38] Homeland Security officials "are struggling to identify new locations where migrants can be held in detention."[39]

67.     Thus, in ICE's determination, "additional ICE detention capacity is necessary" to meet the surge of aliens detained at the border.[40] Indeed, "[a]n increase in detention capacity is critical to supporting ICE's ability to apprehend, detain, and remove aliens."[41]

68.     "Due to its very limited detention capacity, ICE must generally reserve its detention space for those who pose a national security, public safety, or flight risk."[42]

69.     There are currently four dedicated ICE detention facilities in the State of California:

- Adelanto ICE Processing Center, located at 10400 Rancho Road, Adelanto, CA 92301, with a capacity of 1,940 beds.

- Imperial Regional Detention Facility, located at 1572 Gateway Road, Calexico, CA 92231, with a capacity of 704 beds;

- Mesa Verde ICE Processing Center, located at 425 Golden State Avenue, Bakersfield, CA 93301, with a capacity of 400 beds; and

/ / /

---

[37] Caitlin Dickerson, *ICE Faces Migrant Detention Crunch as Border Chaos Spills Into Interior of the Country*, N.Y. TIMES (Apr. 22, 2019)https://nyti.ms/2BEKvGS.

[38] *Id.*

[39] *Id.*

[40] ALBENCE STATEMENT, *supra* note 29, at 4.

[41] 2020 CONGRESSIONAL JUSTIFICATION, *supra* note 33, at ICE-O&S-16.

[42] ALBENCE STATEMENT, *supra* note 29, at 5.

- • Otay Mesa Detention Center, located at 7488 Calzada de la Fuente, San Diego, CA 92231, with a capacity of 1,994 beds.[43]

70. All four of these dedicated ICE detention facilities are privately run. Two of the facilities—Adelanto and Mesa Verde—are owned by GEO or a GEO subsidiary and operated by GEO pursuant to contracts with ICE.[44]

71. In addition, ICE has entered into contracts to convert three other facilities into dedicated ICE detention centers:

- • Central Valley Modified Community Correctional Facility (MCCF), located at 254 Taylor Avenue, McFarland, CA 93250, with a capacity of 700 beds. This facility is an annex to the Mesa Verde facility;

- • Desert View MCCF, located at 10450 Rancho Rd, Adelanto, CA 92301, with a capacity of 750 beds. This facility is an annex to the Adelanto facility;

- • Golden State MCCF, located at 611 Frontage Road, McFarland, CA 93250, with a capacity of 700 beds. This facility is an annex to the Mesa Verde facility.

72. All three of these new, dedicated ICE detention facilities are owned by GEO or a GEO subsidiary and operated by GEO pursuant to contracts with ICE.

/ / /

/ / /

/ / /

/ / /

---

[43] ERO CUSTODY MGMT. DIV., AUTHORIZED DEDICATED FACILITY LIST (Dec. 2, 2019), https://bit.ly/2PXHNmM. All ADP data is through December 2, 2019. Capacity number for Otay Mesa taken from News Release, *CoreCivic Reports Third Quarter 2019 Financial Results* (Nov. 6, 2019), https://bit.ly/2YmBPzJ.

[44] GEO's subsidiary, CPT Operating Partnership, L.P., owns some of GEO's facilities.

**A.**     **Adelanto ICE Processing Center and Desert View MCCF**

     **1.**     **Adelanto ICE Processing Center**

73.     The Adelanto ICE Processing Center was originally built by the City of Adelanto as a correctional facility. GEO purchased the eastern portion of the facility in 2008, and built the western portion in two phases in 2010 and 2015.

74.     In May 2011, ICE entered into an intergovernmental service agreement (IGSA) with the City of Adelanto to house detainees, and the City contracted with GEO that same month to carry out the IGSA.

75.     The City of Adelanto notified ICE and GEO on March 27, 2019, that it would be terminating its contract with ICE effective June 2019.

76.     ICE then entered into a contract directly with GEO to continue operating the Adelanto facility. The contract between ICE and GEO, which was signed on June 25, 2019, was due to expire on March 25, 2020.

77.     On December 19, 2019, ICE entered into a new contract with GEO to continue operating the Adelanto facility. The contract has a period of performance starting on December 20, 2019, and ending December 19, 2034. ICE has the option of terminating the contract early every five years, with the first such option occurring on December 20, 2024.

78.     GEO has continued to operate the Adelanto facility under the terms of the new ICE contract since December 20, 2019, in much the same manner as it was operating prior to signing the new contract.

     **2.**     **Desert View MCCF**

79.     Desert View MCCF is currently a prison owned and operated by GEO under contract with CDCR. CDCR has notified GEO that it will terminate its contract with GEO effective March 31, 2020.

80.     On September 20, 2019, ICE executed a modification to its Adelanto contract to incorporate the Desert View facility as an "annex."

/ / /

81.     The Desert View facility is now incorporated into the same contract as the Adelanto facility, with a period of performance beginning on December 20, 2019 and continuing through December 20, 2034. ICE has the option of terminating the contract early every five years, with the first such option occurring on December 20, 2024.

82.     Under the contract, GEO is obligated to immediately begin "Pre-Transition/Mobilization" activity at Desert View, with a period of performance beginning on from December 20, 2019, during which it must begin preparing the facility to receive ICE detainees. GEO began that process as soon as the contract became effective.

83.     GEO has continued to operate the Desert View facility under the new ICE contract since December 20, 2019, even as it concurrently phases out CDCR operations at Desert View.

**B.     Mesa Verde ICE Processing Center, Central Valley MCCF, and Golden State MCCF**

**1.     Mesa Verde ICE Processing Center**

84.     The Mesa Verde ICE Processing Center was originally built as a minimum-security correctional facility. It has been owned and operated by GEO since 2015.

85.     In January 2015, ICE entered into an IGSA with the City of McFarland to house ICE detainees, and that same month, the City contracted with GEO to carry out the IGSA.

86.     The City of McFarland notified ICE on December 19, 2018, that it would be terminating its contract with ICE effective March 2019. The City had notified GEO on November 30, 2018, of its intent to terminate the IGSA, stating that it "ha[d] been a satisfactory arrangement for the City until recent adoption by the State of California of legislation impacting facilities such as Mesa Verde,

/ / /

including . . . AB 103 and the recent demands by the State Attorney General and Auditor relating to inquiries authorized under [AB-103, *inter alia*]."

87.     On March 5, 2019, ICE entered into a contract directly with GEO to continue operating the Mesa Verde facility. The contract between ICE and GEO was due to expire on March 18, 2020.

88.     On December 19, 2019, ICE entered into a new contract with GEO to continue operating the Mesa Verde facility. The contract has a period of performance starting on December 20, 2019, and ending December 19, 2034. ICE has the option of terminating the contract early every five years, with the first such option occurring on December 20, 2024.

89.     GEO has continued to operate the Mesa Verde facility under the terms of the new ICE contract since December 20, 2019, in much the same manner as it was operating prior to signing the new contract.

### 2.     Central Valley MCCF

90.     Central Valley MCCF is a GEO-owned prison previously operated under contract with CDCR. CDCR terminated its contract with GEO on July 10, 2019, effective September 30, 2019.

91.     On September 20, 2019, ICE executed a modification to its Mesa Verde contract to incorporate the Central Valley facility as an "annex."

92.     The Central Valley facility is now incorporated into the Mesa Verde contract, with a period of performance starting on December 20, 2019, and ending December 19, 2034. ICE has the option of terminating the contract early every five years, with the first such option occurring on December 20, 2024.

93.     Under the contract, GEO is obligated to immediately begin "Pre-Transition/Mobilization" activity at Central Valley, with a period of performance beginning on December 20, 2019, during which it must begin preparing the facility to receive ICE detainees. GEO began that process as soon as the contract became effective.

94.     GEO has continued to operate the Central Valley facility under the terms of the new ICE contract since December 20, 2019.

### 3.     Golden State MCCF

95.     Golden State MCCF is currently a prison owned and operated by GEO under contract with CDCR. CDCR has notified GEO that it will terminate its contract with GEO effective June 30, 2020.

96.     On September 20, 2019, ICE executed a modification to its Mesa Verde contract to incorporate the Golden State facility as an "annex."

97.     The Golden State facility is now incorporated into the Mesa Verde contract, with a period of performance starting on December 20, 2019, and ending December 19, 2034. ICE has the option of terminating the contract early every five years, with the first such option occurring on December 20, 2024.

98.     Under the contract, GEO is obligated to immediately begin "Pre-Transition/Mobilization" activity at Golden State, with a period of performance beginning on from December 20, 2019, during which it must begin preparing the facility to receive ICE detainees. GEO began that process as soon as the contract became effective.

99.     GEO has continued to operate the Golden State facility under the new ICE contract since December 20, 2019, even as it concurrently phases out CDCR operations at Golden State.

### C.     Non-GEO Privately Operated ICE Detention Facilities

### 1.     Imperial Regional Detention Facility

100.    Imperial Regional Detention Facility was, until recently, operated pursuant to an IGSA between ICE and the City of Holtville, California. The City had contracted with MTC—which owns the facility—to operate Imperial Regional since September 22, 2014.

101.    ICE terminated the IGSA effective September 21, 2019, and it entered into a contract directly with MTC to continue operating Imperial Regional effective

September 22, 2019. ICE entered into a new contract with MTC that became effective on December 20, 2019, with a base period of performance running through December 19, 2024. The contract contains two five-year options, so the contract expires on December 19, 2034.

### 2.    Otay Mesa Detention Center

102.   Otay Mesa Detention Center is jointly used by USMS and ICE. It is owned and operated by CoreCivic, formerly known as Corrections Corporation of America, under a direct contract with ICE. ICE entered into a new contract with CoreCivic that became effective on December 20, 2019, with a base period of performance running through December 19, 2024. The contract contains two five-year options, so the contract expires on December 19, 2034.

### D.    Non-Dedicated ICE Detention Facilities

103.   In addition to the dedicated ICE detention facilities in California, there are two facilities in California that, while not dedicated to ICE detention (and thus shared with local governmental entities housing non-ICE detainees), are nonetheless authorized for ICE's use pursuant to IGSAs:

- Glendale Police Department, located at 131 North Isabel Street, Glendale, CA 91206. This facility is owned by the City of Glendale and operated by the Glendale Police Department.

- Yuba County Jail, located at 215 5th Street, Marysville, CA 95901, with a capacity of 220 beds. This facility is owned by Yuba County and operated by Yuba County Sheriff's Department.[45]

---

[45]Although ICE's December 2, 2019, list of non-dedicated facilities continues to list the Orange County Intake Release Facility, that facility (on information and belief) was only used for intake and processing of detainees who were ultimately housed at the James A. Musick and Theo Lacy facilities. The contracts for those facilities were terminated by the Orange County Sheriff's Department in 2019 and are no longer used by ICE. It is thus unclear whether the Intake facility remains a viable non-dedicated ICE detention facility, and its ADP for FY 2020 was zero.

104.   In Fiscal Year 2020, the Glendale Police Department facility has had an average daily population of 0 detainees. ICE "rarely uses the jail."[46]

105.   It is unclear whether the Yuba County Jail will maintain its contract with the Federal Government.[47]

106.   Thus, if no privately operated detention facilities were permitted in California, there would effectively be only one facility in the State that ICE could use for detainees—the Yuba County Jail—which has a capacity of only 220 beds and whose future is in doubt—and there would be *no* detention facilities available to the Federal Government in Southern California along the U.S.-Mexico border. The combined capacity of ICE's seven privately operated detention facilities in California is 7,188.

107.   Absent relief from this Court, AB-32 will force GEO to close the Adelanto, Central Valley, Desert View, Golden State, and Mesa Verde facilities upon the expiration of GEO's contracts with ICE, and other private contractors will be forced to close their dedicated ICE detention facilities as well. Thus, under AB-32, there would be no dedicated ICE detention facilities in the State of California.

**IV.   Financial Impact of AB-32 on GEO**

108.   If AB-32 forces GEO to close its USMS and ICE detention facilities in California, GEO would lose an average of over $250 million per year in revenue over the next fifteen years.

109.   GEO invested over $300 million in acquiring, constructing, outfitting, and otherwise making ready for use its USMS and ICE detention facilities in California, all of which would be lost if GEO were no longer able to use those

/ / /

---

[46] Bradley Zint, *Glendale Police Vow Not To Enforce Federal Immigration Laws*, L.A. TIMES (Apr. 1, 2017), https://lat.ms/31skq8o.

[47] Thompson & Taxin, *supra* note 8 (stating that "Yuba County in northern California still has a contract to detain immigrants but may also soon end it").

facilities for their intended purposes. The replacement cost of these detention facilities is approximately $500 million.

110.   Thus, if AB-32 forces GEO to close its USMS and ICE detention facilities in California, GEO could lose over $4 billion in capital investment and future revenue over the next fifteen years.

### COUNT I: VIOLATION OF INTERGOVERNMENTAL IMMUNITY (DIRECT REGULATION OF THE FEDERAL GOVERNMENT)

111.   Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs.

112.   GEO, as a contractor for the United States, enjoys and is clothed in the Federal Government's intergovernmental immunity. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180–81 (1988); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014).

113.   Under the Supremacy Clause of the United States Constitution, "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943); *see also North Dakota v. United States*, 495 U.S. 423, 451–52 (1990) (Brennan, J., concurring in the judgment in part and dissenting in part) ("[T]hose dealing with the Federal Government enjoy immunity from state control . . . when a state law actually and substantially interferes with specific federal programs.").

114.   By prohibiting federal private detention facilities in the State, AB-32 substantially interferes with Federal Government operations.

115.   AB-32 substantially interferes with USMS's ability to carry out its detention responsibilities for the Federal Government.

116.   AB-32 substantially interferes with ICE's ability to carry out its detention responsibilities for the Federal Government.

117.   Congress has not authorized the State to regulate the Federal Government's activities with respect to federal detention facilities like GEO's.

118.   AB-32 is unconstitutional and invalid as applied to GEO's operations on behalf of USMS and ICE.

**COUNT II: VIOLATION OF INTERGOVERNMENTAL IMMUNITY (DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT)**

119.   Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs.

120.   A state law is invalid "if it operates so as to discriminate against the [Federal] Government or those with whom it deals." *United States v. City of Detroit*, 355 U.S. 466, 473 (1958).

121.   AB-32 prohibits the operation of private detention facilities in the State, *see* CAL. PENAL CODE § 9501, but it then exempts essentially all private detention facilities under contract with the State, *see id.* §§ 9502, 9505(b).

122.   For example, Section 9505(b) of the California Penal Code exempts from its general prohibition *state* private detention facilities used "to provide housing for state prison inmates in order to comply with the requirements of any court-ordered population cap," *id.* § 5003.1(e), and because the population cap in *Brown v. Plata* applies to the State's prison system, AB-32 effectively exempts the entire California prison system from its prohibition on private detention facilities.

123.   By effectively targeting *only* federal private detention facilities, AB-32 discriminates against the Federal Government. *See Dawson v. Steager*, 139 S. Ct. 698, 705–06 (2019); *Boeing*, 768 F.3d at 842–43.

124.   AB-32 is unconstitutional and invalid as applied to GEO's operations on behalf of USMS and ICE.

**COUNT III: FEDERAL PREEMPTION OF INCONSISTENT STATE LAW**

125.   Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs.

126.   Federal immigration law provides that "[t]he Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a

NEWMEYER DILLION

decision on removal," and "[w]hen United States facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the Attorney General may expend . . . amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities . . . necessary for detention." 8 U.S.C. § 1231(g)(1). Congress has instructed that ICE "shall consider the availability for purchase *or lease* of any existing prison, jail, detention center, or other comparable facility suitable for [detention]" before beginning any project to develop a new detention facility. 8 U.S.C. § 1231(g)(2) (emphasis added).

127.   In enacting Section 1231(g)(1), "Congress . . . placed the responsibility of determining where aliens are detained within the discretion of the Attorney General." *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir. 1986). That discretion is "broad." *Id.*

128.   With respect to federal prisoners detained by the U.S. Marshals Service, Congress has authorized the Attorney General, "in support of United States prisoners in non-Federal institutions," to "make payments from funds appropriated for Federal prisoner detention for," among other things, "the housing, care, and security of persons held in custody of a United States marshal pursuant to Federal law under agreements with State or local units of government *or contracts with private entities.*" 18 U.S.C. § 4013(a)(3) (emphasis added).

129.   Congress further authorized the Attorney General, in his "reasonable discretion," to carry out the activities of the Department of Justice "through any means," including "through contracts, grants, or cooperative agreements with non-Federal parties." 28 U.S.C. § 530C(a)(4).

130.   Where Congress delegates broad discretion to an Executive Branch official to achieve some end, state laws are preempted when they frustrate the natural effect of that delegation and blunt the consequences of Executive acts taken pursuant to the delegation. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–377 (2000).

131.   State laws are also preempted whenever they evince a second-guessing of the Federal Government's contracting choices made in conformity with enumerated congressional standards. *See Gartrell Constr. Inc. v. Aubry*, 940 F.2d 437 438–41 (9th Cir. 1991).

132.   AB-32, by effectively prohibiting the Attorney General from using private detention facilities, dramatically reduces his discretion in locating federal immigration detainees and prisoners throughout the District and the State and prohibits a means of federal detention that Congress clearly authorized.

133.   AB-32 also impermissibly second-guesses the Federal Government's contracting decisions by effectively displacing the Federal Government's determination of what immigration detention facilities are "appropriate," 8 U.S.C. § 1231(g)(1), and whether using private prisoner detention facilities is "reasonable," 28 U.S.C. § 530C(a)(4).

134.   AB-32 is unconstitutional and invalid as applied to GEO's operations on behalf of USMS and ICE.

**COUNT IV: TEMPORARY SAFE HARBOR**

135.   Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs.

136.   Although AB-32 prohibits private detention facilities in California, it contains a temporary safe-harbor exception for any "private detention facility that is operating pursuant to a valid contract with a governmental entity that was in effect before January 1, 2020, for the duration of that contract, not to include any extensions made to or authorized by that contract." CAL. PENAL CODE § 9505(a).

137.   Plaintiff's contract with USMS for the Western Region Detention Facility was executed on November 14, 2017, and it was effective November 14, 2017. This facility was, therefore, operating under a contract in effect before January 1, 2020.

/ / /

138.   Because GEO's contract with the Federal Government for the Western Region Detention Facility has a period of performance ending on September 30, 2027, AB-32 does not apply to the Western Region contract prior to that date.

139.   Plaintiff's contract with USMS for the El Centro Service Processing Center was executed on December 23, 2019, and it was effective December 23, 2019. This facility was, therefore, operating under a contract in effect before January 1, 2020.

140.   Because GEO's contract with the Federal Government for the El Centro Service Processing Center has a period of performance ending on September 25, 2028, AB-32 does not apply to the El Centro contract prior to that date.

141.   Plaintiff's contracts with USMS for the Western Region and El Centro facilities are valid through at least September 30, 2027, and September 25, 2028, respectively.

142.   Plaintiff's contracts with ICE for the Adelanto, Central Valley, Desert View, Golden State, and Mesa Verde facilities were executed on December 19, 2019, and they were effective December 20, 2019. These facilities were, therefore, operating under contracts in effect before January 1, 2020.

143.   Because GEO's contracts with the Federal Government for the Adelanto, Central Valley, Desert View, Golden State, and Mesa Verde facilities have a period of performance ending December 19, 2034, AB-32 does not apply to any of these contracts prior to that date.

144.   Plaintiff's contracts with ICE for the Adelanto, Central Valley, Desert View, Golden State, and Mesa Verde facilities are valid through at least December 19, 2034.

/ / /

/ / /

/ / /

/ / /

**PRAYER FOR RELIEF**

145.   WHEREFORE, The GEO Group, Inc., respectfully requests that this Court enter an order and judgment:

a.   Declaring that Assembly Bill 32, codified at California Penal Code §§ 9500–03, 9505, violates the Supremacy Clause of the United States Constitution and is unconstitutional as applied to GEO in its operation of detention facilities for USMS and ICE;

b.   Preliminarily and permanently enjoining Defendants, as well as their successors, agents, employees, and all those under their supervision, from enforcing Assembly Bill 32 against GEO in its operation of detention facilities for USMS and ICE;

c.   Declaring that Plaintiff's USMS contract with the Federal Government for the Western Region Detention Center is valid through September 30, 2027;

d.   Declaring that Plaintiff's USMS contract with the Federal Government for the El Centro Service Processing Center is valid through September 25, 2028;

e.   Declaring that Plaintiff's ICE contracts with the Federal Government for the Adelanto ICE Processing Center, Central Valley MCCF, Desert View MCCF, Golden State MCCF, and Mesa Verde ICE Processing Center are valid through December 19, 2034;

f.   Awarding attorneys' fees and costs as permitted by law; and

/ / /

/ / /

/ / /

/ / /

/ / /

g.   Granting such other and further relief as this Court deems just and proper.

Dated:   December 30, 2019

By:  _/s/ Michael B. McClellan_

Michael B. McClellan, CBN 241570
NEWMEYER & DILLION LLP
895 Dove Street, Fifth Floor
Newport Beach, CA  92660
Telephone: (949) 854-7000
Email: Michael.McClellan@ndlf.com

Charles J. Cooper,* DC Bar No. 248070
Michael W. Kirk,* DC Bar No. 424648
J. Joel Alicea,* DC Bar No. 1022784
Steven J. Lindsay,* VA Bar No. 92363
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC  20036
Telephone: (202) 220-9600
Email: ccooper@cooperkirk.com
*_Pro Hac Vice_ Applications Forthcoming

Michael W. Battin, CBN 183870
NAVIGATO & BATTIN, LLP
755 West A Street, Suite 150
San Diego, CA  92101
Telephone: (619) 233-5365
Email: mike@navbat.com

_Attorneys for Plaintiff The GEO Group, Inc._