1   Charles J. Cooper (Appearing *Pro Hac Vice*),
    DC Bar No. 248070
2   COOPER & KIRK, PLLC
    1523 New Hampshire Avenue, NW
3   Washington, DC  20036
    Telephone: (202) 220-9600
4   Email: ccooper@cooperkirk.com

5   Michael B. McClellan, CBN 241570
    NEWMEYER & DILLION LLP
6   895 Dove Street, Fifth Floor
    Newport Beach, CA  92660
7   Telephone: (949) 854-7000
    Email: Michael.McClellan@ndlf.com
8
    Michael W. Battin, CBN 183870
9   NAVIGATO & BATTIN, LLP
    755 West A Street, Suite 150
10  San Diego, CA  92101
    Telephone: (619) 233-5365
11  Email: mike@navbat.com

12  *Attorneys for Plaintiff The GEO Group, Inc.*

13              UNITED STATES DISTRICT COURT

14            SOUTHERN DISTRICT OF CALIFORNIA

15  THE GEO GROUP, INC.,                Case No. 19cv2491-JLS-WVG

16              Plaintiff,              Assigned to District Judge Janis L.
                                        Sammartino
17  v.
                                        Assigned to Magistrate Judge William v.
18  GAVIN C. NEWSOM, in his official    Gallo
    capacity as Governor of the State of
19  California; XAVIER BECERRA, in his  **MEMORANDUM OF POINTS AND**
    official capacity as Attorney General of **AUTHORITIES IN SUPPORT OF**
20  the State of California,            **MOTION FOR PRELIMINARY**
                                        **INJUNCTION**
21              Defendants.
                                        [*Notice of Motion and Motion,*
22                                      *Declarations of Amber Martin and C.*
                                        *Kendie Schlecht, Appendix of Exhibits*
23                                      *filed concurrently herewith; Order lodged*
                                        *concurrently herewith*]
24
                                        Hearing Date:   April 16, 2020
25                                      Hearing Time:   1:30 p.m.
                                        Place:    4D (4th Floor – Schwartz)
26
                                        FILE DATE:    December 30, 2019
27                                      TRIAL DATE:   No Date Set

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ 3

MEMORANDUM OF POINTS AND AUTHORITIES ............................ 8

STATEMENT .................................................................................... 8

    I.    U.S. Marshals Service Detention Policy ............................... 8

    II.   U.S. Immigration And Customs Enforcement Detention Policy ..... 10

    III.  GEO's Detention Facilities In California ............................ 12

        A.    GEO's USMS Detention Facilities ............................ 12

            1.    Western Region Detention Facility ............... 12

            2.    El Centro Service Processing Center ............ 13

        B.    GEO's ICE Detention Facilities ............................ 13

    IV.  California's Early Efforts To Obstruct
           Federal Immigration Policy ............................ 14

    V.   The Enactment Of AB-32 .................................... 16

ARGUMENT ........................................................................ 19

    I.    GEO Is Likely To Succeed On The Merits ............................ 19

        A.    AB-32 Violates The Intergovernmental-Immunity
            Doctrine ............................................ 19

            1.    AB-32 directly regulates the
                Federal Government ............................ 20

            2.    AB-32 discriminates against the
                Federal Government ............................ 25

        B.    AB-32 Is Preempted By Federal Law ............................ 29

            1.    AB-32 is preempted by federal immigration law ........... 30

            2.    AB-32 is preempted by federal criminal law ............... 34

        C.    Alternatively, GEO Is Entitled To Continue Operating Its USMS
            And ICE Facilities Under AB-32's Temporary Safe-Harbor
            Provision ............................................ 37

    II.   GEO Is Likely To Suffer Irreparable Harm Without A Preliminary
            Injunction ................................................ 38

    III.  The Public Interest And Balance Of Equities
            Favor An Injunction ............................................ 39

    IV.  The Court Should Enter Final Judgment Awarding A Permanent
            Injunction ................................................ 40

CONCLUSION .................................................................... 40

1

## TABLE OF AUTHORITIES

**Page(s)**

2

**Cases**

3

*A Woman's Friend Pregnancy Res. Clinic v. Becerra*,
   901 F.3d 1166 (9th Cir. 2018) ............................................................... 19

4

*All. for the Wild Rockies v. Pena*,
   865 F.3d 1211 (9th Cir. 2017) ............................................................... 19

5

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
   559 F.3d 1046 (9th Cir. 2009) ............................................................... 38

6

7

*Arizona v. California*,
   283 U.S. 423 (1931) .............................................................................. 21

8

*Assoc. Gen. Contractors v. Coal. for Econ. Equity*,
   950 F.2d 1401 (9th Cir. 1991) ............................................................... 38

9

*Az. Dream Act Coal. v. Brewer*,
   855 F.3d 957 (9th Cir. 2017) ................................................................. 38

10

11

*Az. Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) ............................................................... 39

12

*Baby Tam & Co. v. City of Las Vegas*,
   154 F.3d 1097 (9th Cir. 1998) ............................................................... 40

13

*Barnett Bank of Marion Cty., N.A. v. Nelson*,
   517 U.S. 25 (1996) ................................................................................ 32

14

15

*Blackburn v. United States*,
   100 F.3d 1426 (9th Cir. 1996) ............................................................... 21

16

*Boeing Co. v. Movassaghi*,
   768 F.3d 832 (9th Cir. 2014) .............................. 20, 23, 24, 26, 28

17

*Brown v. Plata*,
   563 U.S. 493 (2011) ........................................................................ 17, 28

18

19

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*,
   596 F.3d 1098 (9th Cir. 2010) ............................................................... 39

20

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*,
   563 F.3d 847 (9th Cir. 2009) ........................................................... 39, 40

21

*California v. U.S. Dep't of Health & Human Servs.*,
   941 F.3d 410 (9th Cir. 2019) ................................................................. 39

22

*Coleman v. Brown*,
   952 F. Supp. 2d 901 (E.D. Cal. 2013) .................................................. 17

23

24

*Comm. of Cent. Am. Refugees v. INS*,
   795 F.2d 1434 (9th Cir. 1986) ............................................................... 31

25

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) ........................................................................ 31, 32

26

27

*Davis v. Mich. Dep't of Treasury*,
   489 U.S. 803 (1989) .............................................................................. 26

28

*Dawson v. Steager,*
   139 S. Ct. 698 (2019) ..................................................................... 25, 26, 27, 28

*Demore v. Kim,*
   538 U.S. 510 (2003) ............................................................................................ 30

*Dream Palace v. County of Maricopa,*
   384 F.3d 990 (9th Cir. 2004) .............................................................................. 40

*English v. Gen. Elec. Co.,*
   496 U.S. 72 (1990) .............................................................................................. 29

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,*
   458 U.S. 141 (1982) ............................................................................................ 32

*Gartrell Construction Inc. v. Aubry,*
   940 F.2d 437 (9th Cir. 1991) ......................................................................... 33, 34

*Goodyear Atomic Corp. v. Miller,*
   486 U.S. 174 (1988) ...................................................................................... 22, 24

*Greenwood v. United States,*
   350 U.S. 366 (1956) ............................................................................................ 34

*Hancock v. Train,*
   426 U.S. 167 (1976) .......................................................................... 20, 21, 22, 24

*Harisiades v. Shaughnessy,*
   342 U.S. 580 (1952) ............................................................................................ 30

*Hines v. Davidowitz,*
   312 U.S. 52 (1941) .............................................................................................. 30

*Jennings v. Rodriguez,*
   138 S. Ct. 830 (2018) .......................................................................................... 10

*Johnson v. Maryland,*
   254 U.S. 51 (1920) .............................................................................................. 21

*Kentucky v. Graham,*
   473 U.S. 159 (1985) ............................................................................................ 39

*Leslie Miller, Inc. v. Arkansas,*
   352 U.S. 187 (1956) .................................................................................. 22, 24, 34

*Lusnak v. Bank of Am., N.A.,*
   883 F.3d 1185 (9th Cir. 2018) ............................................................................ 32

*Mayo v. United States,*
   319 U.S. 441 (1943) ...................................................................................... 20, 21

*McCulloch v. Maryland,*
   17 U.S. (4 Wheat.) 316 (1819) .................................................................. 19, 20, 25

*Moore v. Madigan,*
   702 F.3d 933 (7th Cir. 2012) .............................................................................. 40

*Nelson v. Nat'l Aeronautics & Space Admin.,*
   530 F.3d 865 (9th Cir. 2008) .............................................................................. 38

*North Dakota v. United States*,
495 U.S. 423 (1990) ................................................................. 19, 20, 25, 26, 29

*Nw. Cent. Pipeline v. State Corp. Comm'n of Kan.*,
489 U.S. 493 (1989) ................................................................................... 29

*Osborn v. Bank of the U.S.*,
22 U.S. (9 Wheat.) 738 (1824) ............................................................. 21, 22

*Paul v. United States*,
371 U.S. 245 (1963) ...................................................................................... 23

*Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*,
361 U.S. 376 (1960) ...................................................................................... 26

*Pub. Utils. Comm'n of Cal. v. United States*,
355 U.S. 534 (1958) ..................................................................... 22, 23, 24

*Rodriguez v. Robbins*,
715 F.3d 1127 (9th Cir. 2013) ................................................................... 40

*Savage v. Jones*,
225 U.S. 501 (1912) ...................................................................................... 29

*South Carolina v. Baker*,
485 U.S. 505 (1988) ...................................................................................... 25

*Student Loan Servicing All. v. District of Columbia*,
351 F. Supp. 3d 26 (D.D.C. 2018) ........................................................... 33

*United States v. Arizona*,
641 F.3d 339 (9th Cir. 2011) ......................................................... 30, 38, 40

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) ............................................. 10, 24, 25, 26, 40

*United States v. City of Arcata*,
629 F.3d 986 (9th Cir. 2010) ..................................................................... 28

*United States v. City of Manassas*,
830 F.2d 530 (4th Cir. 1987) ..................................................................... 29

*United States v. City of Pittsburg*,
661 F.2d 783 (9th Cir. 1981) ..................................................................... 32

*United States v. City of St. Paul*,
258 F.3d 750 (8th Cir. 2001) ..................................................................... 22

*United States v. Ga. Pub. Serv. Comm'n*,
371 U.S. 285 (1963) ...................................................................................... 23

*Valle del Sol Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013) ......................................................... 38, 39, 40

*Washington v. United States*,
460 U.S. 536 (1983) ...................................................................................... 27

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) ........................................................................................... 19

- 5 -

*Wrenn v. District of Columbia*,
   864 F.3d 650 (D.C. Cir. 2017) ................................................... 40

*Wyeth v. Levine*,
   555 U.S. 555 (2009) ................................................................. 30

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ................................................................. 30

**Statutes**

U.S. CONST. amend. XI ................................................................. 39

6 U.S.C. § 557 ............................................................................. 33

8 U.S.C.
   § 1225 ................................................................................. 107
   § 1226 ................................................................................... 10
   § 1231 ............................................................... 10, 30, 31, 33
   § 1252 ................................................................................... 31

18 U.S.C.
   § 4002 ................................................................................. 335
   § 4013 ................................................................ 8, 9, 10, 35, 36
   § 4086 ............................................................................. 34, 35

28 U.S.C.
   § 530C .......................................................................... 8, 9, 35
   § 561 ............................................................................. 8, 34, 36
   § 566 ..................................................................................... 36

CAL. CIV. CODE § 1670.9 ........................................................... 15

CAL. GOV'T CODE § 7310 ........................................................... 15

CAL. HEALTH & SAFETY CODE § 25359.20 .............................. 28

CAL. PENAL CODE
   § 5003.1 ............................................................................... 16
   § 9500 .............................................................................. 17, 26
   § 9501 ........................................................................ 17, 26, 27
   § 9502 ................................................................................... 27
   § 9505 ...................................................................... 17, 18, 27, 37

**Declarations Cited**

Decl. of Amber Martin, Exec. Vice President of Contract Admin.,
   The GEO Grp., Inc (Dec. 31, 2019) .............. 12, 13, 14, 18, 25, 36, 39

**Exhibits Cited**

Assemb. Comm. on Judiciary, Analysis of SB-29, 2017–18 Sess.
   (Cal. June 27, 2017), https://bit.ly/2O9c3eP, Ex. P .......................... 16

CAL. DEP'T OF CORR. AND REHAB., MONTHLY REPORT OF POPULATION
   (Dec. 1, 2019), https://bit.ly/38ZnK07, Ex. Q ............................ 17

Caitlin Dickerson, *ICE Faces Migrant Detention Crunch as Border Chaos Spills
   Into Interior of the Country*, N.Y. TIMES (Apr. 22, 2019),
   https://nyti.ms/2BEKvGS, Ex. N ............................................... 11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ERO CUSTODY MGMT. DIV., AUTHORIZED DEDICATED FACILITY LIST
(Dec. 2, 2019), https://bit.ly/2PXHNmM, Ex. U ................................................. 25

Press Release, Assembly Member Rob Bonta, *Bonta Introduces Bills Ending State's Involvement in For-Profit, Private Prison Industry* (Dec. 3, 2018), https://bit.ly/2Pga7Ch, Ex. R ..................................................................... 18

Senate Rules Comm., Senate Floor Analyses for AB-32, 2019–20 Sess. (Cal. Sept. 9, 2019), https://bit.ly/35htShk, Ex. S ............................................. 18

Senate Rules Comm., Senate Floor Analyses for SB-29, 2017–18 Sess. (Cal. May 27, 2017), https://bit.ly/2O9c3eP, Ex. O .................................... 15, 16

NEWMEYER
DILLION

19CV2491-JLS-WVG
PTS & AUTH SUPP. MTN. PRELIM. INJ.

1   On January 1, 2020, California's Assembly Bill 32 (AB-32) will take effect.

2   The law purports to prohibit the United States from using detention facilities operated

3   by private contractors to house detainees in the custody of the U.S. Marshals Service,

4   U.S. Immigration and Customs Enforcement, or the Federal Bureau of Prisons. This

5   transparent attempt by the State to shut down the Federal Government's detention

6   efforts within California's borders is a direct assault on the supremacy of federal law

7   that serves as the foundation for the American Constitution.

8   The GEO Group, Inc. (GEO), as the owner and operator of federal private

9   detention facilities threatened by the State, brings this action to vindicate the

10   supremacy of federal law. This Court should declare AB-32 unconstitutional and

11   enter a preliminary and permanent injunction restraining Defendants from enforcing

12   the statute against GEO.

13   **STATEMENT**

14   **I.    U.S. Marshals Service Detention Policy**

15   Established in 1789, the United States Marshals Service (USMS) is an agency

16   within the United States Department of Justice under the supervision of the Attorney

17   General. *See* 28 U.S.C. § 561(a). Congress has authorized the Attorney General to

18   provide for "the housing, care, and security of persons held in custody of a United

19   States marshal pursuant to Federal law under agreements with State or local units of

20   government or contracts with private entities." 18 U.S.C. § 4013(a)(3). Congress has

21   also authorized the Attorney General, in his "reasonable discretion," to carry out the

22   activities of the Department of Justice "through any means," including "through

23   contracts, grants, or cooperative agreements with non-Federal parties." 28 U.S.C.

24   § 530C(a)(4); *see also id.* § 530C(b)(7).

25   "The U.S. Marshals Service houses and transports all federal prisoners from

26   the time they enter federal custody until they are either acquitted or convicted and

27   delivered to their designated federal Bureau of Prisons facility. The Marshals Service

28   assumes custody for all prisoners charged with a federal offense, no matter which

19CV2491-JLS-WVG
PTS & AUTH SUPP. MTN. PRELIM. INJ.

agency made the arrest."[1] Pursuant to the Attorney General's statutory authority under 18 U.S.C. § 4013(a)(3) and 28 U.S.C. § 530C(a)(4), "[t]he Marshals Service does not own or operate detention facilities but partners with state and local governments using intergovernmental agreements to house prisoners. Additionally, the agency houses prisoners in Federal Bureau of Prisons facilities and private detention facilities."[2] Because "both defense attorneys and prosecutors require routine access to prisoners, the Marshals attempt to house prisoners in close proximity to the judicial district in which they are prosecuted."[3]

Along the Southwest Border, "DOJ has not been able to rely as much on [intergovernmental agreements with state and local detention facilities] and Federal facilities to meet housing requirements . . . . As less space in Federal facilities is available, DOJ has increasingly had to rely on the private sector" to meet its detention obligations.[4] USMS estimates that 28.6 percent of the detention facilities used by the Marshals to house detainees from the Southern District of California are privately run.[5] And now that GEO has begun operating the El Centro Service Processing Center on December 23, 2019, *see infra* Statement Section III.A.2, that figure has

---

[1] U.S. MARSHALS SERV., DEFENDANTS IN CUSTODY AND PRISONER MANAGEMENT, https://bit.ly/2MSd4Wv (last visited Dec. 30, 2019), Ex. F at 102.

[2] U.S. MARSHALS SERV., FACT SHEET: PRISONER OPERATIONS 2 (2019), https://bit.ly/2Yi5RED, Ex. G at 106.

[3] *Id.*

[4] U.S. MARSHALS SERV., FY 2020 PERFORMANCE BUDGET PRESIDENT'S BUDGET: FEDERAL PRISONER DETENTION APPROPRIATION 15 (2019), https://bit.ly/2SnzdAx, Ex. H at 115.

[5] U.S. MARSHALS SERV., USMS DETENTION POPULATION 2 (Apr. 31, 2019) [hereinafter DETENTION POPULATION], https://bit.ly/2BmUFMp, Ex. I at 126. This excludes facilities located in other States used by the Marshals to house detainees from this District, to which Section 2 of AB-32 does not apply. It also excludes intergovernmental service agreement facilities with an average daily population (ADP) below 50 because publicly available data does not identify these facilities and the number of individuals detained in them is minimal. These facilities are omitted from all data provided herein unless otherwise stated. And finally, this excludes Metropolitan Detention Center, Los Angeles, because that Federal Bureau of Prisons facility held only a single detainee as of April 31, 2019, and has no reported ADP for Fiscal Years 2018 and 2019.

risen to 37.5 percent. Two of those private facilities—the Western Region Detention Facility and El Centro Service Processing Center—are operated by GEO.

## II.  U.S. Immigration And Customs Enforcement Detention Policy

In November 2002, Congress assigned the border-enforcement functions of the former Immigration and Naturalization Service to the newly created Bureau of Immigration and Customs Enforcement, housed within the Department of Homeland Security.[6] The Bureau began operations in March 2003 and was renamed U.S. Immigration and Customs Enforcement (ICE) in March 2007.[7]

Congress has authorized or required the detention of aliens under several different statutes and conditions. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1)(B)(ii), 1225(b)(2)(A), 1226(a), 1226(c); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 836–38 (2018). Congress has also directed that "[t]he Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," 8 U.S.C. § 1231(g)(1), and it has instructed that ICE "shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for [detention]" "[p]rior to initiating any project for the construction of any new detention facility," *id.* § 1231(g)(2). Thus, like USMS's authority under Section 4013(a)(3), Section 1231(g)(2) authorizes ICE to use private contractors to arrange for detention. *See United States v. California*, 921 F.3d 865, 882 n.7 (9th Cir. 2019).

"[I]n FY2018 the number of book-ins to ICE facilities was nearly 400,000," yet "[a]s of July 12, 2018, ICE's detention capacity was approximately 45,700 beds."[8] "Filling every available bed in a detention facility would necessitate housing

---

[6] U.S. IMMIGRATION & CUSTOMS ENF'T, CELEBRATING THE HISTORY OF ICE (Mar. 1, 2019), https://bit.ly/35Jas68, Ex. J at 130.

[7] *Id.*, Ex. J at 128, 131.

[8] AUDREY SINGER, CONG. RESEARCH SERV., R45804, IMMIGRATION: ALTERNATIVES TO DETENTION (ATD) PROGRAMS 14 (July 8, 2019), https://bit.ly/2ojQNsE, Ex. M at 171.

detainees of varied threat levels together, posing serious safety concerns for detainees, officers, staff, and facility owners. ICE consequently maintains a target utilization rate of about 85 to 90% of total facility capacity," which "also allows for flexibility to respond to emergencies or other unforeseen circumstances that might require immediate availability of detention beds (e.g., charter flight cancellations, surges, or smuggling loads)."[9] In the facilities ICE currently uses, "ICE meets or exceeds its target utilization in almost every instance."[10]

Across the country, ICE's ability to house detainees is "already dire."[11] As then-Acting Secretary of Homeland Security, Kevin K. McAleenan, said in April 2019: "It's clear that all of our resources are being stretched thin. The system is full, and we are beyond capacity."[12] Homeland Security officials "are struggling to identify new locations where migrants can be held in detention."[13]

Thus, ICE has determined that "additional ICE detention capacity is necessary" to meet the surge of aliens detained at the border.[14] Indeed, "[a]n increase in detention capacity is critical to supporting ICE's ability to apprehend, detain, and remove aliens."[15]

/ / /

/ / /

---

[9] U.S. IMMIGRATION & CUSTOMS ENF'T, DEP'T OF HOMELAND SEC., BUDGET OVERVIEW: FISCAL YEAR 2020 CONGRESSIONAL JUSTIFICATION ICE-O&S-119 (2019) [hereinafter 2020 CONGRESSIONAL JUSTIFICATION], https://bit.ly/336G3g3, Ex. L at 154.

[10] *Id.*

[11] Caitlin Dickerson, *ICE Faces Migrant Detention Crunch as Border Chaos Spills Into Interior of the Country*, N.Y. TIMES (Apr. 22, 2019), https://nyti.ms/2BEKvGS, Ex. N at 164.

[12] *Id.*

[13] *Id.*

[14] STATEMENT OF MATTHEW T. ALBENCE, ACTING DIR., U.S. IMMIGRATION & CUSTOMS ENF'T, THE FISCAL YEAR 2020 PRESIDENT'S BUDGET REQUEST 4 (July 25, 2019), https://bit.ly/2Bllfp9, Ex. K at 136.

[15] 2020 CONGRESSIONAL JUSTIFICATION, *supra* note 9, at ICE-O&S-16, Ex. L at 149.

NEWMEYER DILLION

### III. GEO's Detention Facilities In California

The GEO Group, Inc. is a publicly traded corporation that owns and operates detention facilities worldwide. As a contractor for the Federal Government, GEO provides detention services for both USMS and ICE in the State of California.

#### A. GEO's USMS Detention Facilities

##### 1. Western Region Detention Facility

Since 2000, GEO has operated the Western Region Detention Facility in San Diego under a lease from the County of San Diego. Martin Decl. ¶ 5. With a capacity of 725 beds,[16] Western Region is one of only two USMS facilities in San Diego, the other being the Metropolitan Correction Center operated by the Federal Bureau of Prisons. *Id.* ¶¶ 4, 9. USMS has exercised an option to continue its contract with GEO for the Western Region Detention Facility through September 30, 2021. *Id.* ¶ 7. USMS has the authority to exercise three additional two-year options, such that the total contract term runs through September 30, 2027. *Id.* ¶ 6.

The next-closest USMS facility outside of San Diego—Otay Mesa Detention Center—is also privately run. *Id.* ¶ 9. It is primarily used by ICE to house aliens, though USMS is permitted to use the facility for its own detainees. *Id.* Thus, if no privately run USMS detention facilities were permitted in California, there would be only one USMS detention facility in the San Diego area.[17] *Id.* ¶ 10. The next-closest non-private USMS facilities are located approximately 90 miles away from San Diego in Santa Ana, California. *Id.* ¶ 11. Those two USMS facilities in Santa Ana had a combined average daily population of 213 in April 2019, less than one-third the average daily population of the Western Region Detention Facility alone.[18]

/ / /

---

[16] Capacity numbers provided herein refer to capacity as stated in the relevant contract, unless a source other than the contract is indicated.

[17] DETENTION POPULATION, *supra* note 5, at 2, Ex. I at 126.

[18] *Id.*

### 2.   El Centro Service Processing Center

GEO's second California USMS facility—El Centro Service Processing Center—is also located in the San Diego area and has a capacity of 512 beds. *Id.* ¶ 12. El Centro is owned by ICE, which has authorized USMS to use the facility for USMS detainees. *Id.* ¶ 13. GEO was awarded a contract to operate El Centro on December 23, 2019. *Id.* ¶ 14. The base contract period is for two years, with the Marshals retaining the authority to exercise three additional two-year options and one nine-month option. *Id.* Thus, the El Centro contract's period of performance runs through September 25, 2028. *Id.*

### B.   GEO's ICE Detention Facilities

GEO currently operates five ICE detention facilities in California. *Id.* ¶ 15. First, GEO owns and operates the Adelanto ICE Processing Center, located in Adelanto, California, with a capacity of 1,940 beds. *Id.* ¶ 16. GEO has operated the facility as an ICE detention center since 2011. *Id.* ¶ 17. ICE and GEO signed a new contract for Adelanto on December 19, 2019. *Id.* ¶ 20. The contract has a 15-year period of performance starting on December 20, 2019, and ending December 19, 2034. *Id.* ICE has the option of terminating the contract early every five years, with the first such option occurring on December 20, 2024. *Id.*

Second, GEO owns and operates the Desert View Modified Community Correctional Facility (MCCF) as an annex to the Adelanto facility. *Id.* ¶ 22. The Desert View facility has a capacity of 750 beds. *Id.* It is incorporated into the same contract as the Adelanto facility, with a period of performance beginning on December 20, 2019, and continuing through December 20, 2034. *Id.* ¶ 24. Although currently used by the California Department of Corrections and Rehabilitation (CDCR) for state inmates, CDCR has notified GEO that it will phase out its contract and use the facility by March 31, 2020. *Id.* ¶ 22. In the meantime, GEO is required by its contract with ICE to operate the facility by undertaking "Pre-Transition/Mobilization" activities. *Id.* ¶ 25.

Third, GEO owns and operates the Mesa Verde ICE Processing Center, located in Bakersfield, California, with a capacity of 400 beds. *Id.* ¶ 27. GEO has operated the facility as an ICE detention center since 2015. *Id.* ¶ 28. ICE and GEO signed a new contract for Mesa Verde on December 19, 2019. *Id.* ¶ 31. Like the Adelanto contract, the Mesa Verde contract has a 15-year period of performance starting on December 20, 2019, and ending December 19, 2034. *Id.* ICE has the option of terminating the contract early every five years, with the first such option occurring on December 20, 2024. *Id.*

GEO's fourth and fifth facilities—Central Valley MCCF and Golden State MCCF—are operated as annexes to the Mesa Verde facility. Each has a capacity of 700 beds. *Id.* ¶¶ 33, 38. Central Valley is a former CDCR facility previously operated for CDCR through September 30, 2019, *id.* ¶ 33, while Golden State's contract with CDCR will phase out by June 30, 2020, *id.* ¶ 38. Both facilities are incorporated into the Mesa Verde contract, with a period of performance running from December 20, 2019, through December 19, 2034. *Id.* ¶¶ 35, 40. As with Desert View, GEO is required by its contract to operate the facility by undertaking "Pre-Transition/Mobilization" activities. *Id.* ¶¶ 25, 36, 41.

In addition to the foregoing GEO facilities, ICE has two other dedicated detention facilities in California: Imperial Regional Detention Facility in Calexico, California (capacity of 704 beds) and Otay Mesa Detention Center in San Diego, California (capacity 1,994 beds). *Id.* ¶¶ 43, 45. Both of these facilities are operated by private contractors. Imperial Regional is operated by Management & Training Corporation, while Otay Mesa is operated by CoreCivic. *Id.* ¶¶ 43, 45. Thus, all dedicated ICE processing centers in California are privately operated.

## IV. California's Early Efforts To Obstruct Federal Immigration Policy

The 2016 election ushered in a new President whose views on immigration policy differed markedly from those held by a majority of the California Legislature. Less than a month after the election, the Legislature began enacting a series of

measures designed to interfere with the execution of federal immigration policy, an effort that culminated in the enactment of AB-32.

On December 5, 2016, Senate Bill 29 (SB-29) was introduced in the California Legislature. As enacted, the bill prohibits city, county, and local law enforcement agencies from entering into contracts "with the federal government or any federal agency or a private corporation to house or detain noncitizens for purposes of civil immigration custody" unless those contracts were in effect before January 1, 2018. CAL. CIV. CODE § 1670.9(a). The statute also prohibits the renewal or modification of such contracts thereafter "in a manner that would expand the maximum number of contract beds that may be utilized to house or detain in a locked detention facility noncitizens for purposes of civil immigration custody." *Id.* § 1670.9(b). And SB-29 prohibits cities, counties, and public agencies from "approv[ing] or sign[ing] a deed, instrument, or other document related to a conveyance of land or issue a permit for the building or reuse of existing buildings by any private corporation, contractor, or vendor to house or detain noncitizens for purposes of civil immigration proceedings unless the city, county, city and county, or public agency" provides the public 180 days' notice and allows for public comment at two separate public meetings. *Id.* § 1670.9(d).

On January 10, 2017, Assembly Bill 103 (AB-103) was introduced in the California Legislature. As enacted, AB-103 prohibits, among other things, city, county, and local law enforcement agencies from entering into contracts "with the federal government or any federal agency to detain adult noncitizens for purposes of civil immigration custody" unless those contracts were in effect before June 15, 2017. CAL. GOV'T CODE § 7310(a). The statute also prohibits the renewal or modification of such contracts thereafter "in such a way as to expand the maximum number of contract beds that may be utilized to house or detain in a locked detention facility noncitizens for purposes of civil immigration custody." *Id.* § 7310(b).

The Senate Floor Analysis of SB-29 baldly stated that the purpose of its enactment was to obstruct federal immigration policy: "President Donald Trump

1  has . . . made it clear that he intends to detain more immigrants and expand private

2  for profit detention facility use. This bill would protect immigrants held in immigrant

3  detention in California."[19] The Assembly Committee on Judiciary analysis of the bill

4  likewise stated that it was needed "[i]n light of the changed circumstances in the

5  White House,"[20] and quotes SB-29's author as saying that the bill was necessary due

6  to "the new administration's commitment to deport millions."[21] Governor Jerry

7  Brown signed AB-103 into law on June 27, 2017, and he signed SB-29 into law a

8  few months later, on October 5, 2017.

9  **V.   The Enactment Of AB-32**

10  On December 3, 2018, Assembly Bill 32 was introduced in the California

11  Legislature. AB-32 builds on SB-29 and AB-103 by amending the California Penal

12  Code in two principal ways.

13  First, it generally prohibits the California Department of Corrections and

14  Rehabilitation from contracting with private, for-profit prison facilities to house state

15  inmates. As enacted, Section 1 of AB-32, codified at California Penal Code § 5003.1,

16  prohibits CDCR from entering or renewing a "contract with a private, for-profit

17  prison facility located in or outside of the state" to house or incarcerate state prison

18  inmates.

19  Significantly, Section 1 of AB-32 contains an exception permitting the CDCR

20  to "renew or extend a contract with a private, for-profit prison facility to provide

21  housing for state prison inmates in order to comply with the requirements of any

22  court-ordered population cap." Cal. Penal Code § 5003.1(e). California's prison

23  system is subject to a court-ordered population cap in which its total prison

24  population may not exceed 137.5 percent of the prisons' design capacities.

---

[19] Senate Rules Comm., Senate Floor Analyses for SB-29, 2017–18 Sess., at 5 (Cal. May 27, 2017), https://bit.ly/2O9c3eP, Ex. O at 172.

[20] Assemb. Comm. on Judiciary, Analysis of SB-29, 2017–18 Sess., at 2 (Cal. June 27, 2017), https://bit.ly/2O9c3eP, Ex. P at 177.

[21] *Id.*, Ex. P at 179.

*See generally Brown v. Plata*, 563 U.S. 493 (2011); *Coleman v. Brown*, 952 F. Supp. 2d 901 (E.D. Cal. 2013). As of December 1, 2019, California's prison system was operating at 131.2 percent of design capacity. Its male institutions were at 131.3 percent of capacity, while its female institutions were at 129.9 percent of capacity.[22]

Second, Section 2 of AB-32 generally prohibits the operation of a private detention facility in the State of California, including a facility housing federal detainees. The prohibition is codified at California Penal Code § 9501: "Except as otherwise provided in this title, a person shall not operate a private detention facility within the state." Section 9500, defines the key terms as follows:

(a) "Detention facility" means any facility in which persons are incarcerated or otherwise involuntarily confined for purposes of execution of a punitive sentence imposed by a court or detention pending a trial, hearing, or other judicial or administrative proceeding.

(b) "Private detention facility" means a detention facility that is operated by a private, nongovernmental, for-profit entity, and operating pursuant to a contract or agreement with a governmental entity.

Section 9502 then enumerates a series of exceptions to Section 9501's prohibition on the operation of private detention facilities, but as discussed below, these exceptions apply almost exclusively to state private detention facilities, not to federal facilities.

Finally, Section 9505 contains two additional exceptions to the prohibition against the operation of private detention facilities set forth in Section 9501. The first, Section 9505(a), is a temporary safe-harbor provision:

Section 9501 does not apply to . . . [a] private detention facility that is operating pursuant to a valid contract with a governmental entity that was in effect before January 1, 2020, for the duration of that contract, not to include any extensions made to or authorized by that contract.

The second, Section 9505(b), provides a more categorical exception at the option of the CDCR: "Section 9501 does not apply to . . . [a] private detention facility contract

---

[22] CAL. DEP'T OF CORR. AND REHAB., MONTHLY REPORT OF POPULATION (Dec. 1, 2019), https://bit.ly/38ZnK07, Ex. Q at 188.

renewed pursuant to subdivision (e) of Section 5003.1." Subdivision (e) of Section 5003.1, as noted above, allows the CDCR to use private facilities "in order to comply with the requirements of any court-ordered population cap."

Thus, after January 1, 2020 (the effective date of AB-32), the operation of a federal private detention facility will generally be prohibited in California unless the contract was in effect before January 1, 2020. As described above, this will cause the closure of at least ten privately operated facilities totaling 10,925 beds, which represent the overwhelming majority of detention capacity held by the Federal Government in the State of California.  Martin Decl. ¶¶ 4, 12, 14 n.1, 16, 22, 27, 33, 38, 43, 45. GEO manages seven of the privately operated facilities for USMS and ICE, totaling 5,727 beds. *Id.* ¶¶ 4, 12, 16, 22, 27, 33, 38.

On the day he introduced AB-32, Assembly Member Rob Bonta issued a press release in which he denounced "the Trump Administration['s] . . . cruel immigration policies" and criticized GEO for "facilitating the Trump Administration's political agenda."[23] Similarly, the Senate Floor Analysis of AB-32 anticipated litigation challenging its constitutionality by "this anti-immigrant President's Administration."[24] And Christina Fialho, co-founder of Freedom for Immigrants—a group listed as a supporter of AB-32 in the Senate Floor Analysis[25]—observed that AB-32 "will deal a critical blow to the Trump administration's efforts to further expand its system of immigration detention, especially as other states follow our lead."[26] Governor Newsom signed AB-32 into law on October 11, 2019.

---

[23] Press Release, Assembly Member Rob Bonta, *Bonta Introduces Bills Ending State's Involvement in For-Profit, Private Prison Industry* (Dec. 3, 2018), https://bit.ly/2Pga7Ch, Ex. R at 191.

[24] Senate Rules Comm., Senate Floor Analyses for AB-32, 2019–20 Sess., at 5 (Cal. Sept. 9, 2019), https://bit.ly/35htShk, Ex. S at 198.

[25] *Id.*, Ex. S at 206.

[26] Don Thompson & Amy Taxin, *California To End its Use of Private, For-Profit Prisons*, ASSOCIATED PRESS (Oct. 11, 2019), https://bit.ly/2Pgb6C6, Ex. T at 208.

**ARGUMENT**

"A party seeking a preliminary injunction must meet one of two variants of the same standard." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017). As articulated by the Supreme Court, " [a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). "In the Ninth Circuit, a plaintiff may also obtain a preliminary injunction by showing serious questions go[ ] to the merits of its claims and a balance of hardships that tips sharply towards the plaintiff, so long as it makes a showing on the other two factors." *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018) (alteration in original) (quotation marks omitted). GEO is entitled to a preliminary injunction under either test.

**I.     GEO Is Likely To Succeed On The Merits.**

AB-32 is unconstitutional under two related doctrines that, consistent with the Supremacy Clause, prohibit state interference with the implementation of federal law: (1) intergovernmental immunity and (2) preemption. *See North Dakota v. United States*, 495 U.S. 423, 434 (1990) (plurality opinion). In the alternative, under AB-32's temporary safe-harbor provision, GEO's USMS contract for its Western Region facility continues to be valid under state law through September 30, 2027; its contract for its El Centro facility continues to be valid through September 25, 2028; and its ICE contracts continue to be valid through December 19, 2034.

**A.     AB-32 Violates The Intergovernmental-Immunity Doctrine.**

The Supreme Court first recognized the doctrine of intergovernmental immunity two hundred years ago in the foundational case of *McCulloch v. Maryland*. Maryland had attempted to enforce a state tax against a branch of the Bank of the United States. 17 U.S. (4 Wheat.) 316, 317–21 (1819). The Supreme Court held that

the supremacy of the Federal Government within its legitimate sphere of action necessarily meant that the States had no power to interfere with a constitutionally valid federal activity. *Id.* at 427–30. Because "the power to tax involves the power to destroy," the Court held that Maryland's tax was unconstitutional. *Id.* at 431.

In so holding, the Court set forth the canonical formulation of the intergovernmental-immunity doctrine:

> [T]he states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequence of that supremacy which the constitution has declared.

*Id.* at 436. In short, "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). AB-32 violates intergovernmental immunity twice over, for it both directly regulates the Federal Government and it discriminates against the Federal Government and its contractors.

### 1.   AB-32 directly regulates the Federal Government.

A state violates the doctrine of intergovernmental immunity when it purports to directly regulate the Federal Government. *See North Dakota*, 495 U.S. at 436. Direct regulation can manifest itself in different ways. For example, a state may not require the Federal Government to obtain a permit or license in order to carry out a federal function, even if the permit or license requirement is generally applicable. *See, e.g.*, *Hancock v. Train*, 426 U.S. 167, 179–80 (1976) (state could not require federal installations to obtain a state permit to operate an air contaminant source); *Mayo*, 319 U.S. at 447–48 (Secretary of Agriculture could not be required to submit to state inspection and pay inspection fee for fertilizer imported into the state); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839–42 (9th Cir. 2014) (state could not regulate the way in which a contractor conducted environmental remediation on behalf of the Federal Government). Because there can be no doubt that AB-32

1    directly and substantially interferes with federal operations at GEO's USMS and ICE
2    facilities, AB-32 is an unconstitutional form of direct regulation.

3            The Supreme Court has repeatedly held unconstitutional the application of
4    generally applicable state laws to federal activities under the
5    intergovernmental-immunity doctrine. For example, in *Johnson v. Maryland*, a Post
6    Office employee who was delivering U.S. mail was arrested for driving without a
7    state-issued driver's license. 254 U.S. 51, 55 (1920). The Supreme Court
8    acknowledged that "an employee of the United States does not secure a general
9    immunity from state law while acting in the course of his employment," and that state
10   laws that "merely touch the Government servants remotely"—such as laws
11   "regulating the mode of turning at the corners of streets"—might very well be
12   constitutional. *Id.* at 56–57. Nonetheless, the Court held Maryland's generally
13   applicable driver's license law unconstitutional as applied to federal employees
14   carrying out their federal functions because the driver's license law "la[id] hold of
15   [federal employees] in their specific attempt to obey orders and requires
16   qualifications in addition to those that the Government has pronounced sufficient."
17   *Id.* at 57. While generally applicable laws that incidentally and minimally burden
18   federal activities do not run afoul of intergovernmental immunity, *see Hancock*, 426
19   U.S. at 179, such laws are unconstitutional to the extent that they substantially
20   interfere with federal operations, *see id.* at 180; *Mayo*, 319 U.S. at 447–48; *Arizona
21   v. California*, 283 U.S. 423, 451 (1931) (state could not require the Secretary of
22   Interior to submit plans for building a federal dam and reservoir to a state engineer
23   for approval); *see also Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir.
24   1996) (holding that the generally applicable California Resort Act could not be
25   applied to the Federal Government's operations at Yosemite National Park).

26           The same principle holds true when general state laws are applied to federal
27   activities carried out by federal contractors. In *Osborn v. Bank of the United States*,
28   22 U.S. (9 Wheat.) 738 (1824), the Supreme Court held that "the right of the State to

control [a federal contractor's] operations, if those operations be necessary to its character, as a machine employed by the government, cannot be maintained." *Id.* at 867 (Marshall, C.J.). The rule announced in *Osborn* has been repeatedly reaffirmed by the Supreme Court. In *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174 (1988), the Supreme Court held that "a federally owned facility performing a federal function is shielded from direct state regulation, even though the federal function is carried out by a private contractor, unless Congress clearly authorizes such regulation." *Id.* at 181.[27] Because states can just as readily interfere with federal operations by regulating the activities of federal contractors as by regulating the activities of federal employees, the doctrine must extend to both. *See Hancock*, 426 U.S. at 174 n.23, 180 (generally applicable environmental regulations invalid as applied to a private contractor operating federal uranium-enrichment facility); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 189–90 (1956) (state could not require a federal contractor to obtain a license before constructing facilities at an Air Force Base); *see also United States v. City of St. Paul*, 258 F.3d 750, 754 (8th Cir. 2001).

Nor has the Supreme Court limited the application of intergovernmental immunity to contractors operating federally owned facilities. For example, in *Public Utilities Commission of California v. United States*, 355 U.S. 534 (1958), California prohibited common carriers from transporting federal property at reduced rates without first obtaining the permission of the state's Public Utilities Commission. *Id.* at 535–39. The Court held the State's common-carrier law invalid, pointing to "[t]he seriousness of the impact of California's regulation on the action of federal procurement officials." *Id.* at 544. The Court did so even though the immediately regulated parties were private contractors using privately owned vehicles to transport

---

[27] The Court ultimately held that the state regulation could be applied to the nuclear facility because federal law authorized the state's workers' compensation scheme. *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 182 (1988). But the important point is that the Supreme Court drew no distinction between federal activities carried out by federal employees and federal activities carried out by federal contractors for purposes of intergovernmental immunity.

property on non-federal highways. *See id.* at 537 & n.2. What mattered was that the *activity* in question was *federal* activity, and California had no power to interfere with it. *See also Paul v. United States*, 371 U.S. 245, 254–55 (1963) (California minimum wholesale price regulation invalid as applied to milk contractor selling to Travis Air Force Base); *United States v. Ga. Pub. Serv. Comm'n*, 371 U.S. 285, 292–93 (1963).

In line with this precedent, the Ninth Circuit has squarely held that intergovernmental immunity forbids a state from substantially interfering with federal activity carried out by a private contractor, even where the activity occurs on private land. In *Boeing Co. v. Movassaghi*, California enacted a statute imposing environmental-remediation standards on a site that had been contaminated with radiological material over the course of several decades by the Federal Government and its contractor, Boeing. 768 F.3d at 837–38. A small portion of the site was owned by NASA, but the remainder of the site was owned by Boeing. *Id.* at 834. Because the radiological contamination was entirely the result of federal activity, the Federal Government had taken responsibility for remediating it. *Id.* at 835, 839. The Government had hired Boeing to implement the remediation of the site under federal direction. *Id.* at 836.

Even though the statute purportedly applied to Boeing as a private contractor conducting federal activities at a site that was owned almost entirely by Boeing, the Ninth Circuit held that California's statute constituted impermissible direct state regulation of federal activities in violation of the intergovernmental-immunity doctrine. The statute "directly interfere[d] with the functions of the federal government" by "mandat[ing] the ways in which Boeing render[ed] services that the federal government hired Boeing to perform"; it "replace[d] the federal cleanup standards that Boeing ha[d] to meet to discharge its contractual obligations to DOE with the standards chosen by the state"; and it "regulate[d] not only the federal contractor but the effective terms of federal contract itself." *Id.* at 840. Relying on *Goodyear*, the Ninth Circuit held that "[t]he federal government's decision to hire

Boeing to perform its cleanup work d[id] not affect the legal analysis." *Id.* at 839. As the Ninth Circuit observed in a subsequent case: "For purposes of intergovernmental immunity, federal contractors are treated the same as the federal government itself." *United States v. California*, 921 F.3d 865, 882 n.7 (9th Cir. 2019).

*Boeing* is directly applicable here, and in conjunction with the foregoing Supreme Court precedent, it requires holding that AB-32 violates intergovernmental immunity as applied to GEO's ICE and USMS facilities. As in *Boeing*, the activity being carried out by GEO is federal activity. *See also Goodyear Atomic Corp.*, 486 U.S. at 180–81; *Pub. Utils. Comm'n of Cal.*, 355 U.S. at 544; *Leslie Miller, Inc.*, 352 U.S. at 189–90. In fact, the activity at issue here is *inherently* federal: *only* the Federal Government or its authorized contractor may detain aliens and federal criminal defendants. As in *Boeing*, California seeks to "directly interfere[ ] with the functions of the federal government" with respect to the detention of aliens and federal prisoners. 768 F.3d at 840. Indeed, while in *Boeing* California only sought to regulate *how* the contractor carried out its federal activities, here California seeks to *prohibit* the contractor from carrying out an activity that only the Federal Government can perform, a paradigmatic violation of intergovernmental immunity that makes this an easy case. *See Hancock*, 426 U.S. at 179–80.

Indeed, Section 9501 effectively prohibits the Federal Government from using *any* private detention facilities in the State, requiring it instead to directly operate such facilities using federal employees. Simply put, California cannot bar the Federal Government from using private contractors to carry out a uniquely federal function.

There can be no question that AB-32 substantially interferes with federal operations. Once it takes full effect, *every dedicated ICE detention center in California* would be required to shut down, leaving only a few non-dedicated facilities capable of housing only a small fraction of the average daily population of

ICE detainees in the State.[28] The same is true of the Federal Government's USMS facilities in the Southern District of California. Under AB-32, two of the three USMS facilities in the San Diego area (GEO's Western Region Detention Facility and the El Centro Service Processing Center) would be shut down, depriving USMS of nearly two-thirds of its beds in the San Diego area.[29] The next-closest USMS facilities in California that are *not* privately run are located in Santa Ana, which is not even in the Southern District, and could house only a fraction of the average daily population of the Western Region facility.[30] This restriction constitutes substantial interference under any definition of that phrase, and AB-32 is therefore unconstitutional.

### 2.    AB-32 discriminates against the Federal Government.

Like the prohibition of direct state regulation of Federal Government functions, the constitutional prohibition of state regulatory discrimination against the Federal Government prevents states from "defeat[ing] the legitimate operations of a supreme government." *McCulloch*, 17 U.S. (4 Wheat.) at 427. If a state legislature had the authority to tax or regulate the Federal Government's operations without imposing the same tax or regulation on the state's own activities, it could do so without fear of political repercussion from its constituents. *Id.* at 128; *South Carolina v. Baker*, 485 U.S. 505, 525 n.15 (1988). In short, "[t]he nondiscrimination rule finds its reason in the principle that the States may not directly obstruct the activities of the Federal Government." *North Dakota*, 495 U.S. at 437–38 (plurality opinion).[31]

---

[28] ERO CUSTODY MGMT. DIV., AUTHORIZED DEDICATED FACILITY LIST (Dec. 2, 2019), https://bit.ly/2PXHNmM, Ex. U at 210–11.

[29] DETENTION POPULATION, *supra* note 5, at 2, Ex. I at 126.

[30] Martin Decl. ¶ 11; DETENTION POPULATION, *supra* note 5, at 2, Ex. I at 126.

[31] It does not matter whether the discriminatory state law does, in fact, interfere with federal operations; unlike the direct-regulation line of cases (which prohibit only substantial interference with federal operations), the intergovernmental-immunity doctrine forbids *any* discrimination against the Federal Government, no matter how *de minimis* its burden on federal activity. *See Dawson v. Steager*, 139 S. Ct. 698, 704 (2019); *United States v. California*, 921 F.3d 865, 883 (9th Cir. 2019) ("Supreme

1   And because the Federal Government often uses private contractors to carry

2   out its activities, the nondiscrimination principle protects federal contractors just as

3   it protects the Federal Government itself:

4       Since a regulation imposed on one who deals with the Government has
        as much potential to obstruct governmental functions as a regulation
5       imposed on the Government itself, the Court has required that the
6       regulation be one that is imposed on some basis unrelated to the object's
        status as a Government contractor or supplier, that is, that it be imposed
7       equally on other similarly situated constituents of the State.

8   *Id.* at 438. Accordingly, a state must "treat those who deal with the [Federal]

9   Government as well as it treats those with whom it deals itself." *Phillips Chem. Co.*

10  *v. Dumas Indep. Sch. Dist.*, 361 U.S. 376, 385 (1960); *see also Davis v. Mich. Dep't*

11  *of Treasury*, 489 U.S. 803, 814–15 (1989); *Boeing*, 768 F.3d at 842–43.

12      In applying the non-discrimination principle, the key question is whether the

13  state law in question "treat[s] similarly situated persons differently." *Dawson v.*

14  *Steager*, 139 S. Ct. 698, 705 (2019). State laws that treat similarly situated state and

15  federal contractors differently are invalid. "[T]he State's interest in adopting the

16  discriminatory [law], no matter how substantial, is simply irrelevant." *Id.* at 704

17  (quotation marks omitted). In assessing whether two classes are similarly situated,

18  courts ask whether there are "significant difference[s]" between the state and federal

19  classes that are "directly related to" the differential treatment. *Id.*; *Davis*, 489 U.S. at

20  815–16; *Phillips Chem. Co.*, 361 U.S. at 383.

21      There can be no doubt that AB-32 does, in fact, discriminate against the

22  Federal Government. Section 9501 prohibits *a type of activity* in which both state and

23  federal contractors engage: the "operat[ion] [of] . . . private detention facilit[ies]

24  within the state." Section 9500(b) defines "private detention facility"—the operative

25  term in Section 9501's prohibition—without distinguishing between state and federal

26  facilities; nor does the definition of "detention facility" in Section 9500(a) distinguish

27  
────────────────────
28  Court case law compels the rejection of a *de minimis* exception to the doctrine of
    intergovernmental immunity.").

NEWMEYER
DILLION

between state and federal facilities. Accordingly, there can be no question that state and federal contractors operating private detention facilities in California are similarly situated.

Nevertheless, AB-32 treats state private detention facilities very differently than those operated by federal contractors. The general prohibition against the operation of private detention facilities set forth in Section 9501 ostensibly applies to both, but Sections 9502(a)–(g) and 9505(b) create exceptions to the general prohibition that almost exclusively favor state contractors. Subsections 9502(a)–(b) and 9502(d)–(f) describe detention activity that is *only* carried out by the State, specifically referencing parts of the California Code under which the activity is being carried out.[32] Likewise, the exception contained in Section 9505(b) applies *only* to private detention facilities under contract with California Department of Corrections and Rehabilitation. Thus, these exceptions create a favored class of state contractors operating private detention facilities whose activity is not prohibited. States may not discriminate against the Federal Government by granting state actors the benefit of exceptions to a general rule that are denied to similarly situated federal actors. *See Dawson*, 139 S. Ct. at 705–06.

The brazen nature of this favoritism comes into sharp focus when one considers the sum-total effect of AB-32's exceptions. *See Washington v. United States*, 460 U.S. 536, 541–46 (1983) (collecting cases examining the overall effect of the regulatory scheme in determining whether a state violated intergovernmental immunity). Taken together, the net effect of the exceptions is that California systematically exempts the State's *own* contractors from the general prohibition on the operation of private detention facilities even as it enforces the prohibition against federal contractors. For instance, Section 9505(b) effectively

---

[32] Section 9502(e) does not refer to provisions of the California Code, but the Federal Government does not operate school facilities for minors, so it is clear that this exception does not apply to federal contractors.

allows the State to exempt its *entire prison system* from the prohibition set forth in Section 9501 because it can always credibly maintain that it is using any private detention facilities it wishes to operate "in order to comply with the requirements of" the population cap imposed on it by *Brown v. Plata*, 563 U.S. 493 (2011).

Once again, the Ninth Circuit's decision in *Boeing* guides the way. In that case, the California statute imposing stringent environmental-remediation standards appeared to be neutral; it did not expressly target the Federal Government for differential treatment. Instead, it applied to "a responsible party or parties" at the Santa Susana Field Laboratory. 768 F.3d at 839; *see also* CAL. HEALTH & SAFETY CODE § 25359.20(a). But this purported neutrality was, in truth, a farce, because the Federal Government was the "responsible party" at Santa Susana and the California statute singled out Santa Susana for "more stringent cleanup standards than generally applicable state environmental laws." *Boeing Co.*, 768 F.3d at 839, 843. By targeting a federal cleanup site for differential treatment not imposed on any other environmental site in the State, the California statute engaged in impermissible discrimination against the Federal Government and its contractor, Boeing. *Id.* at 842–43. Just as the California statute in *Boeing* was gerrymandered to "discriminat[e] against the federal government and against Boeing as a federal contractor," *id.* at 843, AB-32 is gerrymandered to discriminate against the Federal Government and GEO as a federal contractor, *see also United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) (ordinances discriminated against the Federal Government because "they specifically target[ed] and restrict[ed] the conduct of military recruiters").

The fact that one exception, set forth in Section 9502(c), applies to the operation of some federal private-detention facilities commonly known as halfway houses does not change the analysis. *Dawson* makes clear that the relevant comparison for purposes of determining intergovernmental discrimination is between the favored class of state entities and the disfavored class of federal entities. 139 S. Ct. at 705–06. In other words, that the State treats *some* federal contractors no

worse than *some* state contractors says nothing about whether federal contractors *as a class* are discriminated against, relative to state contractors. Section 9502(c) only shows that the State's discrimination against the Federal Government is not *total*; it does not at all detract from the reality that AB-32 systematically exempts state contractors from its prohibition while leaving the Federal Government as the target of Section 9501. *See United States v. City of Manassas*, 830 F.2d 530, 533 (4th Cir. 1987) (state statute unconstitutionally discriminated against the Federal Government even though it treated the State and Federal Governments alike in most respects), *aff'd*, 485 U.S. 1017 (1988).

Because California has gerrymandered AB-32 to treat federal contractors worse than state contractors, AB-32 discriminates against the Federal Government, and it is unconstitutional.

## B. AB-32 Is Preempted By Federal Law.

Whereas intergovernmental immunity arises directly from the Supremacy Clause even in the absence of an applicable federal statute, preemption occurs when a state regulation "conflict[s] with an *affirmative* command of Congress." *North Dakota*, 495 U.S. at 434 (emphasis added). State law "actually conflicts" with federal law, *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990), when it "stands as an obstacle to the accomplishment and execution of congressional objectives," *Nw. Cent. Pipeline v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 509 (1989). And when deciding whether a state law presents such an obstacle, courts consider "the entire scheme of the statute," and "that which needs must be implied is of no less force than that which is expressed." *Savage v. Jones*, 225 U.S. 501, 533 (1912). In other words, if the federal law's "operation within its chosen field . . . must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Id.*

AB-32 is preempted because it denies to both federal immigration and criminal law-enforcement statutes their "natural effect[s]" and obviously "frustrate[s]" their

operation. *Id.* These statutory schemes authorize ICE and the USMS to carry out their respective detention operations using private contractors. AB-32 directly undermines these authorizations, prohibiting not only what Congress permitted, but also those actions that Congress clearly *anticipated* that the Attorney General and his subordinates would take to enforce federal law.

### 1.    AB-32 is preempted by federal immigration law.

Congress's "considerable authority over immigration matters" includes the "power to detain aliens in connection with removal." *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 711 (2001) (Kennedy, J., dissenting)). Indeed, "*any policy* toward aliens" is "exclusively entrusted to the" Federal Government. *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (emphasis added). Therefore, "[w]hen the national government by treaty or statute has established rules and regulations touching the rights, privileges, obligations or burdens of aliens as such, the treaty or statute is the supreme law of the land." *Hines v. Davidowitz*, 312 U.S. 52, 62–63 (1941).

By contrast, when a state enacts any law touching on the field of immigration, whatever "concurrent state power that may exist is restricted to the narrowest of limits[,]" and must be "subordinate to supreme national law." *Id.* at 68. Because the States' historic police powers do not include immigration-related matters, the presumption against preemption—sometimes applicable for regulatory fields in which the States "have traditionally occupied," *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quotation marks omitted)—has no purchase in the immigration context, *see United States v. Arizona*, 641 F.3d 339, 348 (9th Cir. 2011), *aff'd in part, rev'd in part and remanded*, 567 U.S. 387 (2012).

The Immigration and Nationality Act (INA) provides that "[t]he Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1). And the statute expressly authorizes him to use "facilities adapted or suitably located for detention [that] are

[]available for rental." *Id.* Indeed, the statute authorizes the Attorney General to expend funds to acquire new facilities only when United States facilities are unavailable or suitable facilities are "unavailable for rental." *Id.*

The "natural effect" of Section 1231(g) is unmistakable: "Congress . . . placed the responsibility of determining where aliens are detained within the discretion of the Attorney General." *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir. 1986) (interpreting the similarly worded 8 U.S.C. § 1252(c) (1986)). And that discretion is "broad." *Id.* California may not circumscribe that discretion by prohibiting the Federal Government from contracting with private detention facility operators.

The State's attempt to limit the Attorney General's delegated discretion is unlawful for the same reasons marshalled by the Supreme Court in *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000). Massachusetts had prohibited its agencies from purchasing goods or services from companies doing business with Burma (now Myanmar). 530 U.S. at 367. Meanwhile, Congress had passed a statute imposing certain sanctions on Burma; authorizing the President to impose additional sanctions subject to certain prescribed conditions; and directing the President to develop a strategy for improving Burma's human-rights practices. *See id.* at 368–69. The Court held that this statute preempted the Massachusetts law because the state law "undermine[d] the intended purpose and 'natural effect' of at least three provisions of the federal Act." *Id.* at 373.

Most pertinent here, the Court explained that "Congress clearly intended the federal Act to provide the President with flexible and effective authority over economic sanctions against Burma." *Id.* at 374. Indeed, "[w]ithin the sphere defined by Congress . . . the statute . . . placed the President in a position with as much discretion to exercise economic leverage against Burma . . . as our law will admit." *Id.* at 375–76.

The same is true of AB-32: it undermines the grant of substantial discretion afforded to the Attorney General by the INA. And it is equally "implausible" here that Congress "would have gone to such lengths to empower" the Attorney General with such broad discretion in detaining aliens awaiting removal proceedings and yet, at the same time, "been willing to compromise his effectiveness by deference to every provision of state statute or local ordinance that might, if enforced, blunt the consequences of discretionary . . . action." *Id*. at 376. And, importantly, even *Crosby* did not confront the sort of obstacle posed by AB-32. The state law here does not merely "blunt the consequences" of the Attorney General's exercise of discretion; it narrows his sphere of discretion and essentially *prohibits* him from even taking actions authorized by the federal statute.

Settled precedent makes clear that "normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted." *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1192 (9th Cir. 2018) (quoting *Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996)). Conflict between state and federal law "does not evaporate" because the federal law "simply permits, but does not compel" federal instrumentalities to take certain acts. *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 155 (1982). For example, in *United States v. City of Pittsburg*, 661 F.2d 783 (9th Cir. 1981), the Ninth Circuit found a "clear" conflict between federal and local law where the local ordinance prohibited postal carriers from crossing lawns without first obtaining the owner's express consent, even as federal law authorized postal carriers to cross such lawns unless the owner objected. *Id.* at 785. Because the ordinance interfered with the postal carriers' federal duties to deliver mail efficiently, it was preempted. *Id.* at 786. The same is true here.

AB-32 impermissibly conflicts with the INA because it necessarily restricts the otherwise broad discretion delegated to the Attorney General for detaining aliens within the United States. However, AB-32 also conflicts with the broader federal

policies and priorities expressed in the INA. Most significantly, the INA instructs the Director of ICE,[33] "[p]rior to initiating any project for the construction of any new detention facility," to "consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use." 8 U.S.C. § 1231(g)(2). In other words, under the INA, building new federally owned immigration detention facilities should be a last resort, not to be undertaken when suitably private facilities are available for lease.

AB-32—working in tandem with California's other regulatory statutes—essentially makes it all but impossible for the Attorney General to avoid this last resort. After the passage of AB-103 and SB-29, cities, counties, and other localities in California were largely forbidden from housing federal alien detainees within their jurisdictions.

By prohibiting private detention, AB-32 all but requires the Attorney General to either build or purchase ICE facilities or begin transferring aliens out of California. In no conceivable world did Congress delegate broad authority to the Attorney General to arrange for "appropriate places of detention," only to have the States reduce him to choosing between only two oftentimes *inappropriate* options. And while Congress recognized a variety of potentially "appropriate" arrangements for housing aliens pending removal, it even explicitly disfavored one of the two options left to the Attorney General after AB-32—building or purchasing new facilities.

In particular, it is well settled that "any state law that impedes the federal government's ability to contract . . . [is] preempted." *Student Loan Servicing All. v. District of Columbia*, 351 F. Supp. 3d 26, 62 (D.D.C. 2018), *appeal dismissed sub nom. Student Loan Servicing All. v. Taylor*, No. 19-7001, 2019 WL 2158372 (D.C. Cir. May 15, 2019). In *Gartrell Construction Inc. v. Aubry*, 940 F.2d 437 (9th

---

[33] The statute identifies the Commissioner of the Immigration and Naturalization Services, but his functions have been transferred to the Director of ICE. *See* 6 U.S.C. § 557.

1    Cir. 1991), the Ninth Circuit held—consistent with longstanding Supreme Court

2    precedent—that the state's attempt to regulate contractors performing services on a

3    federal construction project was preempted. *Id.* at 438–41 (citing *Leslie Miller, Inc.*,

4    352 U.S. 187). While the Federal Government had concluded that the contractor in

5    *Gartrell* had satisfied the requirements for "responsibility" dictated by the Federal

6    Acquisition Regulations, the state imposed a parallel licensing regime that

7    "effectively attempt[ed] to review the federal government's responsibility

8    determination." *Id.* 439. Such second-guessing of the Federal Government's

9    contracting choices "interfere with federal government functions and would frustrate

10   the federal policy." *Id.* at 441.

11          This same analysis applies to AB-32: federal law requires the Attorney General

12   to arrange for "appropriate" places of detention for aliens detained pending removal

13   and authorizes him to lease private detention facilities to carry out this function. But

14   the state statute categorically *prohibits* of the use of private detention facilities.

15   AB-32 thus represents precisely the kind of second-guessing that is preempted under

16   *Gartrell Construction.*

17          No matter how one characterizes AB-32—as a limitation on the Attorney

18   General's congressionally delegated discretion, or as an interference with the Federal

19   Government's ability to contract with private entities whose facilities it deems

20   "appropriate" under the INA, or both—it clearly conflicts with federal law. AB-32 is

21   an impermissible obstacle to federal immigration law and is therefore preempted.

22          **2.      AB-32 is preempted by federal criminal law.**

23          AB-32 likewise conflicts with the Federal Government's unique interest in

24   enforcing federal criminal law. The United States has authority to detain individuals

25   accused of committing federal crimes. *See, e.g.*, *Greenwood v. United States*,

26   350 U.S. 366, 375 (1956). The United States Marshals Service—housed within the

27   Department of Justice and supervised by the Attorney General, *see* 28 U.S.C.

28   § 561(a)—is tasked with the responsibility to execute that federal function, *see*

18 U.S.C. § 4086 ("United States marshals shall provide for the safe-keeping of any person arrested, or held under authority of any enactment of Congress pending commitment to an institution.").

The federal statutory scheme also provides the Marshals with ample means for detaining federal criminal defendants. The Attorney General may contract with state or local jurisdictions to house federal detainees. 18 U.S.C. § 4002. Congress has also authorized the Attorney General to "make payments from funds appropriated for Federal prisoner detention for," among other things, "the housing, care, and security of persons held in custody of a United States marshal pursuant to . . . *contracts with private entities.*" *Id.* § 4013(a)(3) (emphasis added). In short, the Attorney General has express statutory authority to contract with "private entities" for the purpose of assisting the Marshals' detention operations.

Congress has confirmed elsewhere in the statutory scheme that the Attorney General's contracting discretion is, like in the immigration context, quite broad. In particular, "the activities of the Department of Justice . . . may, in the *reasonable discretion* of the Attorney General, be carried out through *any means*, including . . . through contracts, grants, or cooperative agreements with non-Federal parties." 28 U.S.C. § 530C(a)(4) (emphases added); *see also id.* § 530C(b)(7).

Reading 18 U.S.C. § 4013(a)(3) and 28 U.S.C. § 530C(a)(4) together, Congress has authorized the Attorney General to enter into contracts with private parties to provide for the detention of federal prisoners in non-federal institutions and has left these contracting decisions to his reasonable discretion. And as in the immigration context, AB-32 necessarily conflicts with these federal laws because it purports to withdraw from the Attorney General discretion delegated to him by Congress. *Crosby*, *City of Pittsburg*, *Leslie Miller*, and *Gartrell Construction* all preclude AB-32 from interfering with the Marshals' detention obligations by prohibiting the use of private detention facilities that Congress has expressly authorized.

The conflict between AB-32 and federal law is all the more acute when considering the Marshals' growing need for private detention, especially in the Southern District of California. Federal law authorizes the Marshals to "designate districts that need additional support from private detention entities" based on "the number of Federal detainees in the district" and "the availability of appropriate Federal, State, and local government detention facilities." 18 U.S.C. § 4013(c)(1)(A)–(B). In fact, private entities are *only* eligible to contract for the housing of persons held in custody of the Marshals if they are "located in a district that has been designated as needing additional Federal detention facilities." *Id.* § 4013(c)(2)(A).

AB-32 would, if allowed to take effect, force GEO to close the Western Region Detention Facility and the El Centro Service Processing Center, reducing the detention capacity available to the Marshals in the San Diego area by nearly two-thirds.[34] The next-closest, non-private facilities—in Santa Ana, California, roughly 90 miles from San Diego—have a combined average daily population of less than one-third the average daily population of the Western Region Detention Facility alone.[35] Congress expressly authorized the Marshals to contract for private detention in districts where other forms of detention prove inadequate. This authority is crucial in light of the Marshals' statutory obligation to remain in or near the judicial district to which they are assigned. *See, e.g.*, 28 U.S.C. §§ 561(c), (e), 566(b). And yet, AB-32 purports to nullify that authorization and override the Marshals' discretionary determination that private detention is necessary for them to fulfill their statutory obligation within the Southern District of California. AB-32 denies to federal law enforcement the very detention tools that Congress expressly provided for, and the law therefore cannot stand under bedrock preemption principles.

---

[34] DETENTION POPULATION, *supra* note 5, at 2, Ex. I at 126.

[35] Martin Decl. ¶ 11; DETENTION POPULATION, *supra* note 5, at 2, Ex. I at 126.

**C.     Alternatively, GEO Is Entitled To Continue Operating Its USMS And ICE Facilities Under AB-32's Temporary Safe-Harbor Provision.**

For the foregoing reasons, AB-32 is a direct assault on the supremacy of federal law, and GEO is entitled to a declaration that it is unconstitutional and an injunction against its enforcement *in toto*. If, however, the Court declines to grant GEO the foregoing equitable relief, it should *at a minimum* provide partial relief by declaring that AB-32's temporary safe-harbor provision protects GEO's facilities through the end of their contractual terms and enjoining Defendants from attempting to shut down GEO's facilities until the contracts terminate.

As noted earlier, Section 9505(a) of AB-32 states: "Section 9501 does not apply to . . . [a] private detention facility that is operating pursuant to a valid contract with a governmental entity that was in effect before January 1, 2020, for the duration of that contract, not to include any extensions made to or authorized by that contract." GEO's USMS and ICE detention facilities are currently operating within this temporary safe harbor.

As recounted above, USMS signed a contract with GEO in November 2017 to operate the Western Region Detention Facility, and it exercised an option on October 1, 2019 to continue the contract. Because both the original contract and the option were "in effect before January 1, 2020," GEO's Western Region contract is therefore valid under Section 9505(a) through its full contract term ending on September 30, 2027. Likewise, USMS signed its contract with GEO to operate the El Centro Service Processing Center on December 23, 2019, and because that contract was "in effect before January 1, 2020," GEO's El Centro contract is valid under AB-32's temporary safe-harbor provision through its full contract term ending on September 25, 2028.

GEO signed new contracts with ICE on December 19, 2019, with an effective date of December 20, 2019. These contracts were therefore "in effect before January

1, 2020" as to all five of GEO's ICE detention facilities: Adelanto, Desert View (as an annex to Adelanto), Mesa Verde, Central Valley (as an annex to Mesa Verde), and Golden State (also as an annex to Mesa Verde). Because GEO's new ICE contracts have a full contract term ending on December 19, 2034, these facilities are protected under AB-32's safe harbor through that date.

## II.    GEO Is Likely To Suffer Irreparable Harm Without A Preliminary Injunction.

GEO has shown a substantial likelihood that AB-32 violates the Federal Constitution and, in the alternative, that GEO's USMS and ICE contracts are protected by AB-32's temporary safe harbor through the end of the contract terms. It follows that the likely harm AB-32 would inflict on GEO during the pendency of litigation—forcing GEO to close its facilities—is irreparable. The Ninth Circuit has long maintained that a "constitutional violation alone, coupled with the damages incurred, can suffice to show irreparable harm." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (presuming irreparable harm from a preempted state law); *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) *aff'd in part, rev'd in part and remanded*, 567 U.S. 387 (2012); *Assoc. Gen. Contractors v. Coal. for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991). This presumption makes eminent sense because "constitutional violations cannot be adequately remedied through damages." *Nelson v. Nat'l Aeronautics & Space Admin.*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd on other grounds*, 562 U.S. 134 (2011).

Even if this Court does not presume irreparable harm from AB-32's conflict with the Constitution, GEO's harm is irreparable under the standard for non-constitutional injuries. "[I]rreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Az. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017) (amended opinion). GEO has no adequate

legal remedy for one obvious reason: it may not pursue a damages suit in federal court against the State of California for the immense financial harm it will suffer if AB-32 takes effect. *See* U.S. CONST. amend. XI; *Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

The Ninth Circuit regularly holds that monetary harms that cannot be compensated because of sovereign immunity are irreparable. *See, e.g.*, *California v. U.S. Dep't of Health & Human Servs.*, 941 F.3d 410, 431 (9th Cir. 2019). Where, as here, plaintiffs show that a state law violates the Supremacy Clause, any resulting monetary harm is irreparable because the Eleventh Amendment "bars the [plaintiff] from ever recovering damages in federal court." *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009) (per curiam), *vacated on other grounds and remanded sub nom. Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012). Here, GEO would suffer over $4 billion in monetary harm. Martin Decl. ¶¶ 53–56. Therefore, "because [GEO] . . . will be unable to recover damages against the [State] even if [it is] successful on the merits of [its] case, [it] will suffer irreparable harm if the requested injunction is not granted." *Id.* at 852; *see also Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 596 F.3d 1098, 1113–14 (9th Cir. 2010) ("[T]o show a risk of irreparable harm, plaintiffs may show . . . that they will lose considerable revenue . . . that they will be unable to recover due to the State's Eleventh Amendment sovereign immunity."), *vacated on other grounds and remanded sub nom. Douglas*, 565 U.S. 606.

## III.   The Public Interest And Balance Of Equities Favor An Injunction.

Because GEO has shown a strong likelihood that AB-32 violates the Federal Constitution, it has "also established that both the public interest and the balance of the equities favor a preliminary injunction." *Az. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). "[I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Valle del Sol Inc.*,

732 F.3d at 1029 (quoting *Arizona*, 641 F.3d at 366). "In such circumstances, the interest of preserving the Supremacy Clause is paramount." *Arizona*, 641 F.3d at 366 (quoting *Cal. Pharmacists Ass'n*, 563 F.3d at 853); *see also California*, 921 F.3d at 893 (reaffirming the court's "previous recognition that preventing a violation of the Supremacy Clause serves the public interest"). Moreover, the State cannot claim hardship from the preliminary injunction "because it cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

## IV. The Court Should Enter Final Judgment Awarding A Permanent Injunction.

For the foregoing reasons, GEO is entitled to a preliminary injunction against enforcement of AB-32, and because the legal questions in this case require no further factual development, permanent injunctive relief is likewise appropriate. The Ninth Circuit has held that, where a plaintiff seeking a preliminary injunction has shown a "100% probability of success on the merits" due to the legal nature of the claim, and "[n]o facts which might be adduced at a trial w[ould] change this result," courts should enter final judgment awarding a permanent injunction. *Baby Tam & Co. v. City of Las Vegas*, 154 F.3d 1097, 1102 (9th Cir. 1998), *abrogated on other grounds Dream Palace v. County of Maricopa*, 384 F.3d 990, 1002 (9th Cir. 2004). That standard is met here: "the merits of the plaintiffs' challenge are certain and don't turn on disputed facts." *Wrenn v. District of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017); *see also Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012).

## CONCLUSION

Plaintiff GEO respectfully requests that this Court declare AB-32 unconstitutional and grant its motion for a preliminary injunction and restrain Defendants from enforcing AB-32 against GEO. In the alternative, GEO respectfully requests a preliminary injunction restraining Defendants from attempting to close GEO's Western Region facility before October 1, 2027, GEO's El Centro facility

1  before September 26, 2028, and GEO's ICE facilities before December 20, 2034.

2  Finally, because there are no genuine disputes of material fact, Plaintiff also

3  respectfully requests that—regardless of whether this Court enters preliminary

4  injunctive relief on the basis of unconstitutionality or on the basis of AB-32's

5  temporary safe harbor—this Court convert its preliminary injunction into a

6  permanent injunction and enter final judgment.

7

8  Dated:    December 31, 2019

9

10                                         By: */s/ Michael B. McClellan*
                                           Michael B. McClellan, CBN 241570
11                                         NEWMEYER & DILLION LLP
                                           895 Dove Street, Fifth Floor
12                                         Newport Beach, CA 92660
                                           Telephone: (949) 854-7000
13                                         Email: Michael.McClellan@ndlf.com

14                                         Charles J. Cooper,* DC Bar No. 248070
                                           Michael W. Kirk,* DC Bar No. 424648
15                                         J. Joel Alicea,* DC Bar No. 1022784
                                           Steven J. Lindsay,* VA Bar No. 92363
16                                         COOPER & KIRK, PLLC
                                           1523 New Hampshire Avenue, NW
17                                         Washington, DC 20036
                                           Telephone: (202) 220-9600
18                                         Email: ccooper@cooperkirk.com
                                           *Appearing *Pro Hac Vice*
19
                                           Michael W. Battin, CBN 183870
20                                         NAVIGATO & BATTIN, LLP
                                           755 West A Street, Suite 150
21                                         San Diego, CA 92101
                                           Telephone: (619) 233-5365
22                                         Email: mike@navbat.com

23                                         *Attorneys for Plaintiff The Geo Group, Inc.*

24

25

26

27

28