# Exhibit F

EXHIBIT F
Page 101

## Defendants in Custody and Prisoner Management

- The U.S. Marshals Service houses and transports all federal prisoners from the time they enter federal custody until they are either acquitted or convicted and delivered to their designated federal Bureau of Prisons facility.

- The Marshals Service assumes custody for all prisoners charged with a federal offense, no matter which agency made the arrest.

- Detaining federal prisoners is challenging in its diversity and complexity. For example, the Marshals Service is responsible for:

  - Taking DNA samples of individuals arrested by the Marshals for an FBI database

  - Managing prisoners with terminal illnesses and contagious diseases

  - Deciding whether to grant the transfer of prisoners to state or local authorities when ordered through state writs

### General Management Issues

- **Public Defender's Handbook -** Provided to assist the attorney when dealing with a fact witness.

- **Prisoner Photographs -** Guidelines on Publicity and Photography of Federal Prisoners

- **Prisoner Marriages -** Guidelines and Procedures

- **Writs and Special Productions**

- **Bureau of Prisons -** This website provides a variety of information including a directory of all federal prisons and community corrections centers, an inmate locator, inmate information and inmate programs/services.

### Medical Care

- The Marshals Service relies on state and local jails as well as Bureau of Prisons detention facilities to provide medical care inside the facilities. However, the Marshals Service is responsible for providing a secure escort and for paying for care when a prisoner must go to medical facilities in the local community.

- **Health care standards utilized for prisoners and defendants in custody**

### Custody and Detention

- **Jail Recommended Practices - Suicide Prevention Program**

- **Federal Performance-Based Detention Standards**

Individuals who are arrested or detained for violation of federal statutes must be brought before a magistrate or judge for an initial hearing. After the hearing, prisoners may be released or remanded into the custody of the respective U.S. Marshal to stand trial. If convicted at the actual trial, it is the agency's responsibility to deliver the prisoner to an institution to serve the imposed sentence. **Read more about detention services and management.**

The Marshals Service is dependent upon state or local governments for the provision of detention space and services for federal prisoners. In support of this requirement, agreements are established with local and state governments willing to provide detention space for federal prisoners. **Further Guidance on e-IGA procedures**

Criteria used to evaluate fixed per diem rates based on actual and allowable costs will be in accordance with the Office of Management and Budget **(OMB) Circular A-87,** *Cost Principles for State, Local, and Indian Tribal Governments.* OMB Circular A-87 establishes principles and standards to provide a uniform approach for determining costs and will be strictly adhered to.

---

Prisoners

**Important Information:**

**Guidance on e-IGA Procedures**

**Protecting Our Collective Interests**

---

EXHIBIT F
Page 103

# Exhibit G

# U.S. Marshals Service

Justice. Integrity. Service.                    U.S. Department of Justice



Fact Sheet

# Prisoner Operations

## 2019

▸ The U.S. Marshals Service prisoner detention mission is a complex and multilayered function. The Marshals are responsible for preserving the integrity of the federal judicial process by overseeing all detention management matters for individuals remanded to U.S. Marshals custody.

▸ The Marshals provide safe, secure and humane custody, housing, medical care and transportation for federal prisoners throughout the United States and its territories.

| *Fiscal 2018 Data* | |
|---|---|
| Total obligations for federal prisoners in U.S. Marshals custody* | $1.61 billion |
| Prisoners escorted by USMS to court appearances and other required events | 934,074 |
| **Total** average daily detention population | **55,872** |
| • State and local facilities | 36,313 |
| • Federal Bureau of Prisons facilities | 9,705 |
| • Private facilities (contracted) | 9,854 |
| Prisoners received | 238,897 |
| Agreements with state and local governments for use of detention space | approx. 1,100 |
| Contracts with privately managed detention facilities | 13 |
| Average daily prisoner detention cost | $90.19 |

*Funded by Federal Prisoner Detention appropriation (separate from U.S. Marshals Service appropriation)

## *Prisoner Custody*

▸ Individuals arrested for federal offenses are brought before a U.S. magistrate or U.S. district court judge for their initial court appearances. The court determines whether prisoners are to be released on bond or remanded to the custody of the Marshals to await trial. Generally, slightly more than 65 percent of those arrested by federal agencies are detained at some point in the judicial process.

▸ The Marshals received approximately 239,000 individuals in fiscal 2018, or about 915 people a day, and escorted more than 900,000 prisoners, or 3,593 prisoners per day, to court appearances or for other matters in the 94 federal judicial districts in more than 300 court cities.

▸ Upon conviction, the Marshals generally deliver prisoners to their designated Federal Bureau of Prisons institutions to serve their sentences. Prisoners who receive short-term sentences of 90 days or less may serve their sentences in U.S. Marshals custody.

▸ The detention of federal prisoners presents diverse and complex challenges, including:
  • Locating detention space near federal courthouses to facilitate court proceedings and attorney access
  • Coordinating with federal, state and local authorities regarding the execution of writs, court orders and the transfer of prisoners
  • Separating multiple co-defendant prisoners from each other to ensure their safety and security and the effective operation of the judicial system
  • Managing prisoners with contagious diseases and chronic illnesses

Office of Public Affairs
April 3, 2019
www.usmarshals.gov

## Prisoner Housing

▸ The Marshals Service does not own or operate detention facilities but partners with state and local governments using intergovernmental agreements to house prisoners. Additionally, the agency houses prisoners in Federal Bureau of Prisons facilities and private detention facilities.

▸ As both defense attorneys and prosecutors require routine access to prisoners, the Marshals attempt to house prisoners in close proximity to the judicial district in which they are prosecuted.

▸ The Marshals annually review state, local and private detention facilities that house federal prisoners to ensure the safe, secure and humane care and custody of those prisoners.

## Prisoner Medical Care

▸ The Marshals Service is responsible for ensuring medically necessary health care is provided to prisoners in its custody.

▸ In fiscal 2018, the Marshals expended $95 million for prisoner medical services.

▸ The agency is limited to paying Medicare rates for medical services provided to federal prisoners, per 18 U.S. Code § 4006.

## Media Requests for Prisoner Information, Interviews and Booking Photos

▸ The Marshals Service does not disclose any personal information, court scheduling, transportation details or other inmate information, other than to verify an inmate is in federal custody.

▸ Prisoner interview requests may be granted when there is no objection from the U.S. attorney or prosecutor of record, the presiding trial judge, the prisoner, the defense attorney, and the management of the detention facility where the prisoner is located. It is the responsibility of media representatives to obtain the aforementioned documentation in writing and provide it to the U.S. marshal, chief deputy U.S. marshal, or the Office of Public Affairs. Upon receipt of the required documentation, the U.S. Marshals will consider the request. Any prisoner interview requests of terrorism-related defendants must be approved, in advance, by the Federal Bureau of Prisons and DOJ National Security Division.

▸ The Marshals generally do not release prisoner mug shots (booking photos) for privacy reasons. (For the policy, see www.usmarshals.gov/foia/policy.)

Office of Public Affairs
April 3, 2019
www.usmarshals.gov

# Exhibit H

# United States Marshals Service
# FY 2020 Performance Budget
# President's Budget

# Federal Prisoner Detention Appropriation



# March 2019

# I.   Federal Prisoner Detention (FPD) Overview

## A.   Introduction

The USMS Federal Prisoner Detention (FPD) appropriation provides housing, transportation, and care for Federal detainees housed in non-Federal detention facilities.  The USMS requests a total of 27 positions, 27 full-time equivalent (FTE), and $1,867,461,000 for FPD in FY 2020.

| Federal Prisoner Detention | | | |
|---|---|---|---|
| | Positions | FTE | Amount ($000) |
| FY 2018 Enacted | 27 | 21 | $1,536,000 |
| FY 2019 Continuing Resolution | 27 | 27 | $1,536,000 |
| FY 2020 Request | 27 | 27 | $1,867,461 |

The USMS is not requesting enhancements for information technology (IT).  The request includes nine positions, nine FTE and $18,850,000 for base IT activities as reported in the Agency IT Portfolio Summary.  The FPD account currently has one IT position.  The nine positions reported in the Agency IT Portfolio Summary reflect all USMS FTE that support a detention function.  The IT resources provide for support staff; hardware; applications providing access to electronic Intergovernmental Agreements (eIGAs), detention facility information, facility contract information, and prisoner movement; and an e-Gov site providing secure role-based access to detention information.

Electronic copies of the Department of Justice's Congressional Budget Justifications and Capital Asset Plan and Business Case exhibits can be viewed or downloaded from the Internet using the Internet address: http://www.justice.gov/02organizations/bpp.htm.

## B.   Background

The FPD appropriation pays for costs associated with the care and custody of Federal detainees in private, state, and local facilities.  The sole purpose of the FPD appropriation is detention.  The USMS is required to house all prisoners remanded to the custody of the Attorney General, and must ensure sufficient resources are available to house and care for its detainees.

The USMS continues to refine and improve detention operations to be more cost-effective and more responsive to the requirements of the changing detention environment.  Although fluctuations in the Average Daily Population (ADP) are largely outside of the USMS' direct control, the USMS continues to coordinate the acquisition of sufficient detention space in the most cost-efficient manner possible.  This objective becomes more challenging in times when detention space availability is limited.  The USMS continues to aggressively seek efficiencies; work with Federal, state, and local partners regarding bed space; and reduce contract costs.  These measures also help contain detention expenditures.

1

Additionally, law enforcement and prosecutorial priorities directly impact USMS detention resource needs, as increases in arrests and prosecutions lead to increases in FPD's ADP. Linking law enforcement initiatives and detention funding requests is essential to provide the Congress with accurate population projections and budgetary resource needs.

The FPD's budget requirement for any given fiscal year is always based on the most current information available regarding the detainee population at the time.

**Prisoner Population:** The USMS experienced a decreasing detention population from FY 2011, when total ADP peaked at 61,701, through FY 2017. The declining Federal detention population over this six-year period was directly attributable to a decrease in the number of prisoners charged with offenses in Federal courts and to prisoners spending less time in detention.

In addition, ongoing initiatives such as fast-track prosecution of selected offenses, expedited designation and transfer of sentenced prisoners to the Bureau of Prisons (BOP), and alternatives to detention have proven successful at reducing detention time, particularly during the post-sentencing period, and resulted in a substantial decrease in the detention population from peak levels.

In April 2017, ADP reached a 13-year low. At that time, the monthly overall ADP was 48,779, including 39,000 detainees housed in non-federal space (for whom detention costs are paid for by the FPD appropriation). However, ADP has since increased at an unprecedented rate, even during months in which it has typically declined during recent years. At the end of February 2019, non-federal ADP was 50,718 – an increase of 30 percent since April 2017.

In the fourth quarter of FY 2017, the USMS began to see an increase in the number of prisoners received, particularly in immigration offenses. In FY 2018, the USMS received 113,646 prisoners with immigration offenses, an increase of 94 percent from the 58,663 prisoners received in FY 2017. The USMS projects it will receive 104,637 prisoners with immigration offenses during FY 2019. For FY 2020, USMS projects it will receive 96,836 immigration offenders, a decrease of seven percent from FY 2019.

Although the USMS anticipates and projects a further increase in immigration activities, the "zero tolerance" policy change has not significantly affected overall detention requirements beyond the initial increased estimate. This is because first-time immigration offenders facing criminal prosecution generally spend minimal time in USMS detention. The USMS projects it will receive 233,898 total prisoners during FY 2020, a decrease of approximately 2% from the 237,363 prisoners projected for FY 2019. However, if zero tolerance implementation leads to future changes in prosecution, court operations, or adjudication patterns that require longer detention in USMS custody, costs for criminal detention attributable to this initiative could become significant.

2

EXHIBIT H
Page 110



**USMS Average Daily Detention Population, FY 2010 through 2020**

\* Data shown for FY 2019 and FY 2020 reflect FPD projections as of January 31, 2019.  All other data shown are FY actuals.

**Projecting the Prisoner Population:**  Projecting the ADP for the detention account is a challenging exercise due to the complexity and dynamic nature of the variables used to calculate projections.  For example, detention projections are calculated using reliable trend analyses comprised of several leading indicators that are factored into the projection with a significant degree of accuracy, such as types of bookings, time in detention, law enforcement and attorney staffing levels.  However, other influences (frequently established outside of the budget process) can also have substantial influence on detention needs, such as special law enforcement and prosecutorial initiatives.  For this reason, population projections are in a fairly constant state of flux and require periodic adjustments.  Despite the complexities of projecting the detention population, building the budget request using current patterns and trends keeps the budget in alignment with detention requirements.

**Average Daily Detention Population and
Prisoners Received, by Offense
Fiscal Year 2010 through 2020**

| Fiscal Year | Total ADP | Total Prisoners Received | Immigration | Drugs | Weapons | Other |
|---|---|---|---|---|---|---|
| 2010 | 59,487 | 211,032 | 82,977 | 30,253 | 8,335 | 89,467 |
| 2011 | 61,701 | 210,822 | 84,341 | 31,087 | 8,090 | 87,304 |
| 2012 | 60,467 | 207,433 | 91,527 | 28,937 | 8,590 | 78,379 |
| 2013 | 59,219 | 222,504 | 98,027 | 28,382 | 8,305 | 87,790 |
| 2014 | 55,170 | 204,633 | 82,178 | 24,525 | 7,578 | 90,352 |
| 2015 | 51,777 | 196,662 | 71,402 | 24,970 | 8,365 | 91,925 |
| 2016 | 51,316 | 197,498 | 68,743 | 26,921 | 9,248 | 92,586 |
| 2017 | 50,492 | 186,471 | 58,663 | 25,603 | 10,300 | 91,905 |
| 2018 | 55,826 | 238,897 | 113,646 | 25,467 | 11,995 | 87,789 |
| 2019* | 61,088 | 237,363 | 104,637 | 27,699 | 11,617 | 93,410 |
| 2020* | 62,159 | 233,898 | 96,836 | 29,142 | 11,758 | 96,162 |

* Data shown for FY 2019 – FY 2020 reflect FPD projections as of January 31, 2019.  All other data shown are FY actuals.

**Detention Population Forecasting Model:** The USMS uses a statistical approach to predict detention needs.  The Detention Population Forecasting Model incorporates factors such as population, demographic trends, number and type of criminal cases processed, average processing time per type of case, and authorized/requested positions of Federal law enforcement, U.S. Attorneys, U.S. District Court judges, and immigration judges.  These factors allow for the development of impact scenarios that address proposed legislation, known DOJ law enforcement initiatives, and current activities.  The USMS bases detention projections on past performance and behavior of the players involved.  Any shift in behavior may alter the outcome.

The detention population projection for FY 2020 is a particularly challenging assessment for the USMS.  The long-term trend prior to FY 2011 reflected steady annual increases in the number of prisoners received, which translated directly to increases in the overall detention population.  However, from FY 2011 to FY 2017, the number of prisoners received for prosecution significantly decreased and overall ADP decreased from 61,701 to 50,492.  This decrease may have been due to factors such as reduced funding for Federal law enforcement agencies and changes in prosecutorial practices and priorities.  Conversely, based on increases observed in FY 2018, it appears that the downward trend was temporary.  Prosecutorial activity has substantially increased after this period of stagnation, particularly as a result of the change in Administration and prosecutorial priorities.

4

As shown in the chart below, the primary drivers of detention expenditures are the number of prisoners booked by the USMS and the length of time those prisoners are held in detention. However, both of these factors are directly influenced by activities and decisions throughout Federal law enforcement components, U.S. Attorneys offices, and the Federal judiciary. Accordingly, the USMS regularly monitors – and tries to anticipate – changes in Federal law enforcement priorities and the number of on-board staff.



## *Primary Drivers of Detention Expenditures*



**Capital Improvement Program (CIP):**  The CIP is a comprehensive program used to address detention space needs in critical areas.  The program offers various contractual vehicles to provide Federal funding to state and local authorities for the expansion, renovation, and construction of jails or the acquisition of equipment, supplies, or materials in exchange for detention beds.  The USMS has approximately 70 active CIP agreements that provide detention beds in critical areas. This program remains an essential tool in helping the USMS provide adequate detention beds in areas where space is limited.  Due to recent decline in prisoner population, there has not been a need for additional bedspace.  Currently, the USMS is revamping the CIP to better identify district needs and possible CIP projects.

The program consists of two parts:  the Cooperative Agreement Program (CAP) and Non-Refundable Service Charge Contract (NSCC).  CAP provides Federal resources to select state and local governments to renovate, construct, and equip detention facilities in return for guaranteed bed space for a fixed period of time for Federal detainees in or near Federal court cities.  The NSCC allows the USMS to directly contract with state and local governments providing up-front funding for renovation or construction of jails to house Federal detainees in

5

## IV.  Program Activity Justification

| *Detention Services* | Direct Pos. | Estimate FTE | Amount |
|---|---|---|---|
| 2018 Enacted | 27 | 21 | $1,536,000 |
| 2019 Continuing Resolution | 27 | 27 | $1,536,000 |
| Adjustments to Base and Technical Adjustments | 0 | 0 | $978 |
| 2020 Current Services | 27 | 27 | $1,536,978 |
| 2020 Program Increases | 0 | 0 | $330,483 |
| 2020 Program Offsets | 0 | 0 | $0 |
| 2020 Request | 27 | 27 | $1,867,461 |
| **Total Change 2019-2020** | **0** | **0** | **$331,461** |

| *Detention Services* **Information Technology Breakout (of Decision Unit Total)** | Direct Pos. | Estimate FTE | Amount |
|---|---|---|---|
| 2018 Enacted | 1 | 1 | $10,515 |
| 2019 Continuing Resolution | 1 | 1 | $9,138 |
| Adjustments to Base and Technical Adjustments | 0 | 0 | $9,712 |
| 2020 Current Services | 1 | 1 | $18,850 |
| 2020 Program Increases | 0 | 0 | $0 |
| 2020 Program Offsets | 0 | 0 | $0 |
| 2020 Request | 1 | 1 | $18,850 |
| **Total Change 2019-2020** | **0** | **0** | **$9,712** |

1.    **Program Description**

**Detention Services**

Detention resources provide housing, transportation, medical care, and medical guard services for federal detainees remanded to USMS custody.  The FPD appropriation expends resources from the time a prisoner is brought into the USMS custody until criminal proceedings are terminated and/or the detainee is committed to BOP.

14

The Federal government relies on various methods to house detainees. The USMS acquires detention bed space for Federal detainees as effectively and efficiently as possible through:

- Federal detention facilities, where FPD uses BOP facilities for which the Federal government has already paid for construction and subsequent operation;

- Intergovernmental Agreements (IGA) with state and local jurisdictions that have excess prison/jail bed capacity and receive a daily rate for the use of a bed;

- private jail facilities where a daily rate is paid per bed; and

- the Capital Improvement Program, which includes the CAP and the NSCC, where capital investment funding is provided to state and local governments for guaranteed detention bed space in exchange for a daily rate negotiated through an IGA.

In certain high demand areas (e.g., the Southwest Border), DOJ has not been able to rely as much on IGAs and Federal facilities to meet housing requirements. For example, in 2018, Federal facility capacity accommodated only 17 percent of its detention population. By contrast, during FY 2000, Federal facilities housed approximately 30 percent of the USMS detention population. As less space in Federal facilities is available, DOJ has increasingly had to rely on the private sector.

**Detention Management Services Automation**

The USMS continues to facilitate efficiencies through process automation by identifying process automation opportunities, designing support solutions, and investing in IT infrastructure – when appropriate, integrating existing detention systems and services. The USMS' primary operational mission systems for Federal Prisoner Detention are the Justice Detainee Information System (JDIS) and Detention Services Network. The current configuration and support for these systems lack stability, scalability, centralization, and are no longer technologically sustainable. System capabilities do not meet current operational mission requirements effectively or efficiently. Moreover, the systems do not easily interface with external local, state, and Federal partners for complex data sharing.

*Capture Initiative*: In FY 2016, the USMS began to integrate required IT solutions with existing systems to maximize the government's return on investment. Capture incorporates a comprehensive integration and improvement of all current USMS operational business and mission capabilities (automated and manual), a consolidation of operational data, and an improvement of operational business processes at headquarters and in the field.

The transformation to implement Capture will be accomplished, in part, with a new web-based solution that enables user access from multiple platforms (i.e., desktops, tablets, and mobile phones) in a manner which is intuitive for each distinctive USMS line of business. These enhancements aim to streamline FPD operations and allow the USMS to leverage new operational efficiencies.

*Detention Services Network (DSNet)*: DSNet is a multifaceted, full-service internet site for the management of detention services and prisoner processing. The USMS' Prisoner Operations

15

Division (POD) administers the DSNet via programs that provide for the housing, transportation, and care of Federal prisoners throughout all 50 states and its U.S. territories. The web-based DSNet system optimizes national detention operations with well-established business practices that achieve cost effective, safe, secure, and humane confinement and transportation of prisoners.

The DSNet system automates many of the processes required to manage prisoners while storing case information related to the "Arrest to Commitment" lifecycle. DSNet is the primary tool utilized by POD to manage detention services and supports the following specific functions:

- Automation of the "sentence to commitment" process for Federal detainees
- Management and procurement of private detention services via state and local intergovernmental agreements
- Inspection and procurement of "bed space" for detention services
- Approval of prisoner medical requests

Modernization of DSNet will provide a comprehensive integration into the Capture initiative, further improving current USMS operational business and mission capabilities at headquarters, in the field, and with detention partners. Detention services offerings continue to be developed and implemented as detention needs arise. The DSNet site currently includes six modules: eDesignate, eMove, Electronic Prisoner Medical Record (ePMR), Electronic Intergovernmental Agreement (eIGA), Facility Review Management System (FRMS), and Detention Facility Review (DFR). DSNet deployment is planned for phase five in FY 2020.

***eDesignate***: eDesignate is a secure, electronic, web-based system that automates the Sentence to Commitment (S2C) process by transferring data and documents electronically. eDesignate includes eMove, a transportation module that allows the USMS to submit movement requests electronically.

Since 2008, eDesignate has been fully operational in all 94 U.S. Federal Court districts. It is the enterprise technology solution used by the U.S. Courts, USMS, and BOP for Federal prisoner designations and JPATS movement requests. eDesignate eliminates the paper process and creates a faster, more transparent, and effective workflow across agencies. Specifically, automated detainee data sharing for designation and movement eliminates redundant efforts, saves time, reduces errors, provides better visibility of the process, enables better problem resolution across agencies, and provides information necessary to manage more effectively.

eDesignate enables the BOP to complete sentence computations and dispositions for designation or return to the USMS. Disposition is based on the sentence length: in the case of a short-term sentence, the USMS maintains custody of the detainee until the sentence is served; for longer sentences, the USMS prepares the prisoner for movement to the commitment location. eDesignate delivers the necessary documents and data in one complete package to the BOP via a secure system, which saves detention costs by enabling all agencies to monitor and provide relevant information to shorten the post-sentence process.

Finally, eDesignate monitors performance objectives and metrics within and across agencies as well as gives managers the ability to watch and react to operational issues and trends. Managing

16

and monitoring the S2C process via eDesignate has reduced the average number of days detainees are in the S2C pipeline.

*eMove*: In 2008, the USMS implemented eMove in all 94 USMS districts in cooperation with JPATS. eMove provides a seamless transition from eDesignate to complete the full automation of the S2C process. It gives the USMS the ability to submit and monitor web-based movement requests to JPATS and streamlines the workflow among participating agencies by fully automating the Federal detainee transportation request process, thereby reducing the time from designation to commitment.

In February 2012, an eMove enhancement was released nationwide that enables districts to schedule and manage all in-district Judgment and Commitment (J&C) detainee moves. The module allows the USMS to submit routine out-of-district movement requests, such as Federal Writs, Attorney Special Requests, and Warrant of Removals, to JPATS. eMove enables districts to submit and manage all prisoner movement information seamlessly in one central system.

The USMS now centrally manages in-district moves, which allows the USMS to develop performance objectives and measure the operational effectiveness of prisoner movement. With this monitoring capability, the USMS can identify movements that minimize time-in-detention, thus reducing detention costs.

*ePMR*: ePMR was implemented in all 94 USMS districts in 2010 to provide a workflow for medical designations. The system streamlines and automates the approval process for requests for detainee medical services from USMS district offices to the Office of Interagency Medical Services (OIMS). ePMR eliminated a paper-based request and approval system and provided the ability to automatically capture relevant detainee data from other agency systems.

ePMR works seamlessly with existing systems and reduces the work associated with data entry, storage, and reduces costs associated with paper/printer usage. The electronic solution presents relevant data and documents in one complete package to OIMS at USMS headquarters at a single point in time. The system also provides feedback mechanisms across USMS offices for faster case resolution. Additionally, ePMR not only provides users within districts with a level of collaboration never before realized, but also enables managers to adjust workloads internally, monitor performance and audit status both internally and externally.

*eIGA*: The USMS deployed the eIGA system in 2008 to manage its interaction with facility providers offering detention services. eIGA automates the application process by enabling a facility to provide essential information via a secure, web-based system and then provides the government with a reliable and justifiable structure for negotiation. The system streamlines the former paper-based process, tracks the negotiation between detention provider and the government, and provides audit and reporting tools.

*FRMS*: The FRMS is a web-based application developed to facilitate, standardize, record, and report the results of Quality Assurance Review (QAR) performed on private facility contract performance. The system documents and produces a comprehensive QAR report that provides consolidated facility information and historic data. FRMS information ensures the adequacy and

17

sufficiency of services provided in non-Federal detention facilities that house Federal detainees. In 2008, FRMS received the Attorney General's Award for Information Technology Excellence based on its innovative concept, successful implementation, and continued program success.

***DFR***:  The DFR application module automates the review of non-Federal facility reviews.  The application allows easy, standardized recording of review results, which then can be summarized into reports for USMS management's use.

18

## 2. Performance Resources Table

### PERFORMANCE AND RESOURCES TABLE

**Decision Unit: Detention Services**

| Workload / Resources ($ in thousands) | Target FY 2018 | Actual FY 2018 | Projected FY 2019 | Changes (Current Services Adjustments and FY 2020 Program Changes) | Requested (Total) FY 2020 Request |
|---|---|---|---|---|---|
| Note: Performance measures reflect amounts for base population. | | | | | |
| Total Average Daily Population | 55,754 | 55,826 | 61,088 | 1,071 | 62,159 |
| State & Local Gov't (IGA) Facilities | 35,807 | 35,969 | 40,629 | 212 | 40,841 |
| Private Facilities | 9,842 | 9,852 | 10,477 | (407) | 11,070 |
| Subtotal Non-Federal Facilities | 45,649 | 45,820 | 51,106 | 805 | 51,911 |
| Federal Facilities (BOP) | 9,788 | 9,663 | 9,615 | 408 | 10,023 |
| Non-Paid Beds | 317 | 342 | 367 | 142 | 225 |

| Total Costs and FTE (Reimbursable: FTE are included, but costs are bracketed and not included in totals) | FTE | Amount | FTE | Amount | FTE | Amount | FTE | Amount | FTE | Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| | 27 | $1,536,000 | 21 | $1,612,064 | 27 | $1,536,000 | 0 | $331,461 | 27 | $1,867,461 |

| TYPE DOJ SG 3 | STRATEGIC OBJECTIVE | PERFORMANCE | FTE | Amount | FTE | Amount | FTE | Amount | FTE | Amount | FTE | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | FY 2018 | | FY 2018 | | FY 2019 | | Current Services Adjustments and FY 2019 Program Changes | | FY 2020 Request | |
| Program Activity | Detention Services | Resources Detainee Housing & Subsistence | 27 | $1,536,000 | 27 | $1,612,064 | 27 | $1,536,000 | 0 | $331,461 | 27 | $1,867,461 |
| Efficiency | Per Day Jail Cost (Non-Federal) | | | $84.51 | | $84.49 | | $84.43 | | $2.68 | | $85.56 |
| Performance | Health Care Cost Per Capita (Non-Federal) | | | $2,123 | | $2,082 | | $2,154 | | $276.00 | | $2,430 |
| Performance | # Targeted Non-Federal Facility Reviews Completed* | | | 18 | | 18 | | 18 | | 0 | | 18 |
| Outcome | Per Day Detention Cost | | | $90.25 | | $90.17 | | $90.37 | | $1.85 | | $92.22 |
| Outcome | # Targeted Non-Federal Facilities Meeting Minimum Standards | | | 18 of 18 | | 18 of 18 | | 18 of 18 | | 0 | | 18 of 18 |

19

## PERFORMANCE MEASURE TABLE

**Decision Unit: Detention Services**

| Strategic Objective | Performance Report and Performance Plan Targets | | FY 2014 Actual | FY 2015 Actual | FY 2016 Actual | FY 2017 Actual | FY 2018 Target | FY 2018 Actual | FY 2019 Target | FY 2020 Target |
|---|---|---|---|---|---|---|---|---|---|---|
| 3.1 | Efficiency Measure | Per Day Jail Costs (Non-Federal) | $76.24 | $79.24 | $81.13 | $83.54 | $84.51 | $84.49 | $84.43 | $85.56 |
| 3.1 | Performance Measure | Health Care Cost Per Capita (Non-Federal) | $2,044 | $2,168 | $2,165 | $2,208 | $2,123 | $2,082 | $2,154 | $2,430 |
| 3.1 | Performance Measure | # Targeted Facility Reviews (Non-Federal) | 15 | 15 | 18 | 16 | 18 | 18 | 18 | 18 |
| 3.1 | Performance Measure: Outcome | Per Day Detention Cost (Non-Federal) | $82.81 | $85.59 | $86.82 | $89.34 | $90.25 | $90.17 | $90.37 | $92.22 |
| 3.1 | Performance Measure: Outcome | Targeted Non-Federal Facilities (Private) Meeting Minimum Standards | 100% 15 of 15 | 100% 15 of 15 | 100% 18 of 18 | 89% 16 of 18 | 100% 18 of 18 | 100% 18 of 18 | 100% 18 of 18 | 100% 18 of 18 |

20

The table below captures the categories of QARs and relative performance goals.  All actively used IGA facilities receive an annual review utilizing the Detention Investigative Facility Report.

| Outcome Measure: Percentage of Targeted Non-Federal Facilities Meeting Minimum Standards | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Facility | | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 | | FY 2019 | FY 2020 |
| Type | Size (ADP) | Actual | Actual | Actual | Actual | Target | Actual | Target | Target |
| Performance Goal:  100% Meet Minimum Standards | | | | | | | | | |
| Private | N/A | 100% | 100% | 100% | 88% | 100% | 100% | 100% | 100% |
| | | 15 | 15 | 18 | 16 | 18 | 18 | 18 | 18 |
| IGA | Large | 100 | 100% | N/A | N/A | N/A | N/A | N/A | N/A |
| | > 480 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Total | | 100% | 100% | 100% | 89% | 100% | 100% | 100% | 100% |
| | | 15 | 15 | 18 | 16 | 18 | 18 | 18 | 18 |

**Performance Plan and Report:**
**Measure:**  Number of Targeted Non-Federal Facilities Meeting Minimum Standards
**FY 2018 Target:** 18
**FY 2018 Actual:** 18

29

## V.   Program Increases by Item

Item Name:                              **Housing of USMS Detainees: Population Increase**

Budget Decision Unit:              Detention Services

Organizational Program:          Prisoner Operations

Program Increase:  Positions 0     Agt/Atty 0    FTE  0   Dollars  $330,483,000

**Description of Item**

The USMS requests an increase of $330,483,000 for costs associated with prisoner detention and care to fund additional bedspace needed for an increased detention population.

**Justification**

The USMS expends resources for detention from the time a prisoner is brought into its custody through termination of the criminal proceeding and/or commitment to the BOP.  The size of the detainee population is dependent upon the number of arrests by federal law enforcement agencies and the length of time defendants are detained pending adjudication, release, or subsequent transfer to the BOP following conviction and sentencing.  The USMS does not control the number of detainees who enter the system nor can it release detainees to stay within current available funding levels; therefore, projections can deviate significantly within a short amount of time.

Between FY 2012 and FY 2017, the USMS experienced an unprecedented decrease in the detention population due to a declining rate of arrests/bookings combined with prisoners spending less time in detention.  However, since April 2017, USMS has seen a sizable and continuous increase in both the number of prisoners received and resulting ADP, particularly related to immigration, weapons, and drug offenses.

The USMS uses a Detention Population Forecasting Model to predict detention needs.  In response to current trends, population projections reflect continued growth at a relatively accelerated rate, and the USMS believes that the current projection provides the best estimate based on available information.  The requested resources will provide housing and care for federal detainees remanded to USMS custody.

**Impact on Performance**

Based on current and projected ADP estimates, the USMS will require additional funding to house federal detainees.  Population increases from 2017 through 2019 have already created a significant strain on USMS resources during FY 2019.  Both USMS and DOJ are committed to identifying and implementing cost mitigation and other measures that will manage the FY 2019 situation within existing departmental resources.  However, without this program increase, the USMS will be unable to afford to house all federal detainees in its custody in FY 2020.

**Funding**

Base Funding

| FY 2018 Enacted | | | | FY 2019 Continuing Resolution | | | | FY 2020 Current Services | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pos | Atty | FTE | Amount ($000) | Pos | Atty | FTE | Amount ($000) | Pos | Atty | FTE | Amount ($000) |
| 27 | 1 | 21 | $1,536,000 | 27 | 1 | 27 | $1,536,000 | 27 | 0 | 27 | $1,536,978 |

Non-Personnel Increase

| Non-Personnel Item | Unit Cost | Quantity | FY 2020 Request ($000) | FY 2021 Net Annualization (change from 2020) ($000) | FY 2022 Net Annualization (change from 2021) ($000) |
|---|---|---|---|---|---|
| Housing of Detainees | N/A | N/A | $330,483 | $0 | $0 |
| Total Non-Personnel | N/A | N/A | $330,483 | $0 | $0 |

Total Request for this Item

| Category | Pos | Atty | FTE | Personnel ($000) | Non-Personnel ($000) | Total ($000) | FY 2021 Net Annualization (change from 2020) ($000) | FY 2022 Net Annualization (change from 2021) ($000) |
|---|---|---|---|---|---|---|---|---|
| Current Services | 27 | 0 | 27 | $4,555 | $1,532,423 | $1,536,978 | N/A | N/A |
| Increases | 0 | 0 | 0 | $0 | $330,483 | $330,483 | $0 | $0 |
| Total | 27 | 0 | 27 | $4,555 | $1,862,906 | $1,867,461 | $0 | $0 |

31

# Exhibit I

EXHIBIT I
Page 124



United States Marshals Service
*Prisoner Operations Division*

**USMS Detention Population, April 31, 2019**

| Facility Name | Facility City | Facility Type | ADP FY2018 | Total Population | Prisoners in Custody, March 31, 2019 | | | | | | ADP FY2019 (YTD) | ADP April 2019 (MTD) | Average Perdiem April 2019 | Proportion of Total Population |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Waiting Adjudication | Waiting Sentencing | Waiting J&C | Waiting Designation | Waiting Release or Transfer | Other | | | | |
| ALL DISTRICTS | | | 55,095 | 61,949 | 38,721 | 12,648 | 1,090 | 1,684 | 4,372 | 2,967 | 60,111 | 61,415 | $85.07 | 100.0% |
| *DISTRICT OF ALASKA* | | | 198 | 205 | 122 | 51 | 2 | 13 | 1 | 16 | 214 | 205 | $168.74 | 0.4% |
| WEST-ANCHORAGE CORR COMPLEX (A | ANCHORAGE, AK | State/Local | 73 | 72 | 46 | 16 | 1 | 3 | 0 | 6 | 76 | 75 | $168.74 | |
| EAST-ANCHORAGE CORR COMPLEX (A | ANCHORAGE, AK | State/Local | 68 | 75 | 50 | 14 | 0 | 1 | 0 | 10 | 75 | 73 | $168.74 | |
| FDC SEATAC | SEATTLE, WA | Federal | 3 | 10 | 4 | 0 | 1 | 5 | 0 | 0 | 5 | 8 | | |
| ALL IGA FACILITIES UNDER 50 ADP | | | 54 | 48 | 22 | 21 | 0 | 4 | 1 | 0 | 56 | 48 | $168.74 | |
| *MIDDLE DISTRICT OF ALABAMA* | | | 147 | 135 | 70 | 30 | 8 | 7 | 2 | 10 | 139 | 127 | $51.12 | 0.2% |
| MONTGOMERY COUNTY DETENTION FA | MONTGOMERY, AL | State/Local | 81 | 64 | 38 | 14 | 3 | 3 | 2 | 4 | 71 | 67 | $48.00 | |
| MONTGOMERY MUNICIPAL JAIL | MONTGOMERY, AL | State/Local | 56 | 51 | 23 | 16 | 4 | 0 | 2 | 6 | 58 | 49 | $48.00 | |
| ROBERT A. DEYTON DETENTION FAC | LOVEJOY, GA | Private | 4 | 6 | 5 | 0 | 0 | 2 | 0 | 0 | 5 | 5 | $130.79 | |
| ALL IGA FACILITIES UNDER 50 ADP | | | 6 | 14 | 4 | 0 | 1 | 2 | 5 | 2 | 6 | 6 | $45.00 | |
| *NORTHERN DISTRICT OF ALABAMA* | | | 277 | 360 | 197 | 23 | 10 | 14 | 20 | 96 | 338 | 364 | $42.63 | 0.6% |
| MORGAN CO JAIL | DECATUR, AL | State/Local | 58 | 91 | 52 | 7 | 4 | 5 | 1 | 22 | 91 | 98 | $40.00 | |
| SHELBY COUNTY JAIL | COLUMBIANA, AL | State/Local | 50 | 47 | 28 | 2 | 3 | 0 | 0 | 14 | 54 | 55 | $49.00 | |
| ALL IGA FACILITIES UNDER 50 ADP | | | 149 | 222 | 117 | 14 | 3 | 9 | 19 | 60 | 186 | 214 | $42.17 | |
| *SOUTHERN DISTRICT OF ALABAMA* | | | 210 | 262 | 120 | 73 | 11 | 19 | 11 | 28 | 246 | 255 | $49.99 | 0.4% |
| BALDWIN COUNTY CORRECTIONS CEN | BAY MINETTE, AL | State/Local | 63 | 104 | 62 | 24 | 4 | 5 | 1 | 8 | 93 | 101 | $60.00 | |
| ESCAMBIA COUNTY DETENTION CENT | BREWTON, AL | State/Local | 54 | 77 | 32 | 28 | 4 | 6 | 3 | 3 | 71 | 75 | $45.00 | |
| ROBERT A. DEYTON DETENTION FAC | LOVEJOY, GA | Private | 14 | 10 | 2 | 2 | 1 | 4 | 0 | 1 | 13 | 21 | $130.79 | |
| ALL IGA FACILITIES UNDER 50 ADP | | | 72 | 71 | 24 | 21 | 2 | 6 | 1 | 17 | 68 | 58 | $44.60 | |
| *EASTERN DISTRICT OF ARKANSAS* | | | 325 | 394 | 325 | 33 | 1 | 19 | 9 | 10 | 380 | 397 | $65.16 | 0.6% |
| WEST TENN DET FAC | MASON, TN | Private | 117 | 83 | 63 | 5 | 0 | 1 | 5 | 9 | 83 | 85 | $91.83 | |
| PULASKI COUNTY REGIONAL DETENT | LITTLE ROCK, AR | State/Local | 92 | 81 | 69 | 6 | 1 | 1 | 1 | 3 | 81 | 80 | $66.00 | |
| DALLAS COUNTY JAIL | FORDYCE, AR | State/Local | 11 | 69 | 59 | 6 | 0 | 0 | 2 | 2 | 65 | 69 | $66.00 | |
| BOWIE COUNTY CORRECTIONAL CENT | TEXARKANA, TX | Pass-Thru | 20 | 37 | 29 | 6 | 1 | 0 | 0 | 1 | 40 | 40 | $79.86 | |
| TALAHATCHIE COUNTY CORRECTION | TUTWILER, MS | Pass-Thru | | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 3 | 1 | $54.68 | |
| ALL IGA FACILITIES UNDER 50 ADP | | | 85 | 123 | 105 | 10 | 0 | 4 | 2 | 2 | 117 | 122 | $47.03 | |
| *WESTERN DISTRICT OF ARKANSAS* | | | 197 | 180 | 70 | 81 | 3 | 1 | 21 | 4 | 189 | 184 | $57.95 | 0.3% |
| WASHINGTON COUNTY DETENTION CE | FAYETTEVILLE, AR | State/Local | 51 | 73 | 24 | 35 | 3 | 1 | 7 | 3 | 71 | 77 | $62.00 | |
| ALL IGA FACILITIES UNDER 50 ADP | | | 146 | 107 | 46 | 46 | 0 | 0 | 14 | 1 | 119 | 107 | $55.03 | |
| *DISTRICT OF ARIZONA* | | | 4,203 | 4,796 | 3,017 | 1,009 | 105 | 137 | 498 | 26 | 4,643 | 4,817 | $110.94 | 7.7% |
| CENTRAL AZ DETENTION FACILITY | FLORENCE, AZ | Private | 3,544 | 3,956 | 2,447 | 900 | 89 | 113 | 380 | 24 | 3,958 | 3,957 | $116.05 | |
| FCI TUCSON | TUCSON, AZ | Federal | 287 | 279 | 132 | 107 | 13 | 8 | 18 | 1 | 282 | 287 | | |
| SAN LUIS REGIONAL DETENTION FA | SAN LUIS, AZ | Pass-Thru | 120 | 178 | 140 | 0 | 2 | 10 | 25 | 1 | 122 | 172 | $92.48 | |
| LA PAZ COUNTY SHERIFF ADULT DE | PARKER, AZ | State/Local | 73 | 147 | 116 | 0 | 1 | 3 | 27 | 0 | 89 | 135 | $60.00 | |
| CIBOLA CO JAIL | MILAN, NM | Pass-Thru | 43 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 52 | 45 | $68.91 | |
| GRAHAM COUNTY ADULT DETENTION | SAFFORD, AZ | State/Local | 7 | 80 | 37 | 0 | 0 | 0 | 43 | 0 | 51 | 56 | $53.00 | |
| ELKO COUNTY JAIL | ELKO, NV | State/Local | 58 | 60 | 56 | 0 | 0 | 2 | 0 | 2 | 48 | 85 | $65.00 | |
| NV SOUTHERN DETENTION CENTER | PAHRUMP, NV | Private | 28 | 50 | 48 | 2 | 0 | 0 | 1 | 1 | 8 | 30 | $110.65 | |
| ALL IGA FACILITIES UNDER 50 ADP | | | 32 | 46 | 40 | 0 | 1 | 1 | 2 | 2 | 30 | 30 | $69.15 | |
| *CENTRAL DISTRICT OF CALIFORNIA* | | | 1,091 | 1,161 | 806 | 200 | 11 | 14 | 55 | 64 | 1,163 | 1,185 | $107.38 | 1.9% |
| MDC LOS ANGELES | LOS ANGELES, CA | Federal | 652 | 514 | 353 | 89 | 5 | 5 | 22 | 37 | 527 | 527 | $105.00 | |
| SANTA ANA | SANTA ANA, CA | State/Local | 207 | 280 | 195 | 70 | 2 | 2 | 7 | 4 | 288 | 288 | $105.00 | |
| SAN BERNARDINO CENTRAL DETENTI | SAN BERNARDINO, CA | State/Local | 194 | 256 | 185 | 33 | 3 | 4 | 13 | 18 | 266 | 257 | $109.00 | |
| FCI VICTORVILLE MED | VICTORVILLE, CA | Federal | 38 | 69 | 41 | 3 | 1 | 3 | 13 | 6 | 13 | 70 | $109.00 | |

EXHIBIT I
Page 125



**United States Marshals Service**
*Prisoner Operations Division*

**USMS Detention Population, April 31, 2019**

*Prisoners in Custody, March 31, 2019* (columns: Waiting Adjudication through Other)

| Facility Name | Facility City | Facility Type | ADP FY2018 | Total Population | Waiting Adjudication | Waiting Sentencing | Waiting J&C | Waiting Designation | Waiting Release or Transfer | Other | ADP FY2019 (YTD) | ADP April 2019 (MTD) | Average Perdiem April 2019 | Proportion of Total Population |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| USP LOMPOC | LOMPOC, CA | Federal | | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | | |
| MCC NEW YORK | NEW YORK, NY | Federal | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| ALL IGA FACILITIES UNDER 50 ADP | | | 37 | 41 | 32 | | 5 | | 2 | 2 | 39 | 33 | $143.57 | 1.1% |
| **EASTERN DISTRICT OF CALIFORNIA** | | | | | | | | | | | | | | |
| SACRAMENTO COUNTY JAIL | SACRAMENTO, CA | State/Local | 588 | 648 | 487 | 74 | 4 | 22 | 39 | 19 | 654 | 646 | $116.16 | |
| FRESNO COUNTY JAIL | FRESNO, CA | State/Local | 228 | 247 | 210 | 16 | 3 | 4 | 3 | 11 | 244 | 244 | $120.00 | |
| KERN COUNTY SHERIFF'S OFFICE | BAKERSFIELD, CA | State/Local | 176 | 180 | 153 | 18 | 1 | 1 | 2 | 2 | 189 | 180 | $125.00 | |
| NV SOUTHERN DETENTION CENTER | PAHRUMP, NV | Private | 87 | 105 | 61 | 37 | 0 | 1 | 2 | 4 | 102 | 102 | $120.00 | |
| WAYNE BROWN CORRECTIONAL FACIL | NEVADA CITY, CA | State/Local | 43 | 57 | 12 | 0 | 0 | 16 | 28 | 1 | 61 | 65 | $110.65 | |
| CENTRAL AZ DETENTION FACILITY | FLORENCE, AZ | Private | 51 | 49 | 45 | 2 | 0 | 0 | 0 | 0 | 54 | 50 | $70.00 | |
| WEST TENN DET FAC | MASON, TN | Private | | 1 | 1 | 0 | 0 | 0 | 0 | 0 | | | | |
| ALL IGA FACILITIES UNDER 50 ADP | | | 3 | 7 | 5 | 1 | 0 | 0 | 2 | 1 | 4 | 5 | $65.80 | 0.6% |
| **NORTHERN DISTRICT OF CALIFORNIA** | | | | | | | | | | | | | | |
| GLEN DYER FACILITY | OAKLAND, CA | State/Local | 302 | 368 | 291 | 21 | 5 | 5 | 13 | 33 | 366 | 273 | $120.74 | |
| SANTA RITA CO JAIL | DUBLIN, CA | State/Local | 193 | 252 | 205 | 13 | 3 | 4 | 11 | 16 | 194 | 189 | | |
| ALL IGA FACILITIES UNDER 50 ADP | | | 84 | 96 | 69 | 8 | 2 | 1 | 2 | 14 | 70 | 68 | $100.56 | 0.6% |
| **SOUTHERN DISTRICT OF CALIFORNIA** | | | | | | | | | | | | | | |
| MCC SAN DIEGO | SAN DIEGO, CA | Federal | 2,762 | 2,865 | 1,698 | 747 | 34 | 175 | 189 | 22 | 2,906 | 2,882 | $142.67 | 4.8% |
| WESTERN REGION DETN FAC | SAN DIEGO, CA | Private | 777 | 808 | 508 | 213 | 2 | 34 | 38 | 13 | 732 | 779 | $178.89 | |
| OTAY MESA DETN CTR | OTAY MESA, CA | Private | 660 | 628 | 504 | 79 | 9 | 9 | 22 | 3 | 675 | 676 | $159.40 | |
| SAN LUIS REGIONAL DETENTION FA | SAN LUIS, AZ | Pass-Thru | 453 | 343 | 187 | 131 | 6 | 12 | 4 | 3 | 468 | 349 | $159.40 | |
| FCI VICTORVILLE MED | VICTORVILLE, CA | Federal | 398 | 400 | 363 | 28 | 1 | 3 | 5 | 0 | 397 | 389 | $92.48 | |
| ORANGE COUNTY - CENTRAL JAIL C | SANTA ANA, CA | State/Local | 149 | 352 | 39 | 100 | 12 | 89 | 111 | 1 | 214 | 367 | | |
| SANTA ANA JAIL | SANTA ANA, CA | State/Local | | 120 | 6 | 104 | 2 | 6 | 2 | 0 | 145 | 112 | $120.00 | |
| IMPERIAL COUNTY SHERIFF'S OFF | EL CENTRO, CA | State/Local | 87 | 102 | 7 | 69 | 1 | 20 | 5 | 0 | 123 | 101 | $106.00 | |
| CENTRAL AZ DETENTION FACILITY | FLORENCE, AZ | Private | 78 | 42 | 41 | 0 | 0 | 0 | 1 | 0 | 57 | 44 | $73.70 | |
| NV SOUTHERN DETENTION CENTER | PAHRUMP, NV | Private | 60 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 | | | |
| JEFFERSON COUNTY DOWNTOWN JAIL | BEAUMONT, TX | Pass-Thru | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | | | |
| MDC LOS ANGELES | LOS ANGELES, CA | Federal | | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | | | |
| ALL IGA FACILITIES UNDER 50 ADP | | | 96 | 68 | 41 | 23 | 1 | 0 | 1 | 2 | 71 | 65 | $119.00 | 0.6% |
| **DISTRICT OF COLORADO** | | | | | | | | | | | | | | |
| AURORA DETENTION FACILITY | AURORA, CO | Private | 239 | 398 | 221 | 99 | 4 | 5 | 44 | 25 | 390 | 388 | $74.19 | |
| FCI ENGLEWOOD - DETENTION | LITTLETON, CO | Federal | 72 | 57 | 30 | 21 | 1 | 1 | 3 | 3 | 67 | 60 | $74.72 | |
| FCI FLORENCE | FLORENCE, CO | Federal | 6 | 3 | 0 | 0 | 0 | 2 | 25 | 8 | 8 | 5 | | |
| USP FLORENCE HIGH | FLORENCE, CO | Federal | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 3 | | |
| ALL IGA FACILITIES UNDER 50 ADP | | | 159 | 148 | 80 | 35 | 0 | 2 | 18 | 11 | 153 | 148 | $73.98 | 0.6% |
| **DISTRICT OF CONNECTICUT** | | | | | | | | | | | | | | |
| WYATT DET FAC | CENTRAL FALLS, RI | State/Local | 254 | 303 | 229 | 49 | 1 | 4 | 16 | 4 | 286 | 298 | $109.39 | |
| MDC BROOKLYN | BROOKLYN, NY | Federal | 203 | 225 | 176 | 41 | 7 | 2 | 3 | 2 | 233 | 225 | $114.87 | |
| FDC PHILADELPHIA | PHILADELPHIA, PA | Federal | 4 | 12 | 0 | 0 | 0 | 1 | 11 | 0 | 6 | 10 | | |
| NE OHIO CORR CTR | YOUNGSTOWN, OH | Private | | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | | |
| ALL IGA FACILITIES UNDER 50 ADP | | | 44 | 64 | 53 | 8 | 0 | 1 | 1 | 1 | 43 | 62 | $89.18 | 0.5% |
| **DISTRICT OF COLUMBIA, DISTRICT COURT** | | | | | | | | | | | | | | |
| DC JAIL | WASHINGTON, DC | State/Local | 573 | 387 | 304 | 34 | 11 | 3 | 12 | 17 | 367 | 387 | $98.69 | |
| PIEDMONT REGIONAL JAIL ATHORIT | FARMVILLE, VA | State/Local | 160 | 222 | 187 | 16 | 7 | 0 | 4 | 8 | 198 | 217 | | |
| FDC PHILADELPHIA | PHILADELPHIA, PA | Federal | 31 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 53 | 57 | $53.00 | |
| ALL IGA FACILITIES UNDER 50 ADP | | | 411 | 140 | 95 | 16 | 2 | 3 | 12 | 6 | 144 | 135 | $76.13 | 0.6% |

EXHIBIT I
Page 126

# Exhibit J



With its passage in November 2002, the Homeland Security Act set into motion what would be the single-largest government reorganization since the creation of the Department of Defense. Opening its doors in March 2003, one of the component agencies in the new Department of Homeland Security was the Bureau of Immigration and Customs Enforcement, now known as U.S. Immigration and Customs Enforcement or ICE.

ICE was granted a unique combination of civil and criminal authorities to better protect national security and strengthen public safety in response to the deadly attacks perpetrated on 9/11.

Leveraging those authorities, ICE has become a powerful and sophisticated federal law enforcement agency.

Throughout 2017, ICE is looking back at its achievements and history through a series of stories, images and milestones, focusing on significant events and accomplishments, one year at a time, beginning with 2003.



# September 11, 2001: 19 terrorists hijack commercial airliners and carry out massive attack on the United States



Terrorists take advantage of security weaknesses in our aviation system to kill nearly 3,000 innocent men, women and children, including citizens of more than 90 countries. It is the deadliest terrorist attack on American soil.

## November 2002: Homeland Security Act

The Homeland Security Act of 2002 is introduced in the aftermath of the Sept. 11 attacks and subsequent mailings of anthrax spores. The act is co-sponsored by 118 members of Congress and signed into law by President George W. Bush Nov. 2002. The Homeland Security Act creates the U.S. Department of Homeland Security and the new cabinet-level position of secretary of homeland security.

The U.S. Department of Homeland Security changes the name (http://www.uscis.gov/ilink/docView/FR/HTML/FR/0-0-0-1/0-0-0-123038/0-0-0-123059/0-0-0-125494.html) of the Bureau of Immigration and Customs Enforcement to U.S. Immigration and Customs Enforcement, and the Bureau of Customs and Border Protection to U.S. Customs and Border Protection.

# June: Detention and Removal Operations assumes programmatic responsibility of the Criminal Alien Program from the Office of Investigations

Detention and Removal Operations assumes responsibility for the Criminal Alien Apprehension Program June 1. ICE aims to arrest and remove criminal aliens by securing a final order of removal before they are released from prison or jail. Identifying and processing incarcerated criminal aliens, prior to release from jails and prisons, decreases or eliminates the time spent in ICE custody, which reduces the overall cost to the federal government.

# September: ICE implements the electronic travel document system, significantly reducing the amount of time required for partner countries to issue a travel document

Sept. 1, 2007 (http://www.ice.gov/doclib/foia/contracts/gs35f0323jhsceop07f01158electronicdatasystem ICE launches their electronic travel document system, a system used to review travel document requests and issue travel documents electronically.

EXHIBIT J
Page 131

# Exhibit K



## U.S. Immigration and Customs Enforcement

STATEMENT

OF

**Matthew T. Albence**
**Acting Director**

**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**
**U.S. DEPARTMENT OF HOMELAND SECURITY**

Regarding
**The Fiscal Year 2020 President's Budget Request**

**UNITED STATES HOUSE OF REPRESENTATIVES**
**COMMITTEE ON APPROPRIATIONS**
**SUBCOMMITTEE ON HOMELAND SECURITY**

**July 25, 2019**
**Rayburn House Office Building, Room 2007**

# **INTRODUCTION**

Chairwoman Roybal-Allard, Ranking Member Fleischmann, and distinguished Members of the Subcommittee:

As you are aware, the United States is currently facing an unprecedented border security and humanitarian crisis at the southwest border. Over the past year, the number of aliens apprehended at or near the southwest border has increased significantly. From October 1, 2018, to June 30, 2019, enforcement actions on the southwest border reached 780,633—an increase of 103% over the prior fiscal year (FY). The increase of aliens arriving in the country has strained U.S. Customs and Border Protection (CBP) to a breaking point. As Acting Secretary McAleenan recently testified, supplemental funding provided to the Department of Homeland Security (DHS) in the recent supplemental funding package has been used to address the urgent humanitarian needs at the border, helping to free up CBP officers to return to their front-line duties.

Today, however, I am here to address other parts of the immigration system that remain in desperate need of resources and funding, as well as to highlight the need for legislation that would help put an end to the current border crisis once and for all. The fact is, the majority of aliens encountered at or near the border are released into the interior of the United States pending removal proceedings before the Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR)—which currently has a backlog of more than 900,000 cases and growing. The women and men of U.S. Immigration and Customs Enforcement (ICE) are responsible for managing these cases, as well as those of the more than 3 million aliens currently on ICE's docket. As I will further discuss, many aliens do not appear for removal proceedings, violating the terms of their release—including the terms of the Alternatives to Detention (ATD) program— or fail to comply with the removal orders issued by EOIR. The result requires a strong interior enforcement component that lends certainty to lawfully issued orders from Immigration Judges. If we only enforce our immigration laws at the border and fail to provide adequate resources to ensure those who have entered illegally proceed through the immigration process and, if ordered removed, are actually removed, the entire system will break down.Such failure will continue to serve as a magnet for additional aliens to illegally enter the country.

With this in mind, I come to ask for your assistance in providing ICE the funding it desperately needs to address not only the humanitarian crisis, but the also enforce our Nation's immigration laws. The FY 2020 President's Budget for ICE includes $8.8 billion in discretionary funding, reflecting a $1.2 billion increase from the FY 2019 enacted budget. Additionally, the Budget estimates $527.4 million in budget authority derived from mandatory fees, bringing total estimated ICE spending authority to $9.3 billion. This increase in funding is critical for ICE to meet its diverse mission needs. The FY 2020 Budget will support current efforts and enable ICE to invest in much needed areas: immigration enforcement, custody and care of the detained population, transportation and processing of aliens, criminal investigations, dismantling transnational criminal organizations, particularly those responsible for smuggling drugs and people into our country, workforce expansion and training, and the information technology needed to meet the security challenges of the 21st century.

Additionally, I would also like to highlight urgent legislative changes needed by DHS. To be clear, this budget request provides the necessary funding and resources for ICE to address the symptoms of the crisis. Legislative changes are the only viable option to swiftly put an end to the

2

current crisis, reducing the victimization of migrants looking for a better life, and starving the cartels and the transnational criminal organizations of a major segment of their illicit enterprises. Absent these reforms, current laws will continue to be exploited and the pull factors they create will only result in more illegal immigration. For the safety and security of our country we implore you:

- Terminate the *Flores* Settlement agreement and clarify the government's detention authority with respect to alien minors, including minors detained as part of a family unit.
- Amend the Trafficking Victims Protection Reauthorization Act (TVPRA) to provide for the prompt repatriation of any Unaccompanied Alien Children (UACs) who are not victims of human trafficking and who do not express a fear of return to their home country and provide for similar treatment of all UACs from both contiguous or noncontiguous countries to ensure they are swiftly and safely returned to their countries of origin.
- Address the credible fear standard—a threshold standard for those subjected to expedited removal to be able to pursue asylum before the immigration courts. The current standard has proved to be ineffective in screening out those with fraudulent, frivolous, or legally insufficient claims.

### ENFORCING IMMIGRATION LAWS

ICE's immigration enforcement efforts are led by the more than 6,000 law enforcement officers of Enforcement and Removal Operations (ERO). ERO's deportation officers enforce our nation's immigration laws by identifying, arresting, detaining, and removing illegal aliens. To ensure the national security and public safety of the United States and the faithful execution of the immigration laws passed by Congress, ICE officers may conduct targeted enforcement actions against any removable alien who is present in violation of immigration law. Despite what is often sensationally misreported, these are not indiscriminate "raids" or "sweeps"; instead, ERO's operations are carefully planned, based on person-specific intelligence-driven leads, focusing on those who represent a public safety threat as well as those who have received a lawfully issued order of removal from an immigration judge (IJ). Approximately 90 percent of ERO's administrative arrests in the interior of the country are of aliens that have prior criminal convictions, face pending criminal charges, are immigration fugitives, or have been previously removed from the country and have illegally reentered, the latter of which is a federal felony that ICE prosecutes thousands of times per year.

While ICE's immigration enforcement is focused on the interior, the current situation at our border directly impacts this agency and its resource requirements in numerous ways. CBP's 780,633 encounters include more than 390,000 members of family units and 63,000 unaccompanied alien children (UAC)—this represents 63 percent of all southwest border encounters in FY 2019 year-to-date. Notably, in the last few months, ICE has been forced to release more than 215,000 members of family units into the interior of the United States due to the Flores Settlement Agreement. The majority of individuals encountered now originate from the three countries of Central America known as the Northern Triangle, which includes Guatemala, Honduras, and El Salvador. These changes in demographics are significant because, unlike single adult migrants from Mexico who previously accounted for the majority of those attempting to cross the border illegally, family units and UAC from Central America cannot be

3

EXHIBIT K
Page 135

swiftly repatriated, which means current arrivals from these groups are further exacerbating the already extensive backlog across our immigration system to a greater extent than ever before.

Typically, when an alien is apprehended by CBP, they are transferred to ICE custody pending removal proceedings. However, ICE's resources have been overburdened by the record numbers of CBP apprehensions at the southwest border and Congress' repeated failure to fund ICE detention and transportation requirements at ICE requested levels, despite the demonstrated need for these resources.

Further, the crisis on the border has impacted ICE's interior enforcement mission, particularly with regard to criminal aliens. Resources dedicated to removing dangerous criminals from the street have necessarily been redeployed to manage the increased workload stemming from the border surge, resulting in an over 14% decrease in criminal alien arrests this FY. Additionally, ICE has reassigned members of Fugitive Operations teams to manage detained dockets or to help respond to the border crisis. The failure of Congress to increase funding for Fugitive Operations teams over the course of several years, has created a large strain on ICE's ability to effectuate arrests of specific aliens who have failed to comply with removal orders or with release conditions, including those who have absconded while on ATD.

Moreover, Homeland Security Investigations has reassigned hundreds of special agents and intel analysts to border patrol facilities to ferret out fraudulent family units and UAC, to reduce the victimization of children stemming from the cartels and smuggling organizations making hundreds of millions of dollars on the suffering and desperation of others.

The influx at the border has especially strained ICE's detention resources. As of July 2019, ICE is currently detaining over 53,000 single adults, and there are approximately 8,000 single adults in CBP custody awaiting processing or transfer to ICE custody. Comparing FY 2019 year-to-date[1] with FY 2018 year-to-date, there has been a 79% percent increase (184,461 to 330,049) in intakes resulting from CBP apprehensions and an almost 11 percent decrease (121,095 to 107,923) in intakes resulting from ICE arrests. In FY 2019 year-to-date,[2] 75 percent of ICE's intakes stem from a CBP apprehension, and 89 percent of those arrested by ICE have criminal convictions or pending criminal charges. Of the small fraction of the current detained population that was not apprehended by CBP and do not have a criminal history, many are foreign fugitives, known or suspected gang members, or have violated the terms of their enrollment in ICE's ATD program.

Based on increased enforcement activity on the border and the need to ensure interior enforcement, additional ICE detention capacity is necessary. Specifically, the budget includes nearly $2.7 billion to expand detention capacity to support an average daily adult population of 51,500 aliens and an average daily family population of 2,500, for a total of 54,000 beds. The budget also includes transportation costs commensurate to the requested detention population and flow of UACs, as well as funding for the ATD program to increase the number of enrolled participants to 120,000. Given the current apprehension rates, ICE is focusing on expanding both detention capacity and ATD enrollment capacity to avoid releasing individuals who are

---

[1] Through the end of June 2019.
[2] As of July 13, 2019.

4

subject to mandatory detention, have a criminal history, or pose a public safety or a flight risk, and to better manage both the detained and non-detained dockets.

ICE cannot abandon its interior enforcement mission. The perceived lack of interior enforcement is a major driving force behind the current crisis, and DHS cannot secure the border without simultaneously ensuring strong interior enforcement to reduce this pull factor. As such, ICE will continue to conduct interior enforcement actions in line with the agency's mission and the laws passed by Congress to uphold the rule of law.

## MANAGING THE DETAINED POPULATION

ICE oversees the civil immigration detention of one of the most highly transient and diverse populations of any detention or correctional system in the world. This entails the execution of a highly complex range of services and significant dedicated resources to areas such as medical care for detainees and transportation of aliens, including single adults, family units, and UAC.

ICE takes the health, safety and welfare of those in its custody extremely seriously. Comprehensive medical care is provided from the moment detainees arrive into ICE custody and throughout the entirety of their stay. All ICE detainees receive a medical intake screening, which includes mental health, within 12 hours of arriving at each detention facility, a full health assessment within 14 days of entering ICE custody or arrival at a facility, and access to daily sick call and 24-hour emergency care. In FY 2018, ICE spent $269 million on health care services.

With regard to transportation, ICE transports aliens domestically for purposes of detention, release, and transfer to other agencies, in accordance with existing laws and policies. Transportation may be from the Southwest Border after apprehension to the interior of the country, between ICE's interior Areas of Responsibility (AORs), or between agencies (ICE does not maintain custody of UAC outside the responsibility of transportation between CBP and Health and Human Services). In FY 2018, ICE spent $475 million on these transportation costs, and is requesting $557 million to support the efficient and expeditious transportation of aliens going forward.

## ALTERNATIVES TO DETENTION

As of July 2019, ICE's non-detained docket has grown to more than 3 million aliens, including more than 1 million who have already received a final order of removal from an IJ.[3] Due to its very limited detention capacity, ICE must generally reserve its detention space for those who pose a national security, public safety, or flight risk. Thus, when an alien is not subject to mandatory detention, ICE maintains the authority to release aliens on a case-by-case basis in accordance with existing laws and regulations and based on the totality of the circumstances in each case.

ICE's ATD program is a tool that monitors compliance of some non-detained aliens going through removal proceedings. Due to the extremely high volume of CBP apprehensions at the border, the growing size of ICE's non-detained docket, and the current backlog of more than

---

[3] ICE National Docket data is a snapshot as of July 6, 2019.

900,000 cases before the immigration courts, the budget includes funding for the ATD program to further increase the number of average daily participants to 120,000. This is in addition to existing enrollments, which have increased from 23,000 in FY 2014 to more than 100,000 as of July 2019.

However, it is important to understand that ATD has significant limitations, especially considering ICE's other resource needs. First, individuals, and especially family units, on ATD abscond at significant rates. In FY 2019 year-to-date[4], the absconder rate for family units stands at 26.2 percent, significantly higher than the 12 percent absconder rate for non-family unit participants, demonstrating the growing challenges such enrollments create for immigration enforcement. Moreover, ATD has been found to be especially ineffective in effectuating removals of aliens so ordered by an immigration judge or for those who have recently arrived in the United States and lack community ties. Without sufficient numbers of Fugitive Operations officers to search for and arrest aliens who fail to comply with ATD, as well as sufficient detention space for those aliens to be detained once they are located and arrested, ATD will continue to offer limited incentive for aliens to comply.

## LEGAL SUPPORT

Additional resources are also requested in FY 2020 to ensure that ICE's Office of the Principal Legal Advisor (OPLA) is able to carry out its statutory responsibility to prosecute administrative immigration cases before the DOJ's immigration courts.[5] During FY 2018, OPLA attorneys prosecuted more than 800,000 immigration-related cases before the immigration courts obtaining 122,750 orders of removal for a ratio of 156 cases per immigration line attorney versus the FY 2017 ratio of 135 cases per immigration line attorney. While Congress has increased the number of funded DOJ immigration judges and support positions during recent budget cycles, OPLA funding has not kept pace. Without these dedicated attorneys, the immigration court process simply does not work. To handle this growing immigration court system, OPLA will need to hire 128 additional attorneys and 41 additional support staff. Without this funding, immigration judges will be unable to effectively manage their dockets and ICE's enforcement efforts will fall short of Administration objectives to appropriately enforce federal law..[6]

## COMBATTING TRANSNATIONAL CRIMINAL ORGANIZATIONS

ICE's Homeland Security Investigations (HSI) protects the United States against terrorists and other criminal organizations through criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration. As the largest investigative arm of DHS, HSI utilizes its broad legal authorities to investigate immigration and customs violations, including those related to export control, human rights abuses, narcotics, weapons and contraband smuggling, financial crimes, cybercrime, human trafficking and smuggling, child exploitation, intellectual property infringements, transnational gangs, immigration document and benefit fraud, and worksite enforcement. The FY 2020 Budget maintains HSI's critical operations abroad,

---

[4] As of May 31, 2019.
[5] 6 U.S.C. § 252(c).
[6] In addition to representing DHS in proceedings before EOIR, OPLA is responsible for advising ICE leadership and operational personnel on legal matters and addressing an array of other litigation and legal matters facing the agency, which have seen significant increases in tempo and complexity.

6

supports hiring of an additional 150 special agents and increases our efforts to target and combat dangerous transnational gangs and other criminal organizations.

In FY 2018, HSI agents arrested 44,069 individuals, making 34,344 criminal arrests and 9,725 administrative arrests. FY 2018 was a positive year for many of our key enforcement initiatives and we continue to request resources to sustain and improve on our successes. HSI made 4,333 arrests of gang leaders, members, and associates, including 959 Mara Salvatrucha (MS-13) members. Our special agents and investigators helped take more than 900 firearms off the streets through these criminal investigations, and we hope to build on that success going forward. We continue targeting transnational criminal gangs like MS-13. Results from across the country show that these policies are working and help make communities safer for all children, including UACs and recent immigrants, who are frequently the prime targets for initiation, joining the very gangs for which they have purported to flee their home countries.

HSI identified and assisted more than 1,562 crime victims in FY 2018, including 308 human trafficking victims and 859 child exploitation victims. We initiated more child exploitation cases and achieved more arrests, indictments and convictions paying immediate dividends when you consider the long-term, lasting damage these criminals can inflict upon their young victims. HSI is prioritizing the identification and rescue of child victims of sexual exploitation, working to disrupt and dismantle the transnational criminal organizations (TCOs) responsible for the sexual exploitation of children through cyber-crime and child sex tourism. Knowing that criminal activities involving the sexual exploitation of children routinely cross our physical and virtual borders, we are continuing efforts to increase global collaboration in these investigations.

Since April 2019, HSI has dedicated over 400 personnel to combatting the increase in fraudulent family relationship claims at the Southwest Border. These personnel are protecting children from being smuggled and are identifying and disrupting the criminal organizations that generat false documents and smuggle children. To date, this effort has resulted in the identification of 400 fraudulent families, the discovery of 991 fraudulent documents or claims, and the presentation of 790 individuals for prosecution, 682 of which have been accepted. Additionally, HSI has identified 59 fraudulent UACs in CBP custody, prosecuting 58 of them. In addition, these teams have successfully expanded a rapid DNA pilot project with the assistance of U.S. Border Patrol. As of July 15, 2019, rapid DNA testing has been established at multiple locations along the southwest border as another tool to help investigators identify suspected fraudulent family units. This testing is being utilized to identify child exploitation, human smuggling and trafficking, and to help remove children from these dangerous situations.

HSI conducted 5,981 Employment Eligibility Verification (Form I-9) inspections; issued over $10.0M in judicial fines, forfeitures and restitutions against employers found to be in violation of employment eligibility verification requirements; conducted over 1,500 presentations to 8,257 employers regarding the requirements and benefits of the ICE Mutual Agreement between Government and Employers (IMAGE) program, designed to reduce unauthorized employment and minimize fraudulent identity documents; and certified 18 exceptional employers as new IMAGE members. Through the Visa Security Program, HSI screened approximately 2.2 million non-immigrant visa applicants at 36 high-risk posts.

Narcotics enforcement efforts throughout FY 2018 resulted in more than 11,400 criminal arrests and the seizure of approximately 1 million pounds of illicit narcotics. Our workforce is

dedicated to disrupting and dismantling the TCOs responsible for the manufacture, distribution and sale of these illegal and deadly drugs. Leveraging the Border Enforcement Security Task Force, or BEST unit resources, HSI is increasing investigation and enforcement activities combating organizations that illicitly introduce and distribute fentanyl, heroin, methamphetamine and cocaine into and throughout the United States.

In addition to leveraging domestic assets, HSI works closely with attaché personnel deployed to 77 offices in 51 countries worldwide. These personnel are uniquely positioned to utilize established relationships with host country law enforcement, including Transnational Criminal Investigative Units (TCIUs). These TCIUs are composed of DHS-vetted and -trained host country counterparts who have the authority to investigate and enforce violations of law in their respective countries. The use of TCIUs enables HSI to promote direct action on its investigative leads while respecting the sovereignty of the host country and cultivating international partnerships. These efforts, often thousands of miles from the U.S.-Mexico border in countries like Colombia and Panama, act as an outer layer of security for our Southwest Border.

Terrorism remains one of the most significant threats law enforcement faces in protecting the homeland. Our counterterrorism and anti-criminal exploitation efforts seek to prevent terrorists and other criminals, such as human rights violators, from exploiting the Nation's immigration system. HSI's overstay analysis efforts provide timely, relevant, and credible information on entry, exit, and immigration overstay status of visitors to the United States in order to enhance security, facilitate legitimate trade and travel, and ensure the integrity of the immigration system, all while protecting the privacy of visitors.

## POSITIONING OUR WORKFORCE TO MEET THE MISSION

The FY 2020 Budget includes $313.9 million to hire additional personnel critical to mission success. This funding would allow ICE to hire 850 ERO Officers, 150 HSI Criminal Investigators, 128 attorneys, and 538 support staff including intelligence analysts, case management specialists, and other operational support personnel. For ICE to be able to address the crisis, these positions are urgently needed.

## INVESTING IN INFORMATION TECHNOLOGY AND INFRASTRUCTURE

The FY 2020 Budget includes $7.8 million to fund the deployment and modernization of ICE's information technology applications – systems infrastructure that support our front-line personnel and improves information sharing with DHS and partner organizations.

Tactical Communication (TACCOM) is an integral part of all successful ICE law enforcement operations, including criminal apprehension, emergency response, surveillance, and multi-agency task force operations. In addition to daily operational needs, TACCOM provides critical support necessary for National Special Security Events (NSSEs) and responses to natural and man-made disasters. ICE needs to procure and deploy multi-band mobile and portable radios and the required radio infrastructure nationwide to support interoperability communications, improve officer safety, increase mission effectiveness, and reduce capability gaps. The FY 2020 Budget sustains $53.6 million in IT resources for this effort.

In addition to information technology enhancements, ICE facilities and vehicle recapitalization plans are funded within the FY 2020 Budget. An additional $71 million is requested to make vital repairs and sustain ICE owned facilities, many of which house over 3,500 migrant detainees. Funding for the 5-year vehicle recapitalization plan is also included, providing $49.4 million to support the lease and acquisition of 1,000 new law enforcement vehicles. With over 12,000 vehicles in the inventory, this 5-year plan is critical to ensuring our officers and agents have law enforcement assets that meet daily demands including mileage and age replacement thresholds. Underfunding the plan would increase the officer safety risk, vehicle and technology obsolescence, and cost of replacement.

ICE relies on the availability of these mission-essential systems to perform critical functions across the enterprises. These systems, in turn, rely on modern and up-to-date infrastructure to ensure operational readiness and optimal performance.

## LEGISLATIVE CHANGES

By requiring the release of family units before the conclusion of immigration proceedings, seemingly well-intentioned court rulings, like those related to the Flores Settlement Agreement (FSA), and legislation like the TVPRA, in its current form, are exploited by transnational criminal organizations and human smugglers. In fact, smugglers may provide a discount to family units or those purporting to be family units, because having a minor in the group creates barriers to immigration enforcement. Additionally, they have created an entire illicit industry, with untold millions of dollars being made through the sale, rental, and recycling of children utilized by unscrupulous adults to pose as family units. These same loopholes also encourage parents to send their children on the dangerous journey north, and further incentivizes illegal immigration. As the record numbers indicate, these loopholes have created an enormous pull-factor. Amendments to the laws and immigration court processes are needed to help ensure the successful repatriation of aliens ordered removed by an immigration judge.

## CONCLUSION

Every day, the dedicated, courageous, professional men and women at ICE work to promote homeland security and public safety through broad enforcement of over 400 federal laws governing border control, customs, trade, and immigration. We have and will continue to exercise all lawful authorities we possess to secure the border and to ensure the integrity of the immigration system; our success, however, rests on Congress' shoulders, and we need your support.

ICE continues to faithfully implement the laws established by Congress to protect the integrity and credibility of our country's borders, as well as our national security and the safety of communities nationwide. Our agency continues to work to balance effective law enforcement with the large number of aliens, including family units, arriving at our borders. The increase in the flow of migrants and the change in those arriving at our border are putting migrants, particularly young children, at risk of harm from smugglers, traffickers, criminals, and the dangers of the difficult journey, and are placing unsustainable pressure on our entire immigration system.

Our workforce also remains dedicated to eliminating the transnational criminal organizations responsible for the manufacture, distribution and sale of illegal and deadly drugs. Opioids, in particular, continue to devastate communities across America. As part of this

9

Administration's all-of-government approach to combatting this epidemic, ICE is determined to work with its local law enforcement partners to meet this crisis head-on and reverse the unacceptable toll these substances are taking on our communities.

Eighteen years after 9/11, the threat of terrorism to the homeland remains significant and is now more diffuse than ever.  The investigative authorities bestowed by Congress will allow ICE to continue to deploy innovative approaches to safeguard our national security and keep Americans safe by combating terrorism at home and abroad.

Funding people, technology, and equipment are especially prudent investments given today's challenges.  We believe no other investment will return more operational value on every dollar than the extraordinary men and women of ICE. Removing illicit narcotics, dismantling gangs, and detaining and removing illegal aliens along with ICE's ability to counter emerging threats will continue to be important investments in the safety and security of the Nation into the future.

Ultimately, to solve the border crisis, we must work collectively to ensure the integrity of the immigration system, as a whole.  Failing to adequately resource interior enforcement efforts— such as fugitive operations, detention beds, and ICE attorneys—creates nothing more than the appearance of border enforcement.  Perhaps that is what some people want; however, it creates a pull factor that ultimately drives more people to make the dangerous journey to the United States, incentivizes more illegal activity, and delays justice for those with meritorious claims for asylum.

As a nation of laws, we owe it to the citizens of our country to maintain the integrity of our immigration system, especially when faced with a serious and ongoing national crisis. Accordingly, I ask that you provide the funding sought in the President's FY 2020 budget for ICE.

Thank you again for inviting me to testify today. I am honored and humbled to represent the more than 20,000 American patriots with U.S. Immigration and Customs Enforcement.  I look forward to your questions.

EXHIBIT K
Page 142

# Exhibit L

EXHIBIT L
Page 143

Department of Homeland Security

# Department of Homeland Security

## *U.S. Immigration and Customs Enforcement*

### Budget Overview



**Fiscal Year 2020**
**Congressional Justification**

ICE - 1

EXHIBIT L
Page 144

Department of Homeland Security

U.S. Immigration and Customs Enforcement

# Table of Contents

*U.S. Immigration and Customs Enforcement*...........................................1

Appropriation Organization Structure .....................................................3

Strategic Context................................................................................4

Budget Comparison and Adjustments .....................................................10

Personnel Compensation and Benefits.....................................................16

Non Pay Budget Exhibits......................................................................17

Supplemental Budget Justification Exhibits .............................................19

ICE - 2

EXHIBIT L
Page 145

Operations and Support

# Department of Homeland Security
## *U.S. Immigration and Customs Enforcement*

### *Operations and Support*



**Fiscal Year 2020**
**Congressional Justification**

ICE – O&S - 1

U.S. Immigration and Customs Enforcement

EXHIBIT L
Page 146

U.S. Immigration and Customs Enforcement

Operations and Support

# Table of Contents

*Operations and Support* .......................................................................................... **1**

   Budget Comparison and Adjustments .......................................................... 3

*Justification* ........................................................................................................... **16**

*Performance* .......................................................................................................... **16**

   Personnel Compensation and Benefits ........................................................ 30

   Non Pay Budget Exhibits .............................................................................. 32

   *Mission Support – PPA* ............................................................................... 34

      Budget Comparison and Adjustments ..................................................... 34

      Personnel Compensation and Benefits .................................................... 39

      Non Pay Budget Exhibits ........................................................................ 41

   *Office of the Principal Legal Advisor – PPA* ............................................ 51

      Budget Comparison and Adjustments ..................................................... 51

      Personnel Compensation and Benefits .................................................... 54

      Non Pay Budget Exhibits ........................................................................ 56

   *Homeland Security Investigations – PPA* ................................................. 61

      Budget Comparison and Adjustments ..................................................... 61

      Personnel Compensation and Benefits .................................................... 65

      Non Pay Budget Exhibits ........................................................................ 66

      *Domestic Investigations – PPA Level II* ............................................... 68

      *International Operations – PPA Level II* ............................................... 82

      *Intelligence – PPA Level II* ................................................................... 90

   *Enforcement and Removal Operations – PPA* ........................................... 98

      Budget Comparison and Adjustments ..................................................... 98

      Personnel Compensation and Benefits .................................................... 103

      Non Pay Budget Exhibits ........................................................................ 104

      *Custody Operations – PPA Level II* ...................................................... 106

      *Fugitive Operations – PPA Level II* ...................................................... 126

      *Criminal Alien Program – PPA Level II* ............................................... 135

      *Alternatives to Detention – PPA Level II* .............................................. 146

      *Transportation and Removal Program – PPA Level II* ......................... 155

ICE – O&S - 2

EXHIBIT L
Page 147

U.S. Immigration and Customs Enforcement

Operations and Support

| Program Changes (Dollars in Thousands) | FY 2020 President's Budget | | |
|---|---|---|---|
| | Positions | FTE | Amount |
| Mission Support | - | - | $4,975 |
| **Program Change 8 - ICE Workstation Refresh** | - | - | $16,000 |
| Mission Support | - | - | $16,000 |
| **Program Change 9 - Office of Professional Responsibility Investigations** | - | - | $9,986 |
| Mission Support | - | - | $9,986 |
| **Program Change 10 - TECS Modernization** | - | - | $23,300 |
| Homeland Security Investigations | - | - | $23,300 |
| Domestic Investigations | - | - | $23,300 |
| **Program Change 11 - Transportation and Removal Increase** | - | - | $56,872 |
| Enforcement and Removal Operations | - | - | $56,872 |
| Transportation and Removal Program | - | - | $56,872 |
| **Program Change 12 - Wiretaps for Criminal Investigators** | - | - | $15,500 |
| Homeland Security Investigations | - | - | $15,500 |
| Domestic Investigations | - | - | $15,500 |
| **Total Program Changes** | 1,672 | 838 | **$598,195** |

ICE – O&S - 15

EXHIBIT L
Page 148

Operations and Support

## U.S. Immigration and Customs Enforcement
### Program Change 1 – ADP Increase to 54,000:

### Description
In FY 2020, ICE requests an increase of 0 positions, 0 FTE, and $77.8M for detention beds. ICE FY 2020 funding will support 51,500 adult beds and 2,500 family beds, for a total of 54,000 detention beds. Of the requested adult beds, 48,965 will be funded from discretionary appropriations and 2,535 will be funded by mandatory fees. The average daily rate for direct costs is projected to total $129.64 for adult beds, including facilities, guards, healthcare, and other costs directly tied to administering the detention program. Family beds are funded through fixed-price contracts and are thus not dependent on the average daily population (ADP) level. An average daily rate for family beds can be calculated by dividing the total funding requirement of $270.1M by the projected family ADP of 2,500 for an effective family bed rate of $295.94. Additional detail on the bed rate methodology is provided in the Custody Operations Level II PPA description. The base for this program in FY 2019 is 0 positions, 0 FTE, and $2,238.4M for adult beds and $290.9M for family beds.

### Justification
The FY 2020 increase sustains the trend of increasing ADP seen in recent fiscal years. The cumulative ADP at the end of FY 2018 was 42,188 (40,075 adult and 2,113 families). Operational factors are expected to drive increases to ADP in FY 2020, on top of increases in arrests, charging documents, and detainers issued. CBP border apprehensions and corresponding transfers into ICE detention went up significantly in FY 2018 after a slight decline in FY 2017, with border apprehension of family units increasing by 30.5% and adult apprehension increasing by 28.1%. Interior enforcement continues to be a steady focus since the issuance of EO 13768 in January 2017. In FY 2018, ICE arrests and charging documents have increased by 11% and ICE detainers have increased by 24% over FY 2017. Interior enforcement and rising border activity will drive the requirement for additional detention beds. The requested increase of $77.8M will partially support a total of 54,000 beds in FY 2020, an increase of 2,000 ADP over the FY 2019 President's Budget.

ICE expects several factors could significantly impact operational conditions in FY 2019 and FY 2020, including EO hiring, policy changes impacting enforcement activities, increased border flows, asylum claims, Executive Office for Immigration Review (EOIR) hearing times, inconsistent cooperation from recalcitrant countries, extended legal processes for aliens apprehended in the interior, and increases in encountered alien populations ineligible for quick-turn apprehension and removal. All of these factors have the potential to increase the ADP level. Funding for 54,000 beds lies within the upper bound of the 75% confidence interval of the ERO Law Enforcement Systems and Analysis (LESA) forecast for FY 2020.

### Performance
This request supports DHS Mission 3, Enforce and Administer Our Immigration Laws, Goal 3.2, Prevent Unlawful Immigration. An increase in detention capacity is critical to supporting ICE's ability to apprehend, detain, and remove aliens. As aliens pass through immigration proceedings, detention capacity provides ICE with sufficient time and flexibility to gain custody of immigration law violators, ensure compliance with court procedures, and efficiently utilize transportation networks to remove priority individuals. By increasing detention capacity to 54,000 beds, ICE will be able to manage an increased detainee population resulting from migrant flow at the southern border and the additional apprehensions associated with EO implementation.

ICE – O&S - 16

EXHIBIT L
Page 149

**U.S. Immigration and Customs Enforcement**

**Program Change 2 – ATD Participant Level Increase:**

**Description**

The FY 2020 request includes an increase of $30.0M to better support the anticipated increase to 120,000 participants. In FY 2018, ATD projected 79,000 participants and concluded the fiscal year at 79,500 participants. ATD is projected to conclude FY 2019 at 99,500 participants. The base for this program in FY 2019 is $184.4M.

**Justification**

ATD enables ICE to supervise individuals who are moving through immigration proceedings without detaining them. ATD supervises participants through a combination of home visits, office visits, alert response, court tracking, and/or technology. ATD enables ICE to supervise a larger population of individuals moving through the immigration process than it could detain.

In response to EO 13768, DHS released guidance entitled *Executive Orders on Immigration*, on February 20, 2017, directing the Department to no longer exempt classes or categories of removable aliens from potential enforcement. Implementation of the EO and DHS guidance has already led to increases in arrests, charging documents, and detainers issued. CBP border apprehensions have been on the rise, with month-over-month increases beginning in the third quarter of FY 2018. ICE projects that these trends will continue as a result of the increased number of ICE law enforcement officers (LEOs) being hired pursuant to the EO.

Increased apprehensions at the border, particularly of family units, have taxed ICE's already overburdened detention system. Without increased detention space and court mandates to not hold certain classes of aliens beyond certain time limits, this overburden has forced more releases than ever before. ICE has used ATD – Intensive Supervision Appearance Program III (ISAP III) in an attempt to manage this increased workload. The lack of new mission support and LEOs to appropriately manage the program has led to a skyrocketing population. ICE's ability to monitor the caseload and perform appropriate case management is exacerbated by increased backlogs for case processing with both EOIR and USCIS. With an increased amount of law enforcement contacts, particularly as ICE reaches and exceeds detention capacity, and an increased burden on all aspects of the immigration process, it is critical that ICE have available under ATD both sufficient monitoring technology options and the ability to assign supplemental reporting requirements to ensure compliance with release conditions.

**Performance**

This proposal supports DHS Mission 3, Enforce and Administer Our Immigration Laws, Goal 3.2, Prevent Unlawful Immigration. This increase in funding for ATD is necessary to ensure that ICE has sufficient resources to effectively supervise individuals who are moving through the immigration process without detaining them and manage the increased number of apprehensions resulting from increased enforcement in FY 2020. The program is projecting an average daily participant level of 120,000 in FY 2020.

EXHIBIT L
Page 150

U.S. Immigration and Customs Enforcement

Operations and Support

**Program Change 3 – Counterintelligence Personnel & Mission Support:**

**Description**
The FY 2020 request includes an increase of one position, one FTE, and $57,000 to protect ICE Federal and contractor personnel, data, and infrastructure from internal and external threats. The base for this program is seven positions, seven FTE, and $1.5M.

**Justification**
In the past 12 months, considerable threats have been directed against ICE personnel and facilities. Employees have faced harassment and threats in their neighborhoods and online while protestors have disrupted operations at several facilities across the country. The ICE Office of Professional Responsibility (OPR) and HSI are responsible for assessing, investigating, and documenting internal and external threats against ICE facilities, employees, and contractors. During this time, using existing base resources, HSI has reorganized to establish a Threat Management Unit (TMU) to efficiently identify, analyze, investigate, and dismantle threats. The TMU coordinates with personnel from OPR and ERO to expedite the analysis of suspected threat information and its dissemination to the relevant investigative field office for action.

This enhancement will fund an additional HSI FTP for identification and assessment of internal and external threats against ICE employees for further action by HSI and OPR criminal investigators LEOs. The requested position is:One GS-0132-9/12 Counterintelligence Operations Specialist.

**Performance**
The additional staff will enhance reporting, collection, analysis, and production to better understand and mitigate insider and external threats and increase protection of critical information and assets.

**Program Change 4 – Counterintelligence Personnel & Mission Support - CI:**

**Description**
The FY 2020 request includes an increase of five positions, two FTE, and $0.5M to protect ICE Federal and contractor personnel, data, and infrastructure from internal and external threats. The base for this program is seven positions, seven FTE, and $1.5M.

**Justification**
These positions will be placed into the TMU as described in the Counterintelligence Personnel and Mission Support program change.

This enhancement will fund an additional five HSI FTPs for identification and assessment of internal and external threats against ICE employees for further action by HSI and OPR LEOs. The five requested positions are as follows:
- One GS-0132-14 Counterintelligence Operations Specialist.
- Two GS-0132-13 Counterintelligence Operations Specialists.
- Two GS-0132-9/12 Counterintelligence Operations Specialists.

ICE – O&S - 18

EXHIBIT L
Page 151

Operations and Support

Enforcement and Removal Operations - PPA

**Family Beds:**

FFP contracts are used for detention beds, guard services, and healthcare at ICE's three FRCs located in South Texas, Karnes County, and Berks County. Since these contracts are fixed price, costs do not vary with the number of family detainees. ICE projects total costs of $270.1M in FY 2020 for family beds. The table below shows the break-out of these costs. Dividing the total funding requirement of $270.1M by the projected family ADP of 2,500 results in an effective family bed rate of $295.94. As with adult beds, beginning in FY 2019, ICE no longer includes indirect expenses in the derivation of its average daily bed rate for family beds following the SWC realignment.

| Projected FFP Contract Costs (Dollars in Thousands) | FY 2018 Enacted | FY 2019 Projected | FY 2020 Projected |
|---|---|---|---|
| South Texas FRC with Healthcare | $207,836 | $211,161 | $185,829 |
| Karnes County FRC with Healthcare | $61,002 | $61,978 | $64,578 |
| Berks County FRC with Healthcare | $11,296 | $12,117 | $12,780 |
| Other Direct Costs | $5,548 | $5,637 | $6,865 |
| **Total Direct Costs** | **$286,312** | **$290,893** | **$270,052** |
| Indirect Costs | $5,112 | N/A | N/A |
| **Total Costs** | **$291,425** | N/A | N/A |
| Effective Family Bed Rate | $319.37 | $318.79 | $295.94 |

**Guaranteed Minimum (GM) Facilities:**

New detention facilities often require significant investment, including renovations to expand facilities or alter the layout to meet ICE-specific requirements. Facility owners leverage the need to recoup these costs in negotiations with Federal contracting officers. To achieve favorable bed rates in these negotiations, ICE employs GM pricing structures, which contractually require ICE to purchase a certain number of detention beds per month regardless of occupation. ICE Office of Acquisition Management (OAQ) uses GM pricing to negotiate the best possible rate for ICE, especially when ICE is the sole agency leasing the facility.

The chart below illustrates ICE's bed space utilization at facilities with GM pricing structures, excluding FRCs.

ICE – O&S - 117

EXHIBIT L
Page 152

## Operations and Support

## Enforcement and Removal Operations – PPA

| DETLOC | Facility Name | Field Office | Facility Type | Available Capacity | ICE Capacity | Daily Population | YTD FY 2018 ADP | FY 2018 Capacity Utilization | Weekly ADP | Weekly Capacity Utilization | Guaranteed Minimum | Per Diem Rate Detailed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ELVDFTX | EL VALLE DETENTION FACILITY | SNA | IGSA | 260 | 660 | 400 | 52 | 8% | 386 | 58% | 500 | 8/1/18-9/30/18: $00 (GM); $119.18 (1-500), $60.15 (501-660); 10//18: 750 (GM?, $107.40 (1-750), $56.80 (751-1000) |
| ADLNTCA | ADELANTO ICE PROCESSING CENTER | LOS | IGSA | 252 | 1,940 | 1,688 | 1,716 | 88% | 1,719 | 89% | 1,455 | 1455 (GM); $114.40 (1-1455), $44.13 (1456-1940) |
| CSCNWWA | TACOMA ICE PROCESSING CENTER (NORTHWEST DET CTR) | SEA | CDF | 224 | 1,575 | 1,351 | 1,403 | 89% | 1,367 | 87% | 1,181 | 1181 (GM); $119.53 (1-1181), $48.12 (1182-1575) |
| CCASDCA | OTAY MESA DETENTION CENTER (SAN DIEGO CDF) | SND | CDF | 214 | 1,142 | 928 | 955 | 84% | 926 | 81% | 600 | 600 (GM), $2,814,791.55 Flat Monthly Fee [$154.24] (1-600), $138.29 (601+) |
| CIBOCNM | CIBOLA COUNTY CORRECTIONAL CENTER | ELP | IGSA | 212 | 500 | 288 | 277 | 55% | 284 | 57% | 150 | 150 (GM), $87.94 (1-150), $87.94 (151-500) |
| STCDFTX | SOUTH TEXAS ICE PROCESSING CENTER | SNA | CDF | 143 | 1,890 | 1,747 | 1,756 | 93% | 1,737 | 92% | 1,350 | 1350 (GM); $91.79 (1-1,350), $9.88 (1,351+) |
| SHERBMN | SHERBURNE COUNTY JAIL | SPM | USMS IGA | 88 | 350 | 262 | 270 | 77% | 267 | 76% | 300 | 300 (GM), $100.00 (1-300), $95.00 (301+) |
| BTV | BUFFALO (BATAVIA) SERVICE PROCESSING CENTER | BUF | SPC | 63 | 650 | 587 | 564 | 87% | 611 | 94% | 400 | 400 (GM), $126.55 (1-400), $17.73 (401-650) |
| HOUICDF | HOUSTON CONTRACT DETENTION FACILITY | HOU | CDF | 61 | 1,000 | 939 | 938 | 94% | 966 | 97% | 750 | 750 (GM); $109.24 (1-750), $109.24 (750-900), $40.00 (901-1,000) |
| STWRTGA | STEWART DETENTION CENTER | ATL | IGSA | 55 | 1,916 | 1,861 | 1,827 | 95% | 1,849 | 97% | 1,600 | 1600 (GM); $62.49 (1-1600), $61.35 (1601-1750), $40.00 (1751-1966) |
| RGRNDTX | RIO GRANDE DETENTION CENTER | SNA | USMS IGA | 28 | 672 | 644 | 606 | 90% | 595 | 88% | 275 | 275 (GM), $27.50 (1-275), $27.50 (276-672) |
| FLO | FLORENCE SERVICE PROCESSING CENTER | PHO | SPC | 28 | 392 | 364 | 400 | 102% | 392 | 100% | 374 | 374 (GM for FLO and FSF combined); $226.87 (1-374), $0.00 (375-712) |
| EPC | EL PASO SERVICE PROCESSING CENTER | ELP | SPC | 24 | 840 | 816 | 743 | 88% | 818 | 97% | 600 | 600 (GM); $2,686,786.46 Flat Monthly Fee, $0.00 (601-840) |
| CACFMES | MESA VERDE ICE PROCESSING CENTER | SFR | IGSA | 23 | 400 | 377 | 378 | 94% | 381 | 95% | 320 | 320 (GM), $125.08 (1-320), $94.95 (321-400) |
| PIC | PORT ISABEL | SNA | SPC | 18 | 1,175 | 1,157 | 1,121 | 95% | 1,120 | 95% | 800 | 800 (GM), $135.30 (1-800), $0.00 (801-1175) |
| WCCPBFL | BROWARD TRANSITIONAL CENTER | MIA | CDF | 16 | 700 | 684 | 661 | 94% | 682 | 97% | 700 | $2,050,620.25 (flat fee) |
| AAORDMD | ANNE ARUNDEL COUNTY ORDNANCE ROAD CORRECTIONAL CTR | BAL | IGSA | 16 | 130 | 114 | 76 | 58% | 114 | 88% | 40 | 40 (GM); $123.48 (1-40), $118.00 (41-130) |
| MONROFL | MONROE COUNTY DETENTION CENTER | MIA | IGSA | 14 | 72 | 58 | 63 | 88% | 63 | 88% | 50 | 50 (GM); $87.00 (1-50), $23.00 (51-72) |
| FRMVLVA | IMMIGRATION CENTERS OF AMERICA FARNVILLE | WAS | IGSA | 14 | 690 | 676 | 664 | 96% | 688 | 100% | 500 | 500 (GM) $119.82; Above GM $28.26 |
| ELZICDF | ELIZABETH CONTRACT DETENTION FACILITY | NEW | CDF | 12 | 304 | 292 | 291 | 96% | 290 | 95% | 285 | 285 (GM), $152.26 (1-285), $138.88 (286-300), $33.52 (301+) |
| DEAPDMI | DEARBORN POLICE DEPARTMENT | DET | IGSA | 8 | 8 | 0 | 4 | 44% | 2 | 21% | 75 | 75 (GM for DEAPDMI and CALHCMI combined); $72.00 (1-75), $40.00 (76-125), $64.27 (126+) |
| IRADFCA | IMPERIAL REGIONAL DETENTION FACILITY | SND | IGSA | 2 | 704 | 702 | 685 | 97% | 698 | 99% | 640 | 640 (GM); $143.14 (1-640), $96.43 (641+) |
| JENADLA | LASALLE ICE PROCESSING CENTER (JENA) | NOL | IGSA | (24) | 1,160 | 1,184 | 1,155 | 98% | 1,193 | 103% | 1,170 | 1170 (GM for JENADLA and JENATLA combined), $76.64 (1-1170), $28.38 (1171-1560) |
| DENICDF | DENVER CONTRACT DETENTION FACILITY | DEN | CDF | (36) | 848 | 884 | 782 | 92% | 878 | 104% | 525 | 525 (GM), $108.46 (1-525), $50.09 (526-848) |
| KRO | KROME NORTH SERVICE PROCESSING CENTER | MIA | SPC | (75) | 581 | 656 | 495 | 85% | 676 | 116% | 450 | 450 (GM), $154.60 (1-450), $59.39 (451+) |
| CALHOMI | CALHOUN COUNTY CORRECTIONAL CENTER | DET | IGSA | (101) | 125 | 226 | 216 | 173% | 219 | 175% | 75 | 75 (GM for DEAPDMI and CALHCMI combined); $72.00 (1-75), $40.00 (76-125), $64.27 (126+) |
| JAMESGA | FOLKSTON ICE PROCESSING CENTER (D. RAY JAMES) | ATL | IGSA | (230) | 780 | 1,010 | 685 | 88% | 1,009 | 129% | 544 | 544 (GM), $1,526,204.00 Flat Monthly Fee (1-544); $30.56 (545-780) |

EXHIBIT L
Page 153

## Operations and Support

### Enforcement and Removal Operations - PPA

Notes: (1) Data is reflective of ICE Integrated Decision Support (IIDS) Database, FY 2018 year to date as of as of 09/29/2018. (2) Measures of ICE capacity in the table above reflects contractual facility capacity for ICE detainees which does not necessarily reflect the actual facility capacity. In certain cases, facilities have overflow beds built into their contractual capacity that are used on a temporary basis for higher fluctuations of population in unforeseen circumstances or transitional purposes, such as transfers and removals.

ICE's current classification system requires that detainees be protected from harm through the assignment of housing with individuals of similar background and criminal history. This classification system ensures the safe and orderly operation of detention facilities and protects staff and detainees from harm. Filling every available bed in a detention facility would necessitate housing detainees of varied threat levels together, posing serious safety concerns for detainees, officers, staff, and facility owners. ICE consequently maintains a target utilization rate of about 85 to 90% of total facility capacity, including 100% usage of all GM beds. This target utilization also allows for flexibility to respond to emergencies or other unforeseen circumstances that might require immediate availability of detention beds (e.g., charter flight cancellations, surges, or smuggling loads). ICE will always make safety and security the primary operational concern at all facilities, including GM facilities.

As the graph below demonstrates, ICE meets or exceeds its target utilization in almost every instance.



**FY 2018 Capacity Utilization by Facility**

ICE – O&S - 119

EXHIBIT L
Page 154

Operations and Support

Enforcement and Removal Operations - PPA

Notes: (1) Refer to GM Utilization Chart above for the full names of the facilities associated with these acronyms; (2) Weekly ADP and FY 2018 YTD ADP data as of 10/01/2018 (IIDS as of 09/29/2018); (3) Two facilities began housing ICE detainees under GM contracts within FY 2018: SHERBMVN was converted to a GM contract in May 2018, and ELVDFTX was signed in July 2018. ELVDFTX low utilization compared to GM is a result of it still being in the ramp up phase from the initiation of the contract; and (4) CALHOMI and DEAPDMI utilization combined in graph above.

## Detention Capacity Requirements:

As evidenced in the chart below, CBP book-ins to ICE custody swung downward from December 2016 to April 2017. However, the number of CBP-apprehended illegal migrants booked into ICE custody increased steadily in the last quarter of FY 2018. This upward trend has continued throughout FY 2018. Additionally, ICE interior intake has increased since issuance of EO 13768. ICE anticipates these trends to continue. Nonetheless, CBP intake can be volatile and is sensitive to geo-political events and environmental factors beyond ICE's control. ICE's FY 2020 ADP estimate may change due to the difficulty of projecting ADP related to CBP intake nearly two years in advance. An ADP of 54,000 lies within ERO LESA's upper 75% confidence interval. The current forecast assumes that operational conditions will remain similar to recent migratory and enforcement trends. ICE's FY 2020 request includes 51,500 adult beds and 2,500 family beds. Of the total adult beds, 48,965 are funded in Custody Operations. The remaining 2,535 are funded in fee accounts.



FY 2017-FY 2018 ICE Intake

ICE – O&S - 120

EXHIBIT L
Page 155