# Exhibit M



*Congressional*
*Research Service*
Informing the legislative debate since 1914

# Immigration: Alternatives to Detention (ATD) Programs

July 8, 2019

**Congressional Research Service**
https://crsreports.congress.gov
R45804

CRS REPORT
Prepared for Members and
Committees of Congress



**Congressional Research Service**
Informing the legislative debate since 1914

SUMMARY

R45804

July 8, 2019

Audrey Singer
Specialist in Immigration
Policy

# Immigration: Alternatives to Detention (ATD) Programs

Since FY2004, Congress has appropriated funding to the Department of Homeland Security's (DHS's) Immigration and Customs Enforcement (ICE) for an Alternatives to Detention (ATD) program to provide supervised release and enhanced monitoring for a subset of foreign nationals subject to removal whom ICE has released into the United States. These aliens are not statutorily mandated to be in DHS custody, are not considered threats to public safety or national security, and have been released either on bond, their own recognizance, or parole pending a decision on whether they should be removed from the United States.

Congressional interest in ATD has increased in recent years due to a number of factors. One factor is that ICE does not have the capacity to detain all foreign nationals who are apprehended and subject to removal, a total that reached nearly 400,000 in FY2018. (ICE reported an average daily population of 48,006 aliens in detention for FY2019, through June 22, 2019.) Other factors include recent shifts in the countries of origin of apprehended foreign nationals, increased numbers of migrants who are traveling with family members, the large number of aliens requesting asylum, and the growing backlog of cases in the immigration court system.

Currently, ICE's Enforcement and Removal Operations (ERO) runs an ATD program called the Intensive Supervision Appearance Program III (ISAP III). On June 22, 2019, program enrollment included more than 100,000 foreign nationals, who are a subgroup of ICE's broader "non-detained docket" of approximately 3 million aliens. Those in the non-detained docket include individuals the government has exercised discretion to release—for example, they are not considered a flight risk or there is a humanitarian reason for their release (as well as other reasons). (Others who are not detained include aliens in state or federal law enforcement custody and absconders with a final order of removal.) Individuals in the non-detained docket, and not enrolled in the ISAP III program, receive less-intensive supervision by ICE. Those in ISAP III are provided varying levels of case management through a combination of face-to-face and telephonic meetings, unannounced home visits, scheduled office visits, and court and meeting alerts. Participants may be enrolled in various technology-based monitoring services including telephonic reporting (TR), GPS monitoring (location tracking via ankle bracelets), or a recently introduced smart phone application (SmartLINK) that uses facial recognition to confirm identity as well as location monitoring via GPS.

From January 2016 to June 2017, ICE also ran a community-based supervision pilot program for families with vulnerabilities not compatible with detention. The Family Case Management Program (FCMP) prioritized enrolling families with young children, pregnant or nursing women, individuals with medical or mental health considerations (including trauma), and victims of domestic violence. The program was designed to increase compliance with immigration obligations through a comprehensive case management strategy run by established community-based organizations. FCMP offered case management that included access to stabilization services (food, clothing, and medical services), obligatory legal orientation programing, and interactive and ongoing compliance monitoring. An ICE review of FCMP in March 2017 showed that the rates of compliance for the program were consistent with other ICE monitoring options. The program was discontinued due to its higher costs as compared to ISAP III. Even with the higher costs, there is considerable congressional interest in the effectiveness of FCMP as a way to maintain supervision for families waiting to proceed through the backlogged immigration court system.

While DHS upholds that ISAP III is neither a removal program nor an effective substitute for detention, it notes that the program allows ICE to monitor some aliens released into communities more closely while their cases are being resolved. Supporters of ATD programs point to their lower costs compared to detention on a per day rate, and argue that they encourage compliance with court hearings and ICE check-ins. Proponents also mention the impracticalities of detaining the entire non-detained population of roughly 3 million aliens. The primary argument against ATD programs is that they create opportunities for participants to abscond (e.g., evade removal proceedings and/or orders). Other concerns include whether the existence of the programs provides incentives for foreign nationals to migrate to the United States with children to request asylum, in the hope that they will be allowed to reside in the country for several years while their cases proceed through the immigration court system, or that it provides incentives—such as community release—for adults without bona fide family relationships to travel with children and file fraudulent asylum claims or do children harm.

EXHIBIT M
Page 158

# Contents

Background ........................................................................................................................... 1

Laws Governing Aliens Arriving at the U.S. Border ........................................................... 3

Detention in the Immigration System .................................................................................. 4

ICE Caseload Size and ATD Participants ............................................................................ 6

Alternatives to Detention (ATD) Programs ......................................................................... 7

    Intensive Supervision Appearance Program III (ISAP III) ........................................... 7

        Who is in the ISAP III program? ........................................................................... 8

        Evaluating ATD ..................................................................................................... 9

    The Family Case Management Program (FCMP) ......................................................... 10

        Who was enrolled in the FCMP? ......................................................................... 11

        Evaluating FCMP ................................................................................................ 13

Why have alternatives to detention? .................................................................................. 14

# Figures

Figure 1. ICE Caseload: Non-detained, Detained, and ISAP III Participants ...................... 7

Figure 2. ISAP III Active Participants by Country of Birth ................................................. 9

Figure 3. ISAP III Active Participants by Criminal Conviction .......................................... 9

Figure 4. FCMP Adult Participants by Country of Birth, 2017 .......................................... 12

Figure 5. All Participants (Children and Adults) by Age, 2017 ......................................... 12

Figure 6. FCMP Participants by Vulnerability ................................................................... 13

# Contacts

Author Information ............................................................................................................. 16

## Evaluating FCMP

ICE conducted an evaluation of the FCMP that focused on three metrics: attendance at ERO appointments, attendance at appointments with community-based organizations, and attendance at court hearings.[82] Data on compliance of the relatively small number of families that completed the program prior to its termination reported it to be high across all locations, with 99% attendance at immigration court proceedings and 99% compliance with ICE monitoring requirements.[83] About 4% of program participants absconded during the life of the program. In total, 65 families left the program: 7 were removed from the United States by ICE, 8 left the country on their own, 9 were granted some form of immigration relief, and 41 absconded. The rest of the families remained in the program; however,

### Figure 6. FCMP Participants by Vulnerability



**Source:** Department of Homeland Security, U.S. Immigration and Customs Enforcement, *Family Case Management Program (FCMP)* [INTERNAL] *Close-Out Report,* February 2018.

because of its short duration the ICE evaluation of the FCMP is limited—the majority of the participants were still in immigration proceedings when it was terminated. It is unknown what the program's success rates would have been if participants were allowed to remain in the program through the final outcome of their cases. When ICE discontinued the program in June 2017, the agency stated that rates of compliance for the FCMP were consistent with its other ATD program (i.e., ISAP III).

In addition to compliance rates, another important factor in evaluating the program is its cost. The FCMP cost approximately $38.47 per family per day in FY2016, versus approximately $4.40 per person per day for ISAP III. By comparison, family detention costs an estimated $237.60 per day and adult detention in the same cities that the FCMP operated in cost $79.57 on average per day in FY2016.[84] The FCMP is more expensive than ISAP III due to the comprehensive case management and services available to its participants, the more vulnerable family populations targeted, and the smaller caseload per case manager (which allowed for more time with each participant household). For example, FCMP case managers were expected to have a high level of experience, used outreach (not just referrals) to connect participants with community resources, had Spanish language ability or accessed interpretation services, and developed individualized plans for families, including children. The evaluation indicated that FCMP families made use of the services offered to them: the most common referrals made by case workers were for legal services, medical attention, and food aid.

---

[82] ICE, *Family Case Management Program (FCMP)*, p 6.

[83] Ibid.

[84] Ibid.

The Consolidated Appropriations Act, 2019 (P.L. 116-6) includes $30.5 million to resume the FCMP. The conference report[85] states that the FCMP "can help improve compliance with immigration court obligations by helping families access community-based support of basic housing, healthcare, legal and educational needs." The conference report also directs ICE to prioritize the use of ATD programs, including the FCMP, for families. In addition, the report instructs ICE to brief the relevant committees,[86] within 90 days of the date of enactment,[87] on a plan for a program within the FCMP managed by nonprofit organizations that have experience in connecting families with community-based services.

The ICE ERO Detention Management website mentions a new program, Extended Case Management Services (ECMS). It states, "as instructed by Congress, ICE recently incorporated many of the Family Case Management Program (FCMP) principles into its traditional ATD program. These principles were incorporated into the current ATD ISAP III through a contract modification and are known as Extended Case Management Services (ECMS). These same services are available through the ECMS modification as they were available under FCMP with two distinct differences: ECMS is available in a higher number of locations and available at a fraction of the cost. While ECMS is a new program, ICE continues to identify and enroll eligible participants." As of June 22, 2019, ICE reported that 57 family units and 59 adults are enrolled in ECMS.[88]

# Why have alternatives to detention?

Supporters of ATD programs cite several reasons for their use. First, the number of foreign nationals currently being taken into custody far exceeds the capacity of existing detention facilities. As noted above, in FY2018 the number of book-ins to ICE facilities was nearly 400,000.[89] As of July 12, 2018, ICE's detention capacity was approximately 45,700 beds; of these, approximately 2,500 were for family units housed in family residential centers.[90] Second, many foreign nationals who are in removal proceedings are not considered security or public safety threats, nor are they an enforcement priority as outlined in guidance to DHS personnel regarding immigration enforcement.[91] Third, some foreign nationals who are found deportable or

---

[85] H.J.Res. 31, H.Rept. 116-9.

[86] House Appropriations Subcommittee on Homeland Security, and the Senate Appropriations Subcommittee on Homeland Security.

[87] P.L. 116-6 was enacted on February 15, 2019.

[88] See https://www.ice.gov/detention-management.

[89] This figure is a gross count of the number of initial book-ins, not the number of unique individuals. See Department of Homeland Security, U.S. Immigration and Customs Enforcement, 2018, *Fiscal Year 2018 ICE Enforcement and Removal Operations Report*, https://www.ice.gov/sites/default/files/documents/Report/2017/iceEndOfYearFY2017.pdf

[90] DHS response to CRS request, July 12, 2018.

[91] ICE ERO removal priorities are outlined in Executive Order 13768, "Enhancing Public Safety in the Interior of the United States," January 25, 2017, and a related DHS implementation memorandum, "Enforcement of the Immigration Laws to Serve the National Interest," issued February 20, 2017. The memorandum directs DHS personnel to prioritize removable aliens who "(1) have been convicted of any criminal offense; (2) have been charged with any criminal offense that has not been resolved; (3) have committed acts which constitute a chargeable criminal offense; (4) have engaged in fraud or willful misrepresentation in connection with any official matter before a governmental agency; (5) have abused any program related to receipt of public benefits; (6) are subject to a final order of removal but have not complied with their legal obligation to depart the United States; or (7) in the judgment of an immigration officer, otherwise pose a risk to public safety or national security. The Director of ICE, the Commissioner of CBP, and the Director of USCIS may, as they determine is appropriate, issue further guidance to allocate appropriate resources to prioritize enforcement activities within these categories-for example, by prioritizing enforcement activities against

---

inadmissible may not be removed because their countries of citizenship refuse to confirm an individual's identity and nationality, issue travel documents, or otherwise accept their physical return.[92] A U.S. Supreme Court ruling from 2001, *Zadvydas v. Davis,* limits the federal government's authority to indefinitely detain aliens who have been ordered removed and who have no significant likelihood of removal in the reasonably foreseeable future.[93]

Those who promote using ATD programs also cite the relatively low cost compared with detention. ICE spent an average of $137 per adult per day in detention nationwide in FY2018.[94] The cost of enrolling foreign nationals in the ISAP III program depends on the method of management, but the average daily cost per participant in FY2018 (through July 2018) was $4.16.[95] GAO utilized two methods of determining the cost of ATD (ISAP II) relative to detention in FY2013 (at that time, the average daily cost of ISAP II was $10.55, while daily detention was an average of $158). First, given the average daily costs of ATD and detention, and the average length of time an alien spent in detention awaiting an immigration judge's final decision, GAO found that the cost of maintaining an enrollee in ISAP II would surpass the costs of detention only if the enrollee were in the program for 1,229 days, which would be 846 days longer than the average number of days a participant typically spent in it. Second, given the average cost of ATD and detention, and the average length of time an alien spent in detention regardless of whether a final decision on her/his case was rendered, GAO determined an individual would have to spend, on average, 435 days in ISAP II before they exceeded the cost of the average length of detention (29 days in FY2013).[96]

There are also arguments against using ATD programs. Of primary concern is that the programs, in comparison to detention, create opportunities for aliens in removal proceedings to abscond and become part of the unauthorized population who are not allowed to lawfully live or work in the United States. Because immigration judges must prioritize detained cases, ATD enrollees must often wait several years before their cases are heard, during which time they may abscond. They may also fall out of contact with ERO for other reasons. For example, an alien may move within the United States and fail to provide updated contact information to ERO. If they do not receive communication from ICE or the immigration court system, they could miss court dates that have changed in the interim. If they fail to show up for a removal hearing, for example, they can be ordered removed *in absentia*, which would render them inadmissible for a certain period (at least 5 years if they are an arriving alien, and at least 10 years for all other aliens) and ineligible for certain forms of relief from removal for 10 years.

Another concern is that asylum-seeking families are often placed into ATD, and this creates incentives for others to travel to the United States with children, request asylum, and receive similar conditions of release into the United States. DHS has expressed concern over adults using children as a "human shields" to avoid detention after illegally entering the United States.[97] Those

---

removable aliens who are convicted felons or who are involved in gang activity or drug trafficking."

[92] For further discussion of "recalcitrant" countries, see CRS In Focus IF11025, *Immigration: "Recalcitrant" Countries and the Use of Visa Sanctions to Encourage Cooperation with Alien Removals*.

[93] 533 U.S. 678

[94] ICE email response to CRS request, October 18, 2018.

[95] ICE email response to CRS request, October 18, 2018.

[96] GAO, "Alternatives to Detention: Improved Data Collection and Analyses Needed to Better Assess Program Effectiveness," 2014.

[97] Isaac Stanley-Becker, "Kirstjen Nielsen asserts women and children were 'human shields' in tear gas attack at border," *Washington Post*, November 26, 2018, https://www.washingtonpost.com/nation/2018/11/27/kirstjen-nielsen-claims-women-children-were-human-shields-tear-gas-attack-border/?utm_term=.629f2fb9cc2f .

# Exhibit N

*The New York Times*

# ICE Faces Migrant Detention Crunch as Border Chaos Spills Into Interior of the Country

**By Caitlin Dickerson**

April 22, 2019

[Read the latest edition of Crossing the Border, a limited-run newsletter about life where the United States and Mexico meet. Sign up here to receive the next issue in your inbox.]

Federal immigration authorities faced with overburdened detention centers are scouring the country to find space to house migrants as the crush of asylum seekers that has overwhelmed the Southwest border spreads deep into the nation's interior.

With mounting federal initiatives to hold more and more migrants in custody, officials at Immigration and Customs Enforcement, which oversees long-term detention centers for migrants, are looking for additional space that can be rented inside existing jails, as well as fast-tracking the deportations of current detainees and releasing as many migrants as possible into the country to make room for newcomers.

In one initiative examined earlier this year, Department of Homeland Security officials looked at housing migrant children at Guantánamo Bay, Cuba, which has a dormitory facility that has been used in the past to hold asylum seekers. The proposal to house migrant children from the Southwest border there has not gained traction, perhaps because of the optics of housing young people adjacent to terrorism suspects, according to one official who had seen the proposal but was not authorized to discuss it publicly.

While there were no "immediate" plans to house migrant children at Guantánamo Bay, the Defense Department is attempting to identify military bases that might be used for that purpose, a department spokesman, Tom Crosson, said on Monday.

Much of the administration's focus in recent months has been on the Southwest border, where the surge of migrant families seeking asylum has overwhelmed short-term holding facilities and left people languishing there for longer periods of time. But authorities already are confronting the next phase of detention, the long-term facilities in the interior of the country where many of the incoming migrants will eventually be transferred, and these also appear to be bucking under pressure.

**Unlock more free articles.**
**Create an account or log in**

Populations in the long-term detention facilities have grown markedly under President Trump, both because of increasing border crossings and his administration's aggressive moves to arrest more undocumented immigrants in the interior of the country. ICE is currently housing 50,223 migrants, one of the highest numbers on record, and about 5,000 more than the congressionally mandated limit of 45,274.

In 2016, President Obama's last year in office, the average daily population of immigrants in detention dipped to 34,376.

A detention crunch that homeland security officials described as already dire threatened last week to become worse with the announcement by Attorney General William Barr that the administration would soon begin mandatorily detaining additional asylum seekers, a move that, if implemented, could put thousands more in custody each month.

"It's clear that all of our resources are being stretched thin. The system is full, and we are beyond capacity," said Kevin K. McAleenan, the new acting homeland security secretary, speaking to reporters at a news conference on the border.

Despite its potential impact on the already congested detention system, a D.H.S. press officer said the agency supported Mr. Barr's order on the detention of asylum seekers because it might discourage migrants from crossing the border to begin with.

Immigrant advocates said the detention crunch has been self-imposed by the administration and its policies.

Under President Trump, ICE agents have been encouraged to arrest anyone living in the country without legal status, regardless of their criminal record, whereas the previous administration put a priority on arresting and deporting undocumented migrants who were considered dangerous.

The Trump administration has also expanded collaboration with local sheriff's departments to gain easier access to anyone in criminal custody who is also suspected of immigration violations. It has once again expanded the use of workplace raids — officials carried out the largest one in a decade earlier this month in Texas. And it has scaled back the use of humanitarian parole, which once allowed many

EXHIBIT N
Page 164

asylum seekers to roam freely and work with temporary permits while they waited for their cases to be resolved.

The result is an increasingly congested system of long-term detention centers around the country, with officials signaling the need for more resources to house more detainees, while immigrant advocates argue that there are humane and effective alternatives to detention.

"We have to remember that it is a choice to jail asylum seekers, and it is a choice that is at odds with international human rights norms," said Heidi Altman, director of policy at the National Immigrant Justice Center.

Ms. Altman pointed to case management programs that have been used in the past to ensure that immigrants show up for court. Studies have shown that the programs are both cheaper than detention and have a proven track record of near universal court compliance.

To address the current crush of detained migrants, ICE officials are working urgently to both expand the current system and to purge it of anyone possible, according to two officials at the Department of Homeland Security who spoke under the condition of anonymity because they were not authorized to discuss internal operations. That effort involves scanning the records of the detained population to find anyone who is ready to be deported immediately, and to identify anyone who qualifies for humanitarian parole and can be released to make room for others.

Another idea, drafted in a memo from Mr. McAleenan in his new capacity as the acting homeland security secretary, would ask the Department of Justice's Executive Office for Immigration Review to dedicate most or all of its resources toward processing the cases of detained immigrants — temporarily pausing the court proceedings of anyone who has already been released into the country. The memo has not yet been sent, according to the official who disclosed it.

Officials in Washington have also suggested to ICE field offices around the country that they begin to release immigrants who have been granted bond by judges but have not yet paid them — presumably because they cannot afford to — in order to make more room.

Many of these measures aimed at clearing out space could face opposition from the White House, since they run contrary to the very policies that are creating the problem — President Trump's often-stated desire to end what he calls "catch and release" of migrants at the border.

Meanwhile, authorities are struggling to identify new locations where migrants can be held in detention. The military awarded a $23 million contract in February to build a "contingency mass migration complex" at Guantánamo, a plan that would expand the existing facility to house 13,000 migrants and 5,000 support staff in tents. That project appears intended primarily to accommodate a crush of migrants that might accompany a new crisis in the Caribbean, though it could theoretically be used to house Central Americans.

In recent months, ICE has also signed or expanded a series of contracts, procuring nearly 3,000 additional beds to house migrants in state and local prisons and jails across the country. Staff have been moved to run the new facilities, but that has further stretched resources at existing detention centers, making it harder to keep cases moving on track.

Medical providers at some ICE facilities have also complained about not having enough resources to maintain minimum requirements, and the officials who spoke on background said that some ICE detention centers had been forced to lower their populations recently because they did not have enough staffing to meet medical standards.

Watchdog groups that favor less immigration detention are warning that slapdash efforts to expand the ICE system could leave detainees at risk.

"You don't have to take my word for it. Their own inspector general has looked into this and expressed concerns about oversight, conditions, inspections, contracting," said Mary Small, policy director of the Detention Watch Network, referring to reports that have documented a long history of inadequacies with health care, sanitation, the use of force and legal access inside detention centers. "Whether by systematically overcrowding the existing system or rapidly expanding it, it's logical to expect to exacerbate all of the underlying problems," Ms. Small said.

Congress has control over ICE's budget for detention, and Democrats have often tried to limit funds in order to rein in the agency's ability to make arrests indiscriminately. Even before the spike in migrant crossings earlier this year, the agency had been on track to require additional emergency funds this fiscal year in order to keep pace with trends at the southern border. Though the majority of those crossing recently are members of migrant families, who are typically being released into the country rather than detained, tens of thousands of individual adults continue to arrive each month, most of whom will end up in long-term detention centers.

Because most migrant families are being released to await the outcome of their asylum cases, ICE's three family detention centers are largely empty now. Facilities certified to house families only have a capacity of about 2,500 people, in any case. Currently, 675 members of migrant families are being detained in one of those facilities in Dilley, Tex. A second one in Karnes City, Tex., has been converted to house adults, to help with overcrowding elsewhere. And the third in Leesport, Pa., is empty.

ICE has historically found ways around congressional attempts to limit arrests, such as using its transfer authority to move funds from other parts of its budget into its account for detention. The agency also routinely arrests more immigrants than it is funded to house, pressuring appropriators to increase its funding in order to support the higher population numbers.

EXHIBIT N
Page 165

But the agency has faced political opposition from local officials around the country in its efforts to expand detention capacity. Last year, California passed a state law barring any new ICE detention contracts from being signed or expanded. And communities around the country have rallied to block plans for migrant detention centers in their regions.

This year, after public allegations of physical abuse against detainees, the local governments in Adelanto, Calif., and Hutto, Tex., pulled out of ICE detention contracts under pressure from constituents.

# Exhibit O

**SENATE RULES COMMITTEE**                                    SB 29
Office of Senate Floor Analyses
(916) 651-1520    Fax: (916) 327-4478

---

THIRD READING

---

Bill No:     SB 29
Author:      Lara (D)
Introduced:  12/5/16
Vote:        21

---

SENATE JUDICIARY COMMITTEE: 5-2, 3/28/17
AYES: Jackson, Hertzberg, Monning, Stern, Wieckowski
NOES: Moorlach, Anderson

SENATE APPROPRIATIONS COMMITTEE: 5-2, 5/25/17
AYES: Lara, Beall, Bradford, Hill, Wiener
NOES: Bates, Nielsen

---

**SUBJECT:** Law enforcement: immigration

**SOURCE:** Community Initiatives for Visiting Immigrants in Confinement
Immigrant Legal Resource Center

---

**DIGEST:** This bill prohibits local law enforcement agencies and local governments from contracting with for-profit entities to detain immigrants on behalf of federal immigration authorities. This bill requires that immigrant detention facilities adhere to national immigration standards for the detention of immigrants. This bill further requires that immigrants in detention be provided other legal rights, as specified. This bill authorizes suits against detention facilities for violations of the national detention standards or violations of other legal rights created by this bill.

**ANALYSIS:**

Existing law:

1) Provides that everyone has the right to seek and to enjoy in other countries asylum from persecution.

2) Protects asylum seekers by prohibiting the federal government from returning to their home countries people who have fled persecution on account of race, religion, nationality, political opinion, or membership in a social group.

3) Provides that victims of certain crimes may obtain immigration relief through a Victim of Crime Visa (U-Visa) and victims of human trafficking may obtain immigration relief through a Victim of Human Trafficking Visa (T-Visa).

4) Provides immigration relief that relies on a state's interest in the welfare of children and provides for Special Immigrant Juvenile Status where a state determines that reunification with one or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or similar basis found under state law and that it would not be in the child's best interest to return to their home country.

5) Establishes that the care and custody of unaccompanied minors is the responsibility of the Office of Refugee Resettlement in the Department of Health and Human Services instead of the Department of Homeland Security.

6) Holds that immigrant detainees with mental disabilities who are facing deportation and who are unable to adequately represent themselves are entitled to qualified legal representatives provided by the federal government for representation during all phases of their immigration proceedings, including appeals and custody hearings.

This bill:

1) Prohibits, as of January 1, 2019, local governments or local law enforcement from entering into or renewing a contract, or modifying a contract to extend the length of the contract, with a private corporation, contractor or vendor to detain immigrants in civil immigration proceedings for profit.

2) Provides that a city, county, city and county, or a local law enforcement agency that chooses to enter into a contract, renews a contract, or modifies a contract to extend the length of the contract, to detain immigrants in civil immigration proceedings, shall detain immigrants only pursuant to a contract that requires the immigration detention facility operator to adhere to the standards for detaining those individuals described in the 2011 Operations Manual Immigration and Customs Enforcement (ICE) Performance-Based National Detention Standards as corrected and clarified in February 2013 and ICE Directive 11065.1 (Review of the Use of Segregation for ICE Detainees).

3) Makes clear that an immigration detention facility can exceed the 2011 Operations Manual ICE Performance-Based National Detention Standards as corrected and clarified in February 2013 or ICE Directive 11065.1 (Review of the Use of Segregation for ICE Detainees).

4) Prohibits immigrant detention facilities, agents of immigration detention facility operators, or those acting on their behalf from depriving immigrant detainees: (a) access to legal representatives; (b) access to translation or interpreters; (c) medical care (which would still include, and not be limited to, HIV medication and transition-related health care, and would still need to be provided even if an immigrant is likely to be released or deported); (d) freedom from harm or harassment; and (e) privacy.

5) Prohibits the involuntary placement of immigration detainees in segregated housing because of the detainee's actual or perceived gender, gender identity, gender expression, or sexual orientation. This bill also requires that transgender and gender non-conforming immigration detainees be given the option to choose a housing placement consistent with their gender identity.

6) Authorizes civil actions for injunctive and other appropriate equitable relief and a civil penalty of $25,000, as specified, when an immigrant detention facility operator, or its agent or person acting on its behalf violates rights created under this bill or the 2011 Operations Manual ICE Performance-Based National Detention Standards as corrected and clarified in February 2013, or ICE Directive 11065.1 (Review of the Use of Segregation for ICE Detainees).

7) Requires that if a civil penalty is requested, the civil penalty shall be assessed individually against each person who is determined to have violated the legal rights of a detained immigrant and awarded to each individual who has been injured.

8) Subjects any facility that detains an immigrant pursuant to a contract with a city, county, city and county, or a local law enforcement agency to the California Public Records Act.

9) Makes related legislative findings and declarations, and includes definitions.

**Background**

In California, and around the country, for-profit detention facilities are increasingly relied upon to detain immigrants who are oftentimes eligible for Asylum, Special Immigrant Juvenile Status immigration relief, U-Visas, T-Visas, or other forms of immigration relief. Additionally, a few local government and local law enforcement entities choose to enter into agreements with federal immigration authorities to detain immigrants in their county or city jails on behalf of the federal immigration authorities.

For-profit detention facilities are accountable to their shareholders and not the people of the State of California. Oftentimes, immigrants in immigrant detention facilities are escaping persecution in their countries of origin and in need of special care due to their persecution or because they have suffered arduous journeys as unaccompanied children. Ensuring that immigrants are provided with the services they need to heal oftentimes is in contrast to corporate interests. Because these facilities are private, they routinely claim exemptions to the California's Public Records Act and the federal Freedom of Information Act. Despite the lack of access to records through these acts, there have been reports of inadequate medical care, suicide attempts, sexual assault, and even deaths at for-profit immigrant detention facilities. Somewhat perversely, because immigration detention is technically a civil form of confinement, immigrants in immigrant detention facilities lack many of the safeguards of the criminal justice system, including access to counsel.

Local government and law enforcement entities that choose to contract with immigration authorities to detain immigrants are supposed to adhere to national immigration detention standards, promulgated by ICE regardless of whether they detain the immigrants in their local jails or contract their immigrant detention duties out to private for-profit corporations. But many detainees have reported experiencing deplorable conditions at city and county immigrant detention facilities in violation of the national standards. No meaningful enforcement mechanism currently exists to hold immigration detention facilities accountable, whether for-profit or run by local governmental agency, when they violate immigrant detainee's rights. Various reports indicate that the rights of Lesbian, Gay, Bisexual, and Transgender (LGBT) detained immigrants have been extensively violated at both types of detention facilities.

Last year, the Legislature passed SB 1289 (Lara), a bill identical to SB 29, but the Governor vetoed the bill. In his veto message the Governor wrote:

I have been troubled by recent reports detailing unsatisfactory conditions and limited access to counsel in private immigration detention facilities. The Department of Homeland Security, however, is now considering whether private contracting should continue for immigrant detention, and if so under what conditions. Their recommendations are expected in November. These actions indicate that a more permanent solution to this issue may be at hand. I urge the federal authorities to act swiftly.

Since the veto of SB 1289, a new President was elected who has made it clear in his executive orders and his administration's enforcement guidelines that every undocumented immigrant could be a target of deportation. President Donald Trump has also made it clear that he intends to detain more immigrants and expand private for profit detention facility use. This bill would protect immigrants held in immigrant detention in California.

**Comments**

The author writes:

In 2011 ICE developed the Operations Performance-Based National Detention Standards, which lays out the basic health and safety standards detainees should receive while in detention. However, these standards are not codified and are unenforceable. There have been widespread reports of human right's abuses in detention facilities, including physical and sexual abuse, poor access to healthcare, little access to legal counsel, overuse of solitary confinement, and even death. LGBT detainees have reported facing discrimination, harassment, and abuse due to their sexual orientation. In many of these instances, even the Department of Homeland Security has found these deaths were preventable. Tragically, the incidents often go unaddressed and victims have no recourse.

Private, for-profit immigration detention facilities present a host of problems. The facilities are not subject to the Freedom of Information Act and operate with little to no oversight. Many also operate under a perverse incentive, where they are guaranteed a minimum number of detainees in their facility at all times, ensuring their profits. For example in Adelanto Detention Facility in Adelanto, California, ICE is guaranteed 975 detainees at all times with a per diem rate of $111 per bed per day. The private detention contracts are designed to incentivize filling the most beds at all times, regardless of public safety or their destructive effects on communities. Private companies make billions in profits every year from

incarcerating mothers, fathers, children, and others in our broken immigration system.

**FISCAL EFFECT:** Appropriation: No   Fiscal Com.: Yes   Local: No

According to the Senate Appropriations Committee:

- Department of Justice: Potentially significant workload increase (General Fund) should the Attorney General choose to bring civil actions for injunctive and other equitable relief, offset in part by civil penalty revenues. To the extent the number and complexity of cases brought forward is significant, costs could rise into the hundreds of thousands of dollars annually.

- Local prosecutors: Potentially significant non-reimbursable local costs (local funds) to bring civil actions for injunctive and other equitable relief, offset in part by civil penalty revenues.

- Local governments/agencies: Potentially significant loss of future revenue (local funds) due to the inability to contract with for-profit entities for immigrant detention services. To the extent a local law enforcement agency opts to detain immigrants in its facilities through a direct contract with the federal government, the agency could incur potentially significant non-reimbursable costs (local funds) to ensure immigrant detainee rights as prescribed are met.

- Private contractors/vendors: Unknown, potentially major costs (private funds) to adhere to the specified standards and processes for detainee transfers and rights to counsel, translators, interpreters, and medical care and comply with public record requests as outlined in the bill.

**SUPPORT:** (Verified 5/25/17)

Community Initiatives for Visiting Immigrants in Confinement (co-source)
Immigrant Legal Resource Center (co-source)
AFSCME, AFL-CIO
AFSCME, Local 685
Alliance for Boys and Men of Color
American Academy of Pediatrics, California
Antelope Valley League of United Latin American Citizens
Association for Los Angles Deputy Sheriffs
Association of Deputy District Attorneys
California Catholic Conference

California Environmental Justice Alliance
California Health+ Advocates
California Immigrant Policy Center
California Latinas for Reproductive Justice
Community Clinic Association of Los Angeles County
Council on American-Islamic Relations
Equality California
Harvey Milk LGBT Democratic Club
Human Rights Defense Center
Inland Coalition for Immigrant Rights
Jewish Public Affairs Committee of California
Latino Coalition for a Healthy California
League of Women Voters of California
Los Angeles County Probation Officers' Union
Los Angeles County Professional Peace Officers Association
Los Angeles LGBT Center
Los Angeles Police Protective League
Mixteco/Indigena Community Organizing Project
National Association of Social Workers, California Chapter
Pangea Legal Services
Riverside Sheriffs' Association
Service Employees International Union
Services, Immigrant Rights and Education Network
Transgender Law Center
United Farm Workers

**OPPOSITION:** (Verified  5/25/17)

California State Sheriffs' Association
Imperial County Board of Supervisors


Prepared by:  Margie Estrada / JUD. / (916) 651-4113
5/27/17 18:32:27

**\*\*\*\* END \*\*\*\***

# Exhibit P

SB 29
Page 1

Date of Hearing:  June 27, 2017

ASSEMBLY COMMITTEE ON JUDICIARY
Mark Stone, Chair
SB 29 (Lara) – As Introduced  December 5, 2016

**SENATE VOTE**:  26-13

**SUBJECT**:  LAW ENFORCEMENT:  IMMIGRATION  DETENTION  FACILITIES

**KEY ISSUES**:

1) BECAUSE OF THE LACK OF PUBLIC OVERSIGHT AND ACCOUNTABILITY IN PRIVATE FACILITIES, SHOULD LOCAL GOVERNMENTS AND LAW ENFORCEMENT AGENCIES BE PROHIBITED FROM CONTRACTING WITH COMPANIES THAT OPERATE PRIVATE FACILITIES FOR PROFIT TO DETAIN IMMIGRANTS IN CIVIL IMMIGRATION PROCEEDINGS?

2) IN LIGHT OF REPORTED ABUSE OF IMMIGRANTS DETAINED IN SUCH FACILITIES, SHOULD IMMIGRATION DETENTION FACILITIES IN CALIFORNIA THAT ARE OPERATED BY FOR-PROFIT COMPANIES BE REQUIRED TO UPHOLD NATIONAL MINIMUM STANDARDS FOR THE HUMANE TREATMENT OF DETAINEES?

**SYNOPSIS**

*Federal immigration authorities, namely the U.S. Immigration & Customs Enforcement (ICE) or the U.S. Marshals, enter into Intergovernmental Service Agreements (IGSAs) with local governments or local law enforcement whereby the local entity agrees to detain immigrants on behalf of the federal government.  Local governments or local law enforcement can then choose to detain the immigrants in their own publicly-run facilities (i.e. county jails) or to subcontract with for-profit operators of private detention facilities instead.  The author contends that because these private detention facilities operate with little to no public oversight and are not subject to public disclosure laws, such as the Freedom of Information Act, they are essentially accountable only to their shareholders and not the people of the State of California.  As a result, abuse and inhumane treatment of detainees is reportedly tolerated and persists in these facilities because the public has no dependable mechanism for getting information about what is going on behind closed doors.  To corroborate these claims, the Committee has received a number of reports and letters from immigrant advocates, watchdog organizations, and human rights advocates describing investigations that have uncovered widespread incidents of abuse and mistreatment of immigrants who are held in private detention facilities in California.*

*This bill, co-sponsored by Community Initiatives for Visiting Immigrants in Confinement (CIVIC) and the Immigrant Legal Resource Center, seeks to prohibit local governments and law enforcement from contracting with companies that operate for-profit immigration detention facilities, and requires these facilities to uphold national standards for humane treatment of detainees.  These national standards are promulgated by ICE itself to govern conditions of confinement in its detention facilitates established through contracts with those facility operators, and are known as the Performance-Based National Detention Standards 2011 (aka "PBNDS 2011").  Among the standards codified by this bill are provisions that prohibit*

EXHIBIT P
Page 176

*immigrant detainees from being deprived of access to an attorney or other authorized legal representative; access to translation or interpreters; medical care; freedom from harm or harassment; and privacy. The bill also creates a number of other protections and rights for immigrant detainees that would be enforceable under the bill.*

*This bill is needed, proponents contend, to address the fact that although the PBNDS 2011 standards may apply under contracts between ICE and detention facilities, the standards are ultimately unenforceable because neither federal nor state law requires adherence to them. Accordingly, this bill would require that immigrant detention facilities adhere to the PBNDS 2011 standards and ICE Directive 11065.1, and protect other rights granted by this bill. The Attorney General, district attorneys, and city attorneys are empowered to enforce these provisions on behalf of the people, although there is no private right of action. This bill is a follow-up to AB 1289 (Lara) of 2016, which was approved by this Committee last year, but ultimately vetoed by Governor Brown, who stated he wanted to wait to see possible new federal regulations from the Obama administration before signing the bill. In light of the changed circumstances in the White House, this bill was introduced in December and is supported by a broad coalition of immigrant advocates, labor organizations, human rights advocates, and some local public safety groups. The bill is opposed by the California State Sheriffs Association and Imperial County, who contend, among other things, that their authority to contract with private detention facilities should not be limited, and that there is already sufficient oversight under federally-created standards and minimum standards provided by state regulations.*

**SUMMARY:** Prohibits local governments and law enforcement from contracting with companies that operate for-profit immigration detention facilities, and requires these facilities to uphold national standards for humane treatment of detainees. Specifically, **this bill:**

1) Prohibits a city, county, city and county, or a local law enforcement agency from entering into or renewing a contract, or modifying a contract to extend the length of the contract, with a private corporation, contractor, or vendor to detain immigrants in civil immigration proceedings for profit.

2) Provides that when an immigration detention facility chooses to enter into a contract to detain immigrants in civil immigration proceedings, it shall detain immigrants only pursuant to a contract that requires the entity contracting with DHS or other federal agency to adhere to the standards for detaining those individuals described in the 2011 Operations Manual Immigration and Customs Enforcement (ICE) Performance-Based National Detention Standards as corrected and clarified in February 2013 and ICE Directive 11065.1 (Review of the Use of Segregation for ICE Detainees).

3) Prohibits immigration detention facilities, their agents, or those acting on their behalf from depriving immigrant detainees from: (a) access to an attorney or other authorized legal representative; (b) access to translation or interpreters; (c) medical care; (d) freedom from harm or harassment; and (e) privacy.

4) Prohibits the involuntary placement of immigrant detainees in segregated housing because of the detainee's actual or perceived gender, gender identity, gender expression, or sexual orientation.

5) Clarifies that an immigration detention facility can provide more rights than are required under the 2011 Operations Manual ICE Performance-Based National Detention Standards as

corrected and clarified in February 2013 or ICE Directive 11065.1 (Review of the Use of Segregation for ICE Detainees).

6) Authorizes the Attorney General, any district attorney, or city attorney to bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California and seek a civil penalty of $25,000, as specified, when an immigration detention facility, or its agent or person acting on its behalf deprives an immigrant detainee of their rights created under this bill or rights under the 2011 Operations Manual ICE Performance-Based National Detention Standards as corrected and clarified in February 2013, or ICE Directive 11065.1 (Review of the Use of Segregation for ICE Detainees).

7) Requires that if a civil penalty is requested by the Attorney General, a district attorney, or city attorney, the civil penalty shall be assessed individually against each person who is determined to have violated the legal rights of a detained immigrant and awarded to each individual who has been injured under these provisions.

8) Defines the key terms "immigration detention facility," "immigration detention facility operator," and "segregated housing."

**EXISTING STATE LAW:**

1) Permits the board of supervisors of any county to contract on behalf of the sheriff of that county, and the legislative body of any city may contract on behalf of the chief of police of that city, to provide supplemental law enforcement services to specified entities under certain conditions, including to private individuals or private entities to preserve the peace at special events or occurrences that happen on an occasional basis. (Government Code 53069.8 (a).)

2) Requires the Board of State and Community Corrections to establish minimum standards for local correctional facilities, which standards shall include, but not be limited to, the following areas: health and sanitary conditions, fire and life safety, security, rehabilitation programs, recreation, treatment of persons confined in local correctional facilities, and personnel training. (Penal Code Section 6030.)

3) Pursuant to the Unruh Civil Rights Act, provides that all persons within the jurisdiction of California are free and equal no matter their national origin, citizenship, or immigration status and are entitled to full and equal accommodations, facilities, and privileges in all business establishments of every kind. (Civil Code Section 51.)

**EXISTING FEDERAL LAW:**

1) Pursuant to the Immigration and Naturalization Act, protects all asylum seekers by prohibiting the federal government from returning to their home countries people who have fled persecution on account of race, religion, nationality, political opinion, or membership in a particular social group. (8 U.S.C. Sec. 1101 (a)(42)(A).)

2) Pursuant to the Immigration and Naturalization Act, provides that victims of certain crimes may obtain immigration relief through a Victim of Crime Visa (U-Visa) and victims of human trafficking may obtain immigration relief through a Victim of Trafficking Visa (T-Visa). (8 U.S.C. Sec. 1101 (a)(15)(U); 8 U.S.C. Sec. 1101 (a)(15)(T).)

3) Pursuant to case law, establishes that immigrant detainees with mental disabilities who are facing deportation and who are unable to adequately represent themselves are entitled to qualified legal representatives provided by the federal government for representation during all phases of their immigration proceedings, including appeals and custody hearings. (*Franco-Gonzalez v. Holder*, CV 10-02211-DMG.)

**FISCAL EFFECT**:  As currently in print this bill is keyed fiscal.

**COMMENTS**:  In one of his first interviews after being elected President, the current occupant of the White House echoed his campaign promises and told "60 Minutes" he intended to deport "millions and millions of undocumented immigrants" after his inauguration in January, focusing on those "who have criminal records" and promising to later "make a determination" on possible deportation of remaining undocumented immigrants.  (Amy Wang, "Donald Trump plans to immediately deport 2 million to 3 million undocumented immigrants." Washington Post, Nov. 14, 2016. Available at: https://www.washingtonpost.com/news/the-fix/wp/2016/11/13/donald-trump-plans-to-immediately-deport-2-to-3-million-undocumented-immigrants).  According to the Washington Post writer:  "What would be new is the speed and scale with which Trump has vowed to remove undocumented immigrants with criminal records.  His proposal to deport '2 to 3 million' people would be roughly equivalent to the number of people removed over the course of about six years under Obama's presidency.  It is unclear how Trump would feasibly implement such a plan immediately after inauguration, as promised, without monumental expense and potentially exposing Americans to all kinds of disruptions." (*Id.*)

On January 25, 2017, the president issued Executive Order 13767 (82 FR 8793), titled "Border Security and Immigration Enforcement Improvements," which, among other things, calls for the immediate detainment and deportation of illegal immigrants and directs the U.S. Customs and Border Protection to hire 5,000 additional border patrol agents.  EO 13767 clearly places a large number of California residents at greater risk of being deported.  According to the author, Department of Homeland Security (DHS) figures show that over 400,000 people nationally are held each year awaiting a civil deportation proceeding, even though nothing in the law requires immigrants to be detained as immigration proceedings are civil, not criminal matters. Furthermore, the data indicate that today over 50% of detainees are held in private immigration detention facilities (i.e. run by private companies who contract with ICE), up from a rate of just 25% only ten years ago.  According to the author:

> With the new administration's commitment to deport millions, it is even more crucial now than ever before that California insists on humane and just treatment for all immigrants in our state.
>
> There have been consistent reports of human rights abuses in private detention facilities, including physical and sexual abuse, poor access to healthcare, little access to legal counsel, and overuse of solitary confinement, and even death.  SB 29 will prohibit local governments from contracting with private companies to detain immigrants for profit.  This bill will also require detention facilities to meet the basic standards laid out by ICE's 2011 Performance-Based National Detention Standards.  Ultimately, SB 29 will ensure that immigrants who are being detained do not face abuse or neglect in detention.

***Immigration detention facilities in California.***  Local governments and local law enforcement entities are not required to detain immigrants on behalf of federal immigration authorities.  The

ones in California that decide to detain immigrants do so by choice. Federal immigration authorities, either U.S. Immigration & Customs Enforcement (ICE) or the U.S. Marshals, enter into Intergovernmental Service Agreements (IGSAs) with local governments or local law enforcement whereby the local entity agrees to detain immigrants on behalf of the federal government. Local governments or local law enforcement can then choose to detain the immigrants in their own facilities or subcontract with for-profit detention facilities instead.

According to figures provided by CIVIC, 62% of all ICE immigration detention beds in the U.S. are operated by for-profit prison corporations, up from 49% in 2009. They contend that operators of these private detention facilities make billions in profit each year from holding undocumented persons, while the California county and city partners in these intergovernmental service agreements experience little economic gain. There are currently four for-profit detention facilities in California:

> (1) ICE contracts with the City of Adelanto, who in turn contracts with GEO Group to detain immigrants at the Adelanto Detention Facility (Adelanto).

> (2) ICE contracts with the City of McFarland, who in turn contracts with GEO Group to detain immigrants at the Mesa Verde Detention Facility (Bakersfield).

> (3) ICE contract with the City of Holtville, who in turn contracts with Management & Training Corp. (MTC) to detain immigrants at the Imperial Regional Detention Facility. (Calexico).

> (4) U.S. Marshals contract with Corrections Corporation of America (CCA) to detain immigrants at the Otay Detention Facility (San Diego).

According to the author, these four privately run facilities hold almost 85% of detainees statewide, approximately 3,700 people, with the rest held in county jail facilities that contract with federal immigration authorities. Specifically, ICE and the U.S. Marshals have intergovernmental service agreements with five counties, for the detention of immigrants at the Yuba County Jail (Marysville), Rio Consumnes Correctional Center (Elk Grove), the West County Detention Facility (Richmond), James Musick Facility (Irvine), and the Theo Lacy Facility (Orange). Lastly, they contract with the City of Santa Ana to detain immigrants at the Santa Ana City Jail. Altogether, CIVIC reports that a total of approximately 6,276 immigrants per day are held in civil confinement in these facilities. Proponents contend that many of these facilities operate under a perverse contractual incentive where they are guaranteed a minimum number of detainees in their facility at all times, thus ensuring their profits. For example, according to CIVIC, at the Adelanto Detention Facility (ADF), ICE is guaranteed 975 detainees at all times with a per diem rate of $111 per bed per day.

***Private immigration detention facilities operate with no mechanism for public oversight.*** The author contends that because private for-profit detention facilities operate with little to no oversight, they are essentially accountable only to their shareholders and not the people of the state of California. For-profit detention facilities claim exemptions to the public disclosure requirements under the Freedom of Information Act (FOIA) (5 U.S.C. Sec. 552) because they are private corporations, which makes the potentially unlawful conduct occurring within the facility hidden from discovery. For example, a 2013 article in Forbes noted that "if serious questions arise about…the 16,500 federal immigration detainees held in privately-operated facilities under contracts with the U.S. Department of Homeland Security, there's no legal remedy in place

forcing those questions to be answered." (Matt Stroud, Private Prisons Are Exempted From Federal Disclosure Laws; Advocates Say that Should Change, (Feb. 7, 2013) Forbes.)

Private detention facilities similarly claim exemptions to the California Public Records Act (CPRA) (Gov. Code Sec 6250 *et seq*). CIVIC notes that despite numerous reports of inadequate medical care, suicide attempts, sexual assault, and even deaths at for profit immigration detention facilities, it is difficult to obtain information about these facilities. CIVIC explains the process for obtaining information about private, for-profit immigration detention facilities as follows:

> [A] person can FOIA the IGSA between ICE and the private prison. When this occurs, ICE is required to ask the corporation if they are OK with the government disclosing it. If the corporation is OK, then it will be disclosed. However, it is completely in the discretion of the private prison corporation whether any document pertaining to the IGSA or any other aspect of the business is disclosed through a FOIA request.

As a result, abuse and inhumane treatment of detainees is reportedly tolerated and persists in these facilities because the public has no dependable mechanism for getting information about what is going on behind closed doors. Journalists and advocacy groups like CIVIC are occasionally able to document problems and incidents of mistreatment at these facilities, but only with the cooperation of the facilities themselves. The public policy of California is certainly not to allow the abuse of people who are detained by the government in facilities where there is no transparency or oversight. Accordingly, this bill would prohibit local governments and law enforcement from contracting with companies that operate for-profit immigration detention facilities to detain immigrants. While the Legislature lacks authority to prohibit private immigration detention facility operators from contracting directly with ICE or federal authorities to hold immigrants, this bill does not attempt to preclude those contracting practices. Rather, this bill attempts to bring more transparency to the operation of these facilities by making any facility that detains an immigrant pursuant to a contract with a city, county, city and county, or a local law enforcement agency subject to the California Public Records Act.

***Despite lack of transparency, advocates have documented patterns of widespread abuse of immigrants held in private detention facilities.*** The Committee has received a number of reports and letters in support of this bill from immigrant advocates, watchdog organizations, and human rights advocates describing widespread incidents of abuse and mistreatment of immigrants held in private detention facilities in California, as well as in facilities in other states operated by the same companies that operate facilities in California. In its report "*Abuse in Adelanto: An Investigation into a California Town's Immigration Jail,*" CIVIC details a number of disturbing examples of prolonged detention, medical abuse and neglect, violations of religious freedom, attempted suicides, and the negligent deaths of detainees—just at the Adelanto facility alone. The National Immigrant Justice Center reports that among LGBT individuals in the detained population, there are higher accounts of the use of solitary confinement, sexual abuse, and poor medical care in immigration detention facilities. (See National Immigrant Justice Center, Stop Abuse of Detained LGBT Immigrants; available at: http://www.immigrantjustice. org/stop-abuse-detained-lgbt-immigrants.) Human Rights Watch reports that it interviewed many transgender women in immigration detention who report being subjected to sexual assault and regular strip searches by male guards, including at the Santa Ana City jail, and others who report being held in abusive conditions of indefinite solitary confinement that are justified by prison authorities as a measure for transgender detainees' protection. Finally, CIVIC summarizes cases from several other states where the same private detention companies (namely,

Geo Group, CCA, and MTC) have faced lawsuits (and in some cases been held civilly liable) for acts of sexual harassment, wrongful death, and medical neglect, among other things.

To address these issues, the bill prohibits immigration detention facilities, their agents, or those acting on their behalf, from depriving immigrant detainees of medical care, freedom from harm or harassment, and privacy. The bill also prohibits the involuntary placement of immigrant detainees in segregated housing because of the detainee's actual or perceived gender, gender identity, gender expression, or sexual orientation.

***Lack of access to legal representation and telephone communication.*** Because immigration proceedings are civil, not criminal, detainees have fewer rights than criminal defendants, including the right to an attorney. CIVIC reports, for example, that of the 89 people detained at ADF that it monitored over a six-month period, only 12.3 percent had legal representation— below the already low national average of 16 percent (*Abuse in Adelanto: An Investigation into a California Town's Immigration Jail* (October 2015); CIVIC and Detention Watch Network.) Because most detainees go completely without legal representation, it is essential that they have access to a law library or telephone communications where they can communicate with advocates or family members outside the center who can arrange assistance. Even where detainees at Adelanto had legal representation, CIVIC reported the difficulties that these people experienced due to obstructive actions taken by facility staff. The lack of access to legal representation is even more tragic because many detainees in custody may, in fact, qualify to remain in the U.S., but are instead deported because they were never able to obtain the assistance of legal counsel. Accordingly, this bill specifically prohibits immigration detention facilities from depriving immigrant detainees access to an attorney or other authorized legal representative, and access to translation or interpreters.

***Codifying the national standards for basic care in immigration detention facilities, promulgated by ICE for facilities it contracts with.*** ICE has promulgated a series of national standards laying out the requirements for basic care in immigration detention facilities, known as the Performance-Based National Detention Standards 2011 as corrected and clarified in February 2013 (Hereafter, PBNDS 2011). ICE uses national detention standards to govern conditions of confinement in its detention facilitates established through contracts with those facilities. (United States Government Accountability Office, "Immigration Detention" Additional Actions Could Strengthen DHS Efforts to Address Sexual Abuse, p. 12 (Nov. 2013), Available at: http://www.gao.gov/assets/660/659145.pdf) Immigration detention facilities agree to follow these standards pursuant to the Inter-governmental Service Agreements (IGSAs) between the federal government and the local governments, including when the local entities contract out with for-profit corporations. (See e.g. Mesa Verde IGSA pp. 4, 7, 19; available at http://www.documentcloud.org/ documents/ 2631228-Mesa-Verde-CA-IGSA-Contract.html.)

An additional federal policy, ICE Directive 11065.1 (Review of the Use of Segregation for ICE Detainees), was created to govern the placement of immigrant detainees in solitary confinement. The directive was created after a joint study by two human rights organizations revealed that immigrant detainees were increasingly placed in solitary confinement due to mental illness, sexual orientation, or not speaking English. (See *Invisible in Isolation: The Use of Segregation and Solitary Confinement in Immigration Detention* (Sept. 2012), Heartland Alliance and Physicians for Human Rights.) Unfortunately, this policy directive is equally unenforceable as there is no law requiring it to be followed.

This bill is necessary, proponents contend, to address the fact that although the PBNDS 2011 standards may be agreed to under the contract, the standards are unenforceable because adherence is not required under any federal or state law. They contend that many of the abuses documented in California violate the PBNDS 2011, but because the standards are not legally binding and have only been implemented at select facilities that have voluntarily elected to modify their operating agreements with ICE, there is virtually no recourse for detainees under existing law when the detention facilities violate these standards.

Accordingly, this bill seeks to create enforceable rights for immigrant detainees centered on the national standards described above. The bill provides that when an immigration detention facility chooses to enter into a contract to detain immigrants in civil immigration proceedings, it shall detain immigrants only pursuant to a contract that requires the entity contracting with DHS or other federal agency to adhere to the PBNDS 2011 standards, as well as ICE Directive 11065.1. The bill makes clear that, as a policy matter, every immigration detention facility in California should be subject to the same national standards for the detention of immigrants, including private detention facilities contracted with local governments. Mandating that private immigration detention facilities in California meet national standards is intended to prevent and reduce patterns of abuse that have been documented in these facilities.

***Enforcement provisions.*** This bill would require that immigration detention facilities adhere to the PBNDS 2011 standards, ICE Directive 11065.1, and other rights granted by this bill. Unlike its predecessor legislation, SB 1289 (2016), there is no private right of action to enable detainees to sue on their own behalf. Instead, enforcement of these provisions is much more limited; the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California. The prosecuting attorney may also seek a civil penalty of $25,000, as specified, when an immigration detention facility deprives an immigrant detainee of their rights created under this bill, or their rights under the PBNDS 2011 standards or ICE Directive 11065.1.

***ARGUMENTS IN SUPPORT***: In addition to immigrant advocates and human rights groups, the bill is supported by some law enforcement organizations, including the Los Angeles Professional Peace Officers Association and the Riverside Sheriffs Association (RSA). RSA writes in support:

> Numerous studies have demonstrated that main objective of these Wall Street private prison cash-cows is to maximize profits for their shareholders. For-profit private prison companies accomplish this goal by implementing relaxed hiring standards, reduced staffing levels, inadequate employee training and by paying their workers substantially less in wages and benefits when compared to professional, public correctional peace officers.

> Stocks for the out-of-state prison corporations are traded on the New York Stock Exchange and must meet the financial goals of the institutional investors. As the CEO of the largest for-profit private prison company, Corrections Corporation of America, once stated, "Inmates are a commodity in our line of work."

> Private, for-profit prisons continue to treat their charges as "commodities" and "lower the bar" when it comes to the entire corrections profession. While we in the public sector are constantly trying to improve operations, the private, for-profit corporations seek only to improve profits. The 4,000-plus members of the

RSA support efforts that improve public safety and save precious tax dollars. SB 29 accomplishes both of these objectives. Private prison companies make all of us in local, state or federal corrections look bad.

***ARGUMENTS IN OPPOSITION***: The bill is opposed by the California State Sheriffs' Association, who state:

> We believe SB 29 inappropriately inserts the state into matters that are appropriately governed by federal authorities. [I]t is certainly possible that this measure would be preempted by federal law. Additionally, by creating a public right of action for alleged violations . . . SB 29 exposes local governments to state civil liability despite federal oversight and enforcement. The costs of litigation resulting from this bill are likely to be significant. We are also concerned that the ban on contracting with private entities could result in overcrowded local facilities being left as the only viable option for immigration detention.

Committee staff notes that this bill merely restricts the ability of local government and law enforcement to contract with private companies, and imposes certain standards of treatment to be upheld in private detention facilities. Neither of these actions interfere or conflict with the federal government's ability to enforce federal immigration laws, and thus are not likely to cause this bill to be preempted by federal law if challenged in court.

***Previously related legislation.*** SB 1289 (Lara) of 2016 is substantially similar to this bill, and would have prohibited local governments and law enforcement from contracting with companies that operate for-profit immigration detention facilities. The bill also would have required these facilities to uphold national standards for humane treatment of detainees, enforceable by a private right of action. In his September 2016 veto message of SB 1289, the Governor reasoned that Department of Homeland Security regulations under the Obama administration may shortly resolve the issue of whether private contracting for immigration detention should continue, and if so, under what conditions. After the November presidential election, however, no additional regulations on the issue are expected, and for reasons described earlier, greater use of private detention facilities is anticipated, not less.

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

Community Initiatives for Visiting Immigrants in Confinement (CIVIC) (co-sponsor)
Immigrant Legal Resource Center (co-sponsor)
AFSCME
Alliance for Boys and Men of Color
American Academy of Pediatrics
Antelope Valley League of United Latin American Citizens
California Catholic Conference
California Environmental Justice Alliance
California Federation of Teachers
California Health+ Advocates
California Latinas for Reproductive Justice
California Immigrant Policy Center
Council on American-Islamic Relations, California

Equality  California
Harvey Milk LGBT Democratic  Club
Human  Rights  Defense Center
Immigrant  Legal Resource  Center
Inland  Coalition  for Immigrant  Justice
In the Public  Interest  (ITPI)
Jewish Public  Affairs  Committee  of California
Latino  Coalition  for a Healthy  California
League  of Women  Voters of California
Los Angeles  LGBT Center
Los Angeles  Professional  Peace Officers  Association
Mixteco  Idigena  Community  Organizing  Project
National  Association  of Social  Workers
Pangea Legal  Services
Riverside  Sheriffs  Association
SEIU  California
Services,  Immigrant  Rights,  Education  Network  (SIREN)
Transgender  Law Center
The United  Farm Workers

**Opposition**

California  State Sheriffs  Association
County  of Imperial

**Analysis  Prepared  by:** Anthony  Lew / JUD. / (916) 319-2334

# Exhibit Q

EXHIBIT Q
Page 186

California Department of Corrections and Rehabilitation
Division of Correctional Policy Research and Internal Oversight
Office of Research
December 1, 2019

Monthly Report of Population
As of Midnight November 30, 2019

Total CDCR Population

| Population | Felon/ Other | Change Since Last Month | Change Since Last Year | Design Capacity | Percent Occupied | Staffed Capacity |
|---|---|---|---|---|---|---|
| A. Total In-Custody/CRPP Supervision | 124,500 | -444 | -3,728 | | | |
| I.  In-State | 124,500 | -444 | -1,736 | | | |
|     (Men, Subtotal) | 118,926 | -401 | -1,432 | | | |
|     (Women, Subtotal) | 5,574 | -43 | -304 | | | |
|  1. Institution/Camps | 117,636 | -253 | -771 | 89,663 | 131.2 | 125,465 |
|     Institutions | 114,623 | -284 | -294 | 85,083 | 134.7 | 121,221 |
|     Camps(CCC, CIW, and SCC) | 3,013 | +31 | -477 | 4,580 | 65.8 | 4,244 |
|  2. In-State Contract Beds | 5,373 | -200 | -1,002 | | | |
|     Private Community Correctional Facilities | 1,229 | -65 | -747 | | | |
|     Public Community Correctional Facilities | 1,645 | -28 | -62 | | | |
|     Community Prisoner Mother Program | 23 | 0 | +6 | | | |
|     California City Correctional Facility | 2,244 | -94 | -202 | | | |
|     Female Community ReEntry Facility, McFarland | 232 | -13 | +3 | | | |
|  3. Department of State Hospitals | 322 | +2 | +113 | | | |
|  4. CRPP Supervision | 1,169 | +7 | -76 | | | |
|     Alternative Custody Program | 157 | -3 | -50 | | | |
|     Custody to Community Treatment | | | | | | |
|        Reentry Program | 341 | +2 | -41 | | | |
|     Male Community Reentry Program | 644 | +6 | +16 | | | |
|     Medical Parole | 27 | +2 | -1 | | | |
| B. Parole | 51,853 | +155 | +3,429 | | | |
|    Community Supervision | 50,048 | +166 | +3,514 | | | |
|    Interstate Cooperative Case | 1,805 | -11 | -85 | | | |
| C. Non-CDCR Jurisdiction | 1,087 | +5 | +63 | | | |
|    Other State/Federal Institutions | 322 | +4 | -3 | | | |
|    Out of State Parole | 728 | +2 | +86 | | | |
|    Out of State Parolee at Large | 13 | -1 | -3 | | | |
|    DJJ-W&IC 1731.5(c) Institutions | 24 | 0 | -17 | | | |
| D. Other Populations | 6,521 | +139 | +394 | | | |
|    Temporary Release to Court and Hospital | 1,578 | +14 | +231 | | | |
|    Escaped | 198 | -1 | 0 | | | |
|    Parolee at Large | 4,745 | +126 | +163 | | | |
| Total CDCR Population | 183,961 | -145 | +158 | | | |

This report contains the latest available reliable population figures from SOMS.  They have been carefully
audited, but are preliminary, and therefore subject to revision.

Report #: SOMS-TPOP-1, Page 1

California Department of Corrections and Rehabilitation
Division of Correctional Policy Research and Internal Oversight
Office of Research
December 1, 2019

Monthly Report of Population
As of Midnight November 30, 2019

| Monthly Institution Population Detail | | | |
|---|---|---|---|
| Institutions | Felon/ Other | Design Capacity | Percent Occupied | Staffed Capacity |
|---|---|---|---|---|
| **Male Institutions** | | | | |
| Avenal State Prison (ASP) | 3,990 | 2,920 | 136.6 | 4,370 |
| Calipatria State Prison (CAL) | 3,292 | 2,308 | 142.6 | 3,333 |
| California Correctional Center (CCC) | 3,831 | 3,883 | 98.7 | 4,762 |
| California Correctional Institution (CCI) | 3,720 | 2,783 | 133.7 | 4,120 |
| Centinela State Prison (CEN) | 3,606 | 2,308 | 156.2 | 3,333 |
| California Health Care Facility - Stockton (CHCF) | 2,840 | 2,951 | 96.2 | 2,951 |
| California Institution for Men (CIM) | 3,656 | 2,976 | 122.8 | 4,186 |
| California Men's Colony (CMC) | 3,813 | 3,838 | 99.3 | 4,308 |
| California Medical Facility (CMF) | 2,548 | 2,361 | 107.9 | 2,847 |
| California State Prison, Corcoran (COR) | 3,147 | 3,116 | 101.0 | 4,233 |
| California Rehabilitation Center (CRC) | 3,540 | 2,491 | 142.1 | 3,210 |
| Correctional Training Facility (CTF) | 5,194 | 3,312 | 156.8 | 4,887 |
| Chuckawalla Valley State Prison (CVSP) | 2,763 | 1,738 | 159.0 | 2,478 |
| Deuel Vocational Institution (DVI) | 2,209 | 1,681 | 131.4 | 2,353 |
| Folsom State Prison (FOL) | 2,838 | 2,066 | 137.4 | 2,897 |
| High Desert State Prison (HDSP) | 3,164 | 2,324 | 136.1 | 3,361 |
| Ironwood State Prison (ISP) | 2,844 | 2,200 | 129.3 | 3,200 |
| Kern Valley State Prison (KVSP) | 3,619 | 2,448 | 147.8 | 3,522 |
| California State Prison, Los Angeles County (LAC) | 3,138 | 2,300 | 136.4 | 3,300 |
| Mule Creek State Prison (MCSP) | 4,027 | 3,284 | 122.6 | 4,009 |
| North Kern State Prison (NKSP) | 4,002 | 2,694 | 148.6 | 3,911 |
| Pelican Bay State Prison (PBSP) | 2,600 | 2,380 | 109.2 | 3,265 |
| Pleasant Valley State Prison (PVSP) | 3,159 | 2,308 | 136.9 | 3,333 |
| RJ Donovan Correctional Facility (RJD) | 3,925 | 2,992 | 131.2 | 3,942 |
| California State Prison, Sacramento (SAC) | 2,214 | 1,828 | 121.1 | 2,449 |
| California Substance Abuse Treatment Facility (SATF) | 5,362 | 3,424 | 156.6 | 5,111 |
| Sierra Conservation Center (SCC) | 4,334 | 3,836 | 113.0 | 4,570 |
| California State Prison, Solano (SOL) | 4,457 | 2,610 | 170.8 | 3,882 |
| San Quentin State Prison (SQ) | 4,216 | 3,082 | 136.8 | 3,984 |
| Salinas Valley State Prison (SVSP) | 2,963 | 2,452 | 120.8 | 3,409 |
| Valley State Prison (VSP) | 2,904 | 1,980 | 146.7 | 2,954 |
| Wasco State Prison (WSP) | 4,780 | 2,984 | 160.2 | 4,351 |
| Male Total | 112,695 | 85,858 | 131.3 | 116,821 |
| **Female Institutions** | | | | |
| Central California Women's Facility (CCWF) | 2,801 | 2,004 | 139.8 | 2,964 |
| California Institution for Women (CIW) | 1,672 | 1,398 | 119.6 | 1,877 |
| Folsom State Prison (FOL) | 467 | 403 | 115.9 | 530 |
| San Quentin State Prison (SQ) | 1 | 3,082 | 0.0 | 3,273 |
| Female Total | 4,941 | 3,805 | 129.9 | 8,644 |
| Institution Total | 117,636 | 89,663 | 131.2 | 125,465 |

California Department of Corrections and Rehabilitation
Division of Correctional Policy Research and Internal Oversight
Office of Research
December 1, 2019

Monthly Report of Population
As of Midnight November 30, 2019

---

Notes

---

- Felon/Other counts are felons, county contract boarders, federal boarders, state boarders, safekeepers, county diagnostic cases, Department of Mental Health boarders, and Division of Juvenile Justice boarders.

- Interstate Cooperative Cases are parolees from other states being supervised in California.

- Non-CDCR Jurisdiction are California cases being confined in or paroled to other states or jurisdictions.

- Welfare and Institution Code (W&IC) 1731.5(c) covers persons under the age of 21 who were committed to CDCR, had their sentence amended, and were incarcerated at the Division of Juvenile Justice for housing and program participation.

- Other Population includes inmates temporarily out-to-court, inmates in hospitals, escapees, and parolees at large.

Report #: SOMS-TPOP-1, Page 3

# Exhibit R

EXHIBIT R
Page 190



Published on *Official Website - Assemblyman Rob Bonta Representing the 18th California Assembly District* (https://a18.asmdc.org (https://a18.asmdc.org))

Home (/) > Bonta Introduces Bills Ending State's Involvement in For-Profit, Private Prison Industry

(https://www.addthis.com/bookmark.php?v=300) [1] (https://www.addthis.com/bookmark.php?v=300) [1] (https://www.addthis.com/bookmark.php?v=300) [1]

Monday, December 3, 2018

***Bills Would End Incarceration of State Inmates in For-Profit, Private Prisons and Require CalSTRS and CalPERS to Divest Holdings***

**(Sacramento, CA)** – Assemblymember Rob Bonta (D-Oakland) introduced two important pieces of legislation today shortly after the legislature adjourned session. The first bill, AB 32, would prohibit California's use of for-profit, private prisons and the second bill, AB 33, would require California's public retirement funds (CalPERS and CalSTRS) to divest their holdings in for-profit, private prisons.

Earlier this year, the Trump Administration introduced cruel immigration policies separating innocent children from their families. Thousands of adults and children have been detained in two for-profit, private prison facilities operating outside of San Antonio, Texas. Last month, the California State Teachers' Retirement Board voted to withdraw the $12.1 million invested in the two largest for-profit, private prison companies—CoreCivic and Geo Group.

"These companies are not only facilitating the Trump Administration's political agenda, but profiting from the cruel, zero tolerance immigration policies that have torn innocent children from their families. This is inhumane and not in line with California's values," Bonta said. "In California, we put our money where our values are and I applaud CalSTRS for its recent decision to divest from for-profit, private prisons."

CalSTRS joins other large U.S. public pension funds in divesting from for-profit, private prison companies, including funds in Illinois, New Jersey, New York and Pennsylvania. AB 33 will statutorily require both CalSTRS and CalPERS to fully strip holdings in for-profit, private prisons.  AB 33 is co-authored by Assemblymembers Chiu, Gipson, Gonzalez, Levine, McCarty, Stone, and Senator Wiener.

Bonta also re-introduced legislation (AB 32) which would end California's use of for-profit, private prisons to incarcerate inmates. Bonta introduced legislation (AB 1320) in 2017 to prohibit the renewal of state government contracts with for-profit, private prisons and completely phase out their use by 2028. AB 1320 passed both houses of the Legislature but was vetoed by Governor Brown. AB 32 is joint authored by Assemblymembers Chiu, Gloria and Gonzalez and is co-authored by Assemblymembers Gipson, Levine, McCarty, Stone, Quirk and Senator Wiener.

"With one of the highest recidivism rates in the country, California needs to invest in rehabilitation, not corporate profits," said Assemblymember David Chiu (D-San Francisco).  "Private, for-profit prisons have a duty to their corporate shareholders to return large profits at every turn, which makes it nearly impossible to spend the resources necessary to genuinely rehabilitate someone.  I applaud Assemblymember Bonta for working to phase out this harmful industry in California."

"There is no place in our country for corporations that profit from incarcerating folks, tearing apart families or putting children in cages," Assemblywoman Lorena Gonzalez (D-San Diego) said. "I'm proud to join Assemblymember Bonta as a joint author of this important legislation and to also co-author a bill that would make California's public investments

EXHIBIT R
Page 191

reflect our values."

"The built-in incentives for these businesses are all wrong," said Bonta. "A private, for-profit company that's traded on Wall Street will inherently be incentivized to maximize profits and minimize costs—including the important "costs" of investments in programs, services and rehabilitation efforts for inmates-- through warehousing our inmates. They have a duty to shareholders, not to California," Bonta said. "It's time we redirect our criminal justice system to value and prioritize effective prison rehabilitation programs, which will help minimize recidivism rates and maximize successes for inmates upon their reentry into society," Bonta concluded.

***Assemblymember Rob Bonta represents the 18th Assembly District, which includes the cities of Oakland, Alameda, and San Leandro and is the Assistant Majority Leader.***

###

Privacy and Conditions of Use (http://www.legislature.ca.gov/footer/use_privacy_policy.html) | Accessibility (http://assembly.ca.gov/accessibility) | General Disclaimer (/article/disclaimer) | © 2019 California State Assembly Democratic Caucus

**Source URL:** https://a18.asmdc.org/press-releases/20181203-bonta-introduces-bills-ending-states-involvement-profit-private-prison
**Links**
[1] https://www.addthis.com/bookmark.php?v=300

EXHIBIT R
Page 192

# Exhibit S

**SENATE RULES COMMITTEE**                                    AB 32
Office of Senate Floor Analyses
(916) 651-1520   Fax: (916) 327-4478

---

### THIRD READING

---

Bill No:     AB 32
Author:      Bonta (D), Chiu (D), Gloria (D), Gonzalez (D), Kamlager-Dove (D)
             and Santiago (D), et al.
Amended:     9/6/19 in Senate
Vote:        21

---

SENATE JUDICIARY COMMITTEE: 7-1, 7/2/19
AYES: Jackson, Durazo, Lena Gonzalez, Monning, Stern, Umberg, Wieckowski
NOES: Jones
NO VOTE RECORDED: Borgeas

SENATE PUBLIC SAFETY COMMITTEE: 5-2, 7/9/19
AYES: Skinner, Bradford, Jackson, Mitchell, Wiener
NOES: Moorlach, Morrell

SENATE APPROPRIATIONS COMMITTEE: 5-2, 8/30/19
AYES: Portantino, Bradford, Durazo, Hill, Wieckowski
NOES: Bates, Jones

ASSEMBLY FLOOR: 61-13, 5/23/19 - See last page for vote

---

**SUBJECT:** Detention facilities: private, for-profit administration services

**SOURCE:**  California State Superintendent of Public Instruction Tony Thurmond
            Riverside Sheriffs' Association

---

**DIGEST:** This bill abolishes, in line with California's interest in ensuring the
safety and welfare of its residents, the private for-profit prison industry from our
state in order to protect incarcerated individuals from serious harm within our state
border.

*Senate Floor Amendments* of 9/6/19 clarify that the detention facility ban will not
get in the way of the state's required compliance with a specified federal court
order.

*Senate Floor Amendments* of 9/5/19 add two Senators as co-authors and also clarify the definition of "private detention facility" to conform the definition with another provision of the bill that provides that the prohibition does not apply to any privately owned property or facility that is leased and operated by the Department of Corrections and Rehabilitation or a county sheriff or other law enforcement agency.

**ANALYSIS:**

Existing law:

1) Authorizes the Secretary of the California Department of Corrections and Rehabilitation (CDCR) to enter into agreements with private entities to obtain secure housing capacity within California. Sunsets this authority on January 1, 2020. (Pen. Code, § 2915 (a) & (d).)

2) Authorizes the Secretary of CDCR to enter into agreements with private entities to obtain secure housing capacity in another state. (Pen. Code, § 2915 (b) & (d).)

3) Prohibits CDCR from operating its own facility outside of California. (Pen. Code, § 2915 (b).)

4) Allows the Secretary of CDCR to enter into an agreement with a city, county, or city and county, to permit the transfer of prisoners in the custody of the secretary to a jail or other adult correctional facility. Sunsets this authority on January 1, 2020. (Pen. Code, § 2010 (a) & (h).)

5) Anticipates, as outlined in the Budget Act of 2018, that all California inmates will be returned from out-of-state contract correctional facilities by February 2019. (Pen. Code § 2067 (a).)

6) Requires CDCR, to the extent that the adult offender population continues to decline, to begin reducing private in-state male contract correctional facilities in a manner that maintains sufficient flexibility to comply with the federal court order to maintain the prison population at or below 137.5 percent of design capacity. The private in-state male contract correctional facilities that are primarily staffed by non-CDCR personnel shall be prioritized for reduction over other in-state contract correctional facilities. (Pen. Code § 2067(a).)

7) Requires CDCR to consider the following factors in reducing the capacity of state-owned and operated prisons or in-state leased or contract correctional facilities: the cost to operate at the capacity; workforce impacts; subpopulation

AB 32
Page 3

and gender-specific housing needs; long-term investment in state-owned and operated correctional facilities, including previous investments; public safety and rehabilitation; and the durability of the state's solution to prison overcrowding. (Pen. Code § 2067 (b).)

This bill:

1) Prohibits the operation of a for-profit detention facility within the state, as specified.

2) Provides that the prohibition of the operation of a for-profit detention facility within the state does not apply to facilities that are primarily engaged in specified services such as:

   a) Rehabilitative, counseling, treatment, mental health, educational, or medical services to a juvenile that is under the jurisdiction of the juvenile court pursuant to Part 1 (commencing with Section 100) of Division 2 of the Welfare and Institutions Code;

   b) Evaluation or treatment services to a person who has been detained, or is subject to an order of commitment by a court, pursuant to Section 1026, or pursuant to Division 5 (commencing with Section 5000) or Division 6 (commencing with Section 6000) of the Welfare and Institutions Code; and

   c) Providing educational, vocational, medical, or other ancillary services to an inmate in the custody of, and under the direct supervision of, the CDCR or a county sheriff or other law enforcement agency.

3) Provides that the prohibition of the operation of a for-profit detention facility within the state does not apply to any privately owned property or facility that is leased and operated by CDCR or a county sheriff or other law enforcement agency.

4) Provides that the prohibition of the operation of a for-profit detention facility within the state does not apply to those that operate pursuant to a valid contract with a government entity that was in effect before January 1, 2020, for the duration of that contract, not to include any extensions made to or authorized by the contract.

5) Provides that on or after January 1, 2020, CDCR: (a) shall not enter into a contract with a private, for-profit prison facility located in or outside of the state

to provide housing for state prison inmates; and (b) shall not renew an existing contract with a private, for-profit prison facility located in or outside of the state to incarcerate state prison inmates.

6) Provides that on or after January 1, 2028, a state prison inmate or other person under the jurisdiction of CDCR shall not be incarcerated in a private, for-profit prison facility.

7) Provides that a "private, for-profit prison facility" does not include a facility that is privately owned, but is leased and operated by CDCR.

8) Clarifies that the detention facility ban will not get in the way of the state's required compliance with a specified federal court order.

9) Contains a severability clause.

**Background**

AB 32 abolishes the private for-profit prison industry from our state in order to protect vulnerable individuals from serious harm within our state border. For-profit run private prison facilities hold Californians against their will pursuant to criminal and civil laws. There are numerous documented abuses of people held in for-profit run prison facilities in California.[1] For-profit prison companies have not limited their business ventures to profiting from the incarceration of Californians convicted of crimes. Private prison corporations also profit from incarcerating Californians in civil detention. The problems inherent in the private prison industry apply to any population they currently house or could house in the future. AB 32 was thus amended on June 25, 2019, to ensure that all Californians are protected. Until June 25, 2019, this bill only sought to end the operation of for-profit run private prison facilities that hold Californians against their will pursuant to criminal laws.

These for-profit run private prison companies benefit from incarcerating Californians and have no incentive to invest in their rehabilitation or mental and physical health. For-profit prison companies owe a fiduciary duty to their shareholders. Their mission is to maximize profits for their investors. They are able to accomplish this by increasing their inmate population and cutting operational costs, which is dangerous and detrimental to the Californians who are held against their will. Every dollar spent in treating their prisoners and detainees in a way that promotes the health and welfare of the prisoners and detainees is a

---

[1] For a detailed description of abuses, please see the Senate Judiciary Committee analysis for this bill.

dollar less in profit for shareholders. Indeed, these for-profit corporations have a documented history of operating in a manner that is detrimental to the health and welfare of those detained against their will. This bill is sponsored by the California Superintendent of Public Instruction, the Riverside Sheriffs' Association, and is supported by numerous civil rights organizations. This bill is opposed by the California State Sheriffs' Association.

**Comments**

AB 32 will likely be challenged in court and will likely survive the challenge.[2] Since AB 32 regulates private for-profit companies that run facilities that detain people who are held against their will under criminal and civil law, including immigrants, this anti-immigrant President's Administration will likely sue California to enjoin this bill's enactment under various theories. The federal government will likely lose. The federal government will likely challenge AB 32 by arguing that AB 32 is preempted by federal immigration law, that AB 32 violates the Intergovernmental Immunity Doctrine, and that AB 32 interferes with existing contractual obligations. Relevant to the constitutional analysis, this bill provides for the following:

> A person shall not operate a detention facility, defined as any facility in which persons are incarcerated or otherwise involuntarily confined for purposes of execution of a punitive sentence imposed by a court or detention pending a trial, hearing, or other judicial or administrative proceeding, that is a private detention facility, defined as a facility that is operated by a private, nongovernmental, for-profit entity, and operating pursuant to a contract or agreement with a governmental entity, within the state. The bill also provides that this prohibition does not apply if the for-profit detention facility is operating pursuant to a valid contract with a governmental entity that was in effect before January 1, 2020, for the duration of that contract, not to include any extensions made to or authorized by that contract. Additionally, the prohibition does not apply to privately owned property or facilities that are leased and operated by any law enforcement agency.

After reviewing AB 32, as amended on June 25, 2019, constitutional law scholar and University of California, Berkeley Law Dean Erwin Chemerinsky, wrote the following:

> I have had the opportunity to closely review AB 32, which would abolish all paid detention in California. I believe that this is constitutional and within the

---

[2] See Senate Judiciary Committee analysis for a detailed analysis of a court challenge of this bill.

power of California to enact. A state has broad power to act to protect all within its borders. The documented serious abuses with paid detention make clear that this is exactly what AB 32 is doing: protecting vulnerable individuals from serious harms. I do not believe that this is preempted by federal law or violates any intergovernmental immunity doctrine. Quite importantly, California is not regulating the federal government; it is regulating private companies, which is very much within the state's constitutional authority. To the extent that this law affects existing contractual obligations, the Supreme Court has been clear that a state government may do so if its action serves a significant and legitimate public purpose and is reasonably related to achieving that goal. AB 32 clearly meets this standard in that it is a reasonable, indeed essential, way of protecting those in California from harm in paid detention centers.

**FISCAL EFFECT:** Appropriation: No   Fiscal Com.: Yes   Local: No

According to the Senate Appropriations Committee:

- *CDCR*: Unknown costs, potentially as high as $133.9 million, if CDCR could no longer contract with for-profit private prisons to house state inmates. Actual costs would depend on a number of factors, including the availability of other non-CDCR capacity (e.g., at a non-profit private prison or a facility operated by a public entity), the number of inmates remaining at a private, for-profit prison at the expiration of the current contracts (i.e., on January 1, 2023) who need to be transferred elsewhere, and the available capacity within CDCR facilities. (General Fund)

  The FY 2019-20 per capita cost to detain a person in a state prison is $84,848 annually, with an annual marginal rate per inmate of over $12,000. The contract rate varies per facility but averages around $26,600 per person for the men's contract facilities and is $35,232 per inmate at the women's contract facility.

- *Department of Justice (DOJ)*: Unknown workload increase, ranging from the tens of thousands of dollars to the hundreds of thousands of dollars in personnel costs, to DOJ to defend against conditions-of-confinement lawsuits (e.g., claims of excessive force, improper medical care, violation of religious rights) by inmates who are transferred to CDCR facilities from for-profit private facilities. Currently, an inmate housed at a contract facility would file these types of suits against the private facility operator and/or staff, which presumably would retain its own legal representation, as DOJ is unaware of its Deputy Attorneys General defending against such types of cases from private facilities. Generally, the

higher the number of inmates imprisoned at CDCR facilities, the higher number of conditions-of-confinement lawsuits against CDCR that DOJ must defend. Litigation costs in these suits would be fully reimbursable by CDCR to DOJ. (Special fund* with respect to DOJ, General Fund with respect to CDCR)

*Legal Services Revolving Fund

**SUPPORT:** (Verified 9/6/19)

California State Superintendent of Public Instruction Tony Thurmond (co-source)
Riverside Sheriffs' Association (co-source)
52nd District
Accountable
ADEM District 41
Alianza Sacramento
All Rise Alameda
American Federation of State, County, and Municipal Employees, AFL-CIO
Amigos de Guadalupe Center for Justice and Empowerment
Asian Americans Advancing Justice -- California
Audaz – Indivisible District 40
Berkeley/Oakland YWCA
Building the Base Face to Face
California Alliance for Retired Americans
California Alliance for Youth & Community Justice
California Civil Liberties Advocacy
California Collaborative for Immigrant Justice
California Correctional Peace Officers Association
California Faculty Association
California for Progress
California Immigrant Policy Center
California Immigrant Youth Justice Alliance
California Public Defenders Association
California Rural Legal Assistance Foundation
California Sanctuary Campaign
Center on Juvenile and Criminal Justice
Central American Resource Center of Northern California
Central Valley Immigrant Integration Collaborative
Centro Legal de la Raza
Cloverdale Indivisible
Coalition for Humane Immigrant Rights Los Angeles
Community Legal Services in East Palo Alto

Contra Costa MoveOn
Council on American-Islamic Relations - Sacramento Valley/Central California
Courage Campaign
Defending Our Future: Indivisible in CA
Disability Rights California
Dolores Huerta Foundation
Dolores Street Community Services
El Cerrito Progressives
ESG Transparency Initiative
Faith in the Valley
Feminists in Action Los Angeles
Freedom for Immigrants
Greater Long Beach Interfaith Community Organization
Haitian Bridge Alliance
Hand in Hand: The Domestic Employers Network
Hillcrest Indivisible
Human Impact Partners
Immigrant Legal Resource Center
Immigration Task Force of Monterey County
Indi Squared
Indivisible 30/Keep Sherman
Indivisible 36
Indivisible 41
Indivisible Auburn CA
Indivisible Beach Cities
Indivisible CA 29
Indivisible CA 33
Indivisible CA 34 Womens
Indivisible CA-25 Simi Valley-Porter Ranch
Indivisible CA-3
Indivisible CA-37
Indivisible CA-39
Indivisible CA-43
Indivisible CA-7
Indivisible California: StateStrong
Indivisible East Bay
Indivisible Lorin
Indivisible Los Angeles
Indivisible Marin
Indivisible Media City Burbank

Indivisible  Normal Heights
Indivisible  North Oakland Resistance
Indivisible  North San Diego County
Indivisible  OC 46
Indivisible  OC 48
Indivisible  Petaluma
Indivisible  Sacramento
Indivisible  San Bernardino
Indivisible  San Jose
Indivisible  Santa Barbara
Indivisible  Sausalito
Indivisible  Sebastopol
Indivisible  SF
Indivisible  SF Peninsula CA-14
Indivisible  Sonoma County
Indivisible  South Bay LA
Indivisible  Stanislaus
Indivisible  Suffragists
Indivisible  Ventura
Indivisible  Windsor
Indivisible  Yolo
Indivisible: San Diego Central
Indivisibles of Sherman Oaks
Inland Empire Immigrant Youth Collective
Interfaith Council of Contra Costa County
Interfaith Movement for Human Integrity
Legal Services for Children
LGBTQ Center OC
Livermore Invisible
Long Beach Immigrant Rights Coalition
Long Beach Sacred Resistance
Los Angeles County Professional Peace Officers Association
Mi Familia Vota
Mill Valley Community Action Network
Mountain Progressives
National Lawyers Guild SF Bay Area Chapter
Nothing Rhymes with Orange
Oakland Community Law Office
Oakland Privacy
Open Immigration Legal Services

AB 32
Page 10

Orange County Rapid Response Network
Orchard City Indivisible
Organizing for Action – Contra Costa
Orinda Progressive Action Alliance
Our Revolution Long Beach
Pacifica Social Justice
Pajaro Valley Rapid Response
Peace and Freedom Party of California
PICO California
Rapid Response Network of Monterey County
Resilience Orange County
RiseUp
Saint John of God Church
San Diego Indivisible Downtown
San Diego Rapid Response Network
San Mateo Faith Leaders Solidarity Cohort
Santa Cruz Indivisible
Secure Justice
Service Employees International Union California
Service Employees International Union Local 1000
Services, Immigrant Rights and Education Network
SFV Indivisible
Simi Valley Democratic Club
Sisters of Mercy of the Americas
Social Justice Collaborative
Social Justice Ministry, St. Jerome Catholic Church
St. Mary the Virgin Episcopal Church
Step Up! Sacramento
Tehama Indivisible
The Resistance Northridge
The Resistance Sacramento/Elk Grove
Time for Change Foundation
Together We Will Contra Costa
TWW/Indivisible – Los Gatos
UDW/AFSCME Local 3930
Unitarian Universalists of San Mateo
Vallejo-Benicia Indivisible
Venice Resistance
Wellstone Democratic Renewal Club
Women's Alliance Los Angeles

**OPPOSITION:** (Verified   9/6/19)

California State Sheriffs' Association

**ARGUMENTS IN SUPPORT:**  The author writes:

> A for-profit, private company that's traded on Wall Street will inherently be incentivized to maximize profits and minimize costs—including the important "costs" of investments in programs, services and rehabilitation efforts for inmates.

> These companies have a duty to their shareholders, not to California. These programs will minimize recidivism rates and maximize successes for inmates upon their reentry into society, outcomes best achieved in facilities run by governments.

> AB 32 would prohibit the California Department of Corrections and Rehabilitation from entering into a contract or renewing a contract with a for-profit, private prison facility located in or outside of the state, on or after January 1, 2020, and completely phase-out their use by 2028.

> As amended, AB 32 expands the scope of the bill to provide a general ban of for-profit, private detention facilities in California—including facilities used for immigration detention.

> We've all seen the current humanitarian crisis play out along the southern border. No human being deserves to be held in the horrific conditions we've been seeing in these for-profit, private facilities. It's clearly not enough to focus our legislation solely on criminal detention facilities.

> Recent inspections by the California Department of Justice show concerning deficiencies.

> B 32 would address the complete scope of what's going on in these Wall Street-run corporate detention facilities. This is inhumane and goes against who we are as Californians and Americans.

> We are better than this and we cannot and must not be silent during this inflection moment in our history.

**ARGUMENTS IN OPPOSITION:** The California State Sheriffs' Association writes the following in opposition:

> Many different tools and approaches are included in California's efforts to eliminate overcrowding in the state prison system. Over the past few years, private prisons have been but one part of a multi-pronged approach to reduce overcrowding, promote better outcomes, and protect public safety.

> While there has been a significant reduction in state prison population since Realignment, it remains a challenge to continue to meet the federal three judge-panel mandate to relieve prison overcrowding. Removing CDCR's authority to contract with private prisons takes away a tool and increases the likelihood of releases of dangerous inmates from state prison and heightens pressure to have county jails take on more custodial capacity that would otherwise be housed in state prison. Given the significant responsibilities and challenges already assumed by local entities under Realignment and the great pressure on local systems that would surely occur in the wake of an influx of new, serious offenders in local custody, we are exceedingly concerned about hamstringing state prison officials and operations.

ASSEMBLY FLOOR: 61-13, 5/23/19

AYES: Aguiar-Curry, Arambula, Bauer-Kahan, Berman, Bloom, Boerner Horvath, Bonta, Burke, Calderon, Carrillo, Cervantes, Chau, Chen, Chiu, Chu, Cooper, Cunningham, Daly, Diep, Eggman, Frazier, Friedman, Gabriel, Cristina Garcia, Gipson, Gloria, Gonzalez, Gray, Grayson, Holden, Irwin, Jones-Sawyer, Kalra, Kamlager-Dove, Lackey, Levine, Limón, Low, Maienschein, McCarty, Medina, Mullin, Muratsuchi, Nazarian, O'Donnell, Petrie-Norris, Quirk, Quirk-Silva, Reyes, Luz Rivas, Robert Rivas, Rodriguez, Blanca Rubio, Santiago, Smith, Mark Stone, Ting, Weber, Wicks, Wood, Rendon

NOES: Bigelow, Brough, Choi, Dahle, Flora, Fong, Gallagher, Kiley, Melendez, Obernolte, Ramos, Salas, Voepel

NO VOTE RECORDED: Cooley, Eduardo Garcia, Mathis, Mayes, Patterson, Waldron

Prepared by:  Margie Estrada / JUD. / (916) 651-4113
9/9/19 18:33:22

**** **END** ****

# Exhibit T

California to end its use of private, for-profit prisons | abc10.com                                    Page 1 of 2

# California to end its use of private, for-profit prisons

The new measure prohibits the state corrections department from renewing contracts starting next year.

SACRAMENTO, Calif. — (AP) — California will ban the use of for-profit, private detention facilities, including those under contract to the federal government to hold immigrants awaiting deportation hearings, under a bill that Gov. Gavin Newsom said Friday that he had signed.

The Democratic governor said the measure helps fulfill a promise he made to end private prison use, which he said contributes to over-incarceration and does "not reflect our values."



The state's prison system was already phasing them out, despite having to comply with an inmate population cap imposed by federal judges.

Immigrant advocates have praised the bill authored by Democratic Assemblyman Rob Bonta, which they said would put an end to almost all immigration detention in California in the next year.

However, one private prison company said it expects that if not all of the law would fail a legal challenge, particularly requiring the federal government to end its contracts.

"States cannot lawfully pass legislation mandating the closure of federal facilities that displease them on the basis of ideological differences," The Geo Group of Adelanto, California, said in a statement.

**RELATED:**

- **Man wrongly imprisoned for 33 years to be released from San Diego prison after conviction is overturned**
- **Unlicensed contractor pleads guilty after lying to Camp Fire survivors**

California has been at the forefront of resisting President Donald Trump's efforts to deport those who are in the country illegally and has a so-called "sanctuary state" law that restricts police from asking people about their immigration status or participating in federal immigration enforcement actions.

The new measure prohibits the state corrections department from renewing contracts starting next year and from housing any state inmates in private, for-profit prisons starting in 2028.

"We are sending a powerful message that we vehemently oppose the practice of profiteering off the backs of Californians in custody," Bonta said.

California previously halted growth in local government contracts to house immigration detainees. After that, populous Orange County south of Los Angeles and other local governments ended their contracts to hold detainees for U.S. Immigration and Customs Enforcement.

**Check Out How To Monetize Your Video Content**

Learn the first and last thing every video team should do to start earning money from posting videos to social media.

Ad By Facebook

EXHIBIT T
Page 207

Four dedicated immigration detention facilities remain in California with an average daily population of about 3,700 detainees. ICE has previously said the largest one, run by The Geo Group in Adelanto, California, has a temporary contract set to expire in 2020, as does another facility in Bakersfield, California.

ICE's acting press secretary, Bryan Cox, said immigration enforcement would still take place, noting that California accounts for less than 10 percent of the agency's detention capacity. He said the impact "would be felt primarily by residents of California who would theoretically have to travel greater distances to visit friends and family in custody."

Christina Fialho, co-founder of Freedom for Immigrants, said she doesn't believe ICE could legally extend the contracts ending in 2020.

"Within the next year, private immigration detention will be abolished for good in California," she said, adding that rural Yuba County in northern California still has a contract to detain immigrants but may also soon end it. "This is huge."

Yolo County supervisors this week ended its decade-old contract with the federal government to house troubled immigrant children in a facility west of Sacramento that is one of two in the nation for teens who entered the country unaccompanied by parents and are considered dangerous to themselves or others.

The move in California comes as ICE has expanded immigration detention across the U.S. amid the Trump administration's immigration crackdown.

California isn't the only state pushing back, Fialho said, adding that Illinois also passed similar legislation and that New Mexico and Minnesota are weighing proposals.

The bill "will deal a critical blow to the Trump administration's efforts to further expand its system of immigration detention, especially as other states follow our lead," she said.

California's corrections department last month ended one of its four contracts with The GEO Group to run three male prisons and one for women that that together house about 1,600 inmates. The remaining contracts expire in 2023.

Police Say To Carry This

The federal receiver who controls medical care in California state prisons recently found inadequate health care at all four privately run prisons, citing problems with their policies and procedures, training, health care grievance process, emergency medical response and physician case reviews. The deficiencies are being reviewed again, with results expected in December.

In 2006, then-Gov. Arnold Schwarzenegger started sending California inmates to private out-of-state prisons to relieve crowding in prisons where nearly 20,000 inmates were bunked three-deep in gymnasiums and dayrooms. The state then relied on the private prisons for years to help meet the federal population cap.

But the last inmate housed out-of-state returned to California in June as the state ended those contracts. The new law allows the department to renew or extend the existing private prison contracts to comply with the court-ordered population cap until 2028.

The state's inmate population has been declining under several measures easing criminal sentences approved by voters and state lawmakers in recent years. Inmates housed in private prisons now make up less than 1% of the prisons' overall 125,000 inmate population.

A 2018 law already directed the corrections department to close male private in-state facilities as the state's prison population declined.

EXHIBIT T
Page 208

# Exhibit U

# ERO Custody Management Division

## Authorized Dedicated Facility List

37 Facilities as of 12/02/2019

Source: IIDS as of 12/02/2019; EID data through 11/30/2019

| NAME | ADDRESS | CITY | STATE | ZIP | AOR | TYPE | Male/Female | FY20 ADP | OVER/UNDER 72 STATUS | LAST INSPECTION STANDARD | LAST INSPECTION DATE | # OF MEDICAL/MENTAL HEALTH PERSONNEL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ELOY FEDERAL CONTRACT FACILITY | 1705 EAST HANNA RD. | ELOY | AZ | 85131 | PHO | DIGSA | Female/Male | 1,218 | Over 72 | PBNDS 2011 | 2/7/2019 | 47 |
| FLORENCE SERVICE PROCESSING CENTER | 3250 NORTH PINAL PARKWAY | FLORENCE | AZ | 85132 | PHO | SPC | Male | 374 | Over 72 | PBNDS 2011 | 4/11/2019 | 26 |
| ADELANTO ICE PROCESSING CENTER | 10250 RANCHO ROAD | ADELANTO | CA | 92301 | LOS | DIGSA | Female/Male | 1,577 | Over 72 | PBNDS 2011 | 10/12/2018 | 74.80 |
| IMPERIAL REGIONAL DETENTION FACILITY | 1572 GATEWAY | CALEXICO | CA | 92231 | SND | DIGSA | Female/Male | 631 | Over 72 | PBNDS 2011 | 1/17/2019 | 29 |
| MESA VERDE ICE PROCESSING CENTER | 425 GOLDEN STATE AVE | BAKERSFIELD | CA | 93301 | SFR | DIGSA | Male | 347 | Over 72 | PBNDS 2011 | 6/27/2019 | 27 |
| OTAY MESA DETENTION CENTER (SAN DIEGO CDF) | 7488 CALZADA DE LA FUENTE | SAN DIEGO | CA | 92154 | SND | USMS CDF | Female/Male | 1,118 | Over 72 | PBNDS 2011 | 1/25/2019 | 41 |
| DENVER CONTRACT DETENTION FACILITY | 3130 N. OAKLAND ST. | AURORA | CO | 80010 | DEN | CDF | Female/Male | 702 | Over 72 | PBNDS 2011 | 10/4/2018 | 25 |
| DENVER CONTRACT DETENTION FACILITY (CDF) II | 11901 E. 30th AVE | AURORA | CO | 80010 | DEN | CDF | Female/Male | 323 | Over 72 | N/A | New Facility | N/A |
| BROWARD TRANSITIONAL CENTER | 3900 NORTH POWERLINE ROAD | POMPANO BEACH | FL | 33073 | MIA | CDF | Female/Male | 558 | Over 72 | PBNDS 2011 | 10/31/2019 | 21 |
| KROME NORTH SERVICE PROCESSING CENTER | 18201 SOUTHWEST 12TH STREET | MIAMI | FL | 33194 | MIA | SPC | Male | 637 | Over 72 | PBNDS 2011 | 2/14/2019 | 47 |
| ANNEX - FOLKSTON IPC | 3424 HIGHWAY 252 EAST | FOLKSTON | GA | 31537 | ATL | DIGSA | Male | 239 | Over 72 | PBNDS 2011 | 6/6/2019 | 26 |
| MAIN - FOLKSTON IPC (D RAY JAMES) | 3026 HIGHWAY 252 EAST | FOLKSTON | GA | 31537 | ATL | DIGSA | Male | 589 | Over 72 | PBNDS 2011 | 6/6/2019 | 26 |
| ROBERT A. DEYTON DETENTION FACILITY | 11866 HASTINGS BRIDGE RD | LOVEJOY | GA | 30250 | ATL | USMS CDF | Male | 29 | Over 72 | N/A | New Facility | 26 |
| STEWART DETENTION CENTER | 146 CCA ROAD | LUMPKIN | GA | 31815 | ATL | DIGSA | Male | 1,614 | Over 72 | PBNDS 2011 | 5/9/2019 | 54 |
| LASALLE ICE PROCESSING CENTER (JENA) | 830 PINEHILL ROAD | JENA | LA | 71342 | NOL | DIGSA | Male | 1,232 | Over 72 | PBNDS 2011 | 9/26/2019 | 31 |
| PINE PRAIRIE ICE PROCESSING CENTER | 1133 HAMPTON DUPRE ROAD | PINE PRAIRIE | LA | 70576 | NOL | DIGSA | Male | 849 | Over 72 | PBNDS 2011 | 4/25/2019 | 24 |
| ELIZABETH CONTRACT DETENTION FACILITY | 625 EVANS STREET | ELIZABETH | NJ | 07201 | NEW | CDF | Female/Male | 265 | Over 72 | PBNDS 2011 | 10/3/2019 | 16 |
| OTERO COUNTY PROCESSING CENTER | 26 MCGREGOR RANGE ROAD | CHAPARRAL | NM | 88081 | ELP | DIGSA | Male | 927 | Over 72 | PBNDS 2011 | 1/31/2019 | 35 |
| BUFFALO (BATAVIA) SERVICE PROCESSING CENTER | 4250 FEDERAL DRIVE | BATAVIA | NY | 14020 | BUF | SPC | Female/Male | 477 | Over 72 | PBNDS 2011 | 4/4/2019 | 23 |
| NORTHEAST OHIO CORRECTIONAL CTR (YOUNGSTOWN CDF) | 2240 HUBBARD ROAD | YOUNGSTOWN | OH | 44505 | DET | CDF | Male | 230 | Over 72 | PBNDS 2011 | 3/21/2019 | 39 |
| BERKS COUNTY FAMILY SHELTER | 1040 BERKS ROAD | LEESPORT | PA | 19533 | PHI | FAMILY | Female/Male | 55 | Over 72 | IFRMU Family | 8/15/2019 | 14 |
| EL PASO SERVICE PROCESSING CENTER | 8915 MONTANA AVE | EL PASO | TX | 79925 | ELP | SPC | Female/Male | 775 | Over 72 | PBNDS 2011 | 12/13/2018 | 24 |
| HOUSTON CONTRACT DETENTION FACILITY | 15850 EXPORT PLAZA DRIVE | HOUSTON | TX | 77032 | HOU | CDF | Female/Male | 754 | Over 72 | PBNDS 2011 | 1/10/2019 | 26 |
| KARNES COUNTY CIVIL DETENTION FACILITY | FM 1144 AT US HIGHWAY 181 | KARNES CITY | TX | 78118 | SNA | FAMILY | Female/Male | 0 | Over 72 | PBNDS 2011 | 6/26/2014 | N/A |
| KARNES COUNTY RESIDENTIAL CENTER | FM 1144 AT US HIGHWAY 181 | KARNES CITY | TX | 78118 | SNA | FAMILY | Female/Male | 190 | Over 72 | IFRMU Family | 8/1/2019 | 62 |
| LAREDO PROCESSING CENTER | 4702 EAST SAUNDERS STREET | LAREDO | TX | 78041 | SNA | DIGSA | Female/Male | 309 | Over 72 | PBNDS 2011 | 6/4/2019 | 17 |
| MONTGOMERY ICE PROCESSING CENTER | 806 HILBIG RD | CONROE | TX | 77301 | HOU | CDF | Female/Male | 952 | Over 72 | PBNDS 2011 | 12/20/2018 | 35 |
| PORT ISABEL | 27991 BUENA VISTA BOULEVARD | LOS FRESNOS | TX | 78566 | SPC | SPC | Female/Male | 914 | Over 72 | PBNDS 2011 | 1/31/2019 | 44 |
| PRAIRIELAND DETENTION FACILITY | 1209 SUNFLOWER LN | ALVARADO | TX | 76009 | DAL | DIGSA | Female/Male | 642 | Over 72 | PBNDS 2011 | 2/14/2019 | 42 |
| RIO GRANDE DETENTION CENTER | 1001 SAN RIO BOULEVARD | LAREDO | TX | 78046 | SNA | USMS CDF | Male | 463 | Over 72 | PBNDS 2008 | 3/14/2019 | 30.75 |
| SOUTH TEXAS FAMILY RESIDENTIAL CENTER | 1925 WEST HIGHWAY 85 | DILLEY | TX | 78017 | SNA | FAMILY | Female/Male | 1,464 | Over 72 | IFRMU Family | 8/28/2019 | 85 |
| SOUTH TEXAS ICE PROCESSING CENTER | 566 VETERANS DRIVE | PEARSALL | TX | 78061 | SNA | CDF | Female/Male | 1,499 | Over 72 | PBNDS 2011 | 2/28/2019 | 52 |
| CORE HUTTO RESIDENTIAL CENTER | 1001 WELCH STREET | TAYLOR | TX | 76574 | SNA | FAMILY | Female | 480 | Over 72 | IFRMU Family | 2/7/2019 | 22 |
| WEBB COUNTY DETENTION CENTER (CCA) | 9998 SOUTH HIGHWAY 83 | LAREDO | TX | 78046 | SNA | DIGSA | Female/Male | 166 | Over 72 | PBNDS 2011 | 2/7/2019 | 11 |
| CAROLINE DETENTION FACILITY | 11093 S.W. LEWIS MEMORIAL DRIVE | BOWLING GREEN | VA | 22427 | WAS | DIGSA | Male | 275 | Over 72 | PBNDS 2011 | 5/22/2019 | 11 |
| IMMIGRATION CENTERS OF AMERICA-FARMVILLE | 508 WATERWORKS ROAD | FARMVILLE | VA | 23901 | WAS | DIGSA | Male | 639 | Over 72 | PBNDS 2011 | 2/28/2019 | 31 |
| TACOMA ICE PROCESSING CENTER (NORTHWEST DET CTR) | 1623 E. J STREET | TACOMA | WA | 98421 | SEA | CDF | Female/Male | 1,095 | Over 72 | PBNDS 2011 | 5/16/2019 | 34 |

# ERO Custody Management Division

## Authorized Non-Dedicated Facility List

**183 Facilities as of 12/02/2019**

Source: IIDS as of 12/02/2019; EID data through 11/30/2019

| NAME | ADDRESS | CITY | STATE | ZIP | AOR | TYPE | Male/Female | FY20 ADP OVER/UNDER 72 STATUS | LAST INSPECTION STANDARD | LAST INSPECTION DATE |
|---|---|---|---|---|---|---|---|---|---|---|
| ANCHORAGE CORRECTIONAL COMPLEX | 1400 E. 4TH AVE | ANCHORAGE | AK | 99501 | SEA | USMS IGA | Female/Male | 0 Over 72 | NDS | 9/8/2017 |
| BALDWIN COUNTY CORRECTIONAL CENTER | 200 HAND AVE. | BAY MINETTE | AL | 36507 | NOL | IGSA | Female/Male | 5 Under 72 | NDS | 9/11/2018 |
| DEKALB COUNTY DETENTION CENTER | 2801 JORDAN ROAD | FORT PAYNE | AL | 35968 | NOL | USMS IGA | Female/Male | 8 Over 72 | NDS | 1/6/2017 |
| ETOWAH COUNTY JAIL (ALABAMA) | 827 FOREST AVENUE | GADSDEN | AL | 35901 | NOL | USMS IGA | Male | 256 Over 72 | NDS | 7/18/2019 |
| MONTGOMERY CITY JAIL | 320 NORTH RIPLEY STREET | MONTGOMERY | AL | 36104 | NOL | IGSA | Female/Male | 4 Over 72 | NDS | 9/27/2018 |
| LONOKE POLICE DEPARTMENT | 203 W. FRONT STREET | LONOKE | AR | 72086 | NOL | IGSA | Female/Male | 1 Under 72 | NDS | 9/18/2018 |
| MILLER COUNTY JAIL | 2300 EAST STREET | TEXARKANA | AR | 71854 | NOL | USMS IGA | Female/Male | 0 Under 72 | NDS | 9/11/2018 |
| SEBASTIAN COUNTY DETENTION CENTER | 801 SOUTH A STREET | FORT SMITH | AR | 72901 | NOL | USMS IGA | Female/Male | 1 Under 72 | NDS | 10/1/2018 |
| CCA, FLORENCE CORRECTIONAL CENTER | 1100 BOWLING ROAD | FLORENCE | AZ | 85132 | PHO | USMS IGA | Male | 261 Over 72 | PBNDS 2008 | 8/29/2019 |
| LA PALMA CORRECTION CENTER - APSO | 5501 NORTH LA PALMA ROAD | ELOY | AZ | 85131 | PHO | IGSA | Male | 544 Over 72 | N/A | New Facility |
| LA PALMA CORRECTIONAL CENTER | 5501 NORTH LA PALMA ROAD | ELOY | AZ | 85131 | PHO | IGSA | Male | 1,367 Over 72 | PBNDS 2011 | 6/27/2019 |
| LA PAZ COUNTY ADULT DETENTION FACILITY | 1109 ARIZONA AVE. | PARKER | AZ | 85344 | PHO | USMS IGA | Female/Male | 3 Under 72 | NDS | 9/27/2018 |
| SAN LUIS REGIONAL DETENTION CENTER | 1445 EL CAMINO AVENUE D | SAN LUIS | AZ | 85349 | SND | IGSA | Female/Male | 65 Over 72 | NDS | 5/2/2019 |
| SANTA CRUZ COUNTY JAIL | 1250 NORTH HOHOKAM DRIVE | NOGALES | AZ | 85621 | PHO | USMS IGA | Female/Male | 0 Under 72 | NDS | 9/27/2018 |
| GLENDALE POLICE DEPARTMENT | 131 NORTH ISABEL STREET | GLENDALE | CA | 91206 | LOS | IGSA | Female/Male | 0 Under 72 | NDS | 9/20/2018 |
| ORANGE COUNTY INTAKE RELEASE FACILITY | 550 NORTH FLOWER STREET | SANTA ANA | CA | 92703 | LOS | IGSA | Female/Male | 0 Under 72 | NDS | 9/27/2018 |
| YUBA COUNTY JAIL | 215 5TH STREET | MARYSVILLE | CA | 95901 | SFR | IGSA | Female/Male | 181 Over 72 | NDS | 11/15/2019 |
| LA PLATA COUNTY JAIL | 742 TURNER DRIVE | DURANGO | CO | 81303 | DEN | USMS IGA | Female/Male | 0 Under 72 | NDS | 9/8/2017 |
| MOFFAT COUNTY JAIL | 800 WEST 1ST STREET | CRAIG | CO | 81625 | DEN | IGSA | Female/Male | 0 Under 72 | NDS | 9/18/2018 |
| RIO GRANDE COUNTY JAIL | 640 CHERRY STREET | DEL NORTE | CO | 81132 | DEN | IGSA | Female/Male | 0 Under 72 | NDS | 7/12/2018 |
| TELLER COUNTY JAIL | 288 WEAVERVILLE ROAD | DIVIDE | CO | 80814 | DEN | IGSA | Female/Male | 32 Over 72 | NDS | 8/22/2019 |
| BAKER COUNTY SHERIFF'S OFFICE | 1 SHERIFF OFFICE DRIVE | MACCLENNY | FL | 32063 | MIA | IGSA | Female/Male | 261 Over 72 | NDS | 5/31/2019 |
| COLLIER COUNTY JAIL | 3301 TAMIAMI TRAIL EAST | NAPLES | FL | 34112 | MIA | IGSA | Female/Male | 0 Under 72 | NDS | 7/27/2018 |
| GLADES COUNTY DETENTION CENTER | 1297 EAST SR 78 | MOORE HAVEN | FL | 33471 | MIA | IGSA | Female/Male | 430 Over 72 | NDS | 3/14/2019 |
| MONROE COUNTY DETENTION CENTER | 5501 COLLEGE ROAD | KEY WEST | FL | 33040 | MIA | IGSA | Male | 82 Over 72 | PBNDS 2008 | 8/1/2019 |
| ORANGE COUNTY JAIL | 3855 SOUTH JOHN YOUNG PARKWAY | ORLANDO | FL | 32839 | MIA | USMS IGA | Female/Male | 3 Under 72 | NDS | 9/21/2018 |
| PINELLAS COUNTY JAIL | 14400 49TH STREET NORTH | CLEARWATER | FL | 33762 | MIA | USMS IGA | Female/Male | 6 Under 72 | NDS | 9/21/2018 |
| WAKULLA COUNTY JAIL | 15 OAK STREET | CRAWFORDVILLE | FL | 32327 | MIA | IGSA | Male | 93 Over 72 | NDS | 10/18/2019 |
| COBB COUNTY JAIL | 1825 COUNTY SERVICES PARKWAY | MARIETTA | GA | 30060 | ATL | IGSA | Female/Male | 4 Under 72 | NDS | 10/16/2018 |
| HALL COUNTY JAIL | 1700 BARBER ROAD | GAINESVILLE | GA | 30507 | ATL | USMS IGA | Female/Male | 0 Under 72 | NDS | 9/15/2017 |
| IRWIN COUNTY DETENTION CENTER | 132 COTTON DRIVE | OCILLA | GA | 31772 | ATL | IGSA | Female/Male | 848 Over 72 | PBNDS 2008 | 6/13/2019 |
| WHITFIELD COUNTY JAIL | 805 PROFESSIONAL BLVD | DALTON | GA | 30720 | ATL | USMS IGA | Female/Male | 2 Under 72 | NDS | 10/16/2018 |
| BREMER COUNTY JAIL | 114 4TH STREET NE | WAVERLY | IA | 50677 | SPM | IGSA | Female/Male | 1 Over 72 | NDS | 9/21/2017 |
| HARDIN COUNTY JAIL | 1116 14TH AVENUE | ELDORA | IA | 50627 | SPM | IGSA | Female/Male | 62 Over 72 | NDS | 9/12/2019 |
| LINN COUNTY JAIL | 53 3RD AVENUE BRIDGE | CEDAR RAPIDS | IA | 52401 | SPM | USMS IGA | Female/Male | 6 Over 72 | NDS | 6/20/2019 |
| POLK COUNTY JAIL | 1985 NE 51ST PLACE | DES MOINES | IA | 50313 | SPM | USMS IGA | Female/Male | 33 Over 72 | NDS | 8/1/2019 |
| POTTAWATTAMIE COUNTY JAIL | 1400 BIG LAKE ROAD | COUNCIL BLUFFS | IA | 51501 | SPM | USMS IGA | Female/Male | 3 Over 72 | NDS | 4/12/2018 |
| DALE G. HAILE DETENTION CENTER | 1115 ALBANY | CALDWELL | ID | 83605 | SLC | IGSA | Female/Male | 1 Over 72 | NDS | 9/5/2017 |
| ELMORE COUNTY JAIL | 2255 E. 8TH NORTH | MOUNTAIN HOME | ID | 83647 | SLC | USMS IGA | Female/Male | 3 Over 72 | NDS | 9/17/2018 |
| JEFFERSON COUNTY JAIL | 200 COURTHOUSE WAY | RIGBY | ID | 83442 | SLC | IGSA | Female/Male | 4 Over 72 | NDS | 9/17/2018 |
| MINICASSIA DETENTION CENTER | 1415 ALBION AVENUE | BURLEY | ID | 83318 | SLC | IGSA | Female/Male | 4 Over 72 | NDS | 9/17/2018 |
| KANKAKEE COUNTY JAIL (JEROME COMBS DET CTR) | 3050 JUSTICE WAY | KANKAKEE | IL | 60901 | CHI | IGSA | Female/Male | 135 Over 72 | NDS | 4/11/2019 |
| MCHENRY COUNTY CORRECTIONAL FACILITY | 2200 NORTH SEMINARY AVENUE | WOODSTOCK | IL | 60098 | CHI | IGSA | Female/Male | 277 Over 72 | NDS | 6/13/2019 |
| OGLE COUNTY JAIL | 103 JEFFERSON STREET | OREGON | IL | 61061 | CHI | USMS IGA | Female/Male | 0 Over 72 | N/A | New Facility |
| PULASKI COUNTY JAIL | 1026 SHAWNEE COLLEGE ROAD | ULLIN | IL | 62992 | CHI | IGSA | Female/Male | 154 Over 72 | PBNDS 2011 | 3/14/2019 |
| CLAY COUNTY JAIL | 611 EAST JACKSON STREET | BRAZIL | IN | 47834 | CHI | USMS IGA | Male | 46 Over 72 | PBNDS 2008 | 5/31/2019 |
| BUTLER COUNTY JAIL | 701 SE STONE ROAD | EL DORADO | KS | 67042 | CHI | USMS IGA | Female/Male | 1 Over 72 | NDS | 9/14/2018 |
| CHASE COUNTY DETENTION FACILITY | 301 SOUTH WALNUT STREET | COTTONWOOD FALLS | KS | 66845 | CHI | IGSA | Female/Male | 73 Over 72 | NDS | 7/11/2019 |

| Facility | Address | City | State | Facility Code | Type | Gender | Over/Under 72 | Standard | Last Inspection |
|---|---|---|---|---|---|---|---|---|---|
| SHAWNEE COUNTY DEPARTMENT OF CORRECTIONS | 501 SOUTHEAST 8TH AVENUE | TOPEKA | KS | 66607 CHI | IGSA | Female/Male | 6 Over 72 | NDS | 9/6/2019 |
| SHAWNEE COUNTY JUVENILE DETENTION CENTER | 401 SE 8TH STREET | TOPEKA | KS | 66607 CHI | JUVENILE | Female/Male | 0 Over 72 | N/A | N/A |
| BOONE COUNTY JAIL | 3020 CONRAD LANE | BURLINGTON | KY | 41005 CHI | USMS IGA | Female/Male | 155 Over 72 | NDS | 3/7/2019 |
| FAYETTE COUNTY DETENTION CENTER | 600 OLD FRANKFORD CR | LEXINGTON | KY | 40510 CHI | USMS IGA | Female/Male | 3 Under 72 | NDS | 8/14/2018 |
| GRAYSON COUNTY JAIL | 320 SHAW STATION ROAD | LEITCHFIELD | KY | 42754 CHI | USMS IGA | Female/Male | 1 Under 72 | NDS | 8/14/2018 |
| OLDHAM COUNTY JAIL | 100 W MAIN STREET | LA GRANGE | KY | 40031 CHI | IGSA | Female/Male | 3 Over 72 | NDS | 8/16/2018 |
| ALLEN PARISH PUBLIC SAFETY COMPLEX | 7340 HIGHWAY 26 WEST | OBERLIN | LA | 70655 NOL | IGSA | Male | 117 Over 72 | PBNDS 2011 | 2/14/2019 |
| BOSSIER PARISH COR. CENTER | 2984 OLD PLAIN DEALING HIGHWAY | PLAIN DEALING | LA | 71064 NOL | USMS IGA | Male | 264 Over 72 | NDS | 1/31/2019 |
| CATAHOULA CORRECTIONAL CENTER | 499 OLD COLUMBIA ROAD | HARRISONBURG | LA | 71430 NOL | IGSA | Male | 484 Over 72 | PBNDS 2011 | 8/22/2019 |
| JACKSON PARISH CORRECTIONAL CENTER | 327 INDUSTRIAL DRIVE | JONESBORO | LA | 71251 NOL | IGSA | Male | 966 Over 72 | PBNDS 2011 | 11/7/2019 |
| RICHWOOD CORRECTIONAL CENTER | 180 PINE BAYOU CIRCLE | RICHWOOD | LA | 71202 NOL | IGSA | Male | 984 Over 72 | PBNDS 2011 | 10/3/2019 |
| RIVER CORRECTIONAL CENTER | 26362 HIGHWAY 15 | FERRIDAY | LA | 71334 NOL | IGSA | Male | 541 Over 72 | PBNDS 2011 | 10/24/2019 |
| SAINT TAMMANY PARISH JAIL | 701 NORTH COLUMBIA STREET | COVINGTON | LA | 70433 NOL | IGSA | Female/Male | 9 Under 72 | NDS | 10/5/2018 |
| SOUTH LOUISIANA DETENTION CENTER | 3843 STAGG AVENUE | BASILE | LA | 70515 NOL | IGSA | Male | 823 Over 72 | PBNDS 2011 | 11/7/2019 |
| WINN CORRECTIONAL CENTER | 560 GUM SPRING ROAD | WINNFIELD | LA | 71483 NOL | IGSA | Male | 1,496 Over 72 | PBNDS 2011 | 5/16/2019 |
| BRISTOL COUNTY DETENTION CENTER | 400 FAUNCE CORNER ROAD | NORTH DARTMOUTH | MA | 02747 BOS | USMS IGA | Male | 192 Over 72 | PBNDS 2008 | 5/2/2019 |
| FRANKLIN COUNTY HOUSE OF CORRECTION | 160 ELM STREET | GREENFIELD | MA | 01301 BOS | IGSA | Female/Male | 28 Over 72 | NDS | 6/13/2019 |
| PLYMOUTH COUNTY CORRECTIONAL FACILITY | 26 LONG POND ROAD | PLYMOUTH | MA | 02318 BOS | IGSA | Male | 357 Over 72 | NDS | 5/16/2019 |
| SUFFOLK COUNTY HOUSE OF CORRECTIONS | 20 BRADSTON STREET | BOSTON | MA | 02118 BOS | IGSA | Male | 21 Over 72 | NDS | 8/29/2019 |
| FREDERICK COUNTY ADULT DETENTION CENTER | 7300 MARCIES CHOICE LANE | FREDERICK | MD | 21704 BAL | IGSA | Female/Male | 17 Over 72 | PBNDS 2011 | 8/29/2019 |
| HOWARD COUNTY DETENTION CENTER | 7301 WATERLOO ROAD | JESSUP | MD | 20794 BAL | IGSA | Female/Male | 68 Over 72 | NDS | 8/29/2019 |
| WORCESTER COUNTY JAIL | 5022 JOYNER ROAD | SNOW HILL | MD | 21863 BAL | IGSA | Female/Male | 68 Over 72 | NDS | 8/15/2019 |
| CUMBERLAND COUNTY JAIL | 50 COUNTY WAY | PORTLAND | ME | 04102 BOS | USMS IGA | Female/Male | 138 Over 72 | NDS | 9/5/2018 |
| MAINE YOUTH CENTER - LONG CREEK | 675 WESTBROOK ST. | SOUTH PORTLAND | ME | 04106 BOS | JUVENILE | Female/Male | 2 Over 72 | N/A | N/A |
| CALHOUN COUNTY CORRECTIONAL CENTER | 185 EAST MICHIGAN AVENUE | BATTLE CREEK | MI | 49014 DET | IGSA | Female/Male | 0 Under 72 | NDS | 3/7/2019 |
| CHIPPEWA COUNTY SSM | 325 COURT STREET | SAULT SAINTE MARIE | MI | 49783 DET | IGSA | Female/Male | 140 Over 72 | NDS | 3/28/2019 |
| DEARBORN POLICE DEPARTMENT | 16099 MICHIGAN AVE | DEARBORN | MI | 48126 DET | IGSA | Female/Male | 29 Over 72 | NDS | 8/17/2018 |
| KENT COUNTY JAIL | 701 BALL AVENUE NORTHEAST | GRAND RAPIDS | MI | 49503 DET | IGSA | Female/Male | 0 Over 72 | NDS | 8/16/2018 |
| MONROE COUNTY DETENTION-DORM | 7000 EAST DURHAM ROAD | MONROE | MI | 48161 DET | IGSA | Female/Male | 0 Over 72 | NDS | 8/16/2019 |
| SAINT CLAIR COUNTY JAIL | 1170 MICHIGAN ROAD | PORT HURON | MI | 48060 DET | IGSA | Female/Male | 73 Over 72 | PBNDS 2008 | 10/31/2019 |
| CARVER COUNTY JAIL | 600 EAST FOURTH ST. | CHASKA | MN | 55318 SPM | IGSA | Female/Male | 57 Over 72 | NDS | 11/16/2017 |
| CARVER COUNTY JUVENILE DETENTION CENTER | 600 EAST FOURTH ST. | CHASKA | MN | 55318 SPM | JUVENILE | Female/Male | 19 Over 72 | N/A | N/A |
| FREEBORN COUNTY ADULT DETENTION CENTER | 411 SOUTH BROADWAY AVENUE | ALBERT LEA | MN | 56007 SPM | IGSA | Female/Male | 0 Over 72 | NDS | 4/18/2019 |
| NOBLES COUNTY JAIL | 1530 AIRPORT ROAD | WORTHINGTON | MN | 56187 SPM | IGSA | Male | 65 Over 72 | NDS | 5/24/2018 |
| SHERBURNE COUNTY JAIL | 13880 BUSINESS CENTER DRIVE | ELK RIVER | MN | 55330 SPM | IGSA | Female/Male | 2 Over 72 | NDS | 11/15/2019 |
| CALDWELL COUNTY DETENTION CENTER | 280 WEST MAIN STREET | KINGSTON | MO | 64650 CHI | IGSA | Female/Male | 305 Over 72 | NDS | 5/24/2018 |
| CHRISTIAN COUNTY JAIL | 110 WEST ELM ST | OZARK | MO | 65721 CHI | IGSA | Female/Male | 17 Over 72 | NDS | 5/24/2018 |
| LINCOLN COUNTY DETENTION CENTER | 65 BUSINESS PARK DRIVE | TROY | MO | 63379 CHI | IGSA | Male | 14 Over 72 | NDS | 9/19/2018 |
| MONTGOMERY COUNTY JAIL | 211 EAST THIRD STREET | MONTGOMERY CITY | MO | 63361 CHI | IGSA | Female/Male | 8 Over 72 | NDS | 11/7/2019 |
| MORGAN COUNTY ADULT DETENTION CENTER | 211 EAST NEWTON STREET | VERSAILLES | MO | 65084 CHI | IGSA | Female/Male | 25 Over 72 | NDS | 2/22/2019 |
| PLATTE COUNTY DETENTION CENTER | 415 THIRD STREET | PLATTE CITY | MO | 64079 CHI | IGSA | Female/Male | 62 Over 72 | NDS | 11/16/2017 |
| ADAMS COUNTY DET CENTER | 20 HOBO FORK RD. | NATCHEZ | MS | 39120 NOL | IGSA | Female/Male | 2 Over 72 | N/A | New Facility |
| TALLAHATCHIE CO CORR FACILITY | 415 U.S. HIGHWAY 49 North | TUTWILER | MS | 38963 NOL | USMS IGA | Male | 11 Over 72 | NDS | 8/15/2019 |
| CASCADE COUNTY JAIL (MONTANA) | 3800 ULM NORTH FRONTAGE ROAD | GREAT FALLS | MT | 59404 SLC | IGSA | Female/Male | 1,146 Over 72 | NDS | 9/17/2018 |
| CABARRUS COUNTY JAIL | 30 CORBAN AVENUE SE | CONCORD | NC | 28025 ATL | IGSA | Female/Male | 630 Over 72 | NDS | 10/15/2018 |
| FORSYTH COUNTY JAIL | 201 NORTH CHURCH STREET | WINSTON-SALEM | NC | 27101 ATL | USMS IGA | Female/Male | 2 Over 72 | NDS | 9/15/2017 |
| GASTON COUNTY JAIL | 425 NORTH MARIETTA STREET | GASTONIA | NC | 28052 ATL | USMS IGA | Female/Male | 0 Under 72 | NDS | 10/15/2018 |
| MECKLENBURG COUNTY DETENTION CENTER NORTH | 5234 SPECTOR DRIVE | CHARLOTTE | NC | 28202 ATL | USMS IGA | Female/Male | 1 Under 72 | NDS | 10/15/2018 |
| NEW HANOVER COUNTY JAIL | 3950 JUVENILE RD | CASTLE HAYNE | NC | 28429 ATL | IGSA | Female/Male | 2 Over 72 | NDS | 9/15/2017 |
| WAKE COUNTY SHERIFF DEPARTMENT | 330 SOUTH SALISBURY STREET | RALEIGH | NC | 27601 ATL | USMS IGA | Female/Male | 2 Over 72 | NDS | 10/15/2018 |
| GRAND FORKS COUNTY | P.O. BOX 726 | GRAND FORKS | ND | 58206 SPM | JUVENILE | Female/Male | 0 Over 72 | N/A | N/A |
| GRAND FORKS COUNTY CORRECTIONAL FACILITY | 1701 NORTH WASHINGTON ST | GRAND FORKS | ND | 58206 SPM | USMS IGA | Female/Male | 6 Over 72 | NDS | 5/17/2018 |
| CASS COUNTY JAIL | 336 MAIN STREET | PLATTSMOUTH | NE | 68048 SPM | IGSA | Male | 19 Over 72 | NDS | 9/19/2019 |
| DAKOTA COUNTY JAIL | 1601 BROADWAY | DAKOTA CITY | NE | 68731 SPM | USMS IGA | Female/Male | 2 Over 72 | NDS | 9/24/2018 |
| DOUGLAS COUNTY DEPARTMENT OF CORRECTIONS | 710 SOUTH 17TH ST | OMAHA | NE | 68102 SPM | IGSA | Female/Male | 12 Over 72 | NDS | 10/24/2019 |
| HALL COUNTY DEPARTMENT OF CORRECTIONS | 110 PUBLIC SAFETY DRIVE | GRAND ISLAND | NE | 68801 SPM | IGSA | Female/Male | 81 Over 72 | PBNDS 2008 | 7/11/2019 |
| PHELPS COUNTY JAIL | 715 5TH AVENUE | HOLDREGE | NE | 68949 SPM | IGSA | Female/Male | 6 Over 72 | NDS | 7/18/2019 |
| STRAFFORD COUNTY DEPARTMENT OF CORRECTIONS | 266 COUNTY FARM ROAD | DOVER | NH | 03820 BOS | IGSA | Female/Male | 78 Over 72 | PBNDS 2008 | 12/13/2018 |
| BERGEN COUNTY JAIL | 160 SOUTH RIVER STREET | HACKENSACK | NJ | 07601 NYC | USMS IGA | Female/Male | 228 Over 72 | NDS | 2/28/2019 |

| Facility | Address | City | State | Zip | AOR | Type | Gender | Pop | Hold | Standard | Inspection Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ESSEX COUNTY CORRECTIONAL FACILITY | 354 DOREMUS AVENUE | NEWARK | NJ | 07105 | NEW | IGSA | Male | 630 | Over 72 | PBNDS 2011 | 9/26/2019 |
| HUDSON COUNTY CORRECTIONAL CENTER | 30-35 HACKENSACK AVE. | KEARNY | NJ | 07032 | NYC | IGSA | Female/Male | 304 | Over 72 | PBNDS 2008 | 5/9/2019 |
| CIBOLA COUNTY CORRECTIONAL CENTER | 2000 CIBOLA LOOP | MILAN | NM | 87021 | ELP | IGSA | Male | 131 | Over 72 | PBNDS 2011 | 5/9/2019 |
| OTERO COUNTY PRISON FACILITY | 10 MCGREGOR RANGE ROAD | CHAPARRAL | NM | 88081 | ELP | USMS IGA | Female/Male | 0 | Over 72 | NDS | 2/9/2017 |
| TORRANCE COUNTY DETENTION FACILITY | 209 COUNTY ROAD 49 | ESTANCIA | NM | 87016 | ELP | IGSA | Female/Male | 220 | Over 72 | PBNDS 2011 | 7/18/2019 |
| HENDERSON DETENTION CENTER | 18 E BASIC ROAD | HENDERSON | NV | 89015 | SLC | USMS IGA | Female/Male | 171 | Over 72 | NDS | 7/25/2019 |
| NEVADA SOUTHERN DETENTION CENTER | 2190 EAST MESQUITE AVENUE | PAHRUMP | NV | 89060 | SLC | USMS IGA | Female/Male | 186 | Over 72 | PBNDS 2008 | 7/25/2019 |
| NYE COUNTY DETENTION CENTER, SOUTHERN (PAHRUMP) | 1520 E. BASIN ROAD | PAHRUMP | NV | 89060 | SLC | IGSA | Female/Male | 74 | Over 72 | NDS | 5/31/2019 |
| WASHOE COUNTY JAIL | 911 PARR BOULEVARD | RENO | NV | 89512 | SLC | USMS IGA | Female/Male | 14 | Over 72 | NDS | 8/30/2018 |
| ALBANY COUNTY JAIL | 840 ALBANY SHAKER ROAD | ALBANY | NY | 12211 | BUF | USMS IGA | Female/Male | 0 | Over 72 | NDS | 9/27/2018 |
| CHAUTAUQUA COUNTY JAIL | 15 E. CHAUTAUQUA STREET | MAYVILLE | NY | 14757 | BUF | JUVENILE | Female/Male | 3 | Under 72 | NDS | 9/25/2018 |
| CLINTON COUNTY JAIL | 25 MCCARTHY DRIVE | PLATTSBURGH | NY | 12901 | BUF | USMS IGA | Female/Male | 7 | Over 72 | NDS | 10/25/2018 |
| COMPASS HOUSE SHELTER | 370 LINWOOD AVE | BUFFALO | NY | 14209 | BUF | JUVENILE | Female/Male | 0 | Under 72 | N/A | N/A |
| ORANGE COUNTY JAIL | 110 WELLS FARM ROAD | GOSHEN | NY | 10924 | NYC | IGSA | Female/Male | 112 | Over 72 | NDS | 4/18/2019 |
| BUTLER COUNTY JAIL | 705 HANOVER STREET | HAMILTON | OH | 45011 | DET | IGSA | Female/Male | 111 | Over 72 | NDS | 5/2/2019 |
| GEAUGA COUNTY JAIL | 12450 MERRITT DR | CHARDON | OH | 44024 | DET | IGSA | Female/Male | 45 | Over 72 | NDS | 10/10/2019 |
| MORROW COUNTY CORRECTIONAL FACILITY | 101 HOME ROAD | MOUNT GILEAD | OH | 43338 | DET | IGSA | Female/Male | 28 | Over 72 | NDS | 3/8/2018 |
| SENECA COUNTY JAIL | 3040 SOUTH STATE HIGHWAY 100 | TIFFIN | OH | 44883 | DET | IGSA | Female | 57 | Over 72 | NDS | 10/3/2019 |
| GARVIN COUNTY DETENTION CENTER | 201 WEST GRANT AVENUE | PAULS VALLEY | OK | 73075 | DAL | IGSA | Female/Male | 1 | Under 72 | PBNDS 2011 | 10/11/2017 |
| KAY COUNTY JUSTICE FACILITY | 1305 DRIVE | TONKAWA | OK | 74647 | DAL | IGSA | Female/Male | 106 | Over 72 | PBNDS 2011 | 10/11/2019 |
| OKMULGEE COUNTY JAIL | 314 W. 7TH STREET | OKMULGEE | OK | 74447 | DAL | IGSA | Female/Male | 229 | Over 72 | PBNDS 2011 | 9/19/2019 |
| TULSA COUNTY JAIL (DAVID L MOSS JUSTICE CTR) | 300 NORTH DENVER AVENUE | TULSA | OK | 74103 | DAL | IGSA | Male | 68 | Over 72 | NDS | 1/25/2019 |
| NORTHERN OREGON CORRECTIONAL FACILITY | 211 WEBBER ROAD | THE DALLES | OR | 97058 | SEA | IGSA | Female/Male | 18 | Over 72 | NDS | 10/31/2019 |
| NORTHERN OREGON JUVENILE DETENTION | 211 WEBBER STREET | THE DALLES | OR | 97058 | SEA | JUVENILE | Male | 1 | Over 72 | JFRMU Juvenile | 7/18/2019 |
| ABRAXAS ACADEMY DETENTION CENTER | 1000 ACADEMY DRIVE | MORGANTOWN | PA | 19543 | PHI | JUVENILE | Female/Male | 0 | Over 72 | JFRMU Juvenile | 7/18/2019 |
| BEAVER COUNTY JAIL | 6000 WOODLAWN BOULEVARD | ALIQUIPPA | PA | 15001 | PHI | USMS IGA | Female/Male | 2 | Over 72 | NDS | 9/18/2017 |
| CAMBRIA COUNTY JAIL | 425 MANOR DRIVE | EBENSBURG | PA | 15943 | PHI | USMS IGA | Female/Male | 40 | Over 72 | NDS | 11/7/2019 |
| CLINTON COUNTY CORRECTIONAL FACILITY | 419 SHOEMAKER ROAD | LOCK HAVEN | PA | 17745 | PHI | USMS IGA | Male | 68 | Over 72 | NDS | 9/26/2019 |
| DELAWARE CO JAIL (GEORGE W. HILL) | 500 CHENEY ROAD | THORNTON | PA | 19373 | PHI | USMS IGA | Female/Male | 3 | Under 72 | NDS | 8/10/2018 |
| ERIE COUNTY JAIL | 1638 ASH STREET | ERIE | PA | 16503 | PHI | IGSA | Male | 2 | Over 72 | NDS | 9/20/2018 |
| PIKE COUNTY CORRECTIONAL FACILITY | 175 PIKE COUNTY BOULEVARD | LORDS VALLEY | PA | 18428 | PHI | IGSA | Male | 192 | Over 72 | PBNDS 2008 | 4/25/2019 |
| YORK COUNTY PRISON | 3400 CONCORD ROAD | YORK | PA | 17402 | PHI | IGSA | Male | 540 | Over 72 | PBNDS 2008 | 10/18/2019 |
| WYATT DETENTION CENTER | 950 HIGH STREET | CENTRAL FALLS | RI | 02863 | BOS | USMS IGA | Male | 132 | Over 72 | NDS | 4/11/2019 |
| CHARLESTON COUNTY DETENTION CENTER | 3841 LEEDS AVENUE | NORTH CHARLESTON | SC | 29405 | ATL | USMS IGA | Female/Male | 12 | Over 72 | NDS | 11/29/2018 |
| LEXINGTON COUNTY JAIL | 521 GIBSON ROAD | LEXINGTON | SC | 29072 | ATL | USMS IGA | Female/Male | 2 | Under 72 | NDS | 9/15/2017 |
| YORK COUNTY DETENTION CENTER | 1675-3A YORK HWY | YORK | SC | 29745 | ATL | USMS IGA | Female/Male | 0 | Under 72 | NDS | 8/11/2016 |
| PENNINGTON COUNTY JAIL (SOUTH DAKOTA) | 307 SAINT JOSEPH STREET | RAPID CITY | SD | 57701 | SPM | USMS IGA | Female/Male | 1 | Over 72 | NDS | 9/24/2018 |
| YANKTON COUNTY JAIL | 410 WALNUT STREET | YANKTON | SD | 57078 | SPM | IGSA | Female/Male | 1 | Under 72 | NDS | 9/24/2018 |
| DAVIDSON COUNTY SHERIFF | 448 2ND AVENUE NORTH | NASHVILLE | TN | 37210 | NOL | USMS IGA | Female/Male | 0 | Over 72 | NDS | 9/24/2018 |
| WESTERN TENNESSEE DETENTION FACILITY | 6299 FINDE NAVEH DRIVE | MASON | TN | 38049 | NOL | IGSA | Female/Male | 8 | Under 72 | PBNDS 2008 | 1/17/2019 |
| BEDFORD MUNICIPAL DETENTION CENTER | 2121 L DON DODSON DRIVE | BEDFORD | TX | 76021 | DAL | IGSA | Female/Male | 2 | Under 72 | NDS | 10/11/2017 |
| BURNET COUNTY JAIL | JAIL ADMINISTRATOR | BURNET | TX | 78611 | SNA | IGSA | Male | 2 | Under 72 | NDS | 10/1/2018 |
| CENTRAL TEXAS DETENTION FACILITY | 218 S. LAREDO ST | SAN ANTONIO | TX | 78207 | SNA | USMS IGA | Female/Male | 27 | Over 72 | NDS | 10/1/2018 |
| COASTAL BEND DETENTION FACILITY | 4909 FM (FARM TO MARKET) 2826 | ROBSTOWN | TX | 78380 | HOU | USMS IGA | Male | 7 | Under 72 | PBNDS 2008 | 10/1/2018 |
| DALLAS COUNTY JAIL – LEW STERRETT JUSTICE CENTER | 111 WEST COMMERCE STREET | DALLAS | TX | 75202 | DAL | USMS IGA | Female/Male | 4 | Over 72 | NDS | 1/10/2019 |
| EAST HIDALGO DETENTION CENTER | 1330 HIGHWAY 107 | LA VILLA | TX | 78562 | SNA | USMS IGA | Female/Male | 741 | Over 72 | NDS | 10/20/2017 |
| EL VALLE DETENTION FACILITY | 1800 INDUSTRIAL DRIVE | RAYMONDVILLE | TX | 78580 | SNA | USMS IGA | Female/Male | 8 | Under 72 | PBNDS 2011 | 9/6/2019 |
| EULESS CITY JAIL | 1102 W. EULESS BLVD. | EULESS | TX | 76040 | DAL | IGSA | Female/Male |  |  | NDS | 10/24/2019 |
| IAH SECURE ADULT DETENTION FACILITY (POLK) | 3400 FM 350 SOUTH | LIVINGSTON | TX | 77351 | HOU | USMS IGA | Female/Male | 619 | Over 72 | PBNDS 2011 | 10/11/2017 |
| JACK HARWELL DETENTION CENTER | 3101 MARLIN HWY | WACO | TX | 76705 | DAL | USMS IGA | Female/Male | 0 | Over 72 | NDS | 1/10/2019 |
| JOE CORLEY ICE PROCESSING CENTER | 500 HILBIG RD. | CONROE | TX | 77301 | HOU | IGSA | Male | 653 | Over 72 | PBNDS 2011 | 10/1/2018 |
| JOHNSON COUNTY CORRECTIONS CENTER | 1800 RIDGEMAR DRIVE | CLEBURNE | TX | 76031 | DAL | IGSA | Female/Male | 221 | Over 72 | PBNDS 2011 | 11/15/2019 |
| KARNES COUNTY CORRECTIONAL CENTER | 810 COMMERCE STREET | KARNES CITY | TX | 78118 | SNA | USMS IGA | Male | 0 | Over 72 | NDS | 8/22/2019 |
| LA SALLE COUNTY REGIONAL DETENTION CENTER | 832 EAST TEXAS STATE HIGHWAY 44 | ENCINAL | TX | 78019 | SNA | USMS IGA | Female/Male | 5 | Over 72 | NDS | 3/16/2017 |
| LIMESTONE COUNTY DETENTION CENTER | 910 NORTH TYUS STREET | GROESBECK | TX | 76642 | SNA | USMS IGA | Male | 309 | Over 72 | NDS | 9/21/2017 |
| LUBBOCK COUNTY DETENTION CENTER | 811 MAIN STREET | LUBBOCK | TX | 79401 | DAL | USMS IGA | Female/Male | 0 | Over 72 | NDS | 10/24/2019 |
| RANDALL COUNTY JAIL | 9100 SOUTH GEORGIA STREET | AMARILLO | TX | 79118 | DAL | USMS IGA | Male | 1 | Under 72 | NDS | 9/6/2019 |
| ROLLING PLAINS DETENTION CENTER | 118 COUNTY ROAD 206 | HASKELL | TX | 79521 | DAL | USMS IGA | Female/Male | 166 | Over 72 | NDS | 10/20/2017 |
| VAL VERDE CORRECTIONAL FACILITY | 253 FARM TO MARKET 2523 | DEL RIO | TX | 78840 | SNA | USMS IGA | Female/Male | 1 | Under 72 | NDS | 9/19/2019 |

| Facility | Address | City | State | ID | Program | Gender | Count | Status | Date |
|---|---|---|---|---|---|---|---|---|---|
| WEST TEXAS DETENTION FACILITY | 401 S. VAQUERO AVE. | SIERRA BLANCA | TX | 79851 ELP | USMS IGA | Female/Male | 211 Over 72 | NDS | 8/8/2019 |
| WILLACY CO REGIONAL DETENTION FACILITY | 1601 BUFFALO DRIVE | RAYMONDVILLE | TX | 78580 SNA | USMS IGA | Female/Male | 0 Over 72 | NDS | 9/12/2019 |
| SALT LAKE COUNTY METRO JAIL | 3415 SOUTH 900 WEST | SALT LAKE CITY | UT | 84119 SLC | USMS IGA | Female/Male | 1 Under 72 | NDS | 9/15/2018 |
| TOOELE COUNTY JAIL | 47 SOUTH MAIN STREET | TOOELE | UT | 84074 SLC | USMS IGA | Female/Male | 0 Under 72 | NDS | 9/15/2018 |
| WASHINGTON COUNTY JAIL (PURGATORY CORRECTIONAL FAC | 750 SOUTH 5400 WEST | HURRICANE | UT | 84737 SLC | USMS IGA | Female/Male | 6 Over 72 | NDS | 9/27/2017 |
| ALEXANDRIA CITY JAIL | 2003 MILL ROAD | ALEXANDRIA | VA | 22314 WAS | USMS IGA | Female/Male | 0 Under 72 | NDS | 9/27/2017 |
| NORTHERN VIRGINIA JUVENILE DETENTION CENTER | 200 SOUTH WHITING STREET | ALEXANDRIA | VA | 22304 WAS | JUVENILE | Female/Male | 0 Under 72 | N/A | N/A |
| ROANOKE CITY JAIL | 340 CAMPBELL AVENUE SOUTHWEST | ROANOKE | VA | 24016 WAS | USMS IGA | Female/Male | 0 Under 72 | NDS | 9/27/2017 |
| ROCKINGHAM COUNTY JAIL | 25 SOUTH LIBERTY STREET | HARRISONBURG | VA | 22801 WAS | USMS IGA | Female/Male | 1 Under 72 | NDS | 9/27/2017 |
| NORTHWEST STATE CORRECTIONAL CENTER | 3649 LOWER NEWTON ROAD | SWANTON | VT | 05488 BOS | USMS IGA | Female/Male | 1 Under 72 | NDS | 9/5/2018 |
| COWLITZ COUNTY JUVENILE | 1725 1ST AVE. | LONGVIEW | WA | 98632 SEA | JUVENILE | Female/Male | 4 Over 72 | JFRMU Juvenile | 8/1/2019 |
| YAKIMA COUNTY DEPARTMENT OF CORRECTIONS | 111 NORTH FRONT STREET | YAKIMA | WA | 98901 SEA | USMS IGA | Female/Male | 1 Under 72 | NDS | 10/2/2017 |
| DODGE COUNTY JAIL | 215 WEST CENTRAL STREET | JUNEAU | WI | 53039 CHI | USMS IGA | Female/Male | 125 Over 72 | NDS | 4/18/2019 |
| KENOSHA COUNTY DETENTION CENTER | 4777 88TH AVENUE | KENOSHA | WI | 53144 CHI | USMS IGA | Female/Male | 157 Over 72 | NDS | 6/6/2019 |
| SOUTH CENTRAL REGIONAL JAIL | 1001 CENTRE WAY | CHARLESTON | WV | 25309 PHI | USMS IGA | Female/Male | 6 Over 72 | NDS | 8/23/2018 |
| NATRONA COUNTY JAIL | 1100 BRUCE LANE | CASPER | WY | 82601 DEN | USMS IGA | Female/Male | 1 Under 72 | NDS | 9/18/2018 |
| PLATTE COUNTY JAIL | 850 MAPLE STREET | WHEATLAND | WY | 82201 DEN | USMS IGA | Female/Male | 1 Under 72 | NDS | 9/18/2018 |