1   Charles J. Cooper (Appearing *Pro Hac Vice*),
    DC Bar No. 248070
2   COOPER & KIRK, PLLC
    1523 New Hampshire Avenue, NW
3   Washington, DC  20036
    Telephone: (202) 220-9600
4   Email: ccooper@cooperkirk.com

5   Michael B. McClellan, CBN 241570
    NEWMEYER & DILLION LLP
6   895 Dove Street, Fifth Floor
    Newport Beach, CA  92660
7   Telephone: (949) 854-7000
    Email: Michael.McClellan@ndlf.com
8
    Michael W. Battin, CBN 183870
9   NAVIGATO & BATTIN, LLP
    755 West A Street, Suite 150
10  San Diego, CA  92101
    Telephone: (619) 233-5365
11  Email: mike@navbat.com

12  *Attorneys for Plaintiff The GEO Group, Inc.*

13              UNITED STATES DISTRICT COURT

14           SOUTHERN DISTRICT OF CALIFORNIA

15  THE GEO GROUP, INC.,                    Case No. 19cv2491-JLS-WVG

16              Plaintiff,                   Assigned to District Judge Janis L.
                                             Sammartino
17  v.
                                             Assigned to Magistrate Judge William v.
18  GAVIN C. NEWSOM, in his official         Gallo
    capacity as Governor of the State of
19  California; XAVIER BECERRA, in his       **PLAINTIFF THE GEO
    official capacity as Attorney General of GROUP, INC.'S COMBINED BRIEF
20  the State of California,                 IN REPLY IN SUPPORT OF
                                             PLAINTIFF'S MOTION FOR
21              Defendants.                  PRELIMINARY INJUNCTION AND
                                             IN OPPOSITION TO
22                                           DEFENDANTS' MOTION TO
                                             DISMISS COMPLAINT**
23
                                             Date:      May 7, 2020
24                                           Time:      1:30 p.m.
                                             Dept:      4D
25
26                                           FILE DATE:   December 30, 2019
                                             TRIAL DATE:  No Date Set
27
28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................ii

ARGUMENT ........................................................................................................ 1

I.  GEO Is Likely To Succeed On The Merits. ................................................ 1

    A.  AB-32 Violates The Intergovernmental-Immunity Doctrine. .............. 1

        1.  AB-32 directly regulates the Federal Government .................... 1

        2.  AB-32 discriminates against the Federal Government .............. 6

    B.  AB-32 Is Preempted By Federal Law. ................................................ 12

        1.  AB-32 is preempted by federal immigration law. ................... 12

            a.  The presumption against federal preemption
               does not apply. ............................................................... 12

            b.  Federal law unambiguously authorizes the
               Federal Government to use private contractor
               services for immigration detention. ............................... 15

            c.  The State's remaining arguments against
               finding preemption are meritless. .................................. 24

        2.  AB-32 is preempted by federal criminal law. .......................... 27

    C.  Alternatively, It Is Undisputed That GEO Is Entitled
        To Judgment On Its Request Arising Under AB-32's
        Temporary Safe Harbor. ..................................................................... 29

II.  The Remaining Factors Favor Granting An Injunction. .............................. 30

III.  GEO Is Entitled To A Permanent Injunction And Final Judgment. ............ 32

CONCLUSION .................................................................................................... 34



# TABLE OF AUTHORITIES

**Case**                                                                                      **Page**

*Arizona v. California*, 283 U.S. 423 (1931) ...................................................................... 2

*Arizona v. United States*, 567 U.S. 387 (2012) ........................................... 6, 15, 16

*Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) ........................ 28

*Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957 (9th Cir. 2017) ........................... 15

*Baby Tam & Co. v. City of Las Vegas*, 154 F.3d 1097 (9th Cir. 1998)............. 32, 33

*Barker v. Kansas*, 503 U.S. 594 (1992)........................................................................ 8

*Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003) ........................................... 20, 22

*Blackburn v. United States*, 100 F.3d 1426 (9th Cir. 1996) ...................................... 2

*Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014)............................ 2, 3, 4, 5

*Bradley v. Henry*, 428 F.3d 811 (9th Cir. 2005)........................................................ 15

*Brown v. Plata*, 563 U.S. 493 (2011) ........................................................................... 8

*Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001) ....................... 14

*Burns v. United States*, 501 U.S. 129 (1991)............................................................. 20

*Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73 (2002) ........................................... 20

*City & County of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018).................................................................................. 31

*Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434 (9th Cir. 1986) ................... 16

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000)....................... 24

*CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993).......................................... 16

*Davis v. Mich. Dep't of Treasury*, 489 U.S. 803 (1989) .............................. 8, 11, 12

*Dawson v. Steager*, 139 S. Ct. 698 (2019) ........................................... 6, 7, 8, 9, 11

*Day v. AT & T Disability Income Plan*,
    698 F.3d 1091 (9th Cir. 2012)................................................................................... 29

*DeCanas v. Bica*, 424 U.S. 351 (1976) ...................................................................... 13

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*,
    458 U.S. 141 (1982) ................................................................................................... 17

*Gartrell Construction Inc. v. Aubry*, 940 F.2d 437
    (9th Cir. 1991) ..............................................................................25, 27, 28, 32

*Gomez-Perez v. Potter*, 553 U.S. 474 (2008) ........................................................... 21

NEWMEYER
DILLION

*Goodyear Atomic Corp. v. Miller*, 486 U.S. 174 (1988) ........................................... 3

*Hancock v. Train*, 426 U.S. 167 (1976) ........................................... 2, 3, 4, 5

*Harisiades v. Shaughnessy*, 342 U.S. 580 (1952) ........................................... 26

*Johnson v. Maryland*, 254 U.S. 51 (1920) ........................................... 2, 3, 6

*Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956) ........................................... 4

*Lindh v. Murphy*, 521 U.S. 320 (1997) ........................................... 21

*Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185 (9th Cir. 2018) ........................... 17, 27

*Marx v. Gen. Rev. Corp.*, 568 U.S. 371 (2013) ........................................... 21

*Mayo v. United States*, 319 U.S. 441 (1943) ........................................... 2

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) ..................................... 1, 5

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ........................................... 12, 13

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ........................................... 32

*Michigan v. EPA*, 135 S. Ct. 2699 (2015) ........................................... 16

*Nat. Res. Def. Council v. U.S. Forest Serv.*,
    421 F.3d 797 (9th Cir. 2005) ........................................... 18

*NLRB v. SW Gen., Inc.*, 137 S. Ct. 929 (2017) ........................................... 23

*North Dakota v. United States*, 495 U.S. 423 (1990) .................................. 2, 4, 5, 6

*Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738 (1824) ....................... 4

*Paul v. United States*, 371 U.S. 245 (1963) ........................................... 5

*Pennsylvania v. West Virginia*, 262 U.S. 553 (1923) ........................................... 31

*PHH Corp. v. CFPB*, 881 F.3d 75 (D.C. Cir. 2018) ........................................... 28

*Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376 (1960) ................. 7, 8

*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*,
    268 U.S. 510 (1925) ........................................... 31, 32

*Portland 76 Auto/Truck Plaza, Inc. v. Union Oil Co. of Cal.*,
    153 F.3d 938 (9th Cir. 1998) ........................................... 20

*Pub. Utils. Comm'n of Cal. v. United States*, 355 U.S. 534 (1958) ...................... 4, 5

*Puente Ariz. v. Arpaio*, 821 F.3d 1098 (9th Cir. 2016) ........................................... 28

*Reyna ex rel. J.F.G. v. Hott*, 921 F.3d 204 (4th Cir. 2019) ........................................... 16

*Rookaird v. BNSF Ry. Co.*, 908 F.3d 451 (9th Cir. 2018) ........................................... 20

NEWMEYER
DILLION

*Soc'y of the Sisters of the Holy Names of Jesus & Mary v. Pierce*,
 296 F. 928 (D. Or. 1924) ...................................................................... 31

*S. Cal. Stroke Rehab. Assocs., Inc. v. Nautilus, Inc.*,
 782 F. Supp. 2d 1096 (S.D. Cal. 2011) ........................................... 15

*Toll v. Moreno*, 458 U.S. 1 (1982) ......................................................... 13

*Tin Cup, LLC v. U.S. Army Corps of Eng'rs*,
 904 F.3d 1068 (9th Cir. 2018) .......................................................... 18

*United States v. Alonso*, 48 F.3d 1536 (9th Cir. 1995) ......................... 29

*United States v. California*, 314 F. Supp. 3d 1077
 (E.D. Cal. 2018) .................................................................................. 3

*United States v. California*, No. 2:18-cv-721-WBS-DB,
 2018 WL 5780003 (E.D. Cal. Nov. 1, 2018) .................................... 2

*United States v. California*, 921 F.3d 865 (9th Cir. 2019) ............... 4, 14, 15, 25, 26

*United States v. City of Arcata*, 629 F.3d 986 (9th Cir. 2010) ............ 2, 9

*United States v. City of Manassas*, 830 F.2d 530 (4th Cir. 1987) ......... 11

*United States v. City of Pittsburg*, 661 F.2d 783 (9th Cir. 1981) ..... 24, 25

*United States v. Ga. Pub. Serv. Comm'n*, 371 U.S. 285 (1963) ............... 5

*United States v. New Mexico*, 455 U.S. 720 (1982) ................................. 4

*United States v. Nye County*, 178 F.3d 1080 (9th Cir. 1999) .................. 9

*United States v. Olmos-Esparza*, 484 F.3d 1111 (9th Cir. 2007) ......... 20

*United States v. Vonn*, 535 U.S. 55 (2002) ........................................... 19

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) .......... 26, 30

*Washington v. United States*, 460 U.S. 536 (1983) ................................. 9

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .................... 31

*Wyeth v. Levine*, 555 U.S. 555 (2009) ............................................ 13, 15

**<u>Statutes, Regulations, & Rules</u>**

48 C.F.R. § 3017.204-90 ........................................................................ 18

6 U.S.C. §
 112(b)(2) ................................................................. 17, 20, 22
 202(3) ............................................................................... 17
 251(2) ............................................................................... 17
 557 .................................................................................... 16

19CV2491-JLS-WVG
COMBINED BRIEF RE MTN FOR PRELIM.
INJUNCTION AND MOTION TO DISMISS

8 U.S.C. §
  1101(a)(18) ........................................................................................ 24
  1103(a)(1) ......................................................................................... 16
  1103(a)(11) ................................................................................. 18, 19
  1231(g) .............................................................................................. 23
  1231(g)(1) .................................................................................... 16, 26
  1231(g)(2) ......................................................................................... 23
  1357 .................................................................................................. 24

18 U.S.C. §
  4013 note ........................................................................................... 18
  4013(c)(2)(C) ..................................................................................... 27

28 U.S.C. §
  530C(a) .............................................................................................. 17
  530C(a)(4) .................................................................................... 17, 22

CAL. HEALTH & SAFETY CODE § 120145 ................................................ 10

CAL. PENAL CODE §
  490.5 .................................................................................................. 10
  1026 .................................................................................................. 10
  9500(a) ........................................................................................ 10, 11
  9500(b) ................................................................................................ 6
  9501 ................................................................................................... 6
  9502 ................................................................................................ 6, 10
  9502(a) ............................................................................................. 6, 10
  9502(b) ............................................................................................... 10
  9502(c) ................................................................................................. 6
  9502(e) ............................................................................................... 10
  9502(f) ................................................................................................ 10
  9502(g) ............................................................................................... 10
  9503 ............................................................................................... 6, 29
  9505(a) ............................................................................................... 29
  9505(b) ........................................................................................... 6, 10

CAL. WELF. & INST. CODE § 1004 ............................................................ 10

Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, sec. 1(a)(4)
  [app. D, div. A, ch. 2, § 213(a)(2)], 114 Stat. 2763 (2000) ................................ 18

Department of Justice Appropriations Act, 2001, Pub. L. No. 106-553,
  sec. 1(a)(2) [app. B, title I, § 119], 114 Stat. 2762 (2000) ............................ 18, 23

Federal Rule of Civil Procedure 65(a)(2) ....................................................... 33

NEWMEYER
DILLION

Homeland Security Act of 2002, Pub. L. No. 107-296, Title I, sec. 102,
    116 Stat. 2135 (2002) ................................................................. 16, 23

Illegal Immigration Reform and Immigrant Responsibility Act of 1996
    (IIRIRA), Pub. L. No. 104–208, Div. C, sec. 373, 110 Stat. 3009 ............. 21, 22

Pub. L. No. 414, ch. 477, § 242(c), 66 Stat. 163 (1952) ......................................... 22

Pub. L. No. 107-273, Div. A, Title II, sec. 201(a), 116 Stat. 1758 (2002) ............. 23

Revision of Department of Homeland Security Acquisition Regulation,
    71 Fed. Reg. 25,759, 25,764 (May 2, 2006) ...................................... 18

## **Other Authorities**

*Departments of Commerce, Justice, and State, the Judiciary, and
Related Agencies Appropriations for 1996: Hearings Before the
Subcomm. on the Departments of Commerce, Justice, and State,
the Judiciary, and Related Agencies of the H. Comm. on
Appropriations*, pt. 2, 104th Cong. 1168 (1995) ...................................... 21

Joan Mullen, *Corrections and the Private Sector*, NAT'L INST. OF JUSTICE:
    RESEARCH IN BRIEF, Oct. 1984 .......................................................... 21, 22

Legality of Fixed-Price Intergovernmental Agreements for Detention Services,
    26 Op. O.L.C. 235 (2002) ................................................................ 18

1 Ralph C. Nash, Jr. & John Cibinic, Jr., *Federal Procurement Law* 5
    (3d ed. 1977) ...................................................................................... 24

U.S. Gov't Accountability Office, GAO/GGD-91-21, Private Prisons:
    Cost Savings and BOP's Statutory Authority Need To Be Resolved
    20 (Feb. 1991) .................................................................................... 22

If the Supremacy Clause means anything, it means that the Federal Government may carry out its constitutional duties without interference from the States. *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 426 (1819). California does not deny that Congress has charged the Federal Government with detaining individuals in anticipation of, or as a consequence of, federal criminal or immigration proceedings; nor does it deny that Congress acted well-within its constitutional powers in doing so. Yet the undisputed fact is that Assembly Bill 32 ("AB-32") would shut down *all* federal immigration detention centers, and severely hamper federal criminal detention centers, in California. There is no way to reconcile AB-32 with the supremacy of federal law, which is the unifying force in our system of federalism. This Court should deny the State's motion to dismiss, grant GEO's motion for a preliminary injunction, and enter a permanent injunction and final judgment declaring AB-32 unconstitutional and restraining its enforcement against GEO.

## ARGUMENT

### I.   GEO Is Likely To Succeed On The Merits.

#### A.   AB-32 Violates The Intergovernmental-Immunity Doctrine.

##### 1.   AB-32 directly regulates the Federal Government.

The State offers four reasons for why AB-32 does not constitute a direct regulation of the Federal Government: (1) the statute is ostensibly neutral toward the Federal Government; (2) it applies to private persons; (3) it usually applies to property owned by private contractors; and (4) obstacles to federal operations are better analyzed under preemption. Each of these arguments is foreclosed by Supreme Court and Ninth Circuit precedent.

First, as demonstrated below, AB-32 is not, in fact, neutral toward the Federal Government. Rather, it discriminates against and targets federal detention operations. *See infra* Part I.A.2. But even if AB-32 were a neutral, generally applicable law, that would not save the statute. The Supreme Court has repeatedly struck down neutral,

NEWMEYER DILLION

generally applicable laws as violations of intergovernmental immunity. *See, e.g.*, *Hancock v. Train*, 426 U.S. 167, 179–80 (1976); *Mayo v. United States*, 319 U.S. 441, 447–48 (1943); *Arizona v. California*, 283 U.S. 423, 451 (1931); *Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920). Similarly, in *Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996), the Ninth Circuit invalidated a generally applicable resort-safety statute even though the statute in that case "did not target the federal government alone." *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010).

And that makes sense: the Supreme Court and the Ninth Circuit have made clear that direct regulation and discrimination are independent violations of intergovernmental immunity. *See North Dakota v. United States*, 495 U.S. 423, 435–38 (1990) (plurality opinion); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839–43 (9th Cir. 2014). It necessarily follows that a law that does *not* discriminate against the Federal Government (i.e., a law that is neutral and generally applicable) may nonetheless run afoul of intergovernmental immunity as a form of direct regulation. *See United States v. California*, No. 2:18-cv-721-WBS-DB, 2018 WL 5780003, at *4 (E.D. Cal. Nov. 1, 2018) ("[A state law] may not expressly name the federal government as its intended object of regulation, but that does not mean the law does not directly regulate the United States."). In its opening brief, GEO highlighted the foregoing Supreme Court precedents invalidating generally applicable laws, *see* Mem. of Points & Authorities in Supp. of Mot. for Prelim. Inj., Doc. 15-1 at 21 (Dec. 31, 2019), yet the State does not even cite—let alone distinguish—*any* of them. These precedents foreclose the State's argument that generally applicable laws cannot constitute direct regulation.

The State does try to distinguish *Boeing*, arguing that the state law in that case "specifically obligated the federal government to act" and was therefore not neutral and generally applicable. Not. of Mot. &Mot. To Dismiss Compl.; Mem. of Points & Authorities, Doc. 20 at 11 (Mar. 5, 2020). But as the foregoing demonstrates, even

generally applicable laws are invalid if they substantially interfere with federal operations, and the law at issue in *Boeing* regulated Boeing's actions as a federal contractor just as AB-32 regulates GEO's actions as a federal contractor. The key point in *Boeing* was that the state statute there "directly interfere[d] with the functions of the federal government" by "mandat[ing] the ways in which Boeing render[ed] services that the federal government hired Boeing to perform." 768 F.3d at 840.[1] In the same way, AB-32 directly interferes with federal detention operations that the Federal Government engaged GEO to perform. Indeed, AB-32 goes much further than the statute in *Boeing* for it effectively *prohibits* the Federal Government from utilizing private contractors to carry out its detention operations.

The State claims that AB-32's ostensibly neutral prohibition on private detention facilities only "tangentially affect[s] the federal government," Doc. 20 at 10, but that assertion cannot be taken seriously. "[I]t demands no stretch of reason to see that [AB-32], in effect, target[s] the operations of federal immigration enforcement" by *completely shutting down* federal immigration detention facilities in California, *United States v. California*, 314 F. Supp. 3d 1077, 1096 (E.D. Cal. 2018), and it significantly hampers the detention operations of the Bureau of Prisons and the U.S. Marshals. The State does not dispute that AB-32 will severely and detrimentally affect the Federal Government's criminal and immigration detention capacity in California, and that alone is sufficient to demonstrate direct regulation.

Second, the State notes that AB-32 "applies to private actors," Doc. 20 at 10, but the Supreme Court has repeatedly held that state laws may violate intergovernmental immunity when applied to private actors carrying out federal operations, *see, e.g.*, *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 (1988);

---

[1] Other direct-regulation cases have similarly focused on the extent of the burden placed on federal operations. *See, e.g.*, *Hancock*, 426 U.S. at 180; *Johnson*, 254 U.S. at 56–57.

*Hancock*, 426 U.S. at 179–80; *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 189–90 (1956); *Osborn v. Bank of the U.S.*, 22 U.S. (9 Wheat.) 738, 867 (1824). So has the Ninth Circuit. *See United States v. California*, 921 F.3d 865, 882 n.7 (9th Cir. 2019); *Boeing Co.*, 768 F.3d at 839–42. Once again, the State does not even attempt to square its argument with these precedents.

California cites *North Dakota* to bolster its point about AB-32's application to private actors, but that case is clearly distinguishable for two independent reasons. First, *North Dakota* involved the States' "virtually complete control over the importation and sale of liquor" under the Twenty-First Amendment's affirmative grant of power, *see* 495 U.S. at 431 (plurality opinion) (quotation marks omitted), which caused a plurality of the Court to accord the state law a "strong presumption of validity" that would not normally apply, *id.* at 433. Second, *North Dakota* was a straightforward application of the principle that state laws that merely "make it more costly for the Government to do its business"—e.g., neutral and generally applicable taxes applied to federal contractors—generally do not violate intergovernmental immunity. *Id.* at 434; *see also United States v. New Mexico*, 455 U.S. 720, 734 (1982). In *North Dakota*, the state labeling and reporting requirements only increased the price per case of liquor imported by the Federal Government, 495 U.S. at 429, so the Supreme Court predictably upheld the regulations. Here, California does not seek to enforce a generally applicable law that has the incidental effect of making federal operations more expensive; the State instead seeks to *prohibit* the Federal Government from carrying out federal operations using private contractors. That is a well-established violation of intergovernmental immunity. *See Hancock*, 426 U.S. at 179–80; *Pub. Utils. Comm'n of Cal. v. United States*, 355 U.S. 534, 544 (1958) [hereinafter *California Commission*].

Third, the State suggests that AB-32 does not violate intergovernmental immunity because GEO's detention operations generally take place on private property. *See* Doc. 20 at 10 n.6. But as pointed out in GEO's opening brief, *see* Doc.

15-1 at 22–23, the Supreme Court has invalidated state laws even when applied to contractors carrying out federal operations *on non-federal property. See Cal. Comm'n*, 355 U.S. at 544; *see also Paul v. United States*, 371 U.S. 245, 254–55 (1963); *United States v. Ga. Pub. Serv. Comm'n*, 371 U.S. 285, 292–93 (1963). So has the Ninth Circuit. *See Boeing Co.*, 768 F.3d at 834, 840. The State asserts that *California Commission* does not apply here, but it does not dispute that the federal operations in that case were carried out on non-federal property. And while it is true that the contractors in *California Commission* were transporting federal property, that actually makes the case highly analogous to this one. The state law in *California Commission* regulated contractors when they had custody of federal property for purposes of transporting it. *Id.* at 535. In the same way, AB-32 regulates contractors when they have custody of federal detainees for purposes of housing them. The State concedes that *California Commission* is an example of direct regulation, and AB-32 cannot be meaningfully distinguished from the law the Supreme Court invalidated in that case.

Finally, the State asserts—without citation to *any* authority—that "the issue of an alleged burden [on federal operations] is properly analyzed within the framework of conflict or obstacle preemption." Doc. 20 at 12. But *McCulloch v. Maryland* is the seminal intergovernmental-immunity case, and it summarized that doctrine in this way: "[T]he states have no power, by taxation or otherwise, *to retard, impede, burden, or in any manner control*, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." 17 U.S. (4 Wheat.) 316, 436 (1819) (emphasis added). And as noted above, other direct-regulation cases have similarly focused on the extent of the burden placed on federal operations. *See, e.g.*, *Hancock*, 426 U.S. at 180; *Cal. Comm'n*, 355 U.S. at 544; *Johnson*, 254 U.S. at 56–57. While there are cases (like this one) where a state law is invalid based *both* on direct-regulation intergovernmental immunity *and* on obstacle preemption, the two doctrines remain "distinct." *See North Dakota*, 495 U.S.

at 434; *see, e.g.*, *Arizona v. United States*, 567 U.S. 387, 403–10 (2012) (state statutes were obstacle-preempted even though they did not implicate intergovernmental immunity); *Johnson*, 254 U.S. at 57 (state statute constituted unconstitutional direct regulation even though there was no federal statute that preempted it). Because AB-32 substantially interferes with federal operations, it regulates the Federal Government directly, and therefore violates the Supremacy Clause.

### 2.    AB-32 discriminates against the Federal Government.

The discriminatory nature of AB-32 is in plain sight: the statute prohibits all private detention facilities in the State, *see* CAL. PENAL CODE § 9501, but it then exempts all state detention facilities from that prohibition, *see id.* §§ 9502, 9505(b), leaving only federal detention facilities subject to the ban. Indeed, the State does not identify *any* state detention facility that would necessarily have to close as a result of AB-32. And while the State points to two exceptions that apply to both federal and state facilities alike—Sections 9502(c) (halfway houses)[2] and 9505(a) (temporary safe harbor),[3] Doc. 20 at 13—"the relevant question isn't whether federal [facilities] are similarly situated to state [facilities] who *don't* receive [an exemption from Section 9501]; the relevant question is whether they are similarly situated to those who *do*." *Dawson v. Steager*, 139 S. Ct. 698, 705 (2019); *see* Doc. 15-1 at 28–29. Thus, Sections 9502(c) and 9505(a) are irrelevant to the discrimination analysis, and the State does not argue otherwise.

As for the remaining exceptions—Sections 9502(a)–(b), (d)–(g) and 9505(b)—the State does not dispute that they apply *solely* to private detention

---

[2] The State agrees with GEO that halfway houses, like those operated by GEO, are exempt from Section 9501 via Section 9502(c). *See United States v. Newsom*, No. 20-cv-154-JLS-WVG, Doc. 12 at 12 n.9, 29 n.17 (S.D. Cal. Mar. 5, 2020).

[3] The State also cites Section 9503, but that provision is not so much an exception as a restatement. Under Section 9500(b), Section 9501's prohibition only applies to facilities that are "*operated* by a private, nongovernmental, for-profit entity." (emphasis added). Section 9503 makes the implication explicit: Section 9501 does not prohibit governmental entities from operating privately *owned* facilities.

NEWMEYER DILLION

facilities operated by state contractors. Where, as here, the State has created a favored class through exceptions to a general rule, the definition of the favored class depends on "the distinguishing characteristic of" the various exceptions, and the differential treatment is only permissible if there are "significant differences" between the favored class and the disfavored class (that is, the classes are not "similarly situated"). *Dawson*, 139 S. Ct. at 705. In *Dawson*, for example, West Virginia exempted "retirement plans associated with West Virginia police, firefighters, and deputy sheriffs" from state income tax. *Id.* Even though each exception related to a different retirement plan serving a different set of state retirees, the Supreme Court looked for the "distinguishing characteristic of these plans" as a whole, identified that characteristic as "the nature of the jobs previously held by retirees who may participate in [the retirement plans]," compared that characteristic with the non-favored federal retirees, and concluded that there were no significant differences. *Id.*; *see also Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376, 383 (1960). With respect to AB-32, therefore, the favored class of state contractors is defined by reference to the distinguishing characteristic that the class has in common.

Here, *there is no distinguishing characteristic* shared by members of the favored class *other than* the fact that they are state contractors. The class is not defined by the type of detainees housed in a facility: the exceptions concern a range of detainees, from juveniles (Sections 9502(a), (e)) to quarantined persons (Section 9502(f)) to hardened criminals (Section 9505(b)). Nor is the class defined by the type of services provided at a facility: the exceptions relate to services as varied as mental health services (Sections 9502(a)–(b)), juvenile disciplinary services (Section 9502(e)), and maximum-security imprisonment (Section 9505(b)). The only thing that unites these exceptions—and, therefore, the only distinguishing characteristic of the favored class—is that they are facilities operated by state contractors, which is precisely the characteristic that the intergovernmental-immunity doctrine requires the State to ignore. In short, AB-32 enacts blatant favoritism for state contractors

operating private detention facilities over federal contractors operating private detention facilities.

Nonetheless, the State argues that the state and federal facilities are not similarly situated because it just so happens that there are no federal facilities that could benefit from Section 9502's discriminatory exceptions. Doc. 20 at 13–14. It makes the same argument with respect to Section 9505(b), pointing out that federal facilities are not subject to the kind of court-ordered population cap that applies to California's prison system. *Id.* at 15.

There are two fundamental problems with this argument. First, *Dawson* made clear that the only kinds of significant differences that a court may consider in conducting a discrimination analysis are those that are embodied in the text of the state law at issue; post-hoc rationalizations purporting to explain the discrimination will not suffice. *See* 139 S. Ct. at 706. But the discriminatory exceptions of AB-32 do *not* draw the line between those facilities that just so happen to offer certain services and those that do not; rather, other than Section 9502(e), *all* of the discriminatory exceptions in AB-32 are expressly limited to facilities operating *pursuant to state law*. Sections 9502(a)–(b), (d), and (f)–(g) all require the detention to occur under the authority of state law and specifically refer to provisions of the California Code, and Section 9505(b) only applies to facilities under contract with the California Department of Corrections and Rehabilitation (CDCR). Thus, for example, even if federal prisons were operating under a court-ordered population cap like the one in *Brown v. Plata*, 563 U.S. 493 (2011), federal prison contractors would *still* not qualify for the Section 9505(b) exception because it is limited on its face to CDCR contractors. The significant difference proposed by the State simply does not explain the discriminatory exceptions of AB-32, and it therefore cannot justify the State's discrimination against federal contractors. *See Dawson*, 139 S. Ct. at 706; *Barker v. Kansas*, 503 U.S. 594, 599 (1992); *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 817 (1989); *Phillips Chem. Co.*, 361 U.S. at 384–85.

Second, the State's proffered distinction is foreclosed by the Supreme Court's instruction that the discriminatory effect of a state statute is analyzed by looking at the statutory scheme *as a whole*, not by examining each exception in isolation. *See Dawson*, 139 S. Ct. at 705; *Washington v. United States*, 460 U.S. 536, 541–46 (1983). Indeed, the case on which the State principally relies, *United States v. Nye County*, reaffirmed this principle. *See* 178 F.3d 1080, 1087 (9th Cir. 1999) (exceptions must be "assess[ed] . . . in light of the [regulatory] statute as a whole"). If the net effect of AB-32's exceptions is to exempt all state contractors from Section 9501's prohibition while subjecting federal contractors to that same prohibition, it clearly "target[s] the federal government alone" and violates intergovernmental immunity. *City of Arcata*, 629 F.3d at 991.

To avoid that conclusion, the State instead asks this Court to analyze each exception individually, determine whether there is a comparable federal facility, and sustain the exception's constitutionality if there is none. But that would allow states to easily circumvent intergovernmental immunity by enacting generally applicable regulations and then framing narrow exceptions that could only apply to state entities—just as California has done here. If, for instance, a state imposed a tax on the incomes of all law-enforcement personnel but then used a series of exceptions to exempt personnel operating under the authority of various provisions of the state code, that tax would clearly be unconstitutional, since it would only burden federal law enforcement (e.g., Federal Bureau of Investigation agents). That is what the State asks this Court to allow, and Supreme Court authority forecloses that argument.

*Nye County* is not to the contrary. *Nye County* allowed an exception-by-exception analysis only "[w]here . . . the statute contains a series of exemptions, some of which favor the federal government, others of which favor the state, most of which are unconcerned with the federal/state distinction." 178 F.3d at 1088. In other words, if there are cross-cutting exceptions to a general rule, there is little danger that the State is trying to circumvent intergovernmental immunity by crafting a

NEWMEYER DILLION

discriminatory regime. But here, it is undisputed that *none* of AB-32's exceptions discriminate in favor of the Federal Government over the State, so *Nye* is inapplicable.

Next, the State asserts that "[p]rivate prisons and immigration detention facilities, 'in which persons are incarcerated or otherwise involuntarily confined' for criminal or administrative proceedings, are quite different than the facilities covered by the exceptions about which Plaintiff complains." Doc. 20 at 14 (quoting CAL. PENAL CODE § 9500(a)). Although the State fails to explain what it perceives to be the difference between the exempted state facilities and the non-exempted federal facilities, the State implies that the difference is either (1) the fact that detainees at federal facilities are "incarcerated or otherwise involuntarily confined" or (2) the fact that federal detainees are being held for or as a result of "criminal or administrative proceedings." *Id.*

But these alleged distinctions too fail to explain AB-32's discriminatory exceptions. All state detainees housed in CDCR facilities under Section 9505(b) and at least some detainees housed in facilities described in Section 9502's discriminatory exceptions are "incarcerated or otherwise involuntarily confined" and are detained for, or as a result of, "criminal or administrative proceedings." *See* CAL. WELF. & INST. CODE § 1004 (authority to detain delinquents) (Section 9502(a)); CAL. PENAL CODE § 1026 (authority to order detention of persons adjudicated insane) (Section 9502(b)); Section 9502(e) (self-evident); CAL. HEALTH & SAFETY CODE § 120145 (authority to quarantine persons "to protect or preserve the public health") (Section 9502(f)); CAL. PENAL CODE § 490.5 (authority of merchant to detain persons suspected of larceny) (Section 9502(g)). And that makes sense: if facilities described in Section 9502 and 9505(b) did not meet the definition of "[d]etention facility" under Section 9500(a), there would be no need to exempt them from Section 9501. The State has identified no significant difference between its exempted facilities and the federal facilities that it seeks to shut down.

Finally, the State makes a few points specific to Section 9505(b), none of which saves AB-32. California argues that that exception "simply recognizes the reality that AB 32 must yield to the orders of a federal court that is actively overseeing the population size of California's prisons." Doc. 20 at 15. "This argument is wholly beside the point, however, for it does nothing to demonstrate that there are significant differences between the two classes themselves; rather, it merely demonstrates that the State has a rational reason for discriminating between two similar groups of [facilities]." *Davis*, 489 U.S. at 816 (quotation marks omitted); *see also Dawson*, 139 S. Ct. at 704. That is, there is no difference *in the nature* of CDCR facilities and the federal facilities at issue in this case: they are all facilities "in which persons are incarcerated or otherwise involuntarily confined for purposes of execution of a punitive sentence imposed by a court or detention pending a trial, hearing, or other judicial or administrative proceeding." CAL. PENAL CODE § 9500(a). The existence of a court-ordered population cap is merely a potential reason for distinguishing between two classes of facilities that are similarly situated. But unlike in equal-protection doctrine—where courts ask whether a government has any rational or compelling reason for distinguishing between two classes—*the only relevant question* under the intergovernmental-immunity doctrine is whether the two classes are similarly situated, which turns on "the nature of" the two classes. *See Davis*, 489 U.S. at 816 ("The State's interest in adopting the discriminatory tax, no matter how substantial, is simply irrelevant to an inquiry into the nature of the two classes receiving inconsistent treatment."); *see also Dawson*, 139 S. Ct. at 705; *United States v. City of Manassas*, 830 F.2d 530, 534 (4th Cir. 1987), *aff'd*, 485 U.S. 1017 (1988).

The State also points to Section 9505(b)'s allegedly "limited" duration and that it is "available only to the extent necessary to meet the court-ordered population cap." Doc. 20 at 15–16. "But the narrowness of a discriminatory state [regulation] has never been enough to render it necessarily lawful." *Dawson*, 139 S. Ct. at 704; *Davis*, 489 U.S. at 815 n.4. Whatever ostensible limitations may apply to Section 9505(b),

they are irrelevant to whether AB-32 unconstitutionally discriminates against the Federal Government.

"The danger that a State is engaging in impermissible discrimination against the Federal Government is greatest when the State acts to benefit itself and those in privity with it." *Davis*, 489 U.S. at 815 n.4. That is the case with AB-32, and it must fall.

## B.   AB-32 Is Preempted By Federal Law.

The State argues that AB-32 does not conflict with federal immigration or criminal law, despite the uncontested fact that AB-32 *necessarily* restricts the Attorney General's and Secretary of Homeland Security's exercises of authority delegated to them by Congress to carry out their detention operations using private facilities. In other words, in the State's view, a state could effectively prohibit a federal executive official from exercising power granted to him—and him alone— by Congress. That is not the law. The State's argument wrongly imputes to Congress an intent to condition the Executive Branch's authority to detain immigrants or criminal defendants on agreement by the States. But that is not what the federal immigration and criminal laws say. The State's argument to the contrary cannot withstand scrutiny.

### 1.   AB-32 is preempted by federal immigration law.

In defending AB-32, the State makes two remarkable assertions. First, the State claims that AB-32 is an exercise of the State's traditional police powers to regulate the health and safety of those within its borders. Second, the State argues that the Federal Government lacks statutory authority to contract at all with corporations like GEO to manage the detention of immigrant detainees. Both assertions are wrong, and so are the remainder of the State's arguments.

#### a.   The presumption against federal preemption does not apply.

"States traditionally have had great latitude under their police powers to

19CV2491-JLS-WVG
COMBINED BRIEF RE MTN FOR PRELIM.
INJUNCTION AND MOTION TO DISMISS

legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons" subject to their jurisdiction. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (quotation omitted). Based on this well-established principle, the State argues that because AB-32 purports to regulate the health and safety of those held in private detention facilities—by means of prohibiting private federal facilities altogether—it falls within the traditional presumption by which "the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quotation omitted). But that presumption does not apply to facilities subject to the jurisdiction of the federal government. A health-and-safety regulation aimed at federal *prisoners* falls beyond the State's traditional police powers; states historically do not dictate the conditions of confinement for federal prisons.

The same is equally true of immigration detainees: the States have no tradition of regulating the conditions of confinement for those aliens held in the custody of the Federal Government. Moreover, unlike a traditional health-and-safety regulation, AB-32 regulates the conduct of federal officials and contractors, not private residents or corporations residing in the State. It is one thing for the State to regulate whether and how private employers residing within the State may employ aliens. *See DeCanas v. Bica*, 424 U.S. 351, 353 (1976).[4] But it is quite another to tell *the*

---

[4] The State invokes *DeCanas*, *see* Opp'n to Mot. For Prelim. Inj., Doc. 21 at 15 n.8 (Mar. 5, 2020), but that case is wholly inapposite because it dealt only with an argument that "the Constitution of its own force," meant that "every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by [Congress's] constitutional power, *whether latent or exercised*." *Id.* at 355 (emphasis added). The Court rejected that argument, which implied that "Congress itself would be powerless to authorize or approve" such state laws, *id.* at 356, and instead held that only "relevant congressional enactments" could preempt a state law indirectly impacting immigration, *id.* at 355. Moreover, *DeCanas* "rejected the pre-emption claim not because of [the] absence of congressional intent to pre-empt, but because Congress *intended* that the States be allowed, 'to the extent consistent with federal law, [to] regulate the employment of illegal aliens.'" *Toll v. Moreno*, 458 U.S. 1, 13 n.18 (1982) (quoting *DeCanas*, 424 U.S. at 361). The State has not—and cannot—argue that Congress affirmatively *intended* for states to prohibit or regulate the Federal Government's privately operated detention facilities.

*Secretary of Homeland Security*, as AB-32 does, how he may house aliens within his custody. While the former law resembles a prototypical state regulation of labor contracts, the latter lacks any historical precedent.

The State's attempt to shoehorn this dispute into an area of "traditional state concern" depends upon couching its police powers at an unreasonably high level of generality. But the Supreme Court has already rejected precisely this approach. In *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), a group of plaintiffs sued a consulting company under state tort law for allegedly making fraudulent representations to the Food and Drug Administration (FDA). While there was no serious dispute that states traditionally exercise their police powers to regulate fraud *generally*, the Supreme Court refused to apply a presumption against preemption because "[p]olicing fraud *against federal agencies* [was] hardly 'a field which the States have traditionally occupied.'" *Id.* at 347 (emphasis added) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Indeed, the Court recognized instead that "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Id.*

The same analysis applies here: while states may generally exercise their police powers to promote the health and safety of those residing in the state, regulating the health and safety of those in federal custody is hardly a field that they have traditionally occupied. Moreover, because the relationship between removable alien detainees and the Federal Government "originates from, is governed by, and terminates according to federal law," *id.*, namely, the Immigration and Nationality Act (INA), the relationship is inherently federal in character and therefore beyond the States' traditional police powers.

Nor does *United States v. California*, 921 F.3d 865 (9th Cir. 2019), require application of the presumption against preemption. The *California* court simply noted, as a descriptive matter, that the United States, as appellant, did not "dispute

that California possesses the general authority to ensure the health and welfare of inmates and detainees in facilities within its borders." *Id.* at 886. Even if it could be read to support application of the presumption to *all* "inmates and detainees," including those in federal custody, that statement was dicta and "thus not binding on the Court." *S. Cal. Stroke Rehab. Assocs., Inc. v. Nautilus, Inc.*, 782 F. Supp. 2d 1096, 1109 n.12 (S.D. Cal. 2011). The assertion regarding the State's police powers was "not necessary to its resolution of the case before it." *Bradley v. Henry*, 428 F.3d 811, 817 (9th Cir. 2005). The presumption against preemption only matters because, when it does apply, Congress must make "clear and manifest" its intent to preempt state law. *Wyeth*, 555 U.S. at 565. Whether the presumption applied had no bearing on the court's decision in *California* because the court ultimately held that "neither the provisions of the INA . . . nor the contracts themselves, demonstrate[d] *any* intent, let alone 'clear and manifest,' that Congress intended to" displace state law. 921 F.3d at 886 (citations and footnote omitted).

At the very least, this Court should not *expand* the scope of *California*'s statement beyond the precise factual context presented there, in which the Federal Government was asked only to "permit inspections and produce data" to assist the State's purported exercise of its police power. *Id.* at 885.

b. **Federal law unambiguously authorizes the Federal Government to use private contractor services for immigration detention.**

But here the presumption against preemption, even assuming it applies, is clearly rebutted. "[A] law that regulates an area of traditional state concern can still effect an impermissible regulation of immigration." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 972 (9th Cir. 2017). While "[p]ermissible state regulations" of immigration "mirror federal objectives," *id.*, AB-32 undermines them. It is clearly and manifestly inconsistent with federal immigration law.

The Supreme Court has emphasized that "[a] principal feature of the removal

system is the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012). And the same is true of federal officials' broad discretion when it comes to detaining those aliens designated for removal. The language of the INA dictates that the Secretary of Homeland Security "shall arrange for *appropriate* places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1) (emphasis added).[5] As the Ninth Circuit has already noted, this language gives the Secretary "broad discretion in exercising his authority to choose the place of detention for deportable aliens." *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir.), *amended*, 807 F.2d 769 (9th Cir. 1986).[6] Most telling is Section 1231(g)'s use of the word "appropriate," "the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors." *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (quotation omitted).

And yet AB-32 self-evidently undermines this broad grant of discretion by removing from the Secretary one mechanism for detaining aliens pending removal. The State does not seriously dispute this. Indeed, the State's opposition and motion simply ignore the settled principle that "normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly

---

[5] Although the text of 8 U.S.C. § 1231(g) refers to "[t]he Attorney General," the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, transferred that authority to the Secretary. *See* 8 U.S.C. § 1103(a)(1) (charging the Secretary with "the administration and enforcement of" chapter 12 of Title 8, in which § 1231(g) is located); 6 U.S.C. § 557 (explaining that "[w]ith respect to any function transferred by or under [chapter 1 of Title 6] . . . reference in any other Federal law to any . . . officer or office the functions of which are so transferred shall be deemed to refer to the Secretary"); *see also Reyna ex rel. J.F.G. v. Hott*, 921 F.3d 204, 208 n.* (4th Cir. 2019).

[6] The State quibbles that *Committee of Central American Refugees* "did not involve any claim or analysis of preemption." Doc. 21 at 18. True, but irrelevant. "Evidence of pre-emptive purpose" must be "sought in the text and structure of the statute at issue." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). Because *Committee of Central American Refugees* touched upon the meaning of the text and structure of the INA and § 1231(g)'s predecessor statute, its analysis is directly on point.

NEWMEYER DILLION

granted" a federal official or entity. *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1192 (9th Cir. 2018) (quoting *Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996)); *see also Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 155 (1982). Rather than dispute this principle, the State instead makes the extraordinary claim that Congress has not *at all* authorized the Secretary to contract with private contractors to operate immigration detention facilities. But this stingy interpretation of federal immigration law is utterly implausible.

Begin with the statute setting forth the Secretary's functions. There, the Secretary is granted authority "to make contracts . . . as may be necessary and proper to carry out [his] responsibilities." 6 U.S.C. § 112(b)(2). There is no indication in either that provision or any other portion of Title 6 that contracts with private parties are "unnecessary" or "improper" for carrying out immigration enforcement. The Secretary also has authority to "carr[y] out," "in [his] reasonable discretion," the activities of U.S. Immigration and Customs Enforcement (ICE) "through *any means*, including . . . through contracts, grants, or cooperative agreements with non-Federal parties," except to the extent that such agreements are otherwise precluded by law. 28 U.S.C. § 530C(a)(4) (emphasis added).[7] Indeed, in the context of the U.S. Marshals Service, the State *concedes* that this language in Section 530C demonstrates that "Congress has expressly permitted private contractors to operate . . . detention facilities." Opp'n to Mot. For Prelim. Inj., Doc. 21 at 20 (Mar. 5, 2020).

Perhaps even more telling, in 2000 Congress enacted a statute stating: "Notwithstanding any other provision of law, . . . the [Secretary] *hereafter* may enter into contracts and other agreements, of any reasonable duration, for detention or

---

[7] While 28 U.S.C. § 530C(a) refers to "the Attorney General," the authority there set forth was transferred to the Secretary in the Homeland Security Act of 2002, insofar as the authority applied to immigration enforcement. *See supra* note 5; *see also* 6 U.S.C. §§ 202(3), 251(2) (transferring to the Secretary the "immigration enforcement functions" of the Immigration and Naturalization Service and "all personnel, assets, and liabilities pertaining to . . . [t]he detention and removal program").

incarceration space or facilities, *including related services*, on any reasonable basis."
Department of Justice Appropriations Act, 2001, Pub. L. No. 106-553, sec. 1(a)(2)
[app. B, title I, § 119], 114 Stat. 2762, 2762A–69 (2000) (emphases added) (codified
at 18 U.S.C. § 4013 note "Contracts for Space or Facilities"); renumbered § 118, *see*
Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, sec. 1(a)(4) [app. D,
div. A, ch. 2, § 213(a)(2)], 114 Stat. 2763, 2763A–179 (2000).[8] And although
Section 118 was embedded in an annual appropriations act, because it included "a
clear statement of 'futurity,' such as 'hereafter,' " *Nat. Res. Def. Council v. U.S.
Forest Serv.*, 421 F.3d 797, 806 n.19 (9th Cir. 2005), it showed Congress's clear
intent to "ma[k]e a permanent change to substantive law," *Tin Cup, LLC v. U.S. Army
Corps of Eng'rs*, 904 F.3d 1068, 1073 (9th Cir. 2018); *see also* Legality of Fixed-
Price Intergovernmental Agreements for Detention Services, 26 Op. O.L.C. 235, 236
(2002) ("Although Public Law 106-553 was an annual appropriations act, section
119 is clearly earmarked as permanent legislation by its use of the term
'hereafter' . . . ."). Congress has therefore granted the Secretary broad authority to
enter into contracts for private detention space and "related services" as long as he
has "any reasonable basis" for doing so. 114 Stat. at 2762A–69.

   The plain text of all these provisions, using broad terms like "appropriate,"
"necessary and proper," "reasonable discretion," "any reasonable basis," and "any
means," clearly includes the authority to make agreements with private contractors
to operate immigration detention facilities. The State's argument for departing from
the plain meaning of these provisions rests primarily on a strained inference from
8 U.S.C. § 1103(a)(11), which lists a pair of specific authorizations relating to federal

---

[8] This provision originally delegated authority to the Attorney General, but as
the Department of Homeland Security has itself explained, "[a]s a result of . . . the
Homeland Security Act, . . . the Department of Homeland Security may exercise th[e]
authority" granted by Section 118 with respect to ICE contracts. Revision of
Department of Homeland Security Acquisition Regulation, 71 Fed. Reg. 25,759,
25,764 (May 2, 2006) (citing 6 U.S.C. §§ 251, 551(d)(2)); *see also* 48 C.F.R.
§ 3017.204-90 (implementing this statutory authority for ICE).

agreements with state and local governments:

>(11)   The [Secretary of Homeland Security], in support of persons in administrative detention in non-Federal institutions, is authorized—
>
>>(A)   to make payments from funds appropriated for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by the Service pursuant to Federal law under an agreement with a State or political subdivision of a State; and
>>
>>(B)   to enter into a cooperative agreement with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services in any State or unit of local government which agrees to provide guaranteed bed space for persons detained by the Service.

According to the State, the language in Section 1103(a)(11) implies that "Congress . . . contemplated that only the federal government and *states* would operate these [immigration detention] facilities." Doc. 21 at 17. But the State's understanding of Section 1103(a)(11) flies in the face of traditional canons of statutory interpretation and the statutory history of the provision itself. The State's textual argument, at bottom, rests on the inference that, because Congress did not mention private immigration detention in Section 1103(a)(11), *every other* relevant statutory provision, including Sections 1231(g) and 530C, must likewise be read to exclude private detention as a means of implementing federal immigration law regardless of the language of those provisions. This application of the negative-implication canon—that "expressing one item of [an] associated group or series excludes another left unmentioned," *United States v. Vonn*, 535 U.S. 55, 65 (2002)—is meritless for several reasons.

First, the negative-implication canon "has force only when [listed] items . . . are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (quoting *Vonn*, 535 U.S. at 65); *see also Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002) ("The canon depends on identifying a series of two or more terms or things that should be understood to go hand in hand, which is abridged in circumstances supporting a sensible inference that the term left out must have been meant to be excluded."). Because Section 1103(a)(11) does not set forth "an associated group or series, or a statutory listing or grouping," this Court cannot conclude that omission of any mention of private detention "was Congress's deliberate choice." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 458 (9th Cir. 2018).

Second, while Section 1103(a) lists *some* of the Secretary's powers and functions, it is most certainly not exhaustive. *See, e.g.*, 6 U.S.C. § 112(b)(2). And when a list is not exhaustive, "it cannot be read pursuant to the principle [of negative implication]." *Portland 76 Auto/Truck Plaza, Inc. v. Union Oil Co. of Cal.*, 153 F.3d 938, 945 (9th Cir. 1998); *see also Echazabal*, 536 U.S. at 81 (refusing to apply the canon when "statutory language suggesting exclusiveness is missing").

Third, "[a]n inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent." *Burns v. United States*, 501 U.S. 129, 136 (1991). As explained above, all other textual evidence unambiguously indicates that the Secretary has authority to contract with private service providers to operate immigration detention facilities. Indeed, there is *no* statutory "restriction" on the Secretary's contracting authority "within the plain language" of the INA and other relevant statutes. *United States v. Olmos-Esparza*, 484 F.3d 1111, 1114 (9th Cir. 2007). "An ambiguity is created, if at all, by [the State's] urged application of the [negative-implication] principle." *Id.*

Fourth, any negative implications that may be drawn from Section 1103(a)(11) are far too weak to overcome the plain meaning of Section 1231(g). As the Supreme Court has instructed, "negative implications raised by disparate provisions are strongest" in those instances in which the relevant statutory provisions were "considered simultaneously when the language raising the implication was inserted." *Lindh v. Murphy*, 521 U.S. 320, 330 (1997). As described in further detail below, Section 1103(a)(11) was enacted in 1996 and the language that now appears in Section 1231(g) was part of the original INA of 1952. Because "the two relevant provisions were not considered or enacted together," *Gomez-Perez v. Potter*, 553 U.S. 474, 486 (2008), it is highly unlikely that Section 1103(a)(11)'s authorization of state and local government agreements implicitly limited the scope of Section 1231(g)'s authorization. The State's argument is further undermined by the fact that Section 1103(a)(11) was "not modeled after" Section 1231(g) and "is couched in very different terms." *Id.* at 487.

Fifth, the State's argument fails to recognize that "[t]he force of any negative implication . . . depends on context." *Marx v. Gen. Rev. Corp.*, 568 U.S. 371, 381 (2013). The statutory history behind Section 1103(a)(11) forecloses any inference that Congress intended to prohibit the Secretary's use of private detention facilities. Section 1103(a)(11) was first enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104–208, Div. C, sec. 373, 110 Stat. 3009–546, 3009–647. By 1996, the Immigration and Naturalization Service (INS) had already been contracting with private detention facilities for more than a decade. *See, e.g.*, *Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations for 1996: Hearings Before the Subcomm. on the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies of the H. Comm. on Appropriations*, pt. 2, 104th Cong. 1168 (1995) (reporting to Congress that during 1994, INS "utilized four private contract detention facilities"); Joan Mullen, *Corrections and the Private Sector*, NAT'L INST. OF JUSTICE: RESEARCH

IN BRIEF, Oct. 1984, at 1, 4 (stating that by early 1984 INS had "4 facility contracts for aliens awaiting deportation . . . providing a total capacity of 625 beds"). Indeed, as of 1991, half of INS's fourteen detention facilities were operated by private contractors and "represent[ed] 26 percent of INS'[s] total rated capacity." U.S. Gov't Accountability Office, GAO/GGD-91-21, Private Prisons: Cost Savings and BOP's Statutory Authority Need To Be Resolved 20 (Feb. 1991). INS had authority to do so under the INA, which, like Section 1231(g), "authorized and directed [the Attorney General] to arrange for appropriate places of detention for those aliens whom he shall take into custody and detain" for purposes of removal. Pub. L. No. 414, ch. 477, § 242(c), 66 Stat. 163, 210 (1952).

If Congress in 1996, knowing that INS had been routinely contracting with private entities for the detention of removable aliens for over a decade, wanted to *deauthorize* that practice, it would have said so directly, rather than *adding authority* to a different provision of the INA an amendment that makes no mention of private detention. It is simply not conceivable that Congress would have taken such a convoluted path to "say no" to the INS practice of using private detention facilities. *Peabody Coal Co.*, 537 U.S. at 168.

The implausibility of the State's interpretation is only magnified and confirmed by the order by which the statutory provisions authorizing the Secretary to contract with private detention providers became law. Section 1103(a)(11) was enacted in 1996 and Section 1231(g)—which borrowed language from the original INA—was enacted at the same time. *See* Pub. L. No. 104–208, Div. C, sec. 241(g), 110 Stat. 3009–546, 3009–606. Again, it would have been passing strange for Congress to reenact, without meaningful alteration, the existing source of INS's private detention contracting authority, while attempting to curb that authority inferentially through the addition of Section 1103(a)(11).

Moreover, three other sources of the Secretary's authority today to contract with private detention providers—6 U.S.C. § 112(b)(2), 28 U.S.C. § 530C(a)(4), and

Section 118 of Public Law 106-553—were all enacted *after* Section 1103(a)(11). *See* Pub. L. No. 107-296, Title I, sec. 102, 116 Stat. 2135, 2142 (2002); Pub. L. No. 107-273, Div. A, Title II, sec. 201(a), 116 Stat. 1758, 1767 (2002); 114 Stat. 2762 at 2762A–69. Congress surely would not have granted the Secretary such broad contracting authority without mentioning any restriction on private detention contracting if Section 1103(a)(11) placed a genuine limitation on that authority. And even if the State were somehow right that Section 1103(a)(11) abrogated the Secretary's authority to contract with private detention services based in Section 1231(g), Section 112(b)(2), or Section 530C, the State *cannot* credibly argue that Section 1103(a)(11) displaces the authority delegated by Section 118. That is because Section 118 grants the Secretary such contracting authority "[n]otwithstanding any other provision of law," 114 Stat. at 2762A–69, including Section 1103(a)(11). *See NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 932 (2017) ("In statutes, 'notwithstanding' clauses show that one provision prevails over another in the event of a conflict.").

The State additionally makes a half-hearted attempt to argue that Section 1231(g)—despite its broad language of "appropriate places of detention"—does not by its plain terms permit private detention contracts. Ignoring the natural breadth of the word "appropriate," the State focuses on the requirement that the Secretary "shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility for such use." 8 U.S.C. § 1231(g)(2). According to the State, Section 1231(g)(2)'s reference to a "lease" "refers to the federal government leasing a facility *from* another entity and the federal government operating that facility itself." Doc. 21 at 18. This, of course, reads language into Section 1231(g) that simply is not there; Section 1231(g) says nothing about whether the Federal Government itself must operate every immigration facility.[9]

---

[9] The State briefly argues that the regulatory and statutory definitions of "immigration officer" (not "immigration detention officer," a term that appears in no statute or regulation) support its position that Congress has not authorized the use of private detention facilities. *See* Doc. 21 at 17. Because "immigration officers" must

NEWMEYER
DILLION

Worse still, the language the State attempts to read into Section 1231(g) runs contrary to the presumption that "executive agencies normally have the discretion to decide whether to accomplish their objective by contract or through the use of Government employees." 1 Ralph C. Nash, Jr. & John Cibinic, Jr., *Federal Procurement Law* 5 (3d ed. 1977). Moreover, the State's proffered standard— requiring the Federal Government to "operate" all immigration detention facilities— is not judicially administrable. Federal detention centers of all stripes commonly enter into contracts with private entities for food, medical, education, or psychological services. Under the State's standard, a court is left only to guess the quality and quantity of private-service contracts necessary to say that the Federal Government is no longer "operating" a detention facility.

**c.    The State's remaining arguments against finding preemption are meritless.**

Almost all of the State's remaining arguments against preemption hinge on the correctness of the State's reading of Section 1103(a)(11). The State's attempt to distinguish *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), is premised on its argument that Section 1231(g) "do[es] not contemplate immigration detention facilities operated by private companies." Doc. 21 at 19. As shown above, that is clearly wrong, especially given that Congress reenacted the language appearing in Section 1231(g) in 1996, long after INS had begun using private detention facilities in the early 1980s.

The State's attempt to distinguish *United States v. City of Pittsburg*, 661 F.2d 783, 785 (9th Cir. 1981), in which the Ninth Circuit held preempted a local ordinance

be employees "of [ICE] or of the United States designated by the [Secretary of Homeland Security]," 8 U.S.C. § 1101(a)(18), it is of course true that private contractors cannot serve as immigration officers. But that does not show that Congress lacked "intent to utilize private immigration detention facilities," Doc. 21 at 17, because most day-to-day activities at a detention facility need not be performed by immigration officers, although they are performed pursuant to and under the close supervision and control of immigration officers, *see* 8 U.S.C. § 1357 (listing the powers of immigration officers, none of which relates to routine detention activities).

NEWMEYER DILLION

that prohibited federal postal carriers from doing what federal law authorized, fails for similar reasons. According to the State, *City of Pittsburg* is inapplicable because, unlike the ordinance there, AB-32 somehow "poses no such direct conflict with the [Secretary's] general responsibility to arrange for immigration detention in federally owned, rented, or newly constructed facilities." Doc. 21 at 19. While we are not exactly sure what this means, it appears that the State believes the Secretary's only responsibility under Section 1231(g) is to arrange for immigration detention in facilities that are operated by federal employees and that AB-32 therefore does not conflict with it. But again, the premise that Section 1231(g) speaks only to federally operated detention facilities is mistaken. *See supra* Part I.B.1.b. Just as the federal law in *City of Pittsburg* was "designed to promote the efficiency of mail delivery" by expanding the discretion of each postal carrier, 661 F.2d at 785, Section 1231(g) was designed to give the Secretary wide discretion to house detainees as *he*—not the State of California—deemed "appropriate." And just as the local ordinance in *City of Pittsburg* "frustrate[d] postal efficiency" by prohibiting postal carriers from fully exercising their delegated discretion, *id.* at 785–86, so too does AB-32 frustrate effective immigration detention operations by prohibiting the Secretary from exercising his congressionally delegated discretion. As in *City of Pittsburg*, "[t]he conflict here between federal and local law is clear" and AB-32 "is therefore unconstitutional." *Id.* at 785, 786.

Likewise, the State resists *Gartrell Construction Inc. v. Aubry*, 940 F.2d 437 (9th Cir. 1991), which held preempted a state law that impeded the Federal Government's ability to contract, solely on the ground that there are "no federal regulations related to contracting that overlap, much less conflict, with AB 32's regulation of detention facility contractors." Doc. 21 at 20. But this myopic focus on the existence of federal regulations misses the forest for the trees. As the Ninth Circuit pointed out in *California*, state laws like those in *Gartrell Construction Inc.* were preempted because they presented a "clear[] interference with federal activity"

and "prevented the federal government from entering into agreements with its chosen contractors until the states' own licensing standards were satisfied," therefore "evinc[ing] states' active frustration of the federal government's ability to discharge its operations." 921 F.3d at 885.

AB-32 constitutes an even greater "interference with federal activity" than those the Ninth Circuit condemned in *California* because traditional state interferences with federal contracting authority at least theoretically permitted federal contractors to satisfy the States' standard. AB-32 is a flat *prohibition* on the execution of contracts that meet the Secretary's standard for "appropriate places of detention." 8 U.S.C. § 1231(g)(1). In fact, AB-32 flunks on *California*'s own terms, as the Ninth Circuit upheld the law at issue there largely because it "d[id] not regulate whether or *where an immigration detainee may be confined*, require that federal detention decisions or removal proceedings conform to state law, or mandate that ICE contractors obtain a state license." 921 F.3d at 885 (emphasis added). AB-32 *does* regulate where immigration detainees may be confined, requires that federal detention decisions conform to California's law, and denies ICE contractors even the opportunity to obtain a state license to operate detention facilities in the State. It therefore represents a clear interference with the Secretary's discharge of his statutorily delegated contracting authority.

No matter how one slices it, AB-32 "create[s] an obstacle to the smooth functioning of federal immigration law, improperly place[s] in the hands of state officials the nation's immigration policy, and strip[s] federal officials of the authority and discretion necessary in managing foreign affairs." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1028 (9th Cir. 2013) (quoting *United States v. South Carolina*, 720 F.3d 518, 531 (4th Cir. 2013)); *see also Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations . . . ."). It is clearly preempted.

NEWMEYER DILLION

## 2.    AB-32 is preempted by federal criminal law.

The State concedes that "Congress has expressly permitted private contractors to operate criminal detention facilities housing [Marshals Service] detainees in specially designated districts." Doc. 21 at 20 (citing 18 U.S.C. § 4013(a), (c)(1); 28 U.S.C. § 530C). And under *Crosby*, *City of Pittsburg*, or *Gartrell Construction Inc.*, none of which the State even mentions in the section of its brief addressing the preemptive scope of federal criminal law, this concession compels the conclusion that AB-32 is preempted to the extent that it withdraws from the Attorney General contracting authority otherwise delegated by Congress.

Nevertheless, the State argues that "Congress has also expressly made those contractors . . . subject to state regulation," *id.* at 20 (citing 18 U.S.C. § 4013(c)(2)(C)), and asserts that AB-32 "is the kind of state regulation that [the federal statute] contemplates," *id.* at 21. Based on this provision, the State submits that AB-32 is not preempted insofar as it applies to the Marshals Service's private detention contracts.

This argument can be dismissed summarily. It is true that the statute requires private contractors for the Marshals Service to "comply with all applicable State and local laws and regulations." 18 U.S.C. § 4013(c)(2)(C). But this boilerplate language expresses, at most, "Congress's view that such laws would not necessarily prevent or significantly interfere with a [private detention facility's] operations." *Lusnak*, 883 F.3d at 1194–95. It does not grant state governments *carte blanche* to prohibit the Federal Government from using private contractors to carry out federal operations.

*Gartrell Construction Inc.* is directly on point and refutes the State's argument. There, the State claimed that a preemption claim was defeated by a contractual provision prescribed by a federal regulation mandating that all private contractors "comply[] with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work." 940 F.2d at 440 (quoting 48 C.F.R.

§ 52.236-7 (1990)). The Ninth Circuit rejected that argument, holding that this language did not set forth a " 'clear Congressional mandate' and 'specific Congressional action' that unambiguously authorize[s] state regulation of a federal activity," *id.* at 440–41 (quoting *Hancock v. Train*, 426 U.S. 167, 178–79 (1976)). Accordingly, the California law interfering with the Federal Government's contracting determination was preempted. *See id.* at 441. The language of Section 4013(c)(2)(C) parallels that in *Gartrell Construction Inc.*

Finally, the State attempts to dismiss GEO's points concerning the potentially debilitating effects of AB-32 on the Marshals Service's present detention needs as mere "policy" arguments. Doc. 21 at 21. But it is well-established that "[i]n considering whether a state law is conflict-preempted, [the court must] consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1062–63 (9th Cir. 2014). Therefore, "[i]f the practical result of" AB-32 renders the Marshals Service without adequate bed space in the Southern District of California, "despite the [Attorney General's] determination, backed by a delegation of Congressional authority," that private detention is necessary to prevent that shortage, then AB-32 "is preempted." *Id.* at 1063. Examining the inevitable consequences of AB-32 on federal criminal detention in California is entirely appropriate because it aids in determining "whether Congress intended to preempt the [State] laws given the practical effect of those laws." *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1106 (9th Cir. 2016).

Of course, even absent these practical effects, AB-32 is preempted as an impermissible infringement of federal discretion and a substantial interference with the Federal Government's contracting authority. The immense burden that AB-32 will place on the Marshals "is at most just 'extra icing on' an unconstitutional 'cake already frosted.'" *PHH Corp. v. CFPB*, 881 F.3d 75, 197 n.19 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting) (quoting *Yates v. United States*, 135 S. Ct.

1074, 1093 (2015) (Kagan, J., dissenting)).

    **C.**    **Alternatively, It Is Undisputed That GEO Is Entitled To Judgment On Its Request Arising Under AB-32's Temporary Safe Harbor.**

    For all the foregoing reasons, AB-32, codified in relevant part at CAL. PENAL CODE § 9500–9503, 9505, is unconstitutional, and Plaintiff is entitled to a preliminary injunction barring its enforcement against GEO. That is the only judgment that will provide complete relief to GEO.

    If, however, this Court were to decline to award such relief, it is undisputed that GEO is at least entitled to a judgment declaring that GEO's contracts with the Marshals Service and ICE are valid through the end of their respective terms under the temporary safe harbor of Section 9505(a). California concedes that "[i]f Plaintiff's factual allegations are true (including the terms and validity of its contracts), then all of its contracts fall within [Section 9505(a)]." Doc. 21 at 22. Yet, California does not dispute *any* of GEO's factual allegations relating to whether its contracts fall within Section 9505(a), and the State's time to do so has now passed. *See Day v. AT & T Disability Income Plan*, 698 F.3d 1091, 1099–1100 (9th Cir. 2012) (arguments not raised in a response brief are waived). And while the State implies that the relevant length of GEO's contract terms do not include "any option exercise," *id.*, it offers no argument whatsoever in favor of that view, so that argument, too, is waived, *see United States v. Alonso*, 48 F.3d 1536, 1544–45 (9th Cir. 1995).

    GEO's ICE contracts expressly state that the "Period of Performance" is "12/20/2019 to 12/19/2034" and that that period is their "total duration." Adelanto Contract, Ex. D at 71; Mesa Verde Contract, Ex. E at 86. And as GEO's undisputed evidence shows, federal law and the Marshals Service contracts themselves distinguish between "options"—which are part of the contract term—and "extensions," which are not. *See* Western Region Contract, Ex. A at 21–22; El Centro Contract, Ex. C at 66. Section 9505(a) only prohibits taking into account "extensions" to the contract term, so the options in GEO's contracts are properly considered part

1  of the contract term under Section 9505(a).

2  Thus, at a bare minimum, GEO is entitled to a judgment declaring that its

3  Western Region Detention Center contract is valid through September 30, 2027; its

4  El Centro Service Processing Center contract is valid through September 25, 2028;

5  and its contracts for the Adelanto ICE Processing Center (with the Desert View

6  MCCF annex) and Mesa Verde ICE Processing Center (with the Central Valley

7  MCCF and Golden State MCCF annexes) are valid through December 19, 2034.

8  **II.   The Remaining Factors Favor Granting An Injunction.**

9  In addition to showing a substantial likelihood that AB-32 violates the

10  Supremacy Clause, or, in the alternative, that its Marshals Service and ICE contracts

11  are protected by AB-32's temporary safe harbor, GEO has also shown that it is (1)

12  likely to suffer irreparable harm absent preliminary relief; and (2) that the balance of

13  equities and public interest favor the injunction.

14  *Irreparable Harm.* At the outset, the State does not contest that the *kind* of

15  harm with which AB-32 threatens GEO—forcing GEO to close its facilities because

16  of a constitutional violation and leaving GEO without a damages remedy against

17  California, *see* Doc. 15-1 at 38–39—is irreparable. The State only argues that because

18  of its concession that GEO's Marshals Service and ICE contracts in California will

19  not face closure under AB-32 until late 2021, at the earliest, GEO does not face

20  sufficiently *imminent* harm to warrant preliminary relief. This argument does not

21  justify withholding equitable relief.

22  First, GEO has already noted—and the State does not dispute—that "an

23  alleged constitutional infringement will often alone constitute irreparable harm."

24  *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (quotation omitted).

25  Whether or not GEO is temporarily protected from shuttering its California facilities

26  because of AB-32's safe harbor provision, that temporary safe harbor does not all-

27  of-a-sudden make AB-32 constitutional. Because GEO is still subject to a preempted,

28  unconstitutional statutory regime, it is entitled to preliminary relief from AB-32 even

if it might not feel the full brunt of the law for several more months.

Second, and more fundamentally, even if the Court disagrees that GEO's irreparable injury is imminent enough to justify a preliminary injunction that conclusion does not undermine, but in fact supports, entering a *permanent* injunction. To secure a permanent injunction, GEO need only show that it is "likely to suffer irreparable injury that cannot be redressed by an award of damages," *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1243 (9th Cir. 2018), not that it "is likely to suffer irreparable harm *before a decision on the merits can be rendered*," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis added) (quoting 11A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.1, p. 139 (2d ed. 1995)). And the likelihood of irreparable harm, absent injunctive relief, is a virtual certainty; GEO even knows the exact dates on which it will lose whatever legal protection it has under AB-32's temporary safe harbor.

"One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923). Nor should GEO have to wait for injunctive relief—whether preliminary or permanent—when its irreparable injury is inevitable. Consider, for example, the famous lawsuit by the Society of the Sisters of the Holy Names of Jesus and Mary seeking to nullify a state compulsory education law that allegedly violated the Fourteenth Amendment rights of parents to choose their children's schools. There, the district court entered a *preliminary* injunction on March 31, 1924—more than *two years* before the statute was to take effect. *See Soc'y of the Sisters of the Holy Names of Jesus & Mary v. Pierce*, 296 F. 928, 933 (D. Or. 1924). The Supreme Court affirmed that preliminary injunction on June 1, 1925—more than a year before the statute's effective date. *See Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 530 (1925). As the Supreme Court explained, the injunction was warranted because the plaintiffs' "injury would have become irreparable" upon the statute's effective date and

"[p]revention of impending injury by unlawful action is a well-recognized function of courts of equity." *Id.* at 536.

   *Balance of Hardships and Public Interest.* The State cannot assert any cognizable hardship to weigh against GEO's claim of inevitable irreparable harm. First, "[n]o significant state interest is served where [a] state law is preempted by federal law and that preemption is 'readily apparent.' " *Gartrell Construction, Inc.*, 940 F.2d at 441 (quoting *Champion Int'l Corp. v. Brown*, 731 F.2d 1406 (9th Cir. 1984)). Second, to the extent that the State represents before this Court that it has no intent to enforce AB-32 against GEO until late 2021, it "cannot be harmed by an order enjoining an action [it] will not take." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). The State therefore faces no harm from a preliminary injunction.

   As for the public interest, the State concedes that "[p]reventing a violation of the Supremacy Clause serves the public interest." Doc. 21 at 22 (citing *United States v. Arizona*, 641 F.3d 339, 345 (9th Cir. 2011), *aff'd in part, rev'd in part and remanded*, 567 U.S. 387 (2012)). Nevertheless, the State maintains that an injunction would be inequitable and against the public interest because it would permit private facilities to continue operating during the litigation, even though, in the State's judgment, they pose an impermissible "threat to detainee safety." Doc. 21 at 22. But the State's argument rings hollow, given that it has already indicated that it cannot and will not enforce AB-32's prohibitions against GEO until late 2021, at the earliest. *See id.* The more equitable course would be for this Court to enjoin AB-32 during the pendency of this litigation, or permanently, as described more fully below, to prevent both a patent violation of the Supremacy Clause and an infliction of irreparable harm on GEO.

## III.   GEO Is Entitled To A Permanent Injunction And Final Judgment.

   Because GEO prevails on the merits of its claims, it is entitled to entry of a permanent injunction and final judgment. The State resists this conclusion, observing that—other than the Ninth Circuit's decision in *Baby Tam & Co. v. City of Las Vegas*,

154 F.3d 1097, 1102 (9th Cir. 1998)—"Defendants are not aware of any other authority" for entry of a permanent injunction in this context. Doc. 21 at 23. Of course, *Baby Tam* is *itself* binding authority for the relief GEO requests here.

But even if further authority were needed, final judgment is warranted under Federal Rule of Civil Procedure 56 because, as stated in GEO's motion, "there is no genuine dispute of material fact," Not. of Mot. and Mot. for Prelim. Inj., Doc. 15 at 2 (Jan. 7, 2020), which the State has confirmed by failing to dispute *any* material fact presented in GEO's motion papers. And even if there were any disputes of fact, the State correctly points out that such factual disputes could be adjudicated for purposes of final judgment by consolidating the preliminary-injunction hearing with a hearing on the merits under Federal Rule of Civil Procedure 65(a)(2).

The State responds by saying that "no party has requested" relief under Rule 65(a)(2), but there is nothing talismanic about the words "pursuant to Rule 65(a)(2)" or "pursuant to Rule 56." What matters is the *type of relief* that GEO requested, which in this case is authorized by both Rule 56 and Rule 65(a)(2). And while the State asserts that "there remains some uncertainty about the reach of AB-32's exceptions and any actual harm that Plaintiff might suffer," Doc. 21 at 23, the Court will necessarily resolve the State's (unspecified) uncertainty when and if it enters a preliminary injunction, and the State points to no evidence or argument that it would offer in a subsequent proceeding that would alter this Court's preliminary-injunction decision. Delaying entry of final judgment would be pointless.

///
///
///
///
///
///
///

## CONCLUSION

Plaintiff GEO respectfully requests that this Court grant its motion for a preliminary injunction and deny the State's cross-motion to dismiss. In addition, GEO requests that this Court enter a permanent injunction and final judgment.

Dated:  April 9, 2020                              COOPER & KIRK, PLLC


                                                   By: */s/ Charles J. Cooper*
                                                       Charles J. Cooper*
                                                       Michael W. Kirk*
                                                       J. Joel Alicea*
                                                       Steven J. Lindsay*
                                                       *Appearing *Pro Hac Vice*
                                                       Attorneys for Plaintiff The GEO
                                                       Group, Inc.

Dated:  April 9, 2020                              NEWMEYER & DILLION LLP


                                                   By: */s/ Michael B. McClellan*
                                                       Michael B. McClellan
                                                       Attorneys for Plaintiff The GEO
                                                       Group, Inc.

Dated:  April 9, 2020                              NAVIGATO & BATTIN, LLP


                                                   By: */s/ Michael W. Battin*
                                                       Michael W. Battin
                                                       Attorneys for Plaintiff The GEO
                                                       Group, Inc.