1  Charles J. Cooper (Appearing *Pro Hac Vice*),
   DC Bar No. 248070
2  COOPER & KIRK, PLLC
   1523 New Hampshire Avenue, NW
3  Washington, DC 20036
   Telephone: (202) 220-9600
4  Email: ccooper@cooperkirk.com

5  Michael B. McClellan, CBN 241570
   NEWMEYER & DILLION LLP
6  895 Dove Street, Fifth Floor
   Newport Beach, CA 92660
7  Telephone: (949) 854-7000
   Email: Michael.McClellan@ndlf.com
8
   Michael W. Battin, CBN 183870
9  NAVIGATO & BATTIN, LLP
   755 West A Street, Suite 150
10 San Diego, CA 92101
   Telephone: (619) 233-5365
11 Email: mike@navbat.com

12 *Attorneys for Plaintiff The GEO Group, Inc.*

13            UNITED STATES DISTRICT COURT

14         SOUTHERN DISTRICT OF CALIFORNIA

15

16 THE GEO GROUP, INC.,                    | Case No. 3:19-cv-02491-JLS(WVG)

17            Plaintiff,                    | Consolidated with Case No. 3:20-cv-
                                            | 00154-JLS(WVG)
18 v.
                                            | Assigned to District Judge Janis L.
19 GAVIN C. NEWSOM, in his official        | Sammartino
   capacity as Governor of the State of
20 California; XAVIER BECERRA, in his      | Assigned to Magistrate Judge William
   official capacity as Attorney General of | V. Gallo
21 the State of California,
                                            | **THE GEO GROUP, INC.'S**
22            Defendants.                   | **ADDITIONAL BRIEF IN**
                                            | **RESPONSE TO THE COURT'S**
23                                          | **JULY 21, 2020 ORDER [DKT. 45]**
                                            | **RE: JULY 16, 2020 HEARING**
24
25                                          | FILE DATE:    December 30, 2019
                                            | TRIAL DATE:   No Date Set
26
27 AND ALL CONSOLIDATED CASES.
28

**INTRODUCTION**

Pursuant to the Court's July 21 order, ECF No. 45, Plaintiff The GEO Group, Inc. (GEO) submits this supplemental brief answering the four questions posed by the Court. GEO respectfully submits that, in light of the arguments discussed herein, in the prior briefing in this case, and at the July 16 hearing, this Court should grant GEO's motion for a preliminary and permanent injunction, deny the State's motion to dismiss, and enter final judgment in favor of GEO.

**ARGUMENT**

**I.  Although the Legal Incidence Test Is Not Relevant to GEO's Claims, the Legal Incidence of AB-32 Falls on the Federal Government.**

Courts have thus far applied the "legal incidence" test only to assess whether *a tax* violates intergovernmental immunity, and there is no doctrinal basis for applying the test to a direct *regulation* of the Federal Government. In any event, even if the test did apply here, its application only confirms that AB-32 violates intergovernmental immunity.

**A.  The Legal Incidence Test Is Inapposite.**

Since the Supreme Court's decision in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), "th[e] Court has adhered to the rule that States may not impose taxes directly on the Federal Government, nor may they impose taxes the legal incidence of which falls on the Federal Government." *United States v. Fresno County*, 429 U.S. 452, 459 (1977). Generally, the "legal incidence" of a tax falls on he "who is ultimately obligated to pay the tax." *Confederated Tribes & Bands of the Yakama Indian Nation v. Gregoire*, 658 F.3d 1078, 1085 (9th Cir. 2011); *see also United States v. Cal. State Bd. of Equalization*, 650 F.2d 1127, 1130–31 (9th Cir. 1981), *aff'd*, 456 U.S. 901 (1982) ("The legal incidence of a tax falls on the party who the legislature intends will pay the tax."). That is, the legal incidence of a tax is determined by asking which entity the law, by its own terms, requires to pay the tax.

In accordance with the formalist character of the legal-incidence test, legal incidence is generally determined without regard to economic realities. *See Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 459–60 (1995). Thus, the "person or entity bearing the legal incidence of the tax is not necessarily the one bearing the economic burden." *Coeur D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 681 (9th Cir. 2004). And because States are generally free to shift the legal incidence of their taxes as they please, *see Okla. Tax Comm'n*, 515 U.S. at 460; *Coeur D'Alene Tribe of Idaho*, 384 F.3d at 685 n.7, most intergovernmental tax immunity cases ultimately turn on whether the economically burdensome tax at issue discriminates against the Federal Government, *see United States v. New Mexico*, 455 U.S. 720, 736 (1982) ("With the abandonment of the notion that the economic- as opposed to the legal-incidence of the tax is relevant, it becomes difficult to maintain that federal tax immunity is designed to insulate federal operations from the effects of state taxation. It remains true, of course, that state taxes on contractors are constitutionally invalid if they discriminate against the Federal Government, or substantially interfere with its activities."); *see also South Carolina v. Baker*, 485 U.S. 505, 526 (1988).

Although this formalist concept of legal incidence serves an important role in determining Federal immunity from nondiscriminatory State *taxation*, it has no relevance in the context of Federal immunity from State *regulation*. And for good reason. Nondiscriminatory taxes imposed on those with whom the Federal Government deals do nothing more than "make it more costly for the Government to do its business," should the taxed entity choose to pass its costs to the Federal Government. *North Dakota v. United States*, 495 U.S. 423, 434 (1990) (plurality opinion). By contrast, regulations often do far more than simply make it "more costly" for the Federal Government to carry out its business; they can actually purport to command or prohibit federal action. Because State regulation of the Federal Government contains within it the potential for much greater interference with federal operations, direct regulations of the Federal Government are invalid even if

their legal incidence falls on a federal contractor. *Id.* at 438 ("[A] regulation imposed on one who deals with the Government has as much potential to obstruct governmental functions as a regulation imposed on the Government itself.").

For example, in *Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014), although the State appealed to a variety of intergovernmental tax immunity precedents, the Ninth Circuit held that those case were "inapposite as they discuss[ed] generally applicable state tax laws, which *resulted in merely an increased economic burden on federal contractors* as well as others." *Id.* at 839 (emphasis added). Those intergovernmental tax immunity cases were inapposite because the "tax laws did not regulate what the federal contractors had to do or how they did it pursuant to their contracts." *Id.* "Unlike the tax cases, [the State law there] regulate[d] not only the federal contractor but the effective terms of federal contract itself." *Id.* at 840.

*Boeing* therefore embraced a pragmatic approach to intergovernmental immunity from State regulation in which the practical effect of State laws must be considered, including the precise kind of regulatory burdens imposed by the State on the Federal Government and its contractors. The Ninth Circuit did not mention, let alone rely upon, any concept of "legal incidence" drawn from the taxation context. If anything, *Boeing* confirms why the legal incidence test is ill-fitted for State *regulations* of federal activity, as opposed to State *taxes*. While taxation generally imposes payment obligations on one entity that may shift the economic burden through contracting, command-and-control regulation can, either through mandate or prohibition, itself dictate the terms of the contracts governing relationships between parties. Thus, unlike taxation, which generally gives the parties free rein to allocate between themselves the burden of a tax, regulations like those *Boeing* carry with them the potential to fundamentally alter—or, as here, eliminate entirely—the parties' abilities to manage their relationship through contract. The character of some regulations to reduce *both* parties' freedom is not present with taxes; only one party will bear the legal obligation of paying a tax and any other shifting of the tax's

NEWMEYER
DILLION

economic burden will be the result of the parties' free choice, not State law. *See United States v. Boyd*, 378 U.S. 39, 44 (1964). This difference alone counsels strongly against applying the legal incidence test outside of the taxation context.

Moreover, even if some kind of "legal incidence" test applied to direct-regulation cases, it would not resemble anything like the formalist test applied in the intergovernmental tax immunity context. For instance, in *Hancock v. Train*, 426 U.S. 167 (1976), Kentucky mandated that "[n]o person" could operate an air contaminant source without a state permit. *Id.* at 173. Federal contractors operated the air contaminant source at issue in *Hancock*, *see id.* at 174 n.23, and the "legal incidence" of the regulation arguably fell on them, not the Federal Government. Nonetheless, the Supreme Court did not hesitate to strike down Kentucky's law as an impermissible direct regulation of the Federal Government. And it did so precisely because the state law, *in effect*, "place[d] a prohibition on the Federal Government." *Id.* at 180 (quoting *Cal. Pub. Util. Comm'n v. United States*, 355 U.S. 534, 544 (1958)). Likewise, in *Johnson v. Maryland*, 254 U.S. 51 (1920), the "legal incidence" of Maryland's law likely fell on the Postal employee personally, as it was he who was arrested and fined for failure to obtain a driver's license from the State. But again, the Supreme Court held the state law invalid because it "la[id] hold of [Federal employees] in their specific attempt to obey orders and require[d] qualifications in addition to those that the Government ha[d] pronounced sufficient." *Id.* at 57. In other words, it was the substantially burdensome nature of the State regulation—not its "legal incidence"—that required invalidation of the Maryland law.

If the legal incidence of a regulation falls on the Federal Government, that might be *evidence* that the regulation substantially interferes with federal operations in violation of the intergovernmental-immunity doctrine, *see, e.g.*, *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010), but the constitutionality of such a regulation certainly does not *depend* on legal incidence. Because there can be no doubt that AB-32 substantially interferes with federal detention operations, the Court

need not consider the legal incidence of AB-32 to hold that the statute is an unconstitutional direct regulation of the Federal Government.

**B.** **The Legal Incidence of AB-32 Falls on Both GEO and the Federal Government.**

As explained above, the legal incidence test applicable to intergovernmental tax immunity cases has no bearing in the direct-regulation context. That said, even if the test were relevant, it would favor enjoining AB-32.

To determine legal incidence in the tax immunity context, "the United States Supreme Court has instructed that [courts] are to conduct 'a fair interpretation of the taxing statute as written and applied.'" *Coeur D'Alene Tribe of Idaho*, 384 F.3d at 681 (quoting *Cal. State Bd. of Equalization v. Chemehuevi Indian Tribe,* 474 U.S. 9, 11 (1985) (per curiam)). In doing so, the Court must "'ascertain [] the legal obligations imposed upon the concerned parties,' and this inquiry 'does not extend to divining the legislature's "true" economic object.'" *Id.* (quoting *Crow Tribe of Indians v. Montana,* 650 F.2d 1104, 1111 (9th Cir. 1981)). That said, "the entire state taxation scheme and the context in which it operates as well as the express words of the taxing statute must be considered." *Cal. State Bd. of Equalization*, 650 F.2d at 1131; *see also United States v. City of Detroit*, 355 U.S. 466, 469 (1958) ("Of course in determining whether a tax is actually laid on the United States or its property this Court goes beyond the bare face of the taxing statute to consider all relevant circumstances.").

The text and structure of AB-32 make clear that any fair interpretation of the law places the legal incidence of the regulation on *both* GEO and the Federal Government. AB-32 defines a "[p]rivate detention facility" as "a detention facility that is operated by a private, nongovernmental, for-profit entity, and *operating pursuant to a contract or agreement with a governmental entity*." Cal. Penal Code § 9500(b) (emphasis added). And apart from its exceptions, AB-32 states that "a person shall not operate a private detention facility within the state." *Id.* § 9501. Read

in conjunction with Section 9500(b), Section 9501 therefore prohibits any private person from operating a detention facility "pursuant to a contract or agreement with a governmental entity."

The plain language of AB-32 shows that the law operates *only* on those persons who act pursuant to a government contract and in doing so it necessarily regulates *both* contracting parties. Of course, it requires that GEO not operate its California ICE or USMS detention facilities. But it also regulates the Federal Government because *the law itself* defines its object of regulation by reference to contractual relationships with governmental entities and regulates the substance of the contracts so referenced. *See United States v. California*, No. 2:18-CV-721-WBS-DB, 2018 WL 5780003, at *3–4 (E.D. Cal. Nov. 1, 2018) (holding that a state statute regulating purchaser of federal land necessarily also regulated the Federal Government directly). In this sense, AB-32 is entirely unlike taxing statutes that merely regulate federal contractors incidentally and do so without directly affecting the execution of the contractors' work for the Federal Government. In other words, those laws held constitutional may have increased the Federal Government's expenses, but they did not substantially alter the contractual relationship between the Federal Government and its contractors. As the Ninth Circuit made clear in *Boeing*, any legal incidence requirement beyond the taxation context is met where the state law in question "regulates not only the federal contractor but the effective terms of federal contract itself." *Boeing Co.*, 768 F.3d at 840. Where, as here, the State seeks to prohibit the performance of a federal contract, it necessarily regulates the Federal Government and "directly interferes with [its] functions." *Id.*

To the extent that the legal incidence test even applies beyond the context of State taxation, it only confirms that AB-32 violates intergovernmental immunity.

/ / /

/ / /

/ / /

## II.   GEO's ICE and USMS Detention Facilities Are Federal Instrumentalities for Purposes of Intergovernmental Immunity.

The relevant question for purposes of determining whether AB-32 violates the direct-regulation prong of the intergovernmental-immunity doctrine is not whether GEO is a "federal instrumentality," but simply whether AB-32 substantially interferes with federal operations. *See* ECF No. 15-1 at 20–25; ECF No. 30 at 1–6.

Nevertheless, the understanding of "federal instrumentalities" expressed in the courts' intergovernmental tax immunity cases covers GEO. Under those tax-related cases, immunity shields from taxation any "instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities." *Baker*, 485 U.S. at 523. Unfortunately, this standard does not admit of simple application. *See Dep't of Emp't v. United States*, 385 U.S. 355, 358–59 (1966) ("[T]here is no simple test for ascertaining whether an institution is so closely related to governmental activity as to become a tax-immune instrumentality"). That said, it is well established that a federal instrumentality's employees need not be "employees of the United States," nor must "government officials . . . direct its everyday affairs." *Id.* at 360.

At the very least, the case law indicates that an entity is likely an "instrumentalit[y] of the federal government" when it is "engaged in the performance of an important governmental function." *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 102 (1941); *see also Lewis v. United States*, 680 F.2d 1239, 1242 (9th Cir. 1982); *United States v. Michigan*, 851 F.2d 803, 806 (6th Cir. 1988). GEO surely meets that requirement. Indeed, one could scarcely think of a more fundamental function of government than the detention of aliens and those convicted or accused of a crime. *See Penn. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 209 (1998), *overruled on other grounds*, *Thornburgh v. Abbott*, 490 U.S. 401 (1989); *Preiser v. Rodriguez*, 411 U.S. 475, 491 (1973). Just as federal land banks are federal instrumentalities as "depositaries of public moneys," *Smith v. Kan. City Title & Tr.*

NEWMEYER
DILLION

*Co.*, 255 U.S. 180, 209 (1921), so too are detention-service providers federal instrumentalities as custodians of federal detainees.

Beyond this standard, courts also consider whether the entity is "subject[] . . . to governmental supervision," *Dep't of Emp't*, 385 U.S. at 359, or "extensive government regulation," *TI Fed. Credit Union v. DelBonis*, 72 F.3d 921, 934 (1st Cir. 1995); *see also Michigan*, 851 F.2d at 806. The Federal Government heavily regulates the operation of these facilities through the Federal Performance-Based Detention Standards. *See* U.S. Customs & Immigration Enf't, *Performance-Based National Detention Standards 2011*, U.S. DEP'T OF HOMELAND SEC. (rev. Dec. 2016), https://bit.ly/3jZA6La. Federal regulation of these facilities is thus at least as extensive as that of other federal instrumentalities, such as the Red Cross, *Dep't of Emp't*, 385 U.S. at 359–60; federal land banks, *Fed. Land Bank of St. Paul*, 314 U.S. at 102; and federal credit unions, *Michigan*, 851 F.2d at 806.

At bottom, while GEO does not maintain that status as a federal instrumentality is needed for AB-32 to violate intergovernmental immunity, should the Court find such analysis necessary, it favors holding AB-32 unconstitutional.

## III. Intergovernmental Immunity Applies Regardless Whether a Federal Contractor's Facility Is a Federal Installation.

It is certainly "well settled that the activities of federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides" otherwise. *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988). But the law is entirely unclear—in fact, it is largely silent—regarding when a particular facility qualifies as a "federal installation."

Even if one adopts a rather narrow definition of "federal installation"—a facility performing federal functions on federal property—it is clear that the protection of intergovernmental immunity is not limited to such "federal installations." It applies also to State regulation of contractor-owned facilities. *See United States v. Town of Windsor*, 765 F.2d 16, 18–20 (2d Cir. 1985) (invalidating a

local building permit ordinance applied to facilities owned by federal contractors). Indeed, the Supreme Court and Ninth Circuit have regularly invalidated state laws even when applied to contractors carrying out federal operations on non-federal property. *See Cal. Comm'n*, 355 U.S. at 544; *Paul v. United States*, 371 U.S. 245, 254–55 (1963); *United States v. Ga. Pub. Serv. Comm'n*, 371 U.S. 285, 292–93 (1963); *Boeing Co.*, 768 F.3d at 834, 840.

Intergovernmental immunity applies where, as here, state regulation of a private facility or federal installation would substantially interfere with the performance of a federal activity. *See Hancock*, 426 U.S. at 181. Because AB-32 meets that test, it is unconstitutional.

## IV.   Neither the Tucker Act nor the Contract Disputes Act Limits This Court's Jurisdiction Over GEO's Claim Under AB-32's Temporary Safe Harbor.

Neither the Contract Disputes Act nor the Tucker Act limits this Court's jurisdiction to decide whether GEO's contracts fall within AB-32's temporary safe harbor for private detention facilities "operating pursuant to a valid contract with a governmental entity that was in effect before January 1, 2020." Cal. Penal Code § 9505(a).

The Tucker Act grants the United States Court of Federal Claims "jurisdiction to render judgment upon any claim *against the United States* . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1) (emphasis added). GEO's claim for a declaratory judgment *against California* plainly falls outside of the Tucker Act's coverage. Moreover, the Tucker Act has "long been construed as authorizing only actions for money judgments," *Richardson v. Morris*, 409 U.S. 464, 465 (1973), and grants jurisdiction only "to award damages but not to grant injunctive or declaratory relief," *Lee v. Thornton,* 420 U.S. 139, 140 (1975) (per curiam); *see also Lake Mohave Boat Owners Ass'n v. Nat'l Park Serv.*, 78 F.3d 1360, 1365 (9th Cir. 1995) ("[T]he Tucker Act does not provide equitable or declaratory relief except in very limited situations not present in this case." (citing

28 U.S.C. § 1491(a)(2) and (3)). GEO has never sought money damages against California (let alone against the United States) and the Court clearly has jurisdiction over its claim for declaratory relief. *See* 28 U.S.C. § 1367(a).

The Contract Disputes Act (CDA) confers jurisdiction on the Court of Federal Claims and the Federal Circuit, *see* 41 U.S.C. § 7104(b)(1); *id.* § 7107(a)(1); *see also* 28 U.S.C. § 1346(a)(2), only over "claim[s] by a contractor *against the Federal Government* relating to a contract," *id.* § 7103(a)(1) (emphasis added), or "claim[s] by the Federal Government against a contractor relating to a contract," *id.* § 7103(a)(3). Although GEO's claim for declaratory relief based on AB-32's temporary safe harbor may "relat[e] to" its contracts with ICE and USMS, it is certainly not "against the Federal Government"; it is against California. Indeed, courts have recognized that district courts have jurisdiction over a subcontractor's suit against a prime contractor to a federal procurement contract because "the subcontractor's dispute was not against the Government." *United Kingdom Ministry of Defence v. Trimble Navigation Ltd.*, 422 F.3d 165, 170–71 (4th Cir. 2005) (collecting cases). Likewise, GEO's suit against California is not a dispute "against the Government." The CDA is therefore inapplicable and this Court has jurisdiction to resolve GEO's claim.

Dated: August 4, 2020

By: */s/ Michael B. McClellan*

Charles J. Cooper,*
   DC Bar No. 248070
Michael W. Kirk,*
   DC Bar No. 424648
Steven J. Lindsay,*
   VA Bar No. 92363
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
Telephone: (202) 220-9600
Email: ccooper@cooperkirk.com
*Appearing *Pro Hac Vice*

Michael B. McClellan, CBN 241570
NEWMEYER & DILLION LLP
895 Dove Street, Fifth Floor
Newport Beach, CA 92660
Telephone: (949) 854-7000
Email: Michael.McClellan@ndlf.com

Michael W. Battin, CBN 183870
NAVIGATO & BATTIN, LLP
755 West A Street, Suite 150
San Diego, CA 92101
Telephone: (619) 233-5365
Email: mike@navbat.com

*Attorneys for Plaintiff The GEO Group, Inc.*