ETHAN P. DAVIS
Acting Assistant Attorney General
ROBERT S. BREWER, JR.
United States Attorney
ALEXANDER K. HAAS
Director, Federal Programs Branch
JACQUELINE COLEMAN SNEAD
Assistant Director, Federal Programs Branch
STEPHEN EHRLICH
Trial Attorney (N.Y. Bar No. 5264171)
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Tel.: (202) 305-9803
Email: stephen.ehrlich@usdoj.gov

*Attorneys for the United States*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE GEO GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> GAVIN NEWSOM, *et al.*, <br><br> Defendants. | Case No. 3:19-cv-02491-JLS-WVG <br> Case No. 3:20-cv-00154-JLS-WVG <br><br> **THE UNITED STATES' SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S REQUEST FOR ADDITIONAL BRIEFING (ECF NO. 45)** <br><br> [Memorandum] <br><br> Hearing Date: July 16, 2020 <br> Hearing Time: 1:30 p.m. <br> Courtroom: 4D |
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> GAVIN NEWSOM, *et al.*, <br><br> Defendants. | |

## INTRODUCTION

The United States writes to address "whether A.B. 32 is a direct regulation of the United States in violation of intergovernmental immunity." Order at 1, ECF No. 45. The answer is yes. The Supremacy Clause flatly prohibits state regulation of federal operations. And by attempting to dictate how the U.S. Marshals Service (USMS), the federal Bureau of Prisons (BOP), and Immigration and Customs Enforcement (ICE) house their prisoners and detainees, California has done exactly that. So the Court should bypass the red herring of whether federally contracted detention facilities are "federal installations," should disregard inapposite cases about the "legal incidence" of a state tax on the United States or "federal instrumentalities," and should enjoin A.B. 32 as it applies to the Federal Government and its contractors. *See id.* at 1–2 (requesting briefing on the "legal incidence" of A.B. 32, whether entities operating private detention facilities are "federal instrumentalities," and whether such facilities are "federal installations"); U.S. Mot. for Prelim. & Perm. Inj. [Pl.'s Mot.] at 14–18, ECF No. 8; U.S. Opp'n & Reply [Pl.'s Reply] at 3–8, ECF No. 22.

## ARGUMENT

**I. STATES VIOLATE INTERGOVERNMENTAL IMMUNITY WHEN THEY DIRECTLY REGULATE FEDERAL OPERATIONS**

"[U]nder the intergovernmental immunity component of the Supremacy Clause to the United States Constitution, states may not directly regulate the Federal Government's operations or property." *Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996). This bar on state regulation of federal operations is not new. Two centuries ago, Chief Justice Marshall wrote that States cannot interfere with the "legitimate operations" of the Federal Government because "[i]t is of the very essence of supremacy, to remove all obstacles to [the Federal Government's] action

within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence." *McCulloch v. Maryland*, 17 U.S. 316, 427 (1819) (Marshall, C.J.).  Nor is this concept outdated.  Chief Justice Roberts, writing for the Court just last month, reaffirmed that "the Constitution guarantees 'the entire independence of the General Government from any control by the respective States,'" and he reiterated that States can neither "control the operations of the constitutional laws enacted by Congress," nor impede the Executive Branch's "execution of those laws." *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020) (quoting *Farmers & Mechanics Sav. Bank of Minneapolis v. Minnesota*, 232 U.S. 516, 521 (1914) & *McCulloch*, 17 U.S. at 436).

Between the words of Chief Justice Marshall and Chief Justice Roberts lies 200 years of Supreme Court case law repeatedly holding that "activities of the Federal Government are free from regulation by any state." *See, e.g.*, *Mayo v. United States*, 319 U.S. 441, 445 (1943); *Arizona v. California*, 283 U.S. 423, 451 (1931) ("The United States may perform its functions without conforming to the police regulations of a state."); *Union Pac. R. Co. v. Peniston*, 85 U.S. 5, 36–37 (1873) (explaining that a state tax on federal operations "is a direct obstruction to the exercise of Federal powers"); *see also Vance*, 140 S. Ct. at 2442–43 & n.5 (Alito, J., dissenting) (collecting cases for the proposition that "two centuries of case law prohibit the States from taxing, regulating, or otherwise interfering with the lawful work of federal agencies, instrumentalities, and officers").  Cases within the Ninth Circuit hold the same. *See, e.g.*, *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014) (finding an intergovernmental immunity violation where state law "directly interfere[d] with the functions of the federal government"); *Blackburn*, 100 F.3d at 1435 ("[S]tates may not directly regulate the Federal Government's operations or property."); *Resolution Tr. Corp. v. California*, 851 F. Supp. 1453, 1456 (C.D. Cal. 1994) ("States may not directly regulate the federal government's activities or property.").  And this Court should too.

## II. A.B. 32 VIOLATES INTERGOVERNMENTAL IMMUNITY BECAUSE IT DIRECTLY REGULATES FEDERAL OPERATIONS

A.B. 32 directly regulates federal operations by preventing the United States from contracting for private detention facilities. *See* Pl.'s Mot. at 14–18; Pl.'s Reply at 3–8. The law does not simply make all federal options more expensive (as the state law upheld in *North Dakota* did).[1] It does not merely impose state licensing standards on federal contractors (as the state law struck down in *Leslie Miller* did).[2] And it does not just mandate higher operational standards for a federal contractor than those set by the Federal Government (as the state law struck down in *Boeing* did). Instead, A.B. 32 goes much further by *eliminating* the United States' ability to contract for private detention facilities *altogether*—it dictates, in other words, that the Federal Government cannot house its own prisoners and detainees in the manner it has long chosen to do so.[3]

---

[1] In *North Dakota v. United States*, 495 U.S. 423, 425 (1990) (plurality), unlike here, "the [state] regulations did not attempt to alter the criteria under which the federal government made its decision," nor did "those [state] regulations prevent the federal government from selecting the bid it believed was most competitive or otherwise enable the [S]tate to second-guess the federal government's judgment as to who should supply the federal enclave." *United States v. Virginia*, 139 F.3d 984, 990 n.7 (4th Cir. 1998) (Luttig, J.). Nothing in *North Dakota* abrogates the fundamental principle—affirmed in two centuries of case law both predating and postdating *North Dakota*—that States cannot regulate federal operations. *Contra* Defs.' Reply at 2, ECF No. 23. And in any event, the plurality opinion in *North Dakota* does not govern because "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment[] on the narrowest grounds." *Ramos v. Louisiana*, 140 S. Ct. 1390, 1403 (2020). That was Justice Scalia's concurrence, which held that the Twenty-first Amendment "is binding on the Federal Government like everyone else, and empowers North Dakota to require that all liquor sold for use in the State be purchased from a licensed in-state wholesaler." *North Dakota*, 495 U.S. at 425.

[2] *See* Pl.'s Mot. at 15–16 (discussing *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 189–90 (1956) (per curiam)).

[3] The effect on the Unites States' decisional process here goes far beyond the state licensing regime invalidated in *Leslie Miller*, which also went far beyond the "incidental effect" of state regulations at issue in *North Dakota*. *See* Pl.'s Mot. at 15–16; *Virginia*, 139 F.3d at 990 n.7 ("The contrast between the incidental effect of the North Dakota regulations on the federal government's decisional processes and the direct interference of the Arkansas regulations in *Leslie Miller* . . . with those processes is stark indeed.").

Put simply, A.B. 32 usurps the Federal Government's decisional process by overriding the Executive Branch's judgment in contracting for private detention facilities. It does not matter whether A.B. 32 accomplishes this improper goal by directly prohibiting the Federal Government from contracting for private detention facilities, or by prohibiting federal contractors (as here) from renewing or entering contracts with the Federal Government. *See* Cal. Penal Code §§ 9501, 9505. They are two sides of the same unconstitutional coin. And both are equally repugnant to the Supremacy Clause because a state law need not "expressly name the Federal Government as its intended object of regulation" to "directly regulate the United States." *United States v. California*, 2018 WL 5780003, at *4 (E.D. Cal. Nov. 1, 2018).

If States could regulate (or outright ban) certain contracts with the United States, the Federal Government would grind to a halt. Chief Justice Marshall rejected such a preposterous theory of state power almost two centuries ago. *See* Pl.'s Mot. at 18; Pl.'s Reply at 5. Just as a State cannot prevent a federal "contractor [ ] supplying a military post with provisions" from "making purchases within any State, or from transporting the provisions to the place at which the troops were stationed," *Osborn v. Bank of U.S.*, 22 U.S. 738, 867 (1824) (Marshall, C.J.), neither can a State prevent federal contractors from supplying the Federal Government with private detention facilities to house federal prisoners and detainees. *See, e.g.*, *United States v. California*, 921 F.3d 865, 880 (9th Cir. 2019) (noting that intergovernmental immunity is implicated when state laws "directly or indirectly affect[] the operation of a federal program or contract"); *Boeing*, 768 F.3d at 839 (finding intergovernmental immunity violated where a state law "directly interfere[d] with the functions of the federal government" by "regulat[ing] not only the federal contractor but the effective terms of [the] federal contract itself"); *GEO Group, Inc. v. City of Tacoma*, 2019 WL 5963112, at *5 (W.D. Wash. Nov. 13, 2019) ("The intergovernmental immunity doctrine . . .

appl[ies] to federal contractors insofar as the challenged law regulates what the federal contractors have to do or how they do it pursuant to their contracts.").

But while States cannot regulate the *operations* of the Federal Government or its contractors (qua contractors) at all, States *can* regulate the *property* of federal contractors if they do so on equal terms as other property.[4] *See* Pl.'s Mot. at 14–15 (collecting cases). And when those state regulations are taxes, the taxes cannot amount to direct taxation of the Federal Government. *See South Carolina v. Baker*, 485 U.S. 505, 523 (1988) ("States can never tax the United States directly but can tax any private parties with whom it does business, even though the financial burden falls on the United States, as long as the tax does not discriminate against the United States or those with whom it deals.").

A state tax equates to direct taxation of the Federal Government "when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities." *United States v. California*, 507 U.S. 746, 753 (1993); *see* Order at 1–2 (requesting briefing on whether entities operating private detention facilities are "federal instrumentalities"). "[T]here is 'no simple test for ascertaining whether an institution is so closely related to governmental activity as to become a tax-immune instrumentality.'" *Nevada ex rel. Hager v. Countrywide Home Loans Servicing, LP*, 812 F. Supp. 2d 1211, 1216 (D. Nev. 2011) (quoting *Dep't of Employment v. United States*, 385 U.S. 355, 358–59 (1966)). But the Ninth Circuit has framed that inquiry "very broad[ly]" by looking at "whether the entity performs an important governmental function." *Lewis v. United States*, 680 F.2d 1239, 1242 (9th Cir. 1982); *Nevada*, 812 F. Supp. 2d at 1216. Likewise, there is no simple test for determining whether a state tax on a non–federal

---

[4] For this reason, the States' inability to regulate federal operations does not, as Defendants maintained at oral argument, render intergovernmental immunity's discrimination prong superfluous. *See* Tr. 86:12–21.

instrumentality falls on the United States itself. *See* Order at 1–2 (requesting briefing on the "legal incidence" of A.B. 32). Courts will look "beyond the bare face of the taxing statute to consider all relevant circumstances" and determine whether the United States bears the "legal incidence" of the tax, rather than the "economic burden" imposed by the tax. *United States v. Delaware*, 958 F.2d 555, 560–61 (3d Cir. 1992) (quoting *United States v. City of Detroit*, 355 U.S. 466, 469 (1957)); *cf. Confederated Tribes & Bands of the Yakama Indian Nation v. Gregoire*, 658 F.3d 1078, 1084–85 (9th Cir. 2011) (explaining that the legal-incidence test requires a court to "determine which entities or individuals will likely face detrimental legal consequences if the tax is not paid," and noting that "legal-incidence determinations necessarily will depend on myriad, often situation-specific factors").

That framework—examining whether the "legal incidence" of a state tax falls on the United States or "federal instrumentalities"—is inapplicable where, as here, a State directly regulates federal operations. In such circumstances, the "legal incidence" of a state law will *always* fall on "the United States itself," *California*, 507 U.S. at 753, a federal "instrumentality" performing "an important governmental function," *Lewis*, 680 F.2d at 1242, or both. Here, for example, A.B. 32 prohibits the Federal Government and its private-detention-facility suppliers from entering or renewing a contract to perform the sovereign task of housing federal prisoners and detainees. So the "legal incidence" of A.B. 32, by definition, falls on the Federal Government.[5] *Cf. Delaware*, 958 F.2d at 561 (recognizing the "*per se* rule on legal incidence: if a state tax on a supplier is mandatorily passed through to the United

---

[5] While the state-taxation concept of "federal instrumentalities" is inapposite for the reasons explained above, federal contractors operating private detention facilities should be considered "federal instrumentalities" for these purposes because they perform a crucially important governmental function—housing federal prisoners and detainees. *Lewis*, 680 F.2d at 1242; *see* Pl.'s Mot. at 23 (explaining that Federal Government has both the unquestionable power and the unflinching obligation to house those in its custody).

States as a consumer, the seemingly indirect tax is functionally indistinguishable from a tax directly imposed on the United States and is therefore unconstitutional"); *see* Pl.'s Mot. at 36–42 (explaining that A.B. 32 "could cripple federal law enforcement operations in California" due to costly out-of-state relocation of federal prisoners and detainees, frequent and costly transport of prisoners and detainees after relocation, and obstruction of federal proceedings).

That is why the Ninth Circuit has not employed the inapposite state-taxation framework when a State regulates federal operations.[6] In *Boeing*, for example, California attempted to impose more-stringent environmental cleanup standards on a federal contractor (Boeing) than those imposed on the contractor by the U.S. Department of Energy. 768 F.3d at 834–37. In finding the state law unconstitutional, the Ninth Circuit did not examine the law's "legal incidence" or ascertain whether Boeing was a "federal instrumentality." *See id.* at 839 (distinguishing cases concerning "generally applicable state tax laws" because those "tax laws did not regulate what the federal contractors had to do or how they did it pursuant to their contracts"). Instead, the court held that California violated intergovernmental immunity because it "directly interfere[d] with the functions of the federal government" by improperly "overrid[ing] federal decisions as to necessary decontamination measures" and "regulat[ing] not only the federal contractor but the effective terms of [the] federal contract itself." *Id.* at 840. Here, again, A.B. 32 goes *further* than the laws struck down in *Boeing* and other federal-contractor cases because it bans the United States' contracts *altogether*. Pl.'s Mot. at 15–16; Pl.'s Reply at 6.

---

[6] Although the *principles* of intergovernmental-tax immunity apply to broader intergovernmental-immunity doctrine, *California*, 921 F.3d at 883, the applicability of general principles says nothing about the applicability of a particular analytical framework. Like intergovernmental immunity, preemption doctrine also springs from the Supremacy Clause and *McCulloch*, but different analyses apply to different types of preemption. *See Kansas v. Garcia*, 140 S. Ct. 791, 802–07 (2020).

### III. FEDERALLY CONTRACTED DETENTION FACILITIES ARE FEDERAL INSTALLATIONS, BUT THE COURT NEED NOT DECIDE THIS ISSUE

A.B. 32's unabashed interference with federal operations violates intergovernmental immunity regardless of whether federally contracted private detention facilities are "federal installations." Order at 1–2 (requesting briefing on whether private detention facilities are "federal installations"); *see* Sections I. & II., *supra*; Pl.'s Mot. at 14–18. But they are. "It is well settled that the activities of federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides clear and unambiguous authorization for such regulation." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988) (quotation omitted). And it is equally well settled that "federally owned facilit[ies] performing a federal function" are so shielded. *Id.* at 181. For El Centro SPC and Taft CI, then, A.B. 32 represents an obvious Supremacy Clause violation. *See* Pl.'s Mot. at 16–17; Pl.'s Reply at 7–8. Defendants have never defended A.B. 32's impermissible regulation of those federal installations and, in fact, attempted to disavow any such regulation at oral argument despite A.B. 32's plain language.[7] *See* Pl.'s Reply at 7–8; Tr. 43:8–25.

The law concerning federal installations is less clear for the remaining detention facilities at issue, all of which are privately owned and operated. But under the Ninth Circuit's reasoning in *Boeing*, those facilities are also considered "federal installations," at least insofar as they house prisoners and detainees on behalf of the Federal Gov-

---

[7] *See* Cal. Penal Code § 9500(b) (defining "Private detention facility" as "a detention facility that is *operated* by a private, nongovernmental, for-profit entity" regardless of whether it is owned by the United States (emphasis added)); *id.* § 9503 (exempting "*privately owned* property . . . that is *leased and operated*" by a law enforcement agency, but not exempting any federally owned property (emphasis added)). As prompted by the Court, Order at 2 n.1, Plaintiffs GEO and the United States contacted Defendants concerning a possible non-enforcement stipulation for federally owned facilities. No stipulation has been reached to date. And if no stipulation is entered by the time the Court rules on the United States' motion, the Court should rule that A.B. 32 is unconstitutional for both privately- and federally-owned detention facilities.

ernment. In *Boeing*, the Ninth Circuit found a violation of intergovernmental immunity and noted that the environmental cleanup *on private property* was "shielded by the Supremacy Clause from direct state regulation" because it was conducted on a "federal installation." *Boeing*, 768 F.3d at 840 (quoting *Goodyear*, 486 U.S. at 180); *id.* at 838 (finding standing because the state law at issue "prohibit[ed] Boeing from transferring its own real property"); *Boeing Co. v. Robinson*, 2011 WL 1748312, at *1 (C.D. Cal. Apr. 26, 2011) (noting that Boeing owned 2,398 acres of the relevant property), *aff'd sub nom. Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014).

So too here. Even though federal contractors house federal prisoners and detainees at privately-owned-and-operated detention facilities, they do so on behalf of the Federal Government. So they are shielded from direct state regulation "unless Congress provides clear and unambiguous authorization for such regulation." *Goodyear*, 486 U.S. at 180. It has not. No statute authorizes state regulation of BOP- and ICE-contracted facilities, at least insofar as their contracts for federal prisoner and detainee housing are concerned. *See* 8 U.S.C. § 1231(g)(1); 18 U.S.C. § 3621(b). Defendants have never contended otherwise. As for USMS, Defendants have argued that Congress authorized state regulation of private detention facilities. *See* 18 U.S.C. § 4013(c)(2). But as the United States explained, and as the Court recognized, Defendants' argument is fatally flawed. Pl.'s Reply at 23–24; Tr. 9:10–19.

The Court need not decide whether federally-contracted detention facilities are "federal installations," as California's direct regulation of federal operations alone resolves this case. *See* Sections I. & II., *supra*; Pl.'s Mot. at 14–18. But if the Court does reach that question, it should find A.B. 32 unconstitutional for the additional reason that it regulates not only federal operations, but those operations of federal installations.

# CONCLUSION

For the reasons explained above, in the United States' motion for preliminary and permanent injunction (ECF No. 8), and in the United States' reply in further support of that motion (ECF No. 22), the Court should preliminarily and permanently enjoin A.B. 32 as it applies to the Federal Government and its contractors.

DATED: August 4, 2020

Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General

ROBERT S. BREWER, JR.
United States Attorney

ALEXANDER K. HAAS
Director, Federal Programs Branch

JACQUELINE COLEMAN SNEAD
Assistant Director, Federal Programs Branch

*/s/ Stephen Ehrlich*
STEPHEN EHRLICH
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC  20005
Tel.:  (202) 305-9803
Email: stephen.ehrlich@usdoj.gov

*Counsel for the United States*