UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE GEO GROUP, INC.,<br><br>                             Plaintiff,<br><br>v.<br><br>GAVIN C. NEWSOM, in his official capacity as Governor of the State of California; XAVIER BECERRA, in his official capacity as Attorney General of the State of California,<br><br>                           Defendants.<br><br>AND ALL CONSOLIDATED CASES | Case No.:  19-CV-2491 JLS (WVG)<br><br>**ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION, AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS AND FOR JUDGMENT ON THE PLEADINGS** |

This Order addresses motions concerning the constitutionality of California Assembly Bill 32 ("A.B. 32") in two consolidated cases: *The GEO Group, Inc. v. Newsom*, No. 19-CV-2491 JLS (WVG) (S.D. Cal. filed Dec. 30, 2019) ("*GEO*"), and *United States v. Newsom*, No. 20-CV-154 JLS (WVG) (S.D. Cal. filed Jan. 24, 2020) ("*U.S.*"). Specifically before the Court are Plaintiff The GEO Group, Inc.'s ("GEO"), and the United States of America's Motions for Preliminary Injunction ("GEO Mot.," *GEO* ECF No. 15, and "U.S. Mot.," *U.S.* ECF No. 8, respectively), as well as Defendants Gavin Newsom and Xavier Becerra's Motion to Dismiss GEO's Complaint ("MTD," *GEO* ECF Nos. 20, 22)

and Defendants Newsom, Becerra, and the State of California's Motion for Judgment on the Pleadings of the United States' Complaint ("MJP," *U.S.* ECF No. 13).  Also before the Court are briefs of *Amici Curiae* Immigrant Legal Resource Center, Human Rights Watch, and Freedom for Immigrants (the "Detention *Amici*") filed in support of Defendants in both cases ("Detention *Amici* Br.," *GEO* ECF No. 26 & *U.S.* ECF No. 19), as well as the brief of *Amici Curiae* Immigrant Defense Advocates and Immigrant Legal Defense (the "Procurement *Amici*") filed in support of Defendants in the *GEO* case ("Procurement *Amici* Br.," *GEO* ECF No. 40).  The Court held a hearing on the above-enumerated matters on July 16, 2020.[1]  *See GEO* ECF Nos. 43, 48 ("Tr."); *U.S.* ECF No. 33.  Having carefully considered the Parties' arguments, pleadings and evidence, and the applicable law, the Court **GRANTS IN PART AND DENIES IN PART** the GEO and U.S. Motions and **GRANTS IN PART AND DENIES IN PART** Defendants' Motions to Dismiss and for Judgment on the Pleadings, as follows.

## BACKGROUND[2]

## I.  A.B. 32

On December 3, 2018, California Assembly Member Rob Bonta introduced A.B. 32 in the California Legislature.  *GEO* ECF No. 1 ("GEO Compl.") ¶¶ 21, 30.  Governor Newsom signed A.B. 32 into law on October 11, 2019.  GEO Compl. ¶ 33.

---

[1] Because of the COVID-19 pandemic, *see, e.g.*, Order of the Chief Judge No. 24 (S.D. Cal. filed Apr. 17, 2020); Executive Order N-33-20, Executive Department of the State of California (Mar. 19, 2020), the hearing was held by video and telephone.  *See GEO* ECF No. 42; *U.S.* ECF No. 32.

[2] On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) or a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), the Court may take into account the Parties' pleadings, any documents physically attached to those pleadings or incorporated by reference therein, and any documents properly subject to judicial notice.  *See, e.g.*, *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (judicial notice and incorporation by reference); *Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (Rule 12(c) motion); *Vasquez v. Los Angeles Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007) (Rule 12(b)(6) motion).  "Nonetheless, in deciding a motion for preliminary injunction—unlike a motion to dismiss—the Court is not limited solely to the pleadings and may consider affidavits or declarations along with other evidence submitted by the parties."  *Walker v. Woodford*, 454 F. Supp. 2d 1007, 1024 (S.D. Cal. 2006) (citing Fed. R. Civ. P. 65; *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984)), *aff'd*, 393 F. App'x 513 (9th Cir. 2010).  The Court is guided by these legal principles in its Analysis.  *See infra* pages 21–69.

A.B. 32 contains three sections.  *See* 2019 Cal. Legis. Serv. Ch. 739 (A.B. 32) (2019).  Section 1 generally prohibits the California Department of Corrections and Rehabilitation ("CDCR") from entering into a new contract, or renewing an existing contract, with a "private, for-profit prison facility located in or outside [California] to provide housing for state prison inmates" after January 1, 2020.  *See* A.B. 32 § 1; Cal. Penal Code § 5003.1(a).  There also is an exception allowing California to renew or extend a contract with a private, for-profit detention facility to comply with any court-ordered population cap.[3]  *See* A.B. 32 § 1; Cal. Penal Code § 5003.1(e).  In its entirety, Section 1 of A.B. 32 provides:

> (a)    On or after January 1, 2020, [CDCR] shall not enter into a contract with a private, for-profit prison facility located in or outside of the state to provide housing for state prison inmates.

> (b)    On or after January 1, 2020, [CDCR] shall not renew an existing contract with a private, for-profit prison facility located in or outside of the state to incarcerate state prison inmates.

> (c)    After January 1, 2028, a state prison inmate or other person under the jurisdiction of [CDCR] shall not be incarcerated in a private, for-profit prison facility.

> (d)    As used in this section, "private, for-profit prison facility" does not include a facility that is privately owned, but is leased and operated by [CDCR].

> (e)    Notwithstanding subdivisions (a) and (b), [CDCR] may renew or extend a contract with a private, for-profit prison facility to provide housing for state prison inmates in order

---

[3] California's prison system is currently subject to a court-ordered population cap, pursuant to which its total population may not exceed 137.5 percent of the prisons' design capacity.  GEO Compl. ¶ 26 (citing *Brown v. Plata*, 563 U.S. 493 (2011); *Coleman v. Brown*, 952 F. Supp. 2d 901 (E.D. Cal. 2013)).  As of December 1, 2019, California's prison system was operating at 131.2 percent of design capacity.  GEO Compl. ¶ 27.

1  to comply with the requirements of any court-ordered
2  population cap.

3  Cal. Penal Code § 5003.1.

4      Section 2 of A.B. 32 contains several provisions codified at California Penal Code
5  sections 9500 through 9505.  *See* A.B. 32 § 2; Cal. Penal Code §§ 9500–9505.  Section
6  9500 defines the terms "[d]etention facility" and "[p]rivate detention facility."  *See*
7  *generally* Cal. Penal Code § 9500.  Specifically, the statute defines a "[d]etention facility"
8  as "any facility in which persons are incarcerated or otherwise involuntarily confined for
9  purposes of execution of a punitive sentence imposed by a court or detention pending a
10 trial, hearing, or other judicial or administrative proceeding," Cal. Penal Code § 9500(a),
11 and a "[p]rivate detention facility" as "a detention facility that is operated by a private,
12 nongovernmental, for-profit entity, and operating pursuant to a contract or agreement with
13 a governmental entity."  Cal. Penal Code § 9500(b).

14     Section 9501 contains a general prohibition on the operation of a private detention
15 facility within the State of California: "Except as otherwise provided in this title, a person
16 shall not operate a private detention facility within the state."  Cal. Penal Code § 9501.
17 This provision is followed by three additional provisions containing exceptions.  *See* Cal.
18 Penal Code §§ 9502, 9503, 9505.

19     Section 9502 excepts several, specific types of facilities, namely:

20     (a)  Any facility providing rehabilitative, counseling,
21          treatment, mental health, educational, or medical services
22          to a juvenile that is under the jurisdiction of the juvenile
23          court pursuant to Part 1 (commencing with Section 100)
            of Division 2 of the Welfare and Institutions Code.

24     (b)  Any facility providing evaluation or treatment services to
25          a person who has been detained, or is subject to an order
26          of commitment by a court, pursuant to Section 1026, or
            pursuant to Division 5 (commencing with Section 5000)
27          or Division 6 (commencing with Section 6000) of the
            Welfare and Institutions Code.

28 ///

4

  (c)  Any facility providing educational, vocational, medical, or other ancillary services to an inmate in the custody of, and under the direct supervision of, the Department of Corrections and Rehabilitation or a county sheriff or other law enforcement agency.

  (d)  A residential care facility licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code.

  (e)  Any school facility used for the disciplinary detention of a pupil.

  (f)  Any facility used for the quarantine or isolation of persons for public health reasons pursuant to Division 105 (commencing with Section 120100) of the Health and Safety Code.

  (g)  Any facility used for the temporary detention of a person detained or arrested by a merchant, private security guard, or other private person pursuant to Section 490.5 or 837.

Cal. Penal Code § 9502.

   Section 9503 exempts facilities that are leased from private parties but operated by CDCR or another law enforcement agency: "Section 9501 does not apply to any privately owned property or facility that is leased and operated by the [CDCR] or a county sheriff or other law enforcement agency."  Cal. Penal Code § 9503.

   The last exception, appearing in Section 9505, exempts contracts in existence before January 1, 2020, and contracts renewed pursuant to Section 5003.1(e):

  Section 9501 does not apply to either of the following:

  (a)  A private detention facility that is operating pursuant to a valid contract with a governmental entity that was in effect before January 1, 2020, for the duration of that contract, not to include any extensions made to or authorized by that contract.

/ / /

5

(b)     A private detention facility contract renewed pursuant to subdivision (e) of Section 5003.1.

Cal. Penal Code § 9505.

Finally, Section 3 of A.B. 32 contains a severability clause: "The provisions of this act are severable.  If any provision of this act or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application."  A.B. 32 § 3.

## II.   Plaintiffs' Private Detention Facilities in California

### A.     The United States Bureau of Prisons

#### 1.     Detention Facilities

The United States Bureau of Prisons ("BOP") is a sub-agency of the United States Department of Justice ("DOJ") that is overseen by the United States Attorney General.  *U.S.* ECF No. 1 ("U.S. Compl.") ¶¶ 6, 14.  BOP has the authority and responsibility to "'designate the place of . . . imprisonment' for persons sentenced to imprisonment," *id.* ¶ 15 (citing 18 U.S.C. §§ 3621, 4042), and "may designate" as a place of confinement "any available penal or correctional facility that meets minimum standards of health and habitability established by [BOP], whether maintained by the Federal Government or otherwise."  *Id.* (quoting 18 U.S.C. § 3621(b)).

Nationwide, BOP houses nearly 25,000, or approximately 14 percent, of its over 175,000 inmates in private detention facilities.  *Id.* ¶ 40.  Roughly the same proportion of BOP's 16,000 inmates in California are also housed in private detention facilities.  *Id.*

BOP owns one detention facility in California, Taft Correctional Institute ("Taft"), that is privately operated.  *Id.* ¶ 41.  Taft houses 1,300 inmates.  *Id.* ¶ 42.  BOP's contract for the private operation of Taft was due to expire in March 2020.  *Id.* ¶ 41.  BOP considered not renewing the contract because of infrastructure issues at Taft, although BOP may seek to award a new contract if it determines that Taft could remain open while repairs are being made.  *Id.*  Although BOP currently does not have plans to contract with other private facilities in California, it may in the future depending on its needs.  *Id.* ¶ 43.

### 2.      *Residential Reentry Centers*

Congress also expressly has provided that a federal prisoner may serve a limited portion of his or her sentence "under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community," including in a community correctional facility.   U.S. Compl. ¶ 17 (quoting 18 U.S.C. § 3624(c)) (citing 18 U.S.C. §§ 3563(b)(10)–(11)).   Congress expanded BOP's use of Residential Reentry Centers ("RRCs") through the First Step Act of 2018, which authorizes extended placement in RRCs of inmates who have earned time credits under the risk-and-needs-assessment system.   U.S. Compl. ¶ 47.   BOP therefore anticipates that the need for RRCs in California will increase significantly over the next few years.   *Id.*

Currently, BOP contracts with four private contractors to operate ten RRCs located throughout California that house and supervise approximately 900 inmates.[4]   *Id.* ¶ 44. These RRCs supervise inmates on home confinement and also provide assistance to inmates who are nearing release by providing a supervised environment and several programs, including employment counseling, job placement, and financial management assistance.  *Id.*  Current contracts expire between March 2020 and February 2021, or, if all option periods are exercised, as they usually are, between March 2021 and January 2030. *Id.* ¶ 45.

BOP also has one open solicitation and one solicitation it would like to open for additional RRCs in San Francisco and San Diego, respectively.  *Id.* ¶ 46.  The anticipated performance dates are in 2021.  *Id.*

Finally, BOP maintains about 15 to 20 percent of available beds in RRCs nationally for use by federal courts as an intermediate sanction during supervision or probation, although these individuals are not in BOP custody.  *Id.* ¶ 48.

/ / /

---

[4] One RRC is located in each of Riverside, Oakland, San Francisco, San Diego, Garden Grove, El Monte, Brawley, and Van Nuys, and two are in Los Angeles.

19-CV-2491 JLS (WVG)

### B.     The United States Marshals Service

The United States Marshals Service ("USMS") is an agency within the DOJ under the supervision of the Attorney General.  GEO Compl. ¶ 34 (citing 28 U.S.C. § 561(a)); U.S. Compl. ¶¶ 6, 14.  Congress has authorized the Attorney General to provide for "the housing, care, and security of persons held in custody of a United States marshal pursuant to Federal law under agreements with State or local units of government or contracts with private entities."  GEO Compl. ¶ 35 (quoting 18 U.S.C. § 4013(a)(3)); *see also* U.S. Compl. ¶ 16 (quoting 18 U.S.C. § 4013(a)).  "[T]he Marshals Service does not own or operate detention facilities but partners with state and local governments using intergovernmental agreements to house prisoners.  Additionally, the agency houses prisoners in Federal Bureau of Prisons facilities and private detention facilities."  GEO Compl. ¶ 27 (quoting U.S. Marshals Serv., Fact Sheet: Prisoner Operations 2 (2019), https://bit.ly/2Yi5RED).  USMS is authorized to "designate districts that need additional support from private detention entities."  U.S. Compl. ¶ 16 (quoting 18 U.S.C. § 4013(c)) (citing 28 C.F.R. § 0.111(k); 28 C.F.R. § 0.111(o)).

The average daily population ("ADP") of USMS detainees has increased "at an unprecedented rate" since April 2017.  GEO Compl. ¶ 39 (quoting U.S. Marshals Serv., FY 2020 Performance Budget President's Budget: Federal Prisoner Detention Appropriation 2 (2019), https://bit.ly/2SnzdAx [hereinafter, "USMS 2020 Budget"]).  The "[p]opulation increases from 2017 through 2019 have already created a significant strain on USMS resources during FY 2019," *id.* (quoting USMS 2020 Budget at 30), and the USMS estimates that, in Fiscal Year 2020, it will have an average daily population of 62,159 detainees, which is the highest level in more than a decade.  *Id.* (citing USMS 2020 Budget at 4).  Based on current prosecutorial trends, USMS anticipates that the detention population in California will increase by approximately 25 percent by Fiscal Year 2023.  U.S. Compl. ¶ 31.

Nationwide, USMS houses approximately 62,000 inmates, over 21,000 of whom (or approximately 34 percent) are housed in private detention facilities.  *Id.* ¶ 28; *see also* GEO

Compl. ¶ 41 (citing USMS 2020 Budget at 19). In California, USMS houses approximately 1,100 of its 5,000 inmates (or approximately 22 percent) in private detention facilities. U.S. Compl. ¶ 28. Because all the private USMS facilities contracted in California are located in the Southern District of California, *id.*, that percentage is even higher in this District, where 37.5 percent of USMS's detention facilities were privately run as of the end of 2019. *See* GEO Compl. ¶ 41. Approximately 1,100 of the approximately 2,900 USMS inmates in this District are housed in private detention facilities, with an additional 450 inmates housed outside of California because of the unavailability of detention space in the state. U.S. Compl. ¶ 28.

### 1.   USMS's San Diego Facilities

There are currently only two USMS facilities located in San Diego, California. GEO Compl. ¶ 47. One, Metropolitan Correction Center ("MCC"), is a BOP facility with an ADP of 779 detainees as of April 2019. *Id.* (citing U.S. Marshals Serv., USMS Detention Population 2 (Apr. 31, 2019), https://bit.ly/2BmUFMp [hereinafter, "USMS Detention Population"]).

The other, Western Region Detention Facility ("WRDF"), the County of San Diego originally built as a maximum-security correctional facility with 725 beds. *Id.* ¶ 42. In 1999, GEO leased WRDF from the County. *Id.* GEO began housing USMS detainees at WRDF in 2000. *Id.* ¶ 43. As of April 2019, WRDF had an ADP of 676 detainees. *Id.* ¶ 42 (citing USMS Detention Population at 2). USMS renewed its contract with GEO on November 14, 2017, for a base period of approximately two years, with four two-year options that USMS can exercise to continue GEO's services through September 30, 2027. *Id.* ¶ 44. USMS exercised its first option under the contract on October 1, 2019, continuing its contract with GEO through September 30, 2021. *Id.* ¶ 45. Because USMS only pursues private detention facilities when there is no other available space, all option years are generally exercised. U.S. Compl. ¶ 30.

/ / /

/ / /

## 2. USMS's Other Southern California Facilities

The next closest USMS facility outside San Diego is the Otay Mesa Detention Center ("OMDC"), which also is privately run.  GEO Compl. ¶ 48.  It is primarily used by U.S. Immigration and Customs Enforcement ("ICE"), as described below.  *Id.*; *see also infra* Section II.C.4.

The El Centro Service Processing Center ("El Centro") in El Cajon, California, GEO Compl. ¶ 51, is owned by ICE, which has authorized USMS to house USMS detainees there.  *Id.* ¶ 52.  USMS is authorized to house over 1,800 inmates in the El Centro facility in 2020.  U.S. Compl. ¶ 29.  On December 23, 2019, USMS awarded GEO a contract to operate El Centro for a base period of two years, with USMS having the right to exercise three two-year options and one nine-month option. GEO Compl. ¶ 53.

The next closest, non-private USMS facilities to San Diego are located approximately 90 miles away in Santa Ana, California.  *Id.* ¶ 50.  These two facilities had a combined ADP of approximately 213 in April 2019.  *Id.* (citing USMS Detention Population at 2).

### C. U.S. Immigration and Customs Enforcement

In November 2002, Congress assigned the border-enforcement functions of the former Immigration and Naturalization Service to the newly created Bureau of Immigration and Customs Enforcement, which is housed within the Department of Homeland Security ("DHS") and was later renamed ICE in March 2007.  GEO Compl. ¶ 56 (citing U.S. Immigration & Customs Enf't, Celebrating the History of ICE (Mar. 1, 2019), https://bit.ly/35Jas68).  Congress has authorized ICE to detain aliens, *id.* ¶ 57 (citing 8 U.S.C. §§ 1225(b)(1)(B)(ii), 1225(b)(2)(A), 1226(a), 1226(c); *Jennings v. Rodriguez*, 583 U.S. ___, 138 S. Ct. 830, 836–38 (2018)); U.S. Compl. ¶ 20 (citing 8 U.S.C. §§ 1187, 1222, 1225, 1226, 1226a, 1231), and has directed that "[t]he Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal."  GEO Compl. ¶ 58 (quoting 8 U.S.C. § 1231(g)(1)).  Consequently, DHS is congressionally authorized to provide appropriate detention facilities for detainees,

including by renting "facilities adapted or suitably located for detention" and by entering cooperative agreements with States and localities.  U.S. Compl. ¶ 21 (quoting 8 U.S.C. §§ 1103(a)(11), 1231(g)).  DHS also may "acquire, build, remodel, repair, and operate facilities . . . necessary for detention," but must first "consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use."  *Id.* (quoting 8 U.S.C. § 1231(g)(1)); *see also* GEO Compl. ¶ 58 (quoting 8 U.S.C. § 1231(g)(2)).

Whereas ICE's immigration-enforcement efforts are usually aimed at the interior of the United States, U.S. Customs and Border Protection ("CBP") enforces immigration law at the border.  GEO Compl. ¶ 60.  "Typically, when an alien is apprehended by CBP, they are transferred to ICE custody pending removal proceedings.  However, ICE's resources have been overburdened by the record numbers of CBP apprehensions at the southwest border."  *Id.* ¶ 61 (quoting Statement of Matthew T. Albence, Acting Dir., U.S. Immigration & Customs Enf't, The Fiscal Year 2020 President's Budget Request 3 (July 25, 2019), https://bit.ly/2Bllfp9 [hereinafter, "Albence Stmt."]).

For example, as of July 2019, ICE was "detaining over 53,000 single adults, and there [were] approximately 8,000 single adults in CBP custody awaiting processing or transfer to ICE custody."  *Id.* ¶ 62 (quoting Albence Stmt. at 3).  As of July 2019, there had been a 79 percent increase in intakes resulting from CBP apprehensions for the fiscal year to date over the same period for Fiscal Year 2018, taxing the "already overburdened" detention system.  *Id.* ¶ 63 (quoting Albence Stmt. at 3).  Indeed, whereas ICE's detention capacity was approximately 45,700 beds as of July 12, 2018, nearly 400,000 detainees were booked into ICE's facilities in Fiscal Year 2018.  *Id.* ¶ 64 (quoting Audrey Singer, Cong. Research Serv., R45804, Immigration: Alternatives to Detention (ATD) Programs 14 (July 8, 2019), https://bit.ly/2ojQNsE [hereinafter, "ATD Programs"]).  In Fiscal Year 2019, ICE arrested and detained over 44,000 aliens in California.  U.S. Compl. ¶ 57.

Because of safety concerns, ICE aims to fill approximately 85 to 90 percent of total facility capacity; however, ICE meets or exceeds that target capacity in nearly all of the

19-CV-2491 JLS (WVG)

facilities it currently uses.  GEO Compl. ¶ 65 (quoting U.S. Immigration & Customs Enf't, Dep't of Homeland Sec., Budget Overview: Fiscal Year 2020 Congressional Justification ICE-O&S-119 (2019), https://bit.ly/336G3g3 [hereinafter, "ICE 2020 Budget Overview"]).  Because the system is "beyond capacity," *id.* ¶ 66 (quoting Caitlin Dickerson, *ICE Faces Migrant Detention Crunch as Border Chaos Spills Into Interior of the Country*, N.Y. Times (Apr. 22, 2019), https://nyti.ms/2BEKvGS), ICE has determined that additional detention capacity is necessary.  *Id.* ¶ 67 (quoting Dickerson, *supra*).

ICE neither constructs nor operates its own detention facilities because significant fluctuations in the alien population require ICE to maintain flexibility.  U.S. Compl. ¶ 52. Of the average population of approximately 50,000 aliens ICE housed in Fiscal Year 2019, an average of about 9,300 were housed in privately owned and operated facilities.  *Id.* ¶ 53. ICE has housing for 5,000 detainees in private detention facilities in California, which accounts for approximately 96 percent of ICE's total detention space in California.  *Id.*

Currently, there are four dedicated ICE detention facilities in California, GEO Compl. ¶ 69; U.S. Compl. ¶ 54, all of which are privately run.  GEO Compl. ¶ 70; U.S. Compl. ¶¶ 53, 54.  These four facilities can house approximately 5,000 detainees.  U.S. Compl. ¶ 54.  ICE also has entered into contracts to convert three other facilities, or "annexes," into dedicated ICE detention centers, GEO Compl. ¶ 71; U.S. Compl. ¶ 54, all of which are owned by GEO or a GEO subsidiary and are operated by GEO under contracts with ICE.  GEO Compl. ¶ 72; U.S. Compl. ¶ 54.  These annexes can house approximately 2,150 additional detainees beginning in August 2020.  U.S. Compl. ¶ 55.  In addition to the four privately owned, dedicated ICE facilities and their annexes, which have a combined capacity of 7,188 beds, GEO Compl. ¶ 106; U.S. Compl. ¶ 54, there are two non-dedicated ICE facilities in California shared with local entities housing non-ICE detainees.  GEO Compl. ¶ 103.

### 1.    *The Adelanto ICE Processing Center and Annex*

The Adelanto ICE Processing Center ("Adelanto") is located in Adelanto, California, and was originally built as a correctional facility by the City of Adelanto.  GEO

Compl. ¶¶ 69, 73.  GEO purchased the eastern portion of the facility from the City of Adelanto in 2008, and it built the western portion of the facility in two phases in 2010 and 2015.  *Id.* ¶ 73.  Currently, Adelanto has a capacity of 1,940 beds.  *Id.* ¶ 69.

In May 2011, ICE entered into an Intergovernmental Service Agreement ("IGSA") with the City of Adelanto to house detainees, and the City of Adelanto in turn contracted with GEO to carry out the IGSA.  *Id.* ¶ 74.  On March 27, 2019, the City of Adelanto informed ICE and GEO that it would terminate its contract with ICE effective June 2019. *Id.* ¶ 75.  On June 25, 2019, ICE therefore contracted directly with GEO to continue operating the Adelanto facility.  *Id.* ¶ 76.  That contract was due to expire on March 25, 2020.  *Id.*  Consequently, on December 19, 2019, ICE entered into a new contract with GEO to continue running the Adelanto facility, with a period of performance starting December 20, 2019, and ending December 19, 2034.  *Id.* ¶ 77; *see also* U.S. Compl. ¶ 55. ICE has the option to terminate the contract every five years, with the first such option occurring on December 20, 2024.  GEO Compl. ¶ 77; *see also* U.S. Compl. ¶ 55.

The Desert View Modified Community Correctional Facility ("Desert View") is a prison owned and operated by GEO in Adelano, California, with a capacity of 750 beds. GEO Compl. ¶¶ 71, 79.  Although GEO had been operating Desert View under a contract with CDCR, CDCR terminated its contract with GEO effective March 31, 2020.  *Id.* ¶ 79. On September 20, 2019, ICE executed a modification to its Adelanto contract with GEO to incorporate Desert View as an "annex."  *Id.* ¶ 80.

### 2.  *The Imperial Region Detention Facility*

The Imperial Region Detention Facility ("Imperial") is located in Calexico, California, and has a capacity of 704 beds.  GEO Compl. ¶ 69.  It is owned by Management & Training Corporation ("MTC") and, until recently, operated pursuant to an IGSA between ICE and the City of Holtville, California, which in turn contracted with MTC to operate the facility.  *Id.* ¶ 100.  ICE terminated the IGSA effective September 21, 2019, and entered into a contract directly with MTC on September 22, 2019, effective
/ / /

December 20, 2019.  *Id.* ¶ 101.  The base period of performance runs through December 19, 2024, with two five-year options.  *Id.*; *see also* U.S. Compl. ¶ 55.

### 3.    The Mesa Verde ICE Processing Center and Annexes

The Mesa Verde ICE Processing Center ("Mesa Verde") is located in Bakersfield, California, and has a capacity of 400 beds.  GEO Compl. ¶ 69.  It was originally constructed as a minimum-security correctional facility and has been owned and operated by GEO since 2015.  *Id.* ¶ 84.

In January 2015, ICE entered into an IGSA with the City of McFarland to house ICE detainees, and the City of McFarland contracted with GEO to carry out the IGSA.  *Id.* ¶ 85.  On December 19, 2018, the City of McFarland informed ICE and GEO that it would terminate its contract with ICE effective March 2019, as a result of the passage of Assembly Bill 103.  *Id.* ¶ 86.  Consequently, on March 5, 2019, ICE contracted directly with GEO to continue operating Mesa Verde, with the contract set to expire on March 18, 2020.  *Id.* ¶ 87.  On December 19, 2019, ICE entered into a new contract with GEO with the same period of performance and option periods as the Adelanto contract.  *See id.* ¶ 88; *see also* U.S. Compl. ¶ 55.

The Central Valley Modified Community Correctional Facility ("Central Valley") and Golden State Modified Community Correctional Facility ("Golden State"), both located in McFarland, California, are annexes to Mesa Verde, and each has a capacity of 700 beds.  GEO Compl. ¶ 71.  Both are owned and operated by GEO and were under contracts with CDCR.  *Id.* ¶¶ 90, 95.  CDCR terminated its contract with GEO for Central Valley on July 10, 2019, effective September 30, 2019.  *Id.* ¶ 90.  On September 20, 2019, ICE executed a modification to the Mesa Verde contract to incorporate Central Valley as an "annex," *id.* ¶ 91, with the same period of performance and option periods as the Mesa Verde contract.  *Id.* ¶ 92.  Similarly, CDCR notified GEO that it would terminate its Golden State contract with GEO effective June 30, 2020, *id.* ¶ 95, so ICE executed a modification to the Mesa Verde contract on September 20, 2019, to incorporate Golden Valley as an "annex," *id.* ¶ 96, with the same period of performance and options periods as the Mesa

Verde and Central Valley contracts.  *Id.* ¶ 97.

### 4.    *The Otay Mesa Detention Facility*

The Otay Mesa Detention Facility ("OMDF") is located in San Diego, California, and has a capacity of 1,994 beds.  GEO Compl. ¶ 69.  USMS and ICE jointly use OMDF, which is owned and operated by CoreCivic.  *Id.* ¶ 102.  ICE entered into a new contract with CoreCivic that became effective December 20, 2019.  *Id.*  Like the contract with MTC for Imperial, the OMDF contract has a base period of performance through December 19, 2024, with two five-year options.  *Id.*; *see also* U.S. Compl. ¶ 55.

### 5.    *Non-Dedicated ICE Detention Facilities*

There are also two non-dedicated ICE detention facilities in California, which are authorized for ICE's use pursuant to IGSAs but also are shared with local governmental entities housing non-ICE detainees.  GEO Compl. ¶ 103.  One is the Glendale Police Department, located in Glendale, California, and owned and operated by the Glendale Police Department.  *Id.*  The second is the Yuba County Jail, located in Marysville, California, with a capacity of 220 beds.  *Id.* ¶¶ 103, 106.  The Yuba County Jail is owned by Yuba County and operated by the Yuba County Sheriff's Department.  *Id.* ¶ 103.  ICE "rarely uses" the Glendale Police Department, which has had an ADP of zero detainees in Fiscal Year 2020, *id.* ¶ 104 (quoting Bradley Zint, *Glendale Police Vow Not To Enforce Federal Immigration Laws*, L.A. Times (Apr. 1, 2017), https://lat.ms/31skq8o), and it is unclear whether Yuba County will maintain its contract with ICE.  *Id.* ¶ 105 (citing Don Thompson & Amy Taxin, *California to End Its Use of Private, For-Profit Prisons*, Assoc. Press (Oct. 11, 2019), https://bit.ly/2Pgb6C6).

## III.    **Impact of A.B. 32 on Plaintiffs**

### A.    *Impact on GEO*

GEO alleges that, if it must close its USMS and ICE detention facilities in California as a result of A.B. 32, it will lose approximately $250 million per year in revenue over the next fifteen years.  GEO Compl. ¶ 108.  GEO has invested over $300 million in acquiring, constructing, outfitting, and otherwise making ready for use its USMS and ICE detention

facilities in California. *Id.* ¶ 109. The replacement cost of GEO's USMS and ICE detention facilities in California is approximately $500 million. *Id.* Consequently, GEO alleges that it could lose over $4 billion in capital investment and revenue over the next fifteen years if A.B. 32 forces GEO to close its USMS and ICE detention facilities in California. *Id.* ¶ 110.

### B.    Impact on the U.S.

#### 1.    BOP

The United States alleges that A.B. 32 would require BOP to transfer 1,300 inmates housed at Taft and 900 inmates housed in RRCs to other BOP facilities or to facilities outside California, which would cost significant taxpayer dollars and result in inmates being incarcerated further from their residences, families, and other visitors. U.S. Compl. ¶¶ 42, 49. In the case of RRCs, this would also result in inmates being placed further from the communities in which they are to be released, *id.* ¶ 49, thereby hindering BOP's ability to provide community placement and develop community ties for offenders facing reentry. *Id.* ¶ 50. The relocation of those housed in RRCs would also prove problematic for federal courts, which use BOP's RRCs to house individuals as an intermediate sanction during supervision or probation. *Id.* ¶ 51.

#### 2.    USMS

If A.B. 32 were to force private detention facilities in California to close, the United States claims that USMS would have to relocate nearly 50% of its inmates in the Southern District of California and nearly 30% of its inmates in California, U.S. Compl. ¶ 32, with many of them likely to be housed out of state. *Id.* ¶ 33. Such relocations would cost taxpayers a significant amount and require USMS to compete with other agencies for limited detention space. *Id.* The displacement of these inmates also could result in overcrowding in additional facilities, *id.* ¶ 34, and the isolation of inmates, whose families are often in California and may lack the resources to visit their loved ones. *Id.* ¶ 35.

Because many of USMS's detainees are pretrial, some prisoners may require frequent transportation, requiring a dramatic increase in transportation coordination and USMS's cost per inmate. *Id.* ¶ 36. The increase in transportation also may heighten

security and safety risks for inmates, USMS personnel, and the public and adversely affect prisoners with medical or mobility concerns. *Id.* ¶ 37. Competition for transportation with other agencies, including BOP, may delay judicial proceedings and increase the length of time prisoners are in USMS custody, *id.* ¶¶ 38, 39, concomitantly increasing the number of prisoners in USMS custody and further increasing USMS's housing, medical, and funding needs. *Id.* ¶ 38.

### 3. ICE

Because ICE has very limited access to housing capacity in California prisons, the United States alleges that A.B. 32 would require ICE to relocate nearly all its detainees outside California to neighboring states. U.S. Compl. ¶ 57. In Fiscal Year 2019, ICE arrested and detained over 44,000 aliens in California. *Id.* Such a large number of relocations would necessitate daily transfers, which would be burdensome and costly, *see id.* ¶ 58, as well as heighten safety and security risks. *See id.* ¶ 59. Relocating California detainees to out-of-state facilities may also cause overcrowding in those facilities, *id.* ¶ 60, and reduce detainees' access to their families and other visitors, *id.*, which in turn may slow immigration proceedings by hindering detainees' ability to enlist friends and families to collect evidence on their behalf. *Id.* ¶ 61.

The United States claims that A.B. 32 may also cause tension with ICE's other obligations under existing court orders and settlements. *Id.* ¶ 61 n.3 (citing *Gonzalez v. Sessions*, 325 F.R.D. 616 (N.D. Cal. Jun. 5, 2018); *Franco-Gonzalez v. Holder*, No. 10-cv-02211-DMG-DTB, 2013 WL 8115423 (C.D. Cal. 2013); *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488 (C.D. Cal. 1988)); *see also infra* pages 66 – 67.

## IV. Procedural Background

GEO filed its Complaint for declaratory and injunctive relief against Governor Newsom and Attorney General Becerra, in their official capacities, on December 30, 2019, alleging that A.B. 32 is unconstitutional (1) for violating the Federal Government's intergovernmental immunity both (a) as a direct regulation of the Federal Government, and (b) by discriminating against the Federal Government; and (2) as conflict preempted by

federal law.  *See generally* GEO Compl.; *see also id.* ¶¶ 111–34.  GEO also asks the Court for a declaration that its current contracts with the Federal Government are valid for their entire periods of performance, including all option extensions.  *See generally id.* ¶¶ 135–44.  GEO filed its Motion for Preliminary Injunction on January 7, 2020, *see generally* GEO Mot., which the Court deemed filed as of December 31, 2019, *see GEO* ECF No. 14, at GEO's request.  *See GEO* ECF No. 13.  Defendants filed their Motion to Dismiss on March 5, 2020.  *See generally* MTD.

The United States filed its Complaint for declaratory and injunctive relief against Governor Newsom and Attorney General Becerra, in their official capacities, and the State of California on January 24, 2020.  *See generally* U.S. Compl.  Like GEO, the United States sought to have A.B. 32 declared unconstitutional as preempted and as violating the United States' intergovernmental immunity.  *See generally id.*; *see also id.* ¶¶ 62–69.  Although the United States' action was originally assigned to the Honorable Michael M. Anello, the United States filed a notice of related case requesting that the action be transferred to this Court as related to *GEO*.  *See generally U.S.* ECF No. 2.  The case was transferred on January 31, 2020, *see U.S.* ECF No. 6, following which the United States filed its Motion for Preliminary Injunction.  *See generally* U.S. Mot.  After filing an answer on February 14, 2020, *see generally U.S.* ECF No. 9, Defendants filed their Motion for Judgment on the Pleadings.  *See generally* MJP.  The Court ordered additional briefing regarding the United States' standing as to its BOP facilities on May 4, 2020, *see generally U.S.* ECF No. 27, pursuant to which both the United States ("U.S. Supp. Br.," *U.S.* ECF No. 28) and Defendants ("Defs.' Supp. Br.," *U.S.* ECF No. 29) filed responses.

With the Court's permission, *see GEO* ECF Nos. 25, 39; *U.S.* ECF No. 18, the Detention *Amici* filed briefs in support of Defendants in both actions, *see generally* Detention *Amici* Br., and the Procurement *Amici* filed a brief in support of Defendants to the *GEO* action.  *See generally* Procurement *Amici* Br.

The Court held a videographic and telephonic hearing on July 16, 2019, *see GEO* ECF No. 43; *U.S.* ECF No. 33, at which the Parties agreed to consolidation of the *GEO*

and *U.S.* actions.  *See* Tr. at 18:15–19:8 (GEO), 32:13–18 (U.S.), 40:15–22 (Defendants).  Accordingly, the Court ordered the cases consolidated.  Tr. at 91:2–5; *see also GEO* ECF Nos. 43–44; *U.S.* ECF Nos. 33–34.  The Court also requested additional briefing from all Parties following the hearing on "whether A.B. 32 is a direct regulation of the United States in violation of intergovernmental immunity and the Court's jurisdiction over Plaintiff The GEO Group, Inc.'s fourth cause of action."  *GEO* ECF No. 45 at 1.  GEO and the United States filed their additional briefs on August 4, 2020, *see GEO* ECF Nos. 49 ("GEO Add'l Br."), 50 ("U.S. Add'l Br."), and Defendants filed their additional brief on August 18, 2020.  *See GEO* ECF No. 51 ("Defs.' Add'l Br.").

## MOTIONS TO DISMISS AND FOR JUDGMENT ON THE PLEADINGS

### I.  Legal Standards

#### A.  *Federal Rule of Civil Procedure 12(b)(6)*

Federal Rule of Civil Procedure 12(b)(6) permits a party to raise by motion the defense that the complaint "fail[s] to state a claim upon which relief can be granted," generally referred to as a motion to dismiss.  The Court evaluates whether a complaint states a cognizable legal theory and sufficient facts in light of Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  Although Rule 8 "does not require 'detailed factual allegations,' . . . it [does] demand more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  In other words, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  A complaint will not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 677 (citing *Twombly*, 550 U.S. at 557).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id*. (quoting

*Twombly*, 550 U.S. at 570); *see also* Fed. R. Civ. P. 12(b)(6).  A claim is facially plausible when the facts pled "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 677 (citing *Twombly*, 550 U.S. at 556).  That is not to say that the claim must be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  Facts "'merely consistent with' a defendant's liability" fall short of a plausible entitlement to relief.  *Id.* (quoting *Twombly*, 550 U.S. at 557).  This review requires context-specific analysis involving the Court's "judicial experience and common sense."  *Id*. at 678 (citation omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Id*.

Where a complaint does not survive 12(b)(6) analysis, the Court will grant leave to amend unless it determines that no modified contention "consistent with the challenged pleading . . . [will] cure the deficiency."  *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co*., 806 F.2d 1393, 1401 (9th Cir. 1986)).

## B.    Federal Rule of Civil Procedure 12(c)

Any party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial."  Fed. R. Civ. P. 12(c).  A motion for judgment on the pleadings attacks the legal sufficiency of the claims alleged in the complaint.  *See Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001).  The Court must construe "all material allegations of the non-moving party as contained in the pleadings as true, and [construe] the pleadings in the light most favorable to the [non-moving] party."  *Doyle v. Raley's Inc.*, 158 F.3d 1012, 1014 (9th Cir. 1998).  "Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law."  *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1990).  "Analysis under Rule 12(c) is 'substantially identical' to

19-CV-2491 JLS (WVG)

analysis under Rule 12(b)(6) because, under both rules, 'a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy.'" *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012).

## II.   *Analysis[5]*

The Supremacy Clause of the United States Constitution provides:

> This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding.

Const. art. V, cl. 2.  Both GEO and the United States allege that A.B. 32 violates the Supremacy Clause because it is preempted by federal law and violates the intergovernmental immunity of the United States and its contractors.  *See generally* GEO Compl.; U.S. Compl.

### A.   *Justiciability of the BOP Claims[6]*

Federal courts are courts of limited jurisdiction and, as such, have an obligation to dismiss claims for which they lack subject-matter jurisdiction.  *Demarest v. United States*, 718 F.2d 964, 965 (9th Cir. 1983).  "The party asserting jurisdiction bears the burden of establishing subject matter jurisdiction."  *In re Dynamic Random Access Memory Antitrust*

---

[5] Because "[a]nalysis under Rule 12(c) is 'substantially identical' to analysis under Rule 12(b)(6)," *Chavez*, 683 F.3d at 1108, and because the Parties' arguments are similar in both actions, *compare GEO* ECF Nos. 15, 22, 30, 31; *with U.S.* ECF Nos. 8, 13, 22, 23, the Court analyzes Defendants' Rule 12(b)(6) and Rule 12(c) Motions together.

[6] Although originally framed as a challenge to standing, *see* MJP Reply at 8; *see also U.S.* ECF No. 27; U.S. Supp. Br.; Defs.' Supp. Br., it appears that the issue raised by Defendants also touches on ripeness. *See, e.g.*, *Coons v. Lew*, 762 F.3d 891, 897 (9th Cir.), *as amended* (Sept. 2, 2014) ("When addressing the sufficiency of a showing of injury-in-fact grounded in potential future harms, Article III standing and ripeness issues often 'boil down to the same question.'") (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014)); *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) ("The constitutional component of the ripeness inquiry is often treated under the rubric of standing and, in many cases, ripeness coincides squarely with standing's injury in fact prong.").

*Litig.*, 546 F.3d 981, 984 (9th Cir. 2008) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Stock W., Inc. v. Confederated Tribes of Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir. 1989)).  "Whether the question is viewed as one of standing or ripeness, the Constitution mandates that prior to [a federal court's] exercise of jurisdiction there exist a constitutional 'case or controversy,' that the issues presented are 'definite and concrete, not hypothetical or abstract.'"  *Thomas*, 220 F.3d at 1139 (quoting *Ry. Mail Ass'n v. Corsi*, 326 U.S. 88, 93 (1945)).

Defendants challenge the United States' "Article III standing to challenge AB 32 as applied to [Taft] or any BOP facility."  MJP Reply at 8.  Specifically, Defendants contend that, because BOP "is transferring all inmates out of Taft Correctional Institution, the only BOP-contracted facility in California," and "[t]here are no imminent plans to resume operations at Taft," "AB 32 threatens no 'actual or imminent' harm related to Taft."  *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

Because the argument was first raised in Defendants' Reply, the Court ordered additional briefing on the issue.  *See U.S.* ECF No. 27.  Claiming that it is "no ordinary litigant," U.S. Supp. Br. at 3, the United States contends that it need not show injury-in-fact, *see id.*; *see also* Tr. at 34:3–35:24, but that the harms it will suffer if A.B. 32 is enforced "more than suffice to satisfy the usual injury-in-fact requirement of standing."  U.S. Supp. Br. at 8 (citing *Rivas v. Rail Delivery Serv., Inc.*, 423 F.3d 1079, 1082–83 (9th Cir. 2005)).  Defendants rejoin that "[t]he standing requirement applies to claims brought by the United States," Defs.' Supp. Br. at 4 (citing *Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 475 n.13 (1976); *United States v. City of Arcata*, 629 F.3d 986, 989–90 (9th Cir. 2010); *United States v. Mattson*, 600 F.2d 1295, 1297–1301 (9th Cir. 1979); *Marshall v. Gibson's Prod., Inc. of Plano*, 584 F.2d 668, 676 (5th Cir. 1978)), and that the United States has failed to demonstrate any "actual or imminent" injury given the absence of evidence concerning the United States' plans to reopen Taft and the lack of a genuine threat of prosecution as to the RRCs.  *See id.* at 5–6.

As an initial matter, the United States first argued at the hearing that "standing is

claim specific and relief specific" and "not fact specific to an agency." *See* Tr. at 66:16–17. Although it is true that standing is claim specific, the question is whether the United States' configuration of its claims, which "are not limited to BOP," *see id.* at 66:20, controls. The Court concludes that it does not. The United States could have broken its claims out by agency, or BOP could have brought suit in its own right. That the United States happens to have presented its claims in one form over another does not confer standing (or ripeness) where none exists. *See Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("[S]tanding is not dispensed in gross."). Consequently, the proper focus is not on the legal theories as arranged by the United States, but rather on the injury-in-fact suffered by it. *See, e.g.*, *Gilmore v. Gonzales*, 435 F.3d 1125, 1134–35 (9th Cir. 2006) (concluding that the plaintiff lacked standing to challenge other security programs stemming from challenged policy beyond the one security program giving rise to his injury in fact); *Friends of Columbia Gorge, Inc. v. Schafer*, 624 F. Supp. 2d 1253, 1278 (D. Or. 2008) (concluding that one claim alleged by the plaintiffs was ripe as to certain guidelines but not as to others); *see also* 13B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.16 (3d ed.). Consequently, to the extent the United States fails to establish that BOP is likely to suffer a concrete injury as a result of A.B. 32, the Court lacks jurisdiction over that part of the United States' claims.

The Court concludes that the United States has failed to establish the requisite justiciable case or controversy concerning the constitutionality of A.B. 32 as applied to its BOP facilities. As an initial matter, the United States—even if "no ordinary litigant," *see* U.S. Supp. Br. at 3—nonetheless must establish justiciability, including standing. *See, e.g.*, *City of Arcata*, 629 F.3d at 989–90. Defendants contend that the United States therefore must establish that there is a "genuine threat of imminent prosecution" under A.B. 32,[7] Defs.' Supp. Br. at 6 (quoting *Thomas*, 220 F.3d at 1139 (quoting *Babbitt v. United Farm*

---

[7] "The threatened state action need not necessarily be a prosecution." *Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2010) (citing *Meese v. Keene*, 481 U.S. 465, 472–73 (1987); *Canatella v. California*, 304 F.3d 843, 852–53 (9th Cir. 2002)).

*Workers Nat'l Union*, 442 U.S. 289, 298 (1979))), requiring an examination of "whether the [United States] ha[s] articulated a 'concrete plan' to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute." *Id.* (quoting *Thomas*, 220 F.3d at 1139). The United States contends, without elaboration, that these factors do not apply. *See* Tr. at 68:1–4. The Court sees no reason why they should not. These factors have been applied to assess the standing of the United States. *See City of Arcata*, 629 F.3d at 989–90 (analyzing threatened enforcement of ordinance against United States). They have also been applied in Supremacy Clause cases. *See, e.g.*, *id.*; *Valley View Health Care, Inc. v. Chapman*, 992 F. Supp. 2d 1016, 1031–35 (E.D. Cal. 2014).

Regarding the United States' standing to challenge A.B. 32 as applied to BOP prisons, the Court concludes that the United States has failed to meet its burden. When it filed its Complaint,[8] the United States indicated that "BOP *may* seek to award a new contract or a contract extension" if it determined that Taft could remain operational while infrastructure repairs were being made.[9] U.S. Compl. ¶ 41 (emphasis added); *see also* Jones Decl.[10] ¶ 14 ("If Taft CI can remain operational, then BOP *may* seek to extend its

---

[8] "The existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed*." *Lujan*, 504 U.S. at 571 n.4 (quoting *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989)) (emphasis in original). When asked at the hearing, counsel for the United States indicated its view that post-filing developments were relevant and could properly be considered in determining a motion for preliminary injunction. *See* Tr. at 33:10–34:2. Those post-filing developments, however, do not strengthen the United States' arguments for standing—Taft has since closed for repairs and relocated its inmates. *See* Tr. at 33:14–19; *see also* Supp. Decl. of Pamela L. Jones in Support of U.S. Mot. ("Supp. Jones Decl.," ECF No. 22-1) ¶¶ 3–4. Although it is "BOP's intent . . . to ultimately return Taft CI to operational status," *id.* ¶ 5, there is no indication as to how or when that may happen.

[9] The contract with MTC to operate Taft was to expire on March 31, 2020. *See* U.S. Compl. ¶ 41; Decl. of Pamela L. Jones in Support of U.S. Mot. ("Jones Decl.," ECF No. 8-2) ¶ 14.

[10] The Jones Declaration was signed on January 24, 2020, *see id.* at 7, the same day that the United States filed its Complaint. *See generally* U.S. Compl. It was also filed on January 24, 2020, along with the Complaint, as an exhibit to an *ex parte* motion seeking leave to file the U.S. Motion in excess of the District's page limit. *See* ECF No. 4-3.

current contract or award a new one.") (emphasis added).[11]  Further, at that time, "BOP d[id] not have any immediate plans for new contracts for private secure detention facilities in California." Jones Decl. ¶ 15.  Whether BOP intends to violate A.B. 32 therefore hinges on several contingencies, including whether Taft can remain operational while repairs are made (it could not), whether BOP decides to continue housing inmates at Taft while repairs are made (it did not), and whether BOP can extend or award a new contract for the private operation of the facility.  "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that [the Supreme Court's] cases require." *Long Beach Area Chamber of Commerce v. City of Long Beach*, 603 F.3d 684, 690 (9th Cir. 2010) (quoting *Lujan*, 504 U.S. at 564); *see also Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.") (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–581 (1985)) (internal quotation marks omitted); *W. Oil & Gas Ass'n v. Sonoma Cty.*, 905 F.2d 1287, 1291 (9th Cir. 1990) (holding that action challenging land use ordinances was not ripe where the new ordinances would only be applied if leases of federal waters off the California coast for oil and gas exploration and development were to be offered for sale in the future).  The United States therefore fails to demonstrate a concrete plan to violate A.B. 32 as to BOP's privately operated prison facilities in California.  *See, e.g.*, *Thomas*, 220 F.3d at 1139 ("A general intent to violate a statute at some unknown date in the future does not rise to the level of an articulated, concrete plan.").

The United States fares no better as to its RRCs.  Although the United States has

---

[11] Although generally limited to the pleadings, *see supra* note 2, "in evaluating a motion for judgment on the pleadings in which a party challenges subject-matter jurisdiction, the Court may look beyond the pleadings and consider extrinsic evidence." *Innovative Sports Mgmt., Inc. v. Robles*, No. 13-CV-00660-LHK, 2014 WL 129308, at *2 (N.D. Cal. Jan. 14, 2014) (citing *Maya v. Centx Corp.*, 658 F.3d 1060, 1067–68 (9th Cir. 2011); *In re Seizure of One Blue Nissan Skyline Auto.*, 683 F. Supp. 2d 1087, 1089 (C.D. Cal. 2010)).

concrete plans to continue operating its RRCs in California, *see, e.g.*, Decl. of Jon Gustin in Support of U.S. Mot. ("Gustin Decl.," ECF No. 8-3) ¶ 23, it has failed to establish a genuine threat of imminent prosecution.  Defendants "ha[ve] suggested that the newly enacted law will not be enforced" as to BOP's RRCs.  *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988).  Indeed, Defendants have gone so far as to represent that BOP's RRCs "are not covered by AB 32."  MJP at 27 n.14 (citing Cal. Penal Code § 9502(c)).  Given the "remote" threat of enforcement, the United States has failed to establish Article III standing as to BOP's RRCs.  *See, e.g.*, *Yoshioka v. Charles Schwab Corp.*, No. C-11-1625 EMC, 2012 WL 5932817, at *9 (N.D. Cal. Nov. 27, 2012) (concluding that the plaintiff lacked standing and that action was not ripe where "[n]ot only is there no history of [agency] enforcement, [but] the [agency] has taken an affirmative stance that it will *not* consider potential prohibited transactions created by such language for the foreseeable future") (emphasis in original).

There are two problems with the United States' argument that Defendants' representation that BOP's RRCs are subject to the Section 9502(c) exception is a "mere litigation position" that cannot "defeat standing."  U.S. Supp. Br. at 8 (citing *Lopez*, 630 F.3d at 788; *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000); *Am.-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 507–08 (9th Cir. 1991); *Valley View Health Care, Inc.*, 992 F. Supp. 2d at 1033).  First, the binding authorities cited by the United States all involved First Amendment challenges, *see, e.g.*, *Lopez*, 630 F.3d at 785; *Thornburgh*, 970 F.2d at 504, to which the Ninth Circuit applies a "less stringent[]," *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010), and "somewhat different" analysis.  *See Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 839 (9th Cir. 2014).  Specifically, in First Amendment pre-enforcement cases, "the plaintiff need not establish an actual threat of government prosecution," *see id.* (citing *Wolfson*, 616 F.3d at 1059–60), but rather merely "a credible threat of prosecution," *Lopez*, 630 F.3d at 785 (quoting *Babbitt*, 442 U.S. at 298), which requires only that "plaintiffs . . . show a reasonable likelihood that the government will enforce the challenged law against them."  *See id.* at

786.  Further, "when the threatened enforcement effort implicates First Amendment rights, the [standing] inquiry tilts dramatically toward a finding of standing."  *Ital. Colors Restaurant v. Becerra*, 878 F.3d 1165, 1172 (9th Cir. 2018) (quoting *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000)).  Because this case is not a First Amendment case, the United States faces a higher standard to bring its pre-enforcement claim.

Second, the United States' binding authorities involve situations in which the plaintiff was already being investigated or prosecuted before filing suit, but the defendant ceased enforcement efforts after filing as a litigation tactic.  *See, e.g.*, *Lopez*, 630 F.3d at 783–84, 788, 791–92 (acknowledging that "the government's disavowal must be more than a mere litigation position" but concluding that the plaintiff had failed to establish standing where party responsible for enforcement of challenged policy wrote letter "indicating that no action w[ould] be taken" and the organization "had not taken any steps to enforce the . . . policy against [the plaintiff], either before or after [the plaintiff]'s threat to sue"); *Thornburgh*, 970 F.2d at 508 (concluding that the plaintiffs established standing where "[a]lready they have once been charged with the challenged provisions, which charges were dropped, not because they were considered inapplicable, but for tactical reasons").  Here, by contrast, Defendant have taken no pre- (or post-)filing enforcement action against the United States with respect to the RRCs and, to the contrary, explicitly have indicated no intent to do so in the future.  Should Defendants change their mind regarding the applicability of the Section 9502(c) exception to the RRCs, the United States may be able to establish standing in the future, *see Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 774–75 (9th Cir. 2006) ("Because [the plaintiff] fails to allege a concrete and imminent injury-in-fact caused by the [challenged] Restrictions, this claim is not justiciable both for lack of standing and ripeness.  Of course, should [the defendant] take action to penalize [the plaintiff] for violating the [challenged] Restrictions at a later date, he would then have standing to challenge their legitimacy."); however, at present, the United States has failed to establish a threat of enforcement that is "not simply 'imaginary or speculative.'"  *Thomas*, 220 F.3d at 1140 (quoting *Babbitt*, 442 U.S. at 298).

1   The Court therefore concludes that the United States has failed to establish a concrete
2   and imminent injury-in-fact caused by A.B. 32 as applied to its BOP facilities.
3   Consequently, those claims are not justiciable, and the Court **DISMISSES WITHOUT**
4   **PREJUDICE** the United States' causes of action to the extent they challenge A.B. 32 as
5   applied to Taft and the BOP's RRCs.

6       **B.**   ***Preemption***

7       "Federal preemption occurs when: (1) Congress enacts a statute that explicitly pre-
8   empts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies
9   a legislative field to such an extent that it is reasonable to conclude that Congress left no
10  room for state regulation in that field."  *CTIA – Wireless Ass'n v. City of Berkeley*, 928
11  F.3d 832, 849 (9th Cir. 2019).  GEO contends that A.B. 32 is preempted under the second
12  category (conflict preemption), *see* GEO Compl. ¶¶ 130–34, while the United States
13  contends that A.B. 32 is preempted by both the second and third (field preemption)
14  categories.  *See* U.S. Compl. ¶¶ 63–65.

15      In both conflict and field preemption cases, *see Puente Ariz. v. Arpaio*, 821 F.3d
16  1098, 1104 (9th Cir. 2016), the Court's analysis "must be guided by two cornerstones of
17  [the Supreme Court's] pre-emption jurisprudence."  *Wyeth v. Levine*, 555 U.S. 555, 565
18  (2009).  "First, 'the purpose of Congress is the ultimate touchstone in every pre-emption
19  case.'"  *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)) (citing *Retail*
20  *Clerks v. Schermerhorn,* 375 U.S. 96, 103 (1963)).  "Second, '[i]n all pre-emption cases,
21  and particularly in those in which Congress has 'legislated . . . in a field which the States
22  have traditionally occupied,' . . . [the Court] 'start[s] with the assumption that the historic
23  police powers of the States were not to be superseded by the Federal Act unless that was
24  the clear and manifest purpose of Congress.'"  *Id.* (quoting *Medtronic, Inc.*, 518 U.S. at
25  485) (first, second, and third alterations in original).

26      **1.**   *Presumption Against Preemption*

27      "[T]he Supreme Court [has] noted that [i]n preemption analysis, courts should
28  assume that the historic police powers of the States are not superseded 'unless that was the

clear and manifest purpose of Congress." *United States v. California*, 921 F.3d 865, 885–86 (9th Cir. 2019) (quoting *Arizona v. United States*, 567 U.S. 387, 400 (2012)), *cert. denied*, ___ S. Ct. ___, 2020 WL 3146844 (2020).  Defendants contend that, because "California possesses the historic police power 'to ensure the health and welfare of inmates and detainees in facilities within its borders,'" MTD at 15 (quoting *California*, 921 F.3d at 885–86) (citing *Medtronic, Inc.*, 518 U.S. at 475; *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985); *Puente Ariz.*, 821 F.3d at 1104); MJP at 15 (quoting *California*, 921 F.3d at 885–86) (citing *Puente Ariz.*, 821 F.3d at 1104), "Plaintiff[s] would have to show that it was Congress's 'clear and manifest purpose' to preempt AB 32."  MTD at 15; MJP at 15.

Plaintiffs contend that the presumption against preemption is inapplicable here.  *See generally GEO* ECF No. 30 ("GEO Opp'n") at 12–15; *U.S.* ECF No. 22 ("U.S. Opp'n") at 11–14.  Specifically, GEO argues that California exceeded its traditional police powers by enacting a law purporting to regulate facilities and detainees subject to the jurisdiction of the Federal Government, GEO Opp'n at 13; *see also id.* at 14, as well as "the conduct of federal officials and contractors." *Id.* at 13.  Similarly, the United States urges that "[t]here is no presumption against preemption in areas that are 'inherently federal in character,'" including "(1) the United States' authority to control rights and obligations under its contracts, (2) the Federal Government's prerogative to provide for those in its custody, and (3) the federal power over foreign relations and immigration." U.S. Opp'n at 11 (quoting *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 347–48 (2001)) (citing *Stengel v. Medtronic Inc.*, 704 F.3d 1224, 1235 (9th Cir. 2013) (Watford, J., concurring); U.S. Mot. at 8).  Defendants respond that "the presumption 'applies when a state regulates in an area of historic state power even if the law touches on' an area of significant federal presence." *GEO* ECF No. 31 ("MTD Reply") at 5 (quoting *Knox v. Brnovich*, 907 F.3d 1167, 1174 (9th Cir. 2018)); *U.S.* ECF No. 23 ("MJP Reply") at 5 (quoting *Knox*, 907 F.3d at 1174).

The Court agrees with Defendants.  The Supreme Court has long recognized that "the regulation of health and safety matters is primarily, and historically, a matter of local

concern." *Hillsborough*, 471 U.S. at 719 (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  As Defendants note, *see* MTD at 15; MJP at 15, the Ninth Circuit recently recognized that "California possesses the general authority to ensure the health and welfare of inmates and detainees in facilities within its borders."[12]  *California*, 921 F.3d at 886.  The statute in question, Assembly Bill 103, authorized the California Attorney General to "engage in reviews of county, local, or private locked detention facilities in which noncitizens are being housed or detained for purposes of civil immigration proceedings in California," Cal. Gov't Code § 12532(b), thereby "relat[ing] exclusively to federal conduct."  *California*, 921 F.3d at 882.  It therefore appears that the Ninth Circuit implicitly has recognized that California's authority to ensure the health and welfare of inmates and detainees within its borders extends to federal inmates and detainees.

As confirmed by its legislative history,[13] A.B. 32 appears to be a regulation ensuring the health and welfare of inmates and detainees within California's borders.  *See* Tr. at

---

[12] Plaintiffs urge the Court to disregard the Ninth Circuit's guidance in *California* as dicta, *see* GEO Opp'n at 15, or as distinguishable on the grounds that the law at issue in *California* "d[id] not regulate whether or where an immigration detainee may be confined." U.S. Opp'n at 13 (quoting *California*, 921 F.3d at 885). Even if dicta, *California* remains the Ninth Circuit's most recent and analogous guidance on the issue, and it is all the more persuasive given Plaintiffs' failure to identify analogous cases rejecting the presumption against preemption.  The portion of *California* from which the United States quotes served to distinguish that case from *In re Tarble*, 80 U.S. 397 (1871). *See California*, 921 F.3d at 885. In *Tarble*, the issue the Supreme Court confronted was "[w]hether any judicial officer of a State has jurisdiction to issue a writ of *habeas corpus*, or to continue proceedings under the writ when issued, for the discharge of a person held under the authority, or claim and color of the authority, of the United States, by an officer of that government." 80 U.S. at 402 (emphasis in original).  Unlike in *Tarble*, neither this case nor *California* involve *habeas corpus* or a state ordering the release of a person held in federal custody; rather, both A.B. 32 and A.B. 103 address conditions in detention facilities located in California. In any event, A.B. 32 "does not regulate whether or where an immigration detainee may be confined," *cf. California*, 921 F.3d at 885, or federal detainees, officials, or contractors, *see* GEO Opp'n at 13; U.S. Opp'n at 11–12; rather, it regulates "person[s] . . . operat[ing] . . . private detention facility[ies] within the state." *See* Cal. Penal Code § 9501.

[13] In each case, Defendants request that the Court take judicial notice of six exhibits, each part of the legislative history of A.B. 32. *See generally GEO* ECF No. 20-1; *GEO* ECF No. 23; *U.S.* ECF No. 13-1; *U.S.* ECF No. 15 (together, "Defs.' RJNs"). Specifically, Defendants request that the Court take judicial notice of the following: (1) Assem. Comm. on Public Safety, Bill Analysis of Assembly Bill 32, 2019-2020 Reg. Sess. (Feb. 26, 2019); (2) Assem. Comm. on Appropriations, Bill Analysis of Assembly Bill 32, 2019-2020 Reg. Sess. (March 6, 2019); (3) Assem. Floor Analysis, Bill Analysis of Assembly Bill 32,

88:23–89:89:8.  For example, the Assembly Committee on Public Safety's February 26, 2019 analysis of A.B. 32 reveals that Assemblyman Bonta—the author of A.B. 32— expressed concern that "[a] private, for-profit company that is traded on Wall Street will inherently be incentivized to maximize profits and minimize costs—including the important 'cost' of investments in programs, services and rehabilitation efforts for inmates."  Defs.' RJNs Ex. 1 at 2.  The Committee also noted "[c]oncerns with [p]rivate [p]risons," specifically, a 2016 investigation by the DOJ's Office of the Inspector General ("OIG") that found, among other things, "that private prisons were less safe than federal prisons, poorly administered, and . . . had higher rates of assaults, both by inmates on other inmates and by inmates on staff."  *Id.* at 4; *see also* Defs.' RJNs Ex. 5 at 6 (Senate Committee on Public Safety analysis discussing same DOJ OIG investigation).  Similarly, the Assembly Committee on Appropriations' March 6, 2019 analysis of A.B. 32 noted that "[t]he California State Auditor recently reported in February 2019 that Geo Group, Inc., operates private facilities in McFarland and Adelanto that house Immigration and Customs Enforcement (ICE) detainees in arguably unsafe and unhealthy facilities with no city, county, or state oversight."  Defs.' RJNs Ex. 2 at 2.  Such health and safety concerns were also present in the Senate, which provided the following "digest" of A.B. 32 for the July 2, 2019 Senate Judiciary Committee hearing: "In line with California's interest in ensuring the safety and welfare of its residents, this bill abolishes the private for-profit prison industry from our state in order to protect incarcerated individuals from serious harm within our state border."  Defs.' RJNs Ex. 4 at 1; *accord* Defs.' RJNs Ex. 6 at 1.  Consequently,

---

2019-2020 Reg. Sess. (May 21, 2019); (4) Sen. Judiciary Comm., Bill Analysis of Assembly Bill 32, 2019-2020 Reg. Sess. (July 2, 2019); (5) Sen. Public Safety Comm., Bill Analysis of Assembly Bill 32, 2019-2020 Reg. Sess. (July 9, 2019); (6) Sen. Floor Analyses, Bill Analysis of Assembly Bill 32, 2019-2020 Reg. Sess. (Sept. 9, 2019).  *See* Defs.' RJNs at 2.  As Defendants note, *see id.* (citing *Tan v. GrubHub, Inc.*, 171 F. Supp. 3d 998, 1004 (N.D. Cal. 2016); *Zephyr v. Saxon Mortg. Servs., Inc.*, 873 F. Supp. 2d 1223, 1226 (E.D. Cal. 2012)), "[t]he legislative history of California statutes is judicially noticeable so long as the documents are readily available public records."  With the caveat that the Court "cannot take judicial notice of disputed facts contained in such public records," *see Khoja*, 899 F.3d at 999 (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001)), the Court therefore **GRANTS** Defendants' Requests for Judicial Notice.

even though A.B. 32 may affect areas of federal concern, including federal detention and contracting, it also regulates the health and safety of detainees held within California. *See, e.g.*, *Puente Ariz.*, 821 F.3d at 1104 ("[W]hile the identity theft laws [at issue] certainly have effects in the area of immigration, the text of the laws regulate for the health and safety of the people of Arizona.") (citing *Medtronic, Inc.*, 518 U.S. at 475).

The Court therefore concludes that the presumption against preemption applies and that Plaintiffs "bear the considerable burden of overcoming the starting presumption that Congress does not intend to supplant state law," *see Stengel*, 704 F.3d at 1227–28 (quoting *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997)) (internal quotation marks omitted), by demonstrating a contrary "clear and manifest purpose of Congress." *California*, 921 F.3d at 885–86 (quoting *Arizona*, 567 U.S. at 400).

### 2. Conflict Preemption

"Conflict preemption is implicit preemption of state law that occurs where there is an actual conflict between state and federal law." *CTIA*, 928 F.3d at 849 (quoting *McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1039 (9th Cir. 2015)). "Conflict preemption arises either when 'compliance with both federal and state regulations is a physical impossibility . . . or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (alteration in original) (quoting *McClellan*, 776 F.3d at 1039).

According to GEO, A.B. 32 is conflict preempted both by federal criminal law and immigration law, *see* GEO Compl. ¶¶ 125–34; *see also* GEO Opp'n at 15–24, while the United States contends that A.B. 32 is conflict preempted by Congress's delegation to Executive Branch agencies authority to house federal prisoners and detainees. *See* U.S. Compl. ¶ 64; *see also* U.S. Opp'n at 21–25.

### a. GEO

GEO argues that "AB-32 is preempted because it denies to both federal immigration and criminal law-enforcement statutes"—which "authorize ICE and the USMS to carry out their respective detention operations using private contractors," GEO Mot. at 30—"their

'natural effect[s]' and obviously 'frustrate[s]' their operation." *Id.* at 29–30 (quoting *Savage v. Jones*, 225 U.S. 501, 533 (1912)) (alteration in original).

### i.      Federal Immigration Law

GEO does not appear to argue that it is impossible to comply with both A.B. 32 and federal law and regulations concerning the housing of immigration detainees; the relevant inquiry, therefore, is whether A.B. 32, as applied to GEO in its contracts with ICE, "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *CTIA*, 928 F.3d at 849 (quoting *McClellan*, 776 F.3d at 1039); *see also* Tr. at 55:5–9.  "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). In other words, "state law is preempted to the extent it actually interferes with the 'methods by which the federal statute was designed to reach [its] goal.'"  *In re Nat'l Sec. Agency Telecommc'ns Records Litig.*, 633 F. Supp. 2d 892, 907 (N.D. Cal. 2007) (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987)) (citing *Verizon N., Inc. v. Strand*, 309 F.3d 935, 940 (6th Cir. 2002)).

Here, the immigration statutes on which GEO relies do not reveal a clear and manifest congressional objective that ICE contract with private detention facilities to house immigration detainees.  GEO relies predominantly on 8 U.S.C. § 1231(g), which provides:

**(g)     Places of detention**

**(1)     In general**

The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal.   When United States Government facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the Attorney General may expend from the appropriation "Immigration and Naturalization Service-- Salaries and Expenses", without regard to section 6101 of Title 41, amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities (including living quarters for immigration officers if not otherwise available) necessary for

detention.

### (2)   Detention facilities of the Immigration and Naturalization Service

Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use.

While Section 1231(g) articulates certain congressional objectives, such as purchasing or leasing available and existing facilities prior to the construction of new facilities, it does not express a clear intent that ICE lease private detention facilities in particular or, much less, contract with private parties to operate such facilities.  Further, where appropriate facilities are "unavailable," Congress explicitly has authorized the construction of new detention facilities.  *See* 8 U.S.C. §§ 1231(g)(1), (2).  Consequently, even if the application of A.B. 32 were to render private detention facilities within California "unavailable," congressional objectives nonetheless can be fully accomplished through the construction of new facilities (or the lease of existing facilities that can no longer be operated by the private detention industry).  "As the Supreme Court has cautioned, [courts] should not 'seek[ ] out conflicts between state and federal regulation where none clearly exists.'"  *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1153 (9th Cir. 2017) (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 90 (1990)) (second alteration in original); *see also Puente Ariz.*, 821 F.3d at 1105 ("[T]ension is not enough to rise to the level of a 'clear and manifest purpose' to preempt the [challenged] laws in their entirety.") (citing *Wyeth*, 555 U.S. at 565).

The additional statutes cited by GEO are no more availing.  GEO notes, for example, that "[t]he Secretary . . . shall have the authority to make contracts, grants, and cooperative agreements, and to enter into agreements with other executive agencies, as may be necessary and proper to carry out the Secretary's responsibilities under this chapter or otherwise provided by law."  6 U.S.C. § 112(b)(2).  Although this statute could conceivably

34

encompass the authority to make contracts with private detention companies, that intention is by no means clearly and manifestly expressed.  Similarly, that, "[e]xcept to the extent provided otherwise by law, the activities of the Department of Justice (including any bureau, office, board, division, commission, subdivision, unit, or other component thereof) may, in the reasonable discretion of the Attorney General, be carried out through any means, including . . . through contracts, grants, or cooperative agreements with non-Federal parties," 28 U.S.C. § 530C(a)(4), does not reveal any clear and manifest congressional intent that ICE house detainees in private detention facilities.  GEO also cites to a Department of Justice Appropriations Act passed in 2000, which provides, "[n]otwithstanding any other provision of law, . . . the [Secretary] hereafter may enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, including related services, on any reasonable basis."  GEO Opp'n at 17–18 (second and third alterations in original) (emphasis omitted).  Again, this does not clearly and manifestly reveal a congressional intent that ICE detainees be housed in private detention facilities.

Although A.B. 32

> might at times be in tension with . . . [the] federal desire [to use private detention facilities,] . . . the question to be answered by the Court is not what preemption holding will produce the smoothest path for government.  The Court is not a general ombudsman, at liberty to fashion a preemption ruling that accommodates priorities that appear to be important.  The key question—the "touchstone"—is the intent of Congress.

*Puente Ariz. v. Arpaio*, No. CV-14-01356-PHX-DGC, 2016 WL 6873294, at \*15 (D. Ariz. Nov. 22, 2016) (citing *Wyeth*, 555 U.S. at 565; *Medtronic, Inc.*, 518 U.S. at 485).  Because GEO has failed to establish a clear and manifest congressional intent that ICE house immigration detainees in private detention facilities, the Court concludes that A.B. 32 is not obstacle preempted as applied to GEO's contracts with ICE.

### ii.    Federal Criminal Law

GEO argues that "AB-32 likewise conflicts with the Federal Government's unique

interest in enforcing federal criminal law."  GEO Mot. at 34.  As with GEO's contracts with ICE, the Court must analyze whether A.B. 32, as applied to GEO in its contracts with USMS, "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *CTIA*, 928 F.3d at 849 (quoting *McClellan*, 776 F.3d at 1039).

Section 4013 of Title 18 of the United States Code, which is central to the Court's inquiry, provides:

> The Attorney General, in support of United States prisoners in non-Federal institutions, is authorized to make payments from funds appropriated for Federal prisoner detention for . . . the housing, care, and security of persons held in custody of a United States marshal pursuant to Federal law under agreements with State or local units of government or contracts with private entities.

18 U.S.C. § 4013(a)(3).  Further, "[t]he United States Marshals Service may designate districts that need additional support from private detention entities under [18 U.S.C. § 4013](a)(3) based on--(A) the number of Federal detainees in the district; and (B) the availability of appropriate Federal, State, and local government detention facilities." *Id.* § 4013(c)(1).  However, "to be eligible for a contract for the housing, care, and security of persons held in custody of the United States Marshals pursuant to Federal law and funding under [14 U.S.C. § 4013](a)(3), a private entity shall," among other things, "be located in a district that has been designated as needing additional Federal detention facilities pursuant to [18 U.S.C. § 4013(c)](1)," *id.* § 4013(c)(2)(A), and "comply with all applicable State and local laws and regulations." *Id.* § 4013(c)(2)(C).

The Court agrees with GEO that A.B. 32 stands as an obstacle to the execution of the full purposes of Congress reflected in Section 4013.  Congress clearly authorized USMS to use private detention facilities in limited circumstances, such as where the number of USMS detainees in a given district exceeds the available capacity of federal, state, and local facilities.  Although Congress plainly required private detention facilities to "comply with all applicable State and local laws and regulations" to be "eligible" for a contract with USMS in such districts, A.B. 32 would render *no* private detention facilities

19-CV-2491 JLS (WVG)

eligible to contract with USMS.  A.B. 32 therefore forecloses USMS from contracting with private detention facilities in those districts in which there does not exist sufficient availability in federal, state, or local facilities, in contravention of Congress' clear and manifest objective that the option be available.  Accordingly, the Court concludes that A.B. 32 is obstacle preempted as applied to GEO's contracts with USMS.

### b.     The United States

According to the United States, A.B. 32 would "eliminate congressionally authorized contracts for private detention facilities and jettison the Executive Branch's congressionally delegated discretion," U.S. Mot. at 32 (citing Cal. Penal Code §§ 9501, 9505(a)), which would "defeat[] the purpose of Congress's pervasive statutory framework" because, "[w]hen Congress charges an agency with balancing competing objectives, it intends the agency to use its reasoned judgment to weigh the relevant considerations and determine how best to prioritize those objectives." *Id.* (quoting *CTIA*, 928 F.3d at 849). "'Allowing a state law to impose a different standard'—or, worse, obviating the need for congressionally prescribed balancing by eliminating an option altogether—violates the Supremacy Clause." *Id.* (quoting *CTIA*, 928 F.3d at 849) (citing *Arizona*, 567 U.S. at 406; *Crosby*, 530 U.S. at 376–77).

### i.     BOP

For the reasons discussed above, *see supra* Section II.A, the Court concludes that the United States has failed to establish a justiciable case or controversy as to whether A.B. 32 is preempted with respect to BOP's privately contracted facilities.  Even if the United States did have standing, however, the Court would conclude that A.B. 32 is not obstacle preempted as to those facilities.

With regard to Taft, the United States relies primarily on Section 3621(b), which instructs:

> The Bureau of Prisons shall designate the place of the prisoner's imprisonment, and shall, subject to bed availability, . . . place the prisoner in a facility as close as practicable to the prisoner's primary residence, and to the extent practicable, in a facility

1    within 500 driving miles of that residence.

2    18 U.S.C. § 3621(b).  Although the United States is correct that this provision reveals a

3    clear congressional objective that BOP detainees be housed "as close as practicable" to

4    their primary residence, it is not clear from the statutory text that Congress intended for

5    BOP to accomplish that objective through the use of private detention facilities.  Further,

6    the directive is limited, among other things, by "bed availability."  To the extent A.B. 32

7    limits "bed availability" within the preferred zone of detention, Congress specifically has

8    authorized imprisonment at facilities further away.

9         The additional sources on which the United States relies are unavailing.  Like

10   Section 3621, Section 530C(a)(4) fails to reveal a clear congressional intent that BOP use

11   private detention facilities.  That statute provides:

12           Except to the extent provided otherwise by law, the activities of
             the Department of Justice (including any bureau, office, board,
13           division, commission, subdivision, unit, or other component
             thereof) may, in the reasonable discretion of the Attorney
14           General, be carried out through any means, including . . . through
             contracts, grants, or cooperative agreements with non-Federal
15           parties.
16

17   28 U.S.C. § 530C(a)(4).  Not only does Section 530(C) make no references to detention,

18   but "non-Federal parties" does not clearly and manifestly refer to private parties, let alone

19   private detention facilities.

20        Further, neither BOP's contracting history nor the opinion from the Office of Legal

21   Counsel is relevant to the Court's analysis.  As the Supreme Court has long recognized—

22   and recently reiterated:

23           In all cases, the federal restrictions or rights that are said to
             conflict with state law must stem from either the Constitution
24           itself or a valid statute enacted by Congress.  "There is no federal
             preemption *in vacuo*," without a constitutional text, federal
25           statute, or treaty made under the authority of the United States.
26

27   *Kansas*, 140 S. Ct. at 801 (quoting *P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp.*,

28   485 U.S. 495, 503 (1988)) (citing *Va. Uranium, Inc.* v. *Warren*, 587 U. S. ___, 139 S. Ct.

1894, 1901 (2019); *U.S. Chamber of Comm. v. Whiting*, 563 U.S. 582, 599 (2011)).  BOP's contracting history—extensive as it may be—and the opinion of the Office of Legal Counsel do not fit into any of these categories and, therefore, cannot establish congressional intent, *see, e.g.*, *id.* at 807 ("The Supremacy Clause gives priority to 'the Laws of the United States,' not the . . . priorities or preferences of federal officers.") (quoting U.S. Const. Art. VI, cl. 2), which is "'the ultimate touchstone' in every preemption case." *Medtronic, Inc.*, 518 U.S. at 485.  Accordingly, the Court concludes that federal criminal law does not obstacle preempt A.B. 32 as applied to BOP's detention facilities.

As for BOP's RRCs, the United States relies primarily on two statutes, neither of which reveals a clear and manifest congressional intent that BOP use private detention facilities for RRCs.  The first statute on which the United States relies provides:

> The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community.  Such conditions may include a community correctional facility.

18 U.S.C. § 3624(c)(1).  The statute does not reveal a clear and manifest congressional intent that the Director of BOP use privately operated detention facilities to achieve the objective of "affording . . . prisoner[s] a reasonable opportunity to adjust to and prepare for . . . reentry . . . into the community."  *See id.*  Further, such opportunities are to be made available "to the extent practicable."  *See id.*

The second statute on which the United States relies lays out certain "[d]iscretionary conditions" of probation.  18 U.S.C. § 3563(b).  Specifically, the United States points to the fact that

> [t]he court may provide, as further conditions of a sentence of probation, . . . that the defendant . . . remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of

39

1
2

> imprisonment authorized for the offense, during the first year of
> the term of probation or supervised release,

3   *id.* § 3563(b)(10), or "reside at, or participate in the program of, a community corrections

4   facility (including a facility maintained or under contract to the Bureau of Prisons) for all

5   or part of the term of probation." *Id.* § 3563(b)(11). This statute applies to the courts, not

6   BOP, and also is explicitly "[d]iscretionary." *See generally id.* § 3563(b). In any event, to

7   the extent that it does reveal a congressional intent that BOP may maintain community

8   corrections facilities under contract with others, it does not clearly and manifestly reveal a

9   congressional intent that those facilities be under contract with the operators of private

10  detention facilities. Consequently, the Court concludes that A.B. 32 also is not obstacle

11  preempted as applied to BOP's RRCs.

### ii.   USMS

12

13  Like GEO, the United States contends that A.B. 32 would "nullif[y]" Congress'

14  authorization that USMS may "'designate districts that need additional support from

15  private detention entities' based on its consideration of 'the number of Federal detainees in

16  the district' and 'the availability of appropriate Federal, State, and local government

17  detention facilities.'" U.S. Mot. at 34 (quoting 18 U.S.C. § 4013(c)(1)). For the reasons

18  set forth above, *see supra* Section II.B.2.a.ii, the Court agrees. Accordingly, the Court

19  concludes that A.B. 32 is obstacle preempted as applied to the USMS's contracts with

20  private detention centers pursuant to Section 4013(c)(1).

### iii.   ICE

21

22  Again, like GEO, the United States argues that A.B. 32 will "nullif[y] Congress's

23  purpose in allowing ICE to rent 'facilities adapted or suitably located for detention' as a

24  first resort before 'acquir[ing], build[ing], remodel[ing], repair[ing], and operat[ing]

25  facilities . . . necessary for detention.'" U.S. Mot. at 34 (quoting 8 U.S.C.

26  § 1231(g)(1)–(2)) (second through sixth alterations in original). For the reasons discussed

27  ///

28  ///

1  above, *see supra* Section II.B.2.a.i, the Court disagrees.[14]  The Court therefore concludes
2  that A.B. 32 is not obstacle preempted as applied to ICE's contracts with private detention
3  centers.

4             iv.    Contract Options

5        Finally, the United States argues that "California's obstruction of congressional
6  objectives is perhaps best illustrated by A.B. 32's prohibition on extending any contracts
7  for private detention facilities, even when extensions are 'authorized by th[ose]
8  contract[s].'"  U.S. Mot. at 34–35 (quoting Cal. Penal Code § 9505(a)) (alterations in
9  original).  The United States argues this is so because "Federal regulations specifically
10  authorize option provisions that allow the United States to unilaterally extend arrangements
11  with its contractors for a specified period," and "the contractor is bound to perform during
12  the 'option period' if exercised by the Federal Government."  *Id.* at 35 (citing 48 C.F.R. §
13  17.208(f)–(g); 48 C.F.R. § 52.217-8; 48 C.F.R. § 52.217-9).  This renders it "impossible
14  for federal contractors providing private detention services to comply with both their
15  obligations under the pre-negotiated contract (authorized by federal law) and California's
16  attempt to ban contract extensions."  *Id.*

17        In the absence of clear and manifest congressional intent that BOP or ICE contract
18  with private detention facilities, A.B. 32 does not unconstitutionally impede the United
19  States' contracting ability.  Further, the Court agrees with Defendants that the federal
20  contract procurement regulations—which nowhere require contracts with private detention
21  facilities to house BOP or ICE detainees or extensions of such contracts—do not conflict
22  preempt A.B. 32.

23          *3.   Field Preemption*

24        The United States additionally contends that A.B. 32 is field preempted.  *See* U.S.

---

26  [14] The additional authorities cited by the United States, consisting mainly of regulations promulgated by
27  DHS, do not reveal a clear and manifest *congressional* intent that ICE use private detention facilities to
house immigration detainees.  That DHS has "promulgated numerous regulations predicated on [its
perceived] authority," *see* U.S. Opp'n at 24–25, does not mean that the Court should find a clear and
28  manifest congressional intent where one is lacking.

Compl. ¶ 63.  "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399 (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 115 (1992) (Souter, J., dissenting)).  The Supreme Court has instructed:

> The intent to displace state law altogether can be inferred from a framework of regulation "so pervasive . . . that Congress left no room for the States to supplement it" or where there is a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."

*Id.* (alterations in original) (quoting *Rice*, 331 U.S. at 230) (citing *English*, 496 U.S. at 79). The Supreme Court recently noted that field preemption has been found "[i]n rare cases." *See Garcia*, 140 S. Ct. at 804.

### a.    The Relevant Field

"[T]o determine whether Congress has implicitly ousted the States from regulating in a particular field, [a court] must first identify the field in which this is said to have occurred." *Kansas*, 140 S. Ct. at 804.  "Because 'Congress must clearly manifest an intention' to 'enter and completely absorb the field' in order to preclude state regulation in that field  .  .  .  , it is necessary to delineate 'the pertinent regulatory field' with specificity." *Knox*, 907 F.3d at 1174 (quoting *Ry. Mail Ass'n*, 326 U.S. at 97; *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 734 (9th Cir. 2016)).  The Parties agree that the pertinent field must be defined "with specificity."  *See* MJP at 16 (citing *Knox*, 907 F.3d at 1173–74); U.S. Opp'n at 18 n.9 (citing *Nat'l Fed'n*, 813 F.3d at 734, 737; *Martin ex rel. Heckman v. Midw. Express Holdings, Inc.*, 555 F.3d 806, 812 (9th Cir. 2009); *Novoa v. GEO Grp., Inc.*, No. EDCV 17-2514 JGB (SHKx), 2018 WL 3343494, at *4 (C.D. Cal. June 21, 2018); *Bernstein v. Virgin Am., Inc.*, 227 F. Supp. 3d 1049, 1071 (N.D. Cal. 2017)).  Indeed, "Courts tasked with delineating the pertinent regulatory field have tailored it narrowly."  *Helicopters for Agric. v. Cty. of Napa*, 384 F. Supp. 3d 1035, 1041 (N.D. Cal. 2019) (citing *Martin*, 555 F.3d at 811).

/ / /

Not surprisingly, given the importance of the inquiry, the United States and Defendants advocate for different definitions of the relevant field.  Defendants argue that "AB 32 affects two fields in which Congress has legislated: (1) the operation of immigration detention facilities and (2) the operation of criminal detention facilities."  MJP at 16; *see also* MJP Reply at 6.  The United States, on the other hand, contends that the relevant field is "contracting for federal prisoner and detainee housing."  MJP Opp'n at 14, 15.  Defendants respond that the United States' proffered field is incorrect for two reasons. *See* MJP Reply at 6–7.  First, "AB 32 regulates private persons' operation of detention facilities," meaning "AB 32's potential effect on the federal government's future contracting practices does not make contracting the subject of the state law."  *Id.* at 6 (citing Cal. Penal Code § 9501).  "Second, there is no single 'field' of federal statutes governing both immigration and criminal detention facilities," as "Congress has created separate statutory schemes to regulate them in Titles 8 and 18, respectively, because they serve entirely different purposes, one civil and one criminal."  *Id.* at 6–7.  Defendants urge that the United States should not be allowed to merge disparate legislative fields "to create the illusion of 'density and detail.'"  *Id.* at 7 (quoting *Nat'l Fed'n of the Blind*, 813 F.3d at 734).

On balance, the Court concludes that Defendants have the better argument.  First, although the Court agrees with the United States that the relevant field must be determined based on federal statutes, not A.B. 32, *see* Tr. at 63:23–64:5; *cf.* MJP Reply at 6 (citing *Knox*, 907 F.3d at 1174),[15] the Court agrees with Defendants that the United States' emphasis on contracting is misplaced.  *See* MJP Reply at 6 ("[Under the United States' argument], a federal agency could argue that *any* state regulation is preempted merely because the federal government may wish to enter into a contract that is [in] any arguable way affected by the regulation.") (emphasis in original).  Second, the United States'

---

[15] Indeed, *Knox* instructs that the Court must determine the field that "*Congress* intended to occupy by enacting the [pertinent s]tatutes."  907 F.3d at 1177 (emphasis added) (citing *Nat'l Fed'n of the Blind*, 813 F.3d at 734).

19-CV-2491 JLS (WVG)

proposed field would have the Court comb through various provisions of Titles 8, 18, and 28 to the United States Code.[16]  The Supreme Court has cautioned, however, that "[i]mplied preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives.'"  *See Whiting*, 563 U.S. at 607.  By defining the field broadly enough to encompass both civil and criminal detention statutes and regulations, the United States invites the Court to engage in such an erroneous and freewheeling inquiry.  Consequently, the Court concludes that the pertinent fields are (1) ICE's housing of immigration detainees and (2) USMS's and BOP's housing of federal prisoners.

### b.    Dominant Federal Interest

As discussed above, "[t]he intent to displace state law altogether can be inferred . . . where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'"  *Arizona*, 567 U.S. at 399 (quoting *Rice*, 331 U.S. at 230).  The United States claims "at least three dominant federal interests preclude A.B. 32: (1) the Federal Government's prerogative to provide for those in its custody, (2) the federal power over foreign relations and immigration, and (3) the United States' authority to control rights and obligations under its contracts."  U.S. Opp'n at 15 (citing U.S. Mot. at 23–25).  The United States urges that, "[i]ndividually or combined, these dominant federal interests preempt the field of contracts for federal prisoner and detainee housing."  *Id.* at 17.

### i.    Federal Custody

As for its first purportedly dominant interest, the United States contends that A.B. 32 "would impermissibly encroach on the United States' sovereign prerogative to house

---

[16] At the hearing, the United States argued that "it doesn't matter if the federal field goes across how you look at the U.S. Code or across different Acts."  Tr. at 64:7–9.  Specifically, the United States cited *United States v. Locke*, 529 U.S. 89 (2000), which regulated oil tankers, and *Knox*, 907 F.3d 1167, which concerned a single statute codified across different Titles about the postal monopoly.  *See* Tr. at 64:9–17.  That other courts have looked across Titles of the United States Code in defining a relevant field, however, does not mean that doing so would be appropriate here, where there are two distinct legislative fields.

its own prisoners and detainees by nullifying the Executive Branch's decision to use a congressionally authorized housing option." U.S. Opp'n at 15 (citing U.S. Mot. at 23). Defendants respond that there can be no preemption as to USMS-contracted detention facilities because "Congress has expressly subjected those facilities to state regulation such as AB 32."[17] MJP Reply at 8 (citing 18 U.S.C. § 4013(c)(2)(C)).

While the federal interest in the housing of the United States' prisoners and detainees is undeniably substantial, the Court cannot conclude that it is to the exclusion of the states. Indeed, in discussing ICE detention facilities in California, the Ninth Circuit recently acknowledged that "California possesses the general authority to ensure the health and welfare of inmates and detainees in facilities within its borders." *See California*, 921 F.3d at 886. Further, as Defendants note, *see* MJP Reply at 8, this conclusion is bolstered by Congress' express recognition that private detention facilities holding those in USMS custody could be subject to further state and local regulations. *See* 18 U.S.C. § 4013(c)(2)(C). Accordingly, the Court concludes that the federal interest in housing its prisoners and detainees does not impliedly preempt A.B. 32.

### ii.   Foreign Relations/Immigration

The United States also contends that "A.B. 32 interferes with the dominant federal interest in foreign relations and immigration," U.S. Opp'n at 16 (citing U.S. Mot. at 24–25), because "it can neither adequately control the safety and security of aliens in its custody, nor communicate effectively with foreign countries as 'one national sovereign,' if States like California are allowed to dictate how and where the United States may house such individuals." *Id.* (citing U.S. Mot. at 24 (quoting *Arizona*, 567 U.S. at 395)). Defendants counter that "the federal interest in the operation of immigration detention facilities does not 'preclude enforcement of state laws on the same subject.'" MJP Reply at 7 (quoting *Puente Ariz.*, 821 F.3d at 1103) (citing *California*, 921 F.3d at 875–76). In

---

[17] Because Defendants challenge the United States' standing regarding its BOP facilities, *see supra* Section II.A, they raise no substantive argument as to BOP. *See* MJP Reply at 8.

1  any event, "AB 32 does not regulate th[e] field [of the Federal Government's exclusive

2  immigration power relating to who may enter and remain in the country]; it merely

3  exercises the state's police power to protect detainees from private actors." *Id.*

4  The Court agrees with Defendants.  It is clear from the face of A.B. 32 that it does

5  not regulate either foreign relations or immigration—it regulates only the operation of

6  private detention facilities in California.  *See* Cal. Penal Code § 9501.  In any event, as

7  discussed above, *see supra* Section II.B.3.b.i, the United States' substantial interest in the

8  operation of detention facilities does not preclude California from enacting any legislation

9  in that area.  *See California*, 921 F.3d at 886.  Accordingly, the Court concludes that the

10  federal interest in foreign relations and immigration does not preempt A.B. 32.

iii.    Federal Contracting

12  Finally, the United States argues that "the United States has a dominant federal

13  interest in controlling obligations to and rights of the United States under its contracts."

14  U.S. Opp'n at 17.  Defendants respond that "AB 32 does not purport to prohibit the federal

15  government from doing anything, including entering into contracts," MJP Reply at 2, and

16  that "AB 32's potential effect on the federal government's future contracting practices does

17  not make contracting the subject of the state law." *Id.* at 6.

18  Again, the Court agrees with Defendants.  A.B. 32 does not regulate federal

19  contracting, but rather the operation of private detention facilities within California, *see*

20  Cal. Penal Code § 9501, and any incidental effect on the Federal Government's contracting

21  interests does not suffice to establish field preemption.  *See, e.g.*, *Knox*, 907 F.3d at

22  1177–78.  Accordingly, the Court concludes that the United States' interest in federal

23  contracting does not preempt A.B. 32.

c.    Pervasive Regulation

25  Field preemption also "can be inferred from a framework of regulation 'so pervasive

26  . . . that Congress left no room for the States to supplement it.'" *Arizona*, 567 U.S. at 399

27  (alteration in original) (quoting *Rice*, 331 U.S. at 230).  "Outside of the[] areas [of

28  immigration, air safety, labor disputes, and pension disputes], field preemption is rare." *In*

46

*re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 1001 (N.D. Cal. 2018).  "In addition, the mere fact that a federal scheme is comprehensive is insufficient for a finding of field preemption, which arises only in extraordinary situations."  *Valentine v. NebuAd, Inc.*, 804 F. Supp. 2d 1022, 1029 (N.D. Cal. 2011) (quoting *In re NSA Telcomms. Records Litig.*, 483 F. Supp. 2d 934, 938 (N.D. Cal. 2007) (quoting *Wayne v. DHL Worldwide Express*, 294 F.3d 1179, 1184 (9th Cir. 2002))) (internal quotation marks omitted).

The United States argues that "[s]tate regulations of contracts for federal prisoner and detainee housing, like A.B. 32, are . . . field preempted because there is 'a framework of regulation so pervasive that Congress left no room for the States to supplement it.'"  U.S. Opp'n at 18 (quoting *Arizona*, 567 U.S. at 399).  According to the United States, "[t]hat framework could not be any clearer: Congress explicitly delegated to the Executive Branch full authority over federal prisoner and detainee housing and provided a full set of standards for USMS, BOP, and ICE to use in contracting for private detention facilities."  *Id.* (citing U.S. Mot. at 26–31).

### i.    ICE

The United States relies primarily on 8 U.S.C. § 1231 to support its argument that Congress has occupied the field of contracting for immigration detainee housing.  In Section 1231, Congress directed that "[t]he [Secretary of Homeland Security] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal" and may rent "facilities adapted or suitable located for detention."  U.S. Opp'n at 18 (quoting 8 U.S.C. § 1231(g)(1)).  Further, "the Secretary may 'acquire, build, remodel, repair, and operate facilities . . . necessary for detention,' but must first 'consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use.'"  *Id.* (quoting 8 U.S.C. § 1231(g)(1)–(2)) (alteration in original).  Defendants rejoin that "Congress has not clearly and manifestly occupied the field of immigration detention operations" because "[i]t has enacted only a handful of statutes that merely provide federal agencies with the general authority to

operate their own detention facilities and to contract with states to operate (and regulate) facilities for them," MJP Reply at 7 (citing 8 U.S.C. §§ 1231(g)(1), 1103(a)(11)), which "are far from 'pervasive,' 'dens[e]' or 'detail[ed],'" *id.* (quoting *Rice.*, 331 U.S. at 230; *Nat'l Fed'n of the Blind*, 813 F.3d at 734) (alterations in original), and "do not constitute a 'full set of standards' that could be threatened by AB 32." *Id.* (quoting U.S. Opp'n at 19).

The Court agrees with Defendants that Congress has not occupied the field of housing immigration detainees. Section 1231 can hardly be said to set forth a framework "so pervasive that Congress left no room for the States to supplement it." *See Arizona*, 567 U.S. at 399. Instead, it merely tasks the Attorney General with arranging for "appropriate places of detention," *see* 8 U.S.C. § 1231(g)(1), and expresses a preference that existing facilities be rented or purchased before new facilities are built. *See id.* §§ 1231(g)(1)–(2). No mention is made of who should operate such facilities, in what manner they should be operated, or any number of additional details. The authorities cited by the United States therefore "do not amount to 'pervasive' regulations of" the housing of immigration detainees. *See Parver v. Jet Blue Airlines Corp.*, 649 F. App'x 539, 543 (9th Cir. 2016) (citing *Gilstrap v. United Air Lines*, 709 F.3d 995, 1006 (9th Cir. 2013)); *see also Trishan Air, Inc. v. Dassault Falcon Jet Corp.*, No. CV 08-7294-VBF(JTLX), 2011 WL 13186258, at *2 (C.D. Cal. May 17, 2011) ("[T]he regulations cited by [the defendant] do not sufficiently show such pervasive federal regulation in the area of flight training so as to preempt all claims based on negligent instruction under state standards of care.") (citing *Martin*, 555 F.3d 806; 14 C.F.R. §§ 142.35–142.39); *Hitt v. Ariz. Beverage Co., LLC*, No. 08 CV 809 WQH (POR), 2009 WL 449190, at *5 (S.D. Cal. Feb. 4, 2009) ("[T]here is nothing in the statutory provisions of [the Federal Food, Drug, and Cosmetic Act], its implementing regulations or its legislative history to suggest that Congress intended to exclusively occupy the field of labeling beverages that purport to contain fruit. The Court finds that this scheme of regulation is not so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.") (internal quotation marks omitted). Accordingly, the Court concludes that A.B. 32 is not field

preempted by existing statutes and regulations concerning the housing of ICE's immigration detainees.

### ii.    BOP

The United States notes that "Congress explicitly delegated BOP the authority to 'designate the place of . . . imprisonment' for persons sentenced to incarceration, including 'any available penal or correctional facility . . . whether maintained by the Federal Government or otherwise.'"  U.S. Opp'n at 20 (quoting 18 U.S.C. §§ 3621(b), 4042). Congress set forth several factors that BOP was to consider in making such determinations, *id.* (citing U.S. Mot. at 28), including "'bed availability,' the 'prisoner's security designation,' the 'prisoner's programmatic needs,' the 'prisoner's mental and medical health needs,' the 'resources of the facility contemplated,' and most importantly, 'the prisoner's primary residence.'"  U.S. Mot. at 28 (quoting 18 U.S.C. § 3621(b)).  Further, Congress

> explicitly commanded that BOP "shall, to the extent practicable," ensure that a federal prisoner "serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community."

U.S. Opp'n at 20 (quoting 18 U.S.C. § 3624(c)).  According to the United States, "'[t]he[se] federal statutory directives provide a full set of standards governing' contracting for federal prisoner housing."  *Id.* (quoting *Arizona*, 567 U.S. at 401) (second alteration in original).

The Court has concluded that there currently is no justiciable controversy as to the United States' BOP facilities, *see supra* Section II.A; nonetheless, the United States' field preemption arguments concerning BOP fare no better than those pertaining to ICE: the United States has failed to identity legislation or regulations relating to the detention of federal BOP prisoners that are so pervasive that Congress left no room for the states to supplement them.  Accordingly, the Court concludes that A.B. 32 is not field preempted by existing statutes and regulations concerning the detention of BOP prisoners.

1

iii.   USMS

2      Finally, as to USMS, the United States relies primarily on 18 U.S.C. § 4013.  The

3 United States notes that, "in 'support of United States prisoners in non-Federal

4 institutions,' Congress specifically authorized the Attorney General to fund USMS custody

5 of individuals 'under agreements with State or local units of government or contracts with

6 private entities.'" U.S. Mot. at 26–27 (quoting 18 U.S.C. § 4013(a)).  Consequently, USMS

7 "may designate districts that need additional support from private detention entities under

8 subsection (a)(3) based on— . . . the number of Federal detainees in the district; and . . .

9 the availability of appropriate Federal, State, and local government detention facilities."

10 *Id.* at 27 (quoting 18 U.S.C. § 4013(c)(1)); *see also, e.g.*, U.S. Opp'n at 20 n.12.

11      Although the Court already has concluded that A.B. 32 is conflict preempted as to

12 USMS's use of private detention facilities, *see supra* Section II.B.2.b.ii, the Court agrees

13 with Defendants that there is no field preemption in this area.  As Defendants note, *see*

14 MJP Reply at 8, the primary statute on which the United States relies expressly

15 contemplates that state and local governments may legislate and regulate such private

16 detention facilities.  *See* 18 U.S.C. § 4013(c)(2)(C).  This would tend to suggest that

17 Congress did not intend to occupy the field of the private detention of USMS detainees.

18 *See, e.g.*, *In re Rader*, 488 B.R. 406, 411 (B.A.P. 9th Cir. 2013) ("By explicitly

19 incorporating other 'applicable law,' § 502(b)(1) demonstrates that Congress did not intend

20 the Bankruptcy Code thoroughly to occupy the field related to the claims allowance

21 process."); *Familias Unidas por la Justicia v. Sakuma Bros. Farms, Inc.*, No. C14-737-

22 MJP, 2014 WL 2154382, at *3 (W.D. Wash. May 22, 2014) ("Consistent with the statute

23 and its regulation's incorporation of and reference to other laws applying to H-2A workers,

24 numerous federal courts have rejected the notion that [the Immigration Reform and Control

25 Act of 1986] occupies the entire regulatory field of immigrants and/or immigrant

26 workers.") (collecting cases).  In any event, the United States again fails to identify statutes

27 or regulations so pervasive as to imply that Congress left no room for supplemental state

28 regulation.  Accordingly, the Court concludes that A.B. 32 is not field preempted by

existing statutes and regulations concerning the detention of USMS prisoners.

### C.   *Intergovernmental Immunity*

Under the doctrine of intergovernmental immunity, "[a] state regulation is invalid only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion) (citing *South Carolina v. Baker*, 485 U.S. 505, 523 (1988); *United States v. Fresno Cty.*, 429 U.S. 452, 460 (1977)).   GEO and the United States allege that A.B. 32 violates intergovernmental immunity principles on both grounds. *See* GEO Compl. ¶¶ 111–24; *see* U.S. Compl. ¶¶ 66–69.

#### 1.   *Direct Regulation*

Both GEO and the United States allege that A.B. 32 directly regulates the United States in contravention of intergovernmental immunity.  *See* GEO Compl. ¶¶ 114–18; U.S. Compl. ¶ 67.   Defendants contend that A.B. 32 does not directly regulate the Federal Government because, by its plain language, "it is a regulation of private persons in California," MTD at 10; MJP at 8, and any indirect regulation of or burden on the Federal Government does not constitute direct regulation.  *See* MTD at 10–11, 12 (citing *North Dakota*, 495 U.S. at 435); MJP at 10 (citing *North Dakota*, 495 U.S. at 435).   Plaintiffs counter that A.B. 32 is a direct regulation of the United States because it directly regulates federal contractors and federal operations.  *See* GEO Opp'n at 1–6; U.S. Opp'n at 3–8.

Following the hearing, the Court requested additional briefing on the issue, in particular "(1) on whom the legal incidence of A.B. 32 falls[ and] (2) whether GEO (or any other private contractor with whom the Federal Government contracts for detention services) is a federal instrumentality."[18]   ECF No. 45 at 1.   Relying heavily on the Ninth

---

[18] The Court also requested additional briefing on "whether privately operated federal detention facilities—whether privately or federally owned—are federal installations." *GEO* ECF No. 45 at 1–2 (footnote omitted).   Because a federal installation is a "federally owned facility performing a federal function," *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 (1988), this inquiry is relevant only to the two federally-owned facilities at issue here: BOP's Taft and USMS's El Centro.  *See* U.S. Compl. ¶¶ 29, 41; Tr. at 32:19–33:9.  Because the Court has concluded that there is no justiciable controversy as to Taft,

Circuit's decision in *Boeing Company v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014), Plaintiffs express skepticism that the legal incidence test applies outside the tax context, *see* GEO Add'l Br. at 2–6; U.S. Add'l Br. at 6–7, but nonetheless contend that the legal incidence of A.B. 32 falls on GEO and the United States. *See* GEO Add'l Br. at 6–7; U.S. Add'l Br. at 6. They also urge that, to the extent it is even relevant, federal contractors operating private detention facilities for the Federal Government are federal instrumentalities for purposes of A.B. 32. *See* GEO Add'l Br. at 8–9; U.S. Add'l Br. at 6 n.5. Defendants counter that the legal incidence of A.B. 32 is borne only by private detention contractors, *see* Defs.' Add'l Br. at 2, 4, and that private detention contractors such as GEO are not federal instrumentalities. *See id.* at 7–11.

As an initial matter, although Plaintiffs contend that tax cases are not applicable here, *see* GEO Add'l Br. at 2–6, U.S. Add'l Br. at 6–7, this distinction does not appear to be borne out by Supreme Court precedent. *See, e.g.*, 1 Laurence H. Tribe, *American Constitutional Law* § 6–34, 1225–26 (3d ed. 2000) ("[S]tate taxes and regulations are subject to the same restrictions under the federal immunity doctrine.") (quoting *North Dakota*, 495 U.S. at 454 n.3 (Brennan, J., concurring in the judgment in part and dissenting in part)) (citing *North Dakota*, 495 U.S. at 435; *Mayo v. United States*, 319 U.S. 441, 445 (1943)); David S. Rubenstein, *Supremacy, Inc.*, 67 UCLA L. Rev 4, at 74 n.361 (2020) ("[T]he Supreme Court's decisions do not draw discernable distinctions between state tax laws and state regulations [for purposes of intergovernmental immunity]; the Court cites the cases interchangeably.") (citing *Mayo*, 319 U.S. at 446–48). Because there is a greater wealth of intergovernmental immunity authority concerning state tax regulations, the Court

/ / /

---

*see supra* Section II.A, and that A.B. 32 is conflict preempted as to USMS facilities, *see supra* Sections II.B.2.a.ii, II.B.2.b.ii, the Court declines to wade into the quagmire of federally owned facilities. Further, given Defendants' admission at the hearing that they "do not contend that [A.B. 32] applies to contractors who operate facilities that are federally owned," *see* Tr. at 43:8–14, any challenge to federally owned facilities would suffer the same justiciability defects identified with regard to the United States' BOP facilities. *See supra* Section II.A.

therefore looks to those cases to supplement state regulation cases in determining whether A.B. 32 is a direct regulation of the United States.

In addressing direct-regulation immunity, the United States Supreme Court has recognized that, "in the absence of congressional consent, there is an implied constitutional immunity of the national government from state taxation and from state regulation of the performance, by federal officers and agencies, of governmental functions." *Penn Dairies v. Milk Control Comm'n of Pa.*, 318 U.S. 261, 269 (1943) (collecting cases).  However, the Supreme Court has also cautioned that

> those who contract to furnish supplies or render services to the government are not such agencies and do not perform governmental functions . . . , and the mere fact that non-discriminatory taxation or regulation of the contractor imposes an increased economic burden on the government is no longer regarded as bringing the contractor within any implied immunity of the government from state taxation or regulation.

*Id.* at 269–70 (citations omitted) (collecting cases).  Rather, to enjoy the benefits of such immunity, the contractor must serve as an "instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being [regulated] is concerned." *See United States v. New Mexico*, 455 U.S. 720, 735 (1982); *accord North Dakota*, 495 U.S. at 435 ("A state regulation is invalid only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals.") (citing *South Carolina*, 485 U.S. at 523; *Fresno Cty.*, 429 U.S. at 460).

Under the legal incidence test, the wording of A.B. 32 is significant: "The Constitution . . . does not forbid a [regulation] whose legal incidence is upon a contractor doing business with the United States, even though the economic burden of the [regulation] . . . is ultimately borne by the United States." *United States v. Boyd*, 378 U.S. 39, 44 (1964); *see also United States v. Nye Cty.*, 178 F.3d 1080, 1084 (9th Cir. 1999) ("*Nye Cty. II*") ("[T]he wording of a [state regulation] is significant.") (quoting *United States v. Nye Cty.*, 938 F.2d 1040, 1042 (9th Cir. 1991) ("*Nye Cty. I*")).  GEO's argument concerning

what A.B. 32 "may as well have read" is therefore inconsequential.  *See* Tr. at 50:24–51:6 ("[A.B. 32] may as well have read as follows: the Federal Government shall not contract with a private for-profit entity for the operation of a detention facility in California.  That would reword the prohibition to focus directly on the Federal Government, but it wouldn't change its impact one bit, and so that would be a very direct regulation."); *see also Nye Cty. II.*, 178 F.3d at 1085; *see also id.* at 1084–86, 1089 (concluding that statute previously found unconstitutional as a direct tax on federal property was constitutional when rewritten to "shift[] the subject of the taxes from the property itself to the beneficial use of that property" because "it [i]s the language of the . . . statute . . . that [i]s critical to the result").  As GEO itself recognizes, A.B. 32, as written, "focuses on the person operating the facility."  *See* Tr. at 50:20–21.  In other words, the legal incidence of A.B. 32 is on those operating private detention facilities, such as GEO, rather than directly on the United States.  Consequently, the only way that A.B. 32 can be a direct regulation of the United States is if those operating detention facilities under contract with the United States qualify as instrumentalities of the Federal Government.

The Court concludes that Plaintiffs have not carried their burden to establish this.  To meet their burden, Plaintiffs must demonstrate that federal contractors operating detention facilities are "so closely connected to the Government that the two cannot realistically be viewed as separate entities."  *New Mexico*, 455 U.S. at 735.  In other words, GEO (and its compatriots) "must actually 'stand in the Government's shoes,'" *id.* at 736 (quoting *City of Detroit v. Murray Corp.*, 355 U.S. 489, 491 (1958) (Frankfurter, J.)), or be "so assimilated by the Government as to become one of its constituent parts."  *Id.* (quoting *Boyd*, 378 U.S. at 47 (quoting *United States v. Muskegon Twp.*, 355 U.S. 484, 486 (1958))); *see also id.* at 736–37 ("The Court's other cases describing the nature of a federal instrumentality have used similar language: 'virtually . . . an arm of the Government,' . . . 'integral parts of [a governmental department,' and 'arms of the Government deemed by it essential for the performance of governmental functions.'") (first and third alterations in original) (citation omitted) (quoting *Dep't of Emp't v. United States*, 385 U.S. 355, 359–

60 (1966); *Standard Oil Co. v. Johnson*, 316 U.S. 481, 485 (1942)).  Although GEO is correct that "[t]here is no simple test for ascertaining whether an institution is so closely related to government activity as to become a tax-immune instrumentality," GEO Add'l Br. at 8 (quoting *Dep't of Emp't*, 385 U.S. at 358–59), Defendants identify several factors used by the Supreme Court and Ninth Circuit in prior cases.  *See* Defs.' Add'l Br. at 7–9 (collecting cases).

Although decided in a different context, *Logue v. United States*, 412 U.S. 521 (1973), is illuminating.  In *Logue*, the plaintiffs sued the United States under the Federal Tort Claims Act ("FTCA") to recover for the wrongful death of their son, who had hanged himself while incarcerated in a county jail that had contracted with BOP to house federal prisoners.  *Id.* at 522–23.  To be liable under the FTCA, the employees of the county jail would have to be employees of the Federal Government or a "corporation[] primarily acting as [an] instrumentalit[y] or agenc[y] of the United States."  *See id.* at 526 (quoting 28 U.S.C. § 2671).  The Court rejected the plaintiffs' contentions that the "County jail is a 'Federal agency' by reason of its contract for the care of federal prisoners, or that the employees of the jail are 'acting on behalf of' the Bureau of Prisons or the Government in performing services for federal prisoners."  *Id.*  In so concluding, the Court reasoned that, pursuant to the contract between the county and the Federal Government, "[t]he county undertakes to provide custody in accordance with the Bureau of Prison's 'rules and regulations governing the care and custody of persons committed' under the contract . . . [, b]ut the agreement gives the United States no authority to physically supervise the conduct of the jail's employees."  *Id.* at 530.  Ultimately, the Court was "not persuaded that employees of a contractor with the Government, whose physical performance is not subject to governmental supervision, are to be treated as 'acting on behalf of' a federal agency simply because they are performing tasks that would otherwise by performed by salaried employees of the Government."  *See id.* at 531–32.

As in *Logue*, GEO contends that it is an instrumentality of the Federal Government because it houses federal detainees and is subject to specific rules and regulations,

19-CV-2491 JLS (WVG)

including the Federal Performance-Based Detention Standards, *see* GEO Add'l Br. at 8–9; however, under Supreme Court precedent, this does not suffice. *See Logue*, 532 U.S. at 526, 531–32. Further, neither GEO's Complaint, *see generally* GEO Compl., nor the relevant contracts,[19] demonstrate that the United States has "authority to physically supervise the conduct of the jail's employees." *Logue*, 412 U.S. at 530.

*Boyd* is also instructive. In *Boyd*, Tennessee imposed sales and use taxes on purchases made by two companies contracting with the Atomic Energy Commission. *See* 378 U.S. at 40–41. One of the contractors "manage[d], operate[d], and maintain[ed] the [federal nuclear] plants and facilities," *id.* at 41–42, while the other "perform[ed] construction services relating both to new facilities and to the modification of the existing plant." *Id.* at 42–43. The contractors and the United States contended that the contractors should be entitled to immunity from the taxes because their "use of government property [wa]s . . . a use exclusively for the benefit of the United States." *See id.* at 44. The Court rejected that the contractors were "so assimilated by the Government as to become one of its constituent parts," *id.* at 47 (quoting *Muskegon Twp.*, 355 U.S. at 486), noting:

> No one suggests that either [contractor] has put profit aside in contracting with the Commission[;] that the fee of either company is not set with commercial, profit-making considerations in mind[;] or that the operation of either company at [the federal nuclear facility] were not an important part of their regular business operations.

*Id.* at 45. Indeed, "'[t]he vital thing' is that [the contractors] 'w[ere] using the property in connection with [their] own commercial activities.'" *Id.* (quoting *Muskegon Twp.*, 355 U.S. at 486). The Court added:

/ / /

---

[19] GEO attached excerpts of the relevant contracts to its Complaint. *See generally GEO* ECF No. 15-5 Exs. A–E. GEO's counsel indicated at the hearing that it would lodge copies of the full contracts with the Court, *see* Tr. at 20:4–22:3, and on September 25, 2020, the Court issued an order requesting the unexcerpted contracts. *See* ECF No. 52. The Court has reviewed the full contracts that were electronically submitted by GEO's counsel on October 1, 2020.

> Should the Commission intend to build or operate the plant with its own servants and employees, it is well aware that it may do so and familiar with the ways of doing it.  It chose not to do so here.  [The Court] cannot conclude that [the contractors], both cost-plus contractors for profit, have been so incorporated into the government structure as to become instrumentalities of the United States and thus enjoy governmental immunity.

*Id.* at 48.   Ultimately, the Court concluded, "[i]f the[ taxes] unduly intrude upon the business of the Nation, it is for Congress, in the valid exercise of its powers, not this Court, to make the desirable adjustment."  *Id.* at 51.

So, too, here—BOP's, ICE's, and USMS's decisions to outsource work to private detention facilities does not transform those contractors into instrumentalities of the Federal Government.  Ultimately, GEO and other private detention facility operators are pursuing their "own private ends—in connection with commercial activities carried on for profit."  *See id.* at 44; *see also id.* at 48.  The Court therefore concludes that A.B. 32 does not directly regulate the United States in violation of the intergovernmental immunity doctrine.  Rather, A.B. 32 directly regulates only "person[s] . . . operat[ing] a private detention facility within the state," Cal. Penal Code § 9501, meaning that the legal incidence of A.B. 32 falls only on government contractors, and Plaintiffs have failed to show that those contractors are so closely connected to the Federal Government as to be instrumentalities of the United States.

2.      *Discriminatory Regulation*

"[I]ntergovernmental immunity attaches only to state laws that discriminate against the federal government *and* burden it in some way."  *California*, 921 F.3d at 880 (emphasis added); *see also id.* at 881 ("Since the advent of the doctrine, intergovernmental immunity has attached where a state's discrimination negatively affected federal activities in some way.").  "[A] state 'does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them.'"  *Id.* at 881 (quoting *Washington v. United States*, 460 U.S. 536, 544–45 (1983)).  The Ninth Circuit also has clarified that there is no *de minimis* exception to intergovernmental immunity; rather,

"*[a]ny* economic burden that is discriminatorily imposed on the federal government is unlawful." *Id.* at 883–84 (emphasis in original); *see also* Tr. at 46:3–5.  Even if a state law does discriminate against and burden the Federal Government, it may nonetheless survive if that burden is "justified by[] 'significant differences between the two classes.'"  *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 816 (1989) (quoting *Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376, 383–385 (1960)).  Consequently, Plaintiffs must clear two hurdles with respect to intergovernmental immunity, showing that (1) A.B. 32 discriminates against the Federal Government (or its contractors) by treating somebody similarly situated better, and (2) that discrimination in some way burdens the Federal Government (or its contractors).  *See, e.g.*, *California*, 821 F.3d at 881 ("Since the advent of the doctrine, intergovernmental immunity has attached where a state's discrimination negatively affected federal activities in some way.").

a.    Discrimination

The Court must first determine whether A.B. 32 discriminates against the United States and its contractors, *i.e.*, whether A.B. 32 "treats someone else better than it treats them."  *California*, 821 F.3d at 881 (quoting *Washington*, 460 U.S. at 544–45).  Although A.B. 32 applies to CDCR and "person[s] . . . operat[ing] . . . private detention facility[ies] within the state," *see* Cal. Penal Code §§ 5003.1, 9501, Plaintiffs allege that the various exceptions contained in Sections 5003.1(e), 9502, 9503, and 9505(b) discriminate against them to the benefit of California and its contractors.  *See, e.g.*, GEO Compl. ¶¶ 121, 123; U.S. Compl. ¶ 68.

Before delving into the merits of the Parties' arguments, the Court must address two preliminary considerations.  Initially, the Court rejects the United States' argument that "the sole regulation of governmental actors itself renders A.B. 32 constitutionally infirm." U.S. Opp'n at 8 (citing *Travis v. Reno*, 163 F.3d 1000, 1002 (7th Cir. 1998); *United States v. Kernen Constr.*, 349 F. Supp. 3d 988, 994 (E.D. Cal. 2018)).  Not only is neither authority binding on this Court, but the rationale on which those cases relied does not apply here.  In *Kernen Construction*, for example, the district court concluded that the underlying statute

58

still discriminated against the Federal Government, even though it "applie[d] to all public agencies, state and federal." 349 F. Supp. 3d at 993. The court reasoned that "it is important that burdens also fall on private parties to ensure that there is a broad state constituency that can provide a political check against the abuse of a state's regulatory authority." *See id.* at 944 (citing *Fresno Cty.*, 429 U.S. at 463; *United States v. Lewis Cty.*, 175 F.3d 671, 676 (9th Cir. 1999)). This is so because "the federal government does not have a direct voice in state legislatures, [so] states can unfairly burden its operations by subjecting it to disparate treatment." *Id.* (citing *Washington*, 460 U.S. at 545). That reasoning does not apply here for several reasons.

First, there are private parties that may provide a political check here. Although GEO and other private detention facility operators are government contractors, they also are private parties. There are also a significant number of California residents employed by these private detention facilities that "can provide a political check against the abuse of a state's regulatory authority." *See id.*

Second, the authorities on which *Kernen Construction* relied were largely tax cases, in which the state government profits by imposing a discriminatory tax on the Federal Government. *See, e.g.*, *Fresno Cty.*, 429 U.S. at 453, 455–56, 467–68 (upholding property tax on possessory interests of improvements on tax-exempt land imposed on Forest Service employees living in federally owned houses located in national forests); *Lewis Cty.*, 175 F.3d at 673, 675–76 (upholding tax on farm property owned by the federal Farm Service Agency). In such circumstances, when a tax is applied to the state's constituents as well as the Federal Government (or its contractors), the interest of the state's constituents will provide a "check" on the unrepresented interest of the Federal Government. *See, e.g.*, *Lewis Cty.*, 175 F.3d at 675–76. Here, by contrast, the profit motive is lacking—there is no allegation that California profits from the closure of the Federal Government's private detention facilities in California; rather, the Assembly Committee on Appropriations estimated that A.B. 32 would "[i]ncrease[] annual operating costs in the hundreds of millions of dollars." *See* Defs.' RJNs Ex. 2 at 1.

Third and finally, as Defendants note, *see* MTD Reply at 4; MJP Reply at 4, this is an area in which there can be no burden imposed on non-government contractors given that there simply are no truly private actors that legally can detain others in detention facilities. Consequently, it is appropriate for the Court to consider whether A.B. 32 treats California and its contractors better than the Federal Government and its contractors. *See, e.g.*, *South Carolina*, 485 U.S. at 527 (concluding that federal law was nondiscriminatory and did not violate intergovernmental immunity where "the Federal Government has directly imposed the same registration requirement on itself that it has effectively imposed on States").

This brings the Court to the second preliminary consideration:  Although GEO urges that "the discriminatory effect of a state statute is analyzed by looking at the statutory scheme *as a whole*, not by examining each exception in isolation," GEO Opp'n at 9 (emphasis in original) (citing *Dawson v. Steager*, 586 U.S. ___, 139 S. Ct. 698, 705 (2019); *Washington*, 460 U.S. at 541–46), that rule is not absolute.  "Where, as here, the statute contains a series of exemptions, some of which favor the federal government, others of which favor the state, most of which are unconcerned with the federal/state distinction, [the Court should] focus on the individual exemption to determine whether each taken on its own terms discriminates between state and federal interests to the detriment of the federal government." *Nye Cty. II*, 178 F.3d at 1088.  GEO urges that *Nye County II* is inapplicable because "*none* of AB-32's exceptions discriminate in favor of the Federal Government over the State." GEO Opp'n at 10 (emphasis in original).  Certain provisions of A.B. 32, however, apply only to CDCR, such as Section 5003.1, which, among other things, prohibits CDCR from "enter[ing] into a contract with a private, for-profit prison facility located in *or outside of the state* to provide housing for state prison inmates." Cal. Penal Code § 5003.1(a) (emphasis added).  These provisions, which are more restrictive than those imposed on Plaintiffs, would favor the Federal Government under Plaintiffs' logic. Other provisions, as discussed below, are facially neutral.

The Court therefore concludes that *Nye County II* applies here.  Accordingly, the Court analyzes each of the three groups of exceptions in A.B. 32 that Plaintiffs contend

discriminate in favor of California and its contractors: (1) the Section 9502 exceptions, (2) the Section 9503 exception, and (3) the Sections 5003.1(e) and 9505(b) exception.

i.      The Section 9502 Exceptions

Section 9502 exempts seven specific types of facilities from the blanket ban on operating private detention facilities found in Section 9501, namely:

(a)     Any facility providing rehabilitative, counseling, treatment, mental health, educational, or medical services to a juvenile that is under the jurisdiction of the juvenile court pursuant to Part 1 (commencing with Section 100) of Division 2 of the Welfare and Institutions Code.

(b)     Any facility providing evaluation or treatment services to a person who has been detained, or is subject to an order of commitment by a court, pursuant to Section 1026, or pursuant to Division 5 (commencing with Section 5000) or Division 6 (commencing with Section 6000) of the Welfare and Institutions Code.

(c)     Any facility providing educational, vocational, medical, or other ancillary services to an inmate in the custody of, and under the direct supervision of, the Department of Corrections and Rehabilitation or a county sheriff or other law enforcement agency.

(d)     A residential care facility licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code.

(e)     Any school facility used for the disciplinary detention of a pupil.

(f)     Any facility used for the quarantine or isolation of persons for public health reasons pursuant to Division 105 (commencing with Section 120100) of the Health and Safety Code.

(g)     Any facility used for the temporary detention of a person detained or arrested by a merchant, private security guard, or other private person pursuant to Section 490.5 or 837.

Cal. Penal Code § 9502.

GEO argues that "Subsections 9502(a)–(b) and 9502(d)–(f) describe detention activity that is only carried out by the State, specifically referencing parts of the California Code under which the activity is being carried out." GEO Mot. at 27. The United States similarly contends that five of the exceptions—those contained in subsections 9502(a)–(b), (d), and (f)–(g)—"apply to [California's] own contracts but are facially inapplicable to the Federal Government's contracts." U.S. Mot. at 20. Further, "of the [two] exceptions that might conceivably apply to the United States' contracts, the Federal Government cannot currently use any of them" because "[t]he Federal Government does not contract, and has never contracted, with 'school facilit[ies] used for the disciplinary detention of a pupil' in California" and "also does not contract for facilities in California 'providing educational, vocational, medical, or other ancillary services to an inmate in the custody of, and under the direct supervision of' a federal 'law enforcement agency.'" U.S. Mot. at 20–21 (quoting Cal. Penal Code §§ 9502(c), (e)).

Defendants counter that, even if certain of these exceptions describe only state detention facilities, "such a situation does not amount to discrimination resulting from AB 32" because "[i]t simply reflects the reality that 'there are no federal contractors analogous to the state contractors who benefit from' these exceptions." MTD at 10–11 (quoting *Nye Cty. II*, 178 F.3d at 1088); MJP at 12 (quoting *Nye Cty. II*, 178 F.3d at 1088). Further, the private detention facilities banned by Section 9501 "are quite different than the facilities covered by the [the Section 9502] exceptions," MTD at 12; MJP at 12, which do not give rise to the same health and safety concerns as immigration and criminal detention facilities, *see* MTD Reply at 4 (citing Cal. Penal Code §§ 9502(a)–(g)); MJP Reply at 4 (citing Cal. Penal Code §§ 9502(a)–(g)), rendering "[a]ny disparate treatment . . . justified." MTD at 12 (citing *Davis*, 489 U.S. at 815–16); MJP at 12 (citing *Davis*, 489 U.S. at 815–16).

To the extent that neither GEO nor the United States operates any of the facilities enumerated in the Section 9502 exception, the Court concludes that they are not similarly situated to California and, consequently, that the exception does not discriminate against

the Federal Government and its contractors.  This leaves only one of the Section 9502 exceptions: the exception appearing in subsection (c), exempting "[a]ny facility providing educational, vocational, medical, or other ancillary services to an inmate in the custody of, and under the direct supervision of, the Department of Corrections and Rehabilitation or a county sheriff or other law enforcement agency."  *See* Cal. Penal Code § 9502(c).  But as explained above, *see supra* Section II.A, the Court concludes that it lacks jurisdiction over the United States' challenges to A.B. 32 to the extent they relate to the BOP's RRCs. Accordingly, based on the current record,[20] the Court concludes that the Section 9502 exceptions do not impermissibly discriminate against the Federal Government.

ii.   The Section 9503 Exception

Section 9503 exempts from the general provision in Section 9501 facilities that are privately owned but leased and operated by "law enforcement agenc[ies]": "Section 9501 does not apply to any privately owned property or facility that is leased and operated by the Department of Corrections and Rehabilitation or a county sheriff or other law enforcement agency."  Cal. Penal Code § 9503.  The United States argues that no "federal law enforcement agency 'lease[s] and operate[s]' a detention facility in California that is 'privately owned.'"  U.S. Mot. at 21 (quoting Cal. Penal Code § 9503).  Further, "the only facility in the State that would currently meet this exception is the California City Correctional Center, which is owned by a private company and conveniently 'leased and operated' by [CDCR]."  *Id.*

Although the United States currently does not operate any facilities falling under the exception in Section 9503, nothing in the text of Section 9503 prohibits the United States from operating such facilities in the future.  *See also* Tr. at 44:24–45:3 (conceding that

---

[20] The Parties have reported that they "are in communications about submitting a written stipulation to the Court related to the RRCs," Defs.' Add'l Br. at 11 n.8; however, no such stipulation has been filed as of the date of this Order.  The Court notes, however, that if California were to enforce A.B. 32 against the Federal Government's RRCs but not the facilities in its own Alternative Custody Program, it would appear that California is treating itself and its contractors better than the Federal Government and its contractors, which would be constitutionally impermissible.

USMS, BOP, and ICE are all "law enforcement agenc[ies]" for purposes of Section 9503). Because Section 9503 does not treat California better than the United States, the Court concludes that Section 9503 does not render A.B. 32 discriminatory in violation of intergovernmental immunity.

iii.    The Sections 5003.1(e) and 9505(b) Exception

Section 9505(b) provides that the general rule against those operating private detention facilities appearing in "Section 9501 does not apply to . . . [a] private detention facility contract renewed pursuant to subdivision (e) of Section 5003.1." Cal. Penal Code § 9505(b). Section 5003.1, in turn, provides that "[CDCR] may renew or extend a contract with a private, for-profit prison facility to provide housing for state prison inmates in order to comply with the requirements of any court-ordered population cap." Cal. Penal Code § 5003.1(e).

GEO maintains that "the exception contained in Section 9505(b) applies only to private detention facilities under contract with [CDCR]." GEO Mot. at 27. The United States similarly contends that "no comparable exception exists for the Federal Government to cope with overcrowding in *its* facilities under a court order or otherwise," meaning "California has plainly 'treat[ed] someone else better than it treats' the United States and its contractors." U.S. Mot. at 19 (quoting *Washington*, 460 U.S. at 544–45) (emphasis in original).

Defendants respond that the provisions in question do "not create an exception generally related to overcrowding in California's prisons," but rather "accommodate[] compliance with a particular court order currently in place" setting "a population cap of 137.5% of design capacity," which "is an ongoing obligation of [CDCR]." MJP at 13 (citing *Brown*, 563 U.S. at 539[21]); MTD at 13 (citing *Brown*, 563 U.S. at 539). On the

---

[21] The Court may *sua sponte* take judicial notice of the population cap imposed by *Brown v. Plata*. *See, e.g.*, *Reyn's Pasta Bella, LLC v. Visa USA, Inc.* 442 F.3d 741, 746 n.6 (9th Cir. 2006); *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (a court may take judicial notice "of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue").

other hand, "[n]either the federal government nor local governments are subject to similar litigation," meaning "California [is] not similarly situated to the federal government or local governments."  MJP at 13 (citing *Davis*, 489 U.S. at 815–16); MTD at 13 (citing *Davis*, 489 U.S. at 815–16).  Further, "[t]he provision in AB 32 is a temporary bridge that enables California to comply with an existing federal court order while it transitions its inmate population away from private operators, not a permanent, discriminatory loophole for California."  MJP at 14; MTD at 14.

The Court concludes that CDCR and its contractors are not similarly situated to the Federal Government and its contractors, given that the former must comply with a court-ordered population cap while the latter do not.  As for GEO's argument concerning the nature of the two classes, *see* GEO Opp'n at 11, the Supreme Court explained in *Dawson* that "[w]hether a State treats similarly situated state and federal employees differently depends on how the State has defined the favored class."  *See* 139 S. Ct. at 705 (citing *Davis*, 489 U.S. at 817).  The favored class for purposes of the Section 9505(b) exception, however, explicitly is defined as CDCR *to the extent that it would violate a court-ordered population cap*.  *See* Cal. Penal Code §§ 5003.1(e), 9505(b).  This serves to distinguish the instant cases from *Dawson* and *Davis*, in which the defendant attempted to justify the discrimination based on an implicit distinction between the classes not expressed in the statute.  *See, e.g.*, *Dawson*, 139 S. Ct. at 706 (state could not claim that discrimination between taxation of state and federal pensions was based on generosity of pensions where statute defined favored class on basis of job responsibilities); *Davis*, 489 U.S. at 816–17 (state did not demonstrate significant differences between classes where statute provided for different tax treatment based on source of income, not its amount).  Because this distinction is explicit in the particular exception to A.B. 32 that Plaintiffs challenge, the Court may consider whether the existence (or absence) of a court-ordered population cap is a significant difference between CDCR, on the one hand, and local and Federal law enforcement agencies, on the other.

/ / /

The Court concludes that this is a significant difference between the two classes that renders them not similarly situated for purposes of intergovernmental immunity. Neither the United States nor GEO has identified any court-ordered population cap affecting their detention facilities, whether operated for USMS, BOP, or ICE, within the State of California. While the United States speculates that "A.B. 32 may cause overcrowding in federal facilities both in California and neighboring States,"[22] *see* U.S. Mot. at 19, that is not relevant to the distinction drawn between the two classes by A.B. 32. The relevant difference is that California has been ordered by a court not to exceed 137.5% of design capacity, whereas the Federal Government has not. *See Brown*, 563 U.S. at 539. Should the Federal Government face a court-ordered population cap in the future, it may find itself similarly situated to California and seek to renew its challenge.

To the extent the United States contends that "A.B. 32 may also cause tension with ICE's other obligations under existing court orders and settlements," *see* U.S. Mot. at 38 n.20 (citing *Gonzalez*, 325 F.R.D. 616; *Franco-Gonzalez*, 2013 WL 8115423), none of these cases involve population caps. In *Gonzalez*, the district court preliminarily enjoined the Federal Government "from detaining Plaintiffs and the class members pursuant to [8 U.S.C. §] 1231(a)(6) for more than 180 days without [] providing each a bond hearing before an [immigration judge] as required by *Diouf[ v. Napolitano*, 634 F.3d 1081 (9th Cir. 2011)]." 325 F.R.D. at 629. In *Franco-Gonzalez*, the district court enjoined the Federal Government from (1) pursuing immigration proceedings against immigration detainees with serious mental disorders who are facing deportation and are unable adequately to represent themselves, unless those detainees are appointed a qualified representative; and (2) holding immigration detainees with serious mental disorders for more than 180 days without providing "a bond hearing before an Immigration Judge with the authority to order

---

[22] Indeed, it appears that California and the Federal Government may be similarly situated in this regard, as the Assembly Committee on Appropriations noted that California would need "to absorb approximately 4,252 inmates currently held in four private, for-profit facilities both in California and Arizona." Defs.' RJNs Ex. 2 at 1.

their release on conditions of supervision, unless the Government shows by clear and convincing evidence that [their] ongoing detention is justified." 2013 WL 8115423, at *1– 2. The United States also notes that "the permanent injunction issued in *Orantes-Hernandez* . . . prohibits ICE from transferring unrepresented Salvadorian nationals from their district of apprehension for at least seven days." U.S. Mot. at 38 n.20. Because none of these cases have imposed a population cap on the Federal Government's ICE detention facilities, however, they are not material to the issue before the Court.

In light of the foregoing, the Court concludes that, although A.B. 32's exception in Sections 5003.1(e) and 9505(b) does treat CDCR differently than Federal or local law enforcement agencies, it does not discriminate because CDCR is not similarly situated to the extent that it is subject to a court-ordered population cap. Accordingly, that particular exception does not violate the Federal Government's intergovernmental immunity.

### b. Burden

Whether California has discriminated against the Federal Government and its contractors is not the end of the inquiry, however, because Plaintiffs must also demonstrate that they would be burdened as a result of the discrimination. *See, e.g.*, *California*, 921 F.3d at 880; *see also* Tr. at 24:25–25:12, 36:6–13, 45:18–46:6. GEO alleges that, "if AB-32 forces GEO to close its USMS and ICE detention facilities in California, GEO could lose over $4 billion in capital investment and future revenue over the next fifteen years." GEO Compl. ¶ 110. The United States contends that A.B. 32 would require it to transfer 1,300 inmates housed at Taft, 900 inmates housed in RRCs, 50 percent of USMS inmates in this District, 30 percent of USMS inmates in California, and nearly all of ICE's detainees in California, all of which would cost significant taxpayer dollars. U.S. Compl. ¶¶ 32–33, 36, 42, 49, 57–58.

These are real and substantial burdens; however, to the extent that the Federal Government and its contractors are not similarly situated and therefore face no discrimination under A.B. 32, *see supra* Section II.C.2.a, they cannot establish the requisite causal connection to the burden. For example, the relocation of ICE detainees is not the

result of the Federal Government and its contractors not being able to use the exemption in Sections 5003.1(e) and 9505(b).  Like California, GEO and the United States have to relocate their privately detained prisoners to the extent that they are not exempted by a population cap (which, according to GEO's Complaint, California cannot currently use, *see* GEO Compl. ¶ 27).  In other words, the relocation is happening as a result of the generally applicable prohibition appearing in Section 9501, not as a result of the challenged exceptions.[23]  The Court therefore concludes that Plaintiffs have failed to establish the requisite causal connection between any alleged discrimination and the resultant burden.

**III.   Conclusion**

In light of the foregoing, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motions to Dismiss and for Judgment on the Pleadings.  Specifically, regarding the Motion to Dismiss, the Court **DISMISSES** GEO's first and second causes of action for intergovernmental immunity and GEO's third cause of action for obstacle preemption as to GEO's contracts with ICE.  As for the Motion for Judgment on the Pleadings, the Court **DISMISSES** the United States' first and second causes of action as they relate to BOP facilities for lack of subject-matter jurisdiction.  Additionally, the Court **DISMISSES** the United States' first cause of action to the extent it is predicated on field preemption and to the extent that it claims obstacle preemption as to its contracts for private detention facilities on behalf of BOP and ICE.  Finally, the Court **DISMISSES** the United States' second cause of action for intergovernmental immunity in its entirety.  In all remaining respects, Defendants' Motions to Dismiss and for Judgment on the Pleadings

/ / /

---

[23] The one exception would be for BOP's RRCs with regard to Section 9502(c).  Although the Court has concluded that the United States has failed to allege a justiciable controversy as to A.B. 32's application to its BOP facilities, including the RRCs, *see supra* Section II.A, Section 9502(c) likely discriminates against the RRCs.  *See supra* note 20.  This discrimination also would directly result in the United States having to relocate the 900 inmates in that program.  *See* U.S. Compl. ¶¶ 42, 49.  Consequently, although not yet ripe for adjudication, the Section 9502(c) exception would appear unconstitutionally to violate the Federal Government's intergovernmental immunity if enforced against the RRCs.

are **DENIED**.  Any dismissals are **WITHOUT PREJUDICE** so that Plaintiffs may file amended complaints addressing the deficiencies outlined above.

## MOTIONS FOR PRELIMINARY INJUNCTION

### I.   Legal Standard

A preliminary injunction is an equitable remedy aimed at preserving the status quo and preventing the occurrence of irreparable harm during the course of litigation.  *See* Fed. R. Civ. P. 65.  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.

### II.   Analysis

Both GEO and the United States request that the Court preliminarily enjoin Defendants from enforcing A.B. 32 against their privately operated facilities within the State of California.  *See, e.g.*, GEO Compl. ¶ 145(b); U.S. Compl. ¶ 71; *see also* GEO Mot. at 40–41; U.S. Mot. at 43.

#### A.   *Likelihood of Success on the Merits*

Because the Court concludes that both GEO and the United States have failed to state a plausible claim for relief as to the BOP's privately operated detention facilities, obstacle preemption as to BOP and ICE, field preemption, or intergovernmental immunity, *see generally supra* pages 21–69, the Court concludes that they are unlikely to succeed on the merits as to those claims.  Accordingly, the Court **DENIES** the Motions for Preliminary Injunction as to those causes of action.  *See, e.g.*, *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 753 (9th Cir. 1982).  The Court therefore analyzes only (1) the constitutionality of A.B. 32 as applied solely to USMS's privately contracted facilities, and (2) GEO's request that the Court enjoin Defendants from enforcing A.B. 32 against their facilities through the end of their contractual terms.

1

   *1. USMS*

2

  For the reasons discussed above, *see supra* pages 35–37, 40, the Court concludes

3

that both GEO and the United States have demonstrated a likelihood of succeeding on the

4

merits of their claim that A.B. 32 is obstacle preempted as applied to USMS's contracts

5

with privately operated detention facilities.

6

   *2. Applicability of Safe Harbor Through End of GEO's Contractual*

7

     *Terms*

8

  Section 9505(a) provides that "Section 9501 does not apply to . . . [a] private

9

detention facility that is operating pursuant to a valid contract with a governmental entity

10

that was in effect before January 1, 2020, for the duration of that contract, not to include

11

any extensions made to or authorized by that contract." Cal. Penal Code § 9505(a). GEO

12

alleges that this provision exempts its current contracts—entered into before January 1,

13

2020—from Section 9501 through their full periods of performance, including any option

14

extensions.[24] *See* GEO Compl. ¶¶ 135–44. GEO therefore requests that the Court enjoin

15

Defendants from enforcing A.B. 32 against those contracts for their full periods of

16

performance. *See id.* ¶¶ 145(c)–(e); *see also* GEO Mot. at 40–41.

17

  As an initial matter, the Procurement *Amici* urge the Court to "decline to exercise

18

jurisdiction" because "[t]he validity of the contracts in dispute is subject to the Contract

19

Disputes Act of 1978, and thus any relief with respect to these contracts must be obtained

20

through that statute, or alternatively through the United States Court of Federal Claims."

21

Procurement *Amici* Br. at 22 (citing 41 U.S.C. §§ 7101–7109). Because the Court "has an

22

independent obligation to address *sua sponte* whether [it] ha[s] subject matter jurisdiction,"

23

24

               

[24] Specifically, GEO's WRDF contract with USMS currently extends through September 30, 2021, with

25

options extending through September 30, 2027. *See* GEO Compl. ¶¶ 44–45. The base period for GEO's El Centro contract with USMS ends on December 22, 2021, with options extending through September

26

25, 2028. *Id.* ¶ 53. Finally, GEO's contracts with ICE for Adelanto, Desert View, Mesa Verde, Central Valley, and Golden State have option periods beginning December 20, 2024, with periods of performance

27

through December 19, 2034. *Id.* ¶¶ 77–78, 80–81, 88, 92, 97. GEO therefore seeks to have the Court declare that A.B. 32 does not apply to its WRDF contract until September 30, 2027, its El Centro contract

28

until September 25, 2028, and its ICE contracts until December 19, 2034. *See id.* ¶¶ 135–44, 145(c)–(e).

*Allstate Ins. Co. v. Hughes*, 358 F.3d 1089, 1093 (9th Cir. 2004) (citing *Dittman v. California*, 191 F.3d 1020, 1025 (9th Cir. 1999)), the Court may properly address a jurisdictional question first raised by *amici*. *See, e.g.*, *Swan v. Peterson*, 6 F.3d 1373, 1383 (9th Cir. 1993) (citing *Miller-Wohl Co. v. Comm'r of Labor & Indus.*, 694 F.2d 203, 204 (9th Cir. 1982)); *see also* Tr. at 31:6–23.

The Court therefore requested additional briefing as to its jurisdiction over GEO's fourth cause of action following the hearing. *See GEO* ECF No. 45 at 1–2. The Parties all agreed that the Court has jurisdiction. *See* GEO Add'l Br. at 10–11; Defs.' Add'l Br. at 13. The Court continues to harbor some doubts—although styled as a claim against the State of California, GEO's fourth cause of action, at heart, seeks a "declaration of contract rights against the government," over which the Court would lack jurisdiction. *See N. Side Lumber Co. v. Block*, 753 F.2d 1482, 1485–86 (9th Cir. 1985).

Regardless, the Court determines that GEO's Motion must be denied as to its fourth cause of action because, assuming it has jurisdiction, the Court nonetheless concludes that GEO cannot demonstrate the requisite likelihood of success on the merits. Section 9505(a) explicitly excludes "any extensions made to or authorized by that contract." *See* Cal. Penal Code § 9505(a). It appears unlikely that GEO will succeed in arguing that the options are not such extensions. Accordingly, the Court concludes that GEO is unlikely to succeed on the merits of its safe harbor cause of action. The Court's analysis therefore proceeds only as to A.B. 32's enforcement against USMS's privately contracted facilities.

### B. *Likelihood of Irreparable Harm*

Plaintiffs must make a clear showing that irreparable harm will occur absent the preliminary injunction. This clear showing requires a plaintiff to prove more than a mere "possibility" of irreparable harm; instead, she must "demonstrate that irreparable injury is likely in the absence of an injunction." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). "[E]conomic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597,

603 (9th Cir. 1991).

GEO contends that it would suffer irreparable harm if forced to close its facilities during this litigation, because "constitutional violations cannot be adequately remedied through damages," GEO Mot. at 38 (quoting *Nelson v. Nat'l Aeronautics & Space Admin.*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd on other grounds*, 562 U.S. 134 (2011)), and GEO "may not pursue a damages suit in federal court against the State of California" because of California's sovereign immunity. *Id.* at 38–39 (citing U.S. CONST. amend. XI; *Kentucky v. Graham*, 473 U.S. 159, 169 (1985)). The United States similarly contends that "irreparable harm necessarily results from the enforcement of a preempted state law." U.S. Mot. at 36–37 (citing *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 366-67 (1989); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013); *Arizona*, 641 F.3d at 366), and that, "[a]s a result of this unconstitutional law, the United States and the public will suffer three principal harms: (1) costly relocation of prisoners and detainees and attendant consequences, (2) frequent and costly transport of prisoners and detainees, and (3) obstruction of federal proceedings," which "could cripple federal law enforcement operations in California." *Id.* at 37. Defendants respond that Plaintiffs are not threatened by imminent harm such that a preliminary injunction is necessary, because GEO's USMS contracts do not expire until September 30, 2021, at the earliest. *See* Opp'n to GEO Mot. at 22; Opp'n to U.S. Mot. at 31. The United States rejoins that, "despite contracts 'expiring' in 2021, USMS must immediately begin planning for A.B. 32's deleterious effects." U.S. Opp'n at 29.

Defendants do not contest the irreparability of the harm Plaintiffs may suffer. In addition to the irreparable harm caused by the likely violation of the Supremacy Clause should A.B. 32 be enforced against USMS's privately operated detention facilities, *see, e.g.*, *California*, 921 F.3d at 893 (collecting authorities), it appears that the United States and GEO may face further imminent, irreparable injury in the form of disrupted operations and the incurrence of incompensable damages, respectively. Accordingly, the Court

/ / /

72

concludes that this factor weighs in favor of preliminarily enjoining enforcement of A.B. 32 against USMS's privately operated detention facilities.

### C.    Balance of Equities

"To qualify for injunctive relief, [a p]laintiff must establish that 'the balance of the equities tips in [its] favor.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).  A court has the "duty . . . to balance the interests of all parties and weigh the damage to each." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980).

GEO urges that, to the extent it has established that A.B. 32 is unconstitutional, "it has 'also established that . . . the balance of the equities favor a preliminary injunction.'" GEO Mot. at 39 (quoting *Az. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014)).  The United States similarly urges that "California 'cannot suffer harm from an injunction that merely ends an unlawful practice,'" U.S. Mot. at 42 (citing *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)), and "California is free to implement A.B. 32 for itself and its localities." *Id.*  Defendants counter that "a preliminary injunction enjoining the enforcement of AB 32 would lead to significant, concrete harm to the public," because "[t]he California Legislature determined (and the federal government has recognized) that private prisons are a critical, ongoing public policy concern and that conditions in private facilities pose a threat to detainee safety." Opp'n to GEO Mot. at 22; Opp'n to U.S. Mot. at 32.

The Court recognizes that California has a legitimate interest in safeguarding the health and safety of USMS detainees within its borders, *see California*, 921 F.3d at 886; however, given the Court's conclusion that A.B. 32 is obstacle preempted with respect to privately operated USMS detention facilities, *see supra* pages 35–37, 40, the Court ultimately concludes that the equities tip in favor of Plaintiffs.

### D.    Public Interest

Finally, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of

injunction." *Winter*, 555 U.S. at 24.  GEO contends that it has established that the public interest favors a preliminary injunction for the same reasons that it has established that the equities favor issuing an injunction, *see* GEO Mot. at 39–40; *see also supra* Section II.C, while the United States contends that it has established this factor because the United States will suffer irreparable harm "because the Government represents the public interest."  U.S. Mot. at 36 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Defendants also reiterate their arguments concerning the balance of the equities in support of the public interest.  *See* Opp'n to GEO Mot. at 22–23; Opp'n to U.S. Mot. at 32–33; *see also supra* Section II.C. For the reasons discussed above, *see supra* Sections II.B–C, the Court concludes that the public interest also favors issuance of a preliminary injunction.

### E. Permanent Injunction

Relying on *Baby Tam & Company v. City of Las Vegas*, 154 F.3d 1097, 1102 (9th Cir. 1998), *abrogated on other grounds by Dream Palace v. County of Maricopa*, 384 F.3d 990, 1002 (9th Cir. 2004), both GEO and the United States request that the Court enter final judgment awarding a permanent injunction.  *See, e.g.*, GEO Mot. at 41; U.S. Mot. at 43.  Although the Court may have the authority to issue a permanent injunction at this stage, it declines to do so here, particularly given that several claims have been dismissed and leave to amend has been granted.

## III. Conclusion

In light of the foregoing, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motions for Preliminary Injunction.  Accordingly, the Court **PRELIMINARILY ENJOINS** Defendants from enforcing A.B. 32 against the USMS's privately contracted detention facilities within the State of California.  Plaintiffs' Motions are otherwise **DENIED**.

## CONCLUSION

In light of the foregoing, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motions to Dismiss (*GEO* ECF Nos. 20, 22) and for Judgment on the Pleadings (*U.S.* ECF No. 13), as set forth above.  *See supra* pages 68–69.  Plaintiffs **MAY**

19-CV-2491 JLS (WVG)

**FILE** amended complaints within <u>twenty-one (21) days</u> of the electronic docketing of this Order.  *Should Plaintiffs elect not to file amended complaints, this action will proceed on their surviving causes of action.*

The Court also **GRANTS IN PART AND DENIES IN PART** GEO's and the United States' Motions for Preliminary Injunction (*GEO* ECF No. 15 and *U.S.* ECF No. 7, respectively), as set forth above, *see supra* page 74, and **PRELIMINARILY ENJOINS** Defendants from enforcing A.B. 32 against the USMS's privately contracted detention facilities within the State of California.

**IT IS SO ORDERED.**

Dated:  October 8, 2020

Hon. Janis L. Sammartino
United States District Judge